STATE OF NEW YORK,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
EDUCATION and ELISABETH DEVOS,
*in her official capacity as the Secretary of
Education*,

        Defendants.

Civil Action No. 1:20-cv-4260

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     For nearly fifty years, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), has been a crucial tool for addressing and eradicating sex-based discrimination in federally funded education programs and activities. Under the landmark federal civil rights law, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's expansive prohibitions have protected generations of students, employees, and others from the myriad forms of sex-based discrimination in elementary and secondary schools, colleges, universities, and other entities offering education programs and activities.[1]

2.     On May 19, 2020, the U.S. Department of Education (the "Department") radically and unjustifiably amended the Department's longstanding Title IX implementing regulations through its Final Rule, *Nondiscrimination on the Basis of Sex in Education Programs or*

---

[1] For ease of reference, this Complaint collectively refers to covered entities as "schools" or "institutions," although Title IX also applies to other recipients offering education programs or activities (*e.g.*, libraries, museums).

*Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the

"Final Rule"). The Final Rule guts decades of firmly established policy on schools' obligations

to respond to sexual harassment and other forms of sex discrimination; strips existing protections

for students and others targeted for and victimized by sexual harassment; invents new rights for

individuals accused of sexual harassment that find no basis in the letter or spirit of Title IX; and

imposes onerous new procedural requirements on educational institutions, in the midst of the

COVID-19 global pandemic, with a mere 87 days to implement the extensive changes to their

policies, practices, and procedures.

      3.     As the Supreme Court has consistently recognized, the scope of Title IX's anti-

discrimination protections is far-reaching. The Court has held that Title IX must be construed

expansively to "accord it a sweep as broad as its language." *N. Haven Bd. of Educ. v. Bell*, 456

U.S. 512, 521 (1982). Accordingly, Title IX "covers a wide range of intentional unequal

treatment" based on sex. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

      4.     To fulfill Title IX's broad anti-discrimination mandate, the Department is charged

with implementing and enforcing Title IX to ensure that schools provide all students, employees,

and others safe, nondiscriminatory learning environments. Through its Office for Civil Rights

("OCR"), the Department enforces Title IX's implementing regulations, codified at 34 C.F.R. pt.

106, by, among other things, investigating sex discrimination complaints against schools,

seeking voluntary measures to cure violations, and, in relatively rare cases, initiating

administrative enforcement proceedings that may result in the termination of federal funds.

      5.     For decades, the Department has consistently interpreted Title IX to require

schools to investigate all sexually harassing conduct of which they have actual or constructive

notice, and to take steps reasonably calculated to prevent, address, and remedy any adverse

effects on individual students or the school environment.  Until now, the Department has applied these same standards to all forms of harassment, including gender-based harassment under Title IX; harassment based on race, color, or national origin under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000d7 ("Title VI"); and harassment based on disability under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("Title II").

6.      In late 2018, the Department published a notice of proposed rulemaking, 83 Fed. Reg. 61,462 (Nov. 29, 2018) (the "Proposed Rule"), under the auspices of providing greater protections for individuals *accused* of sexual harassment.  During the notice and comment period, the Department received nearly 125,000 comments, many of which vigorously opposed the Proposed Rule as an unwarranted departure from existing policies, a threat to the rights, safety, and well-being of victims of sexual harassment and other forms of gender-based discrimination, and a contravention of the Department's statutory mandate to combat sex discrimination in schools.  A wide range of New York stakeholders—including the State's Attorney General, The State University of New York ("SUNY"), New York State Education Department ("NYSED"), public and private colleges and universities, public school districts, and victims' rights groups, among others—submitted comments in opposition to the Proposed Rule.

7.      Nevertheless, on May 19, 2020, the Department published the Final Rule, retaining most of the objectionable provisions of the Proposed Rule.  Upending decades of established Title IX policy, the Final Rule redefines sexual harassment narrowly to exclude many forms of harassment that deprive students and others from equal access to educational opportunities; drastically limits, and in many instances prohibits, institutions from investigating and addressing harassment; guts Title IX's longstanding protections for survivors of sexual

harassment and assault; and abdicates the Department's central role in enforcing schools' compliance with Title IX's prohibitions against sexual harassment.

8.     In addition, the Final Rule prescribes, for the first time in Title IX's history, an unduly prescriptive and burdensome grievance and adjudicatory process that schools must follow when they receive complaints of sexual harassment. The Final Rule imposes—in conflict with Title IX's central purpose of protecting students from sex-based discrimination—arbitrary and burdensome procedural requirements that will likely frustrate schools' ability to protect students.

9.     The Final Rule radically and unjustifiably departs from the Department's longstanding Title IX enforcement policies. The Department's drastic redefinition of sexual harassment and the severe narrowing of schools' obligations to investigate and respond to harassing conduct that impedes access to their education programs will permit schools to ignore conduct that harms students and others. The Final Rule turns Title IX on its head: it deprives individuals experiencing sexual harassment the longstanding right to go to school free from discriminatory and harassing conduct, while creating a slew of highly prescriptive, burdensome grievance procedures that will discourage victims from stepping forward and make it more difficult for schools to fulfill their obligation of eradicating sex-based discrimination in their programs and activities. These changes are an abrupt and stark departure from decades of Department policy, and greatly undermine the central purpose of Title IX to address and prevent sex-based discrimination in educational institutions.

10.    The Final Rule's preemption clause—which was not included in the Proposed Rule and therefore not subject to public notice and comment—requires schools to comply with the Final Rule to the extent a conflict with state or local law exists. This provision will hinder the State and its educational institutions from enforcing their own policies that provide greater

substantive and procedural protections to victims of sexual harassment and assault than the amended Title IX regulations under the Final Rule. This includes New York Education Law Article 129-B, known as the "Enough is Enough" law, which was enacted to combat sexual assault on college and university campuses statewide. *See* N.Y. Educ. Law §§ 6439-6449 ("Enough is Enough"), which sets comprehensive and careful standards for colleges in addressing sexual assault and has served as a model for similar laws across the country. Until this point, Enough is Enough complemented and was coextensive with Title IX as it furthered the common purpose of addressing sexual harassment in higher educational institutions. Now, the Final Rule will bar New York and its educational institutions from enforcing more robust protections under Enough is Enough and their own codes of conduct. Perversely, a school's good-faith compliance with Enough is Enough's procedural protections may, under the Final Rule, violate the Title IX regulations.

11.     Adding insult to injury, the Department published the Final Rule in the midst of the global COVID-19 pandemic that has shuttered nearly every school and college campus in the country for at least the remainder of the 2019-2020 school year and possibly beyond. Ignoring the extraordinary challenges that schools face during this public health crisis—including shifting to virtual teaching and learning, implementing measures to keep school campuses safe, and having to divert their limited financial resources to this response—the Department has nevertheless set the effective date of the Final Rule for August 14, 2020, less than 90 days after issuing a rule that will discard decades of established Title IX policy and practice.

12.     The Final Rule will cause immediate, irreparable, and ongoing injury to Plaintiff the State of New York (the "State"), the State's educational institutions, and its residents. Implementation of the Final Rule will drain and divert educational resources from the State's

educational institutions, hinder the State's effective administration and enforcement of its own laws and institutional policies, harm the State's interest in ensuring all students can attend school in a safe, nondiscriminatory environment conducive to teaching and learning, and frustrate the State's interest in enforcing robust civil rights protections for all victims of sexual harassment.

13. Defendants' drastic departure from longstanding Title IX policy violates the Administrative Procedure Act ("APA"). *First*, the Department exceeds its statutory authority by imposing burdensome procedural requirements that frustrate, rather than effectuate, Title IX's robust anti-discrimination protections. *Second*, the Final Rule is contrary to law, because it unduly narrows the scope of protections afforded to students under Title IX, conflicts with other federal civil rights laws prohibiting harassment, violates students' federal privacy rights, and conflicts with federal protections for students with disabilities. *Third*, the Final Rule is arbitrary and capricious because it fails to (a) justify the Department's departure from decades of settled policy, (b) adequately consider the substantial harms to educational institutions, their students and employees, and the general public, or (3) justify the contravention of the Department's longstanding policy of applying the civil rights laws it enforces in a consistent manner, by creating weaker standards for sexual harassment than for harassment based on race, national origin, and disability. *Finally*, in publishing the Final Rule, Defendants failed to observe procedures required by law, as certain provisions, including the preemption provision, were not included in the Proposed Rule and were thus issued without adequate notice to the public.

14. Plaintiff the State of New York brings this action to vacate the Final Rule and enjoin its implementation because (a) the Final Rule exceeds the Department's statutory jurisdiction, authority, and limitations in violation of the APA, 5 U.S.C. § 706(2)(C); (b) the Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with

law under the APA, 5 U.S.C. § 706(2)(A); and (c) the Department failed to observe procedure required by law in issuing aspects of the Final Rule in violation of 5 U.S.C. § 706(2)(D).

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

16. Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

17. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

## PARTIES

18. Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63. Plaintiff is aggrieved by Defendants' actions and has standing to bring this action because the Final Rule harms its sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Final Rule is vacated and enjoined.

19. Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government, and is an agency within the meaning of 5 U.S.C. § 552(f). The Department promulgated the Final Rule and is responsible for its enforcement.

20.     Defendant Elisabeth DeVos is the United States Secretary of Education and is sued in her official capacity.

**ALLEGATIONS**

**I.     Title IX and the Department's Implementing Regulations Broadly Prohibit Discrimination on the Basis of Sex, Including Sexual and Gender-Based Harassment, in Federally Funded Education Programs and Activities.**

**A.     Overview of Title IX.**

21.     Title IX, a landmark federal civil rights law, was enacted by Congress in 1972 with the broad goal of ensuring that all students have access to educational opportunities free from discrimination on the basis of sex, and to further protect faculty, staff, and others from sex-based discrimination in educational institutions.  Title IX, which provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a), applies to all aspects of a school's education program, including academics, extracurricular activities, housing, admissions, recruiting, and employment.

22.     Title IX, enacted under Congress's Spending Clause powers, was modeled after Title VI, which broadly prohibits all recipients of federal funds (including educational institutions) from discriminating against individuals on the basis of race, color, or national origin. *See* U.S. Dep't of Educ., Off. for Civ. Rts., *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,038 n.2 (Mar. 13, 1997) ("1997 Guidance").  Title IX's anti-discrimination protections are virtually identical to those under Title VI and Section 504 (which prohibits federal funding recipients from discriminating against individuals on the basis of disability).  The Department has long recognized that Title IX's protections against sexual harassment are similar to those applicable to

racial harassment in Title VI, as well as to the harassment protections for employees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII").

23.     As with Title VI, Section 504, and other civil rights laws adopted under the Spending Clause, Title IX conditions federal education funding on covered institutions' compliance with the statute's broad anti-discrimination mandate.  Title IX authorizes and directs federal agencies that extend federal education funding, including the Department, to administratively enforce its protections.  *See* 20 U.S.C. § 1682.  An institution's failure to comply with Title IX and refusal to adopt voluntary corrective measures to cure violations after being notified of a violation by an agency may result in the termination of or refusal to extend federal funds to that institution.  *Id.*

24.     Under the Civil Rights Restoration Act of 1987 ("CRRA"), Congress amended Title IX, Title VI, Section 504, and the Age Discrimination Act to clarify that the terms "program or activity" and "program" under those laws are defined as "all of the operations" of a covered entity, "any part of which is extended Federal financial assistance."  Pub. L. No. 100-259, 102 Stat. 28 (1988) (codified at 20 U.S.C. § 1687 (Title IX); 42 U.S.C. § 2000d-4a (Title VI); 29 U.S.C. § 794(b) (Section 504); 42 U.S.C. § 6108 (Age Discrimination Act)).  In enacting the CRRA, Congress emphasized the expansive original purpose of these civil rights laws, finding that "certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application" of the laws and that "legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered."  *Id.*

25.     Title IX contains a provision exempting an educational institution controlled by a religious organization from parts of the law that are inconsistent with the organization's religious tenets.  20 U.S.C. § 1681(a)(3).

**B.     The Department's Title IX Implementing Regulations.**

26.     Every federal agency that provides federal funds to educational institutions must issue regulations to effectuate Title IX.  20 U.S.C. § 1682.

27.     As the Department provides funding to virtually all public schools, colleges, and universities, and the vast majority of private higher educational institutions, it plays a significant role in enforcing Title IX's broad anti-discrimination mandate and regulating schools' compliance with the law.

28.     The Department's predecessor, the U.S. Department of Health, Education, and Welfare promulgated the agency's Title IX implementing regulations in 1975.  40 Fed. Reg. 24,128 (June 4, 1975) (codified at 45 C.F.R. pt. 86).  The regulations were formally adopted and recodified without substantive changes by the Department when it began operations in 1980.  45 Fed. Reg. 30,802, 30,955-65 (May 9, 1980) (codified at 34 C.F.R. pt. 106).  The Department has enforced those regulations ever since.  These regulations have furthered Title IX's core purpose of addressing and eradicating sex discrimination in education, and have provided a framework for institutions' compliance with Title IX's broad anti-discrimination mandate.

29.     The regulations, mirroring the statute, provide that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."  34 C.F.R. § 106.31(a).

30.     In addition, the regulations specifically prohibit institutions from engaging in enumerated conduct, on the basis of sex, in "providing any aid, benefit, or service to a student." 34 C.F.R. § 106.31(b).  These specific prohibitions include, *inter alia*, "(1) [t]reat[ing] one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; (2) [p]rovid[ing] different aid, benefits, or services or provide aid, benefits, or services in a different manner; (3) [d]eny[ing] any person any such aid, benefit, or service; (4) [s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment; . . . (6) [a]id[ing] or perpetuat[ing] discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees; [and] (7) [o]therwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity."  *Id.*

31.     To effectuate these protections, the Department's Title IX regulations have always provided that where the Assistant Secretary for Civil Rights ("Assistant Secretary") finds that a covered institution has discriminated on the basis of sex, that institution "shall take such remedial action as the Assistant Secretary deems necessary to *overcome the effects* of such discrimination," and, "[i]n the absence of a finding of discrimination on the basis of sex," that the institution "may take affirmative action to overcome the effects of conditions which resulted in limited participation . . . by persons of a particular sex."  34 C.F.R. § 106.3(a)-(b).  The regulations further mandate that every applicant for and recipient of federal funding from the Department assure that the applicant or recipient's education program or activity will comply with the Title IX regulations, and that such assurance "shall not be satisfactory to the Assistant Secretary" if the applicant or recipient "fails to commit itself to take whatever remedial action is

necessary . . . to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination whether occurring prior or subsequent to the submission to the Assistant Secretary of such assurance." 34 C.F.R. § 106.4(a).

32. The regulations contain other procedural requirements designed to protect students from discrimination and ensure schools' compliance with the statute's anti-discrimination protections. These include, *inter alia*, requiring that institutions (a) designate at least one employee to coordinate Title IX compliance and investigations, 34 C.F.R. § 106.8(a), (b) establish and publish a grievance procedure for the "prompt and equitable resolution of student and employee complaints" regarding prohibited discriminatory conduct, *id.* § 106.8(b), and (c) implement "specific and continuing steps" to widely disseminate their Title IX anti-discrimination policies to reach students, parents, applicants for admission, employees, recruiters, unions, and others, *id.* § 106.9.

33. With respect to the religious exemption contained in 20 U.S.C. § 1681(a)(3), the Department's Title IX regulations have, since 1975, permitted religious institutions to claim this exemption "by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization." 34 C.F.R. § 106.12(b). Following receipt of such a statement, OCR's longstanding practice has been to acknowledge the claimed exemptions in writing, reminding the institution that it remains bound by all other provisions of Title IX for which no exemption was claimed. The Department posts all religious exemption requests, and its responses to those requests, on its website.[2] Copies of all requests and responses from 1975 to the present are available online. The purpose of this longstanding practice is two-fold: it

---

[2] U.S. Dep't of Educ., Off. for Civ. Rts., *Other Correspondence*, https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html (last updated May 5, 2020).

(a) follows the statutory mandate to respect religious institutions' beliefs in the enforcement of Title IX, and (b) provides notice to prospective and current students and employees of those institutions that certain Title IX protections may be unavailable to them.

## II. The Department Has Consistently Enforced Title IX's Protections to Protect Victims of Sexual and Gender-Based Harassment from Harm for Decades.

34. For many years, the Department has recognized sexual harassment as a form of sex discrimination that, ignored or inadequately addressed, results in educational harms to victimized students. In turn, the Department has consistently enforced Title IX to protect students and others from sexual harassment that impedes or denies access to institutions' programs or activities. As required by law, the Department has always employed the same standards for addressing sexual harassment under Title IX as it does for other forms of discriminatory harassment under Title VI, Section 504, and Title II. Through the Final Rule, the Department has created an unlawful and unjustifiable schism between its enforcement standards for sexual harassment and all other forms of prohibited harassment in schools.

### A. The Department Has Consistently Interpreted Title IX's Protections Against Sexual Harassment Since At Least 1997.

35. The Department articulated its well-settled sexual harassment policies in multiple guidance documents issued by OCR over the course of two decades.

36. In 1997, OCR issued the 1997 Guidance to advise institutions of their obligations under Title IX to respond to sexual harassment of students and OCR's standards for investigating and enforcing schools' compliance with those obligations. Four years later, in 2001, OCR issued substantially similar guidance to update and replace the 1997 Guidance. *Revised Sexual*

*Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001)[3] ("2001 Revised Guidance").

37.     The 1997 Guidance and 2001 Revised Guidance were both issued by the Department following a public notice and comment process.

38.     The 2001 Revised Guidance, which remains in effect but will be superseded on August 14, 2020 by the Final Rule, reiterates the definitions and standards set forth in the 1997 Guidance. The document clarified that OCR's policies for the administrative enforcement of Title IX were unaffected by two intervening Supreme Court decisions, *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), and *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), which only addressed the liability standards for private Title IX sexual harassment lawsuits seeking monetary damages. 2001 Revised Guidance at i-iv.

39.     As the Department observed in the 1997 Guidance, OCR's enforcement of Title IX revealed "that a significant number of students, both male and female, have experienced sexual harassment, that sexual harassment can interfere with a student's academic performance and emotional and physical well-being, and that preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn." 1997 Guidance at 12,034. The Department noted that OCR had "long recognized that sexual harassment of students engaged in by school employees, other students, or third parties is covered by Title IX" and that "OCR's policy and practice is consistent with the Congress' goal in enacting Title IX—the elimination of sex-based discrimination in federally assisted education programs." *Id.* The Department added that guidance specific to sexual harassment "is important because school personnel who understand their obligations under Title IX are in the best position

---

[3] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

to *prevent* harassment and to lessen the harm to students if, despite their best efforts, harassment occurs." *Id.* (emphasis added).

40. In the 2001 Revised Guidance, the Department expressly distinguished the standards OCR applies to investigations and administrative enforcement of its Title IX regulations from the standards applicable to private suits seeking monetary damages, the latter of which were addressed in *Gebser* and *Davis*. 2001 Revised Guidance at i. The Department stated that the 2001 Revised Guidance is, "[i]n most other respects . . . identical to the 1997 Guidance" and was intended "to serve the same purpose" as the earlier document in providing a framework for educators to prevent and mitigate the harm of sexual harassment faced by their students. *Id.*

41. The 2001 Revised Guidance explains that the liability standards used in *Gebser* and *Davis* "are limited to private actions for monetary damages" and that those cases "did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding," a position, it noted, that was "uniformly agreed" upon by the institutions and individuals who submitted comments. *Id.* at ii, iv. In the 2001 Revised Guidance, the Department noted that the Supreme Court, in *Gebser*, specifically distinguished its authority to establish liability standards for private damages suits from the authority of federal agencies, including the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," under circumstances that may not give rise to a claim for money damages. *Id.* at ii.

42. In 2006, OCR issued a guidance document, *Dear Colleague Letter: Sexual Harassment Issues* (Jan. 25, 2006)[4] ("2006 DCL"), "to increase awareness of an important issue affecting students—sexual harassment—and to remind [schools] of the principles that a school

---

[4] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006 html.

should use to recognize and effectively respond to the sexual harassment of students."  2006 DCL.  The letter reiterated schools' "essential" obligation to prevent and remedy sexual harassment, reaffirming the 2001 Revised Guidance as the operative statement of OCR's enforcement policies for sexual harassment, and expressly distinguishing OCR's administrative enforcement standards from those applicable to private Title IX damages lawsuits.  *Id.*

43.  On October 26, 2010, amid growing national attention to bullying in schools, OCR issued a Dear Colleague Letter on Harassment and Bullying[5] ("2010 DCL"), to clarify when bullying amounted to discriminatory harassment in violation of Title IX and other civil rights laws.  The letter reminded schools that they have substantially similar obligations to prevent, investigate, and respond to harassment, regardless of whether the harassment is based on sex, race, color, national origin, or disability.  *Id.* at 1-4.

44.  On April 4, 2011, the Department further supplemented its 2001 Revised Guidance with a Dear Colleague Letter on Sexual Violence[6] ("2011 DCL") to address rising concerns about pervasive sexual violence in schools.  The letter clarified that sexual violence (including rape, sexual assault, sexual battery, and sexual coercion) is a form of sexual harassment covered by Title IX and provided schools guidance on responding to sexual violence faced by their students.  2011 DCL at 1.  The letter also noted that about 1 in 5 women and 1 in 16 men were victims of attempted or completed sexual assault in college, and, in just one recent school year, there were "800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools."  *Id.* at 2.

45.  The 2011 DCL explained that schools should adhere to the standards and procedures contained in the 2001 Revised Guidance when addressing incidents of sexual

---

[5] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.
[6] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

violence and other forms of sexual harassment, and provided further recommendations to educational institutions on the proper application of Title IX's various requirements (*e.g.*, publishing nondiscrimination notices, designating a Title IX coordinator, and adopting and publishing grievance procedures) to complaints of sexual violence. *Id.* at 2-3.

46.     On April 29, 2014, OCR published a supplemental guidance document, *Questions and Answers on Title IX and Sexual Violence*[7] ("2014 Q&A"), to "further clarify the legal requirements and guidance articulated in the [2011] DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent is recurrence, and address its effects." 2014 Q&A at ii.

47.     The Department withdrew the 2011 DCL and 2014 Q&A in September 2017.

**B.      These Guidance Documents Used the Same Definitions of Key Terms, Including Sexual Harassment, and Set Forth Compliance Standards Consistent with Title IX's Anti-Discrimination Mandate.**

48.     The Department's guidance documents issued between 1997 and 2014 consistently (1) defined key terms, including "program or activity" and "sexual harassment," (2) explained schools' obligations under Title IX to respond to and remedy sexual harassment, (3) articulated when the Department would find an institution to be in violation of those obligations, and (4) clarified the privacy protections that must be afforded to students during sexual harassment investigations.

**1.      Definitions of key terms.**

*a.      Definition of "education program or activity."*

49.     Consistent with the statutory definition of "education program or activity" contained in Title IX, 20 U.S.C. § 1687, and the Department's Title IX regulations, 34 C.F.R.

---

[7] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

§ 106.2(h), the Department has treated "all of [a] school's operations," including "all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere," to be subject to Title IX's requirements. 1997 Guidance at 12,038; 2001 Revised Guidance at 2-3.

### b. Definition of "sexual harassment."

50.     Under the Department's longstanding enforcement policies, sexual harassment is defined as "unwelcome conduct of a sexual nature" that "can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature." 2001 Revised Guidance at 2. Where the harassment rises to the level that it "den[ies] or limit[s] . . . the student's ability to participate in or to receive benefits, services, or opportunities in the school's program," it is a form of sex discrimination prohibited by Title IX. *Id.* Sexual harassment can take the form of either (1) *quid pro quo* harassment, where a teacher or other school employee conditions a student's participation in a program or activity on their submission to unwanted sexual conduct, or (2) hostile environment harassment, defined as unwelcome conduct of a sexual nature by employees, students, or others that "is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex." *Id.* at 5; *see also* 1997 Guidance at 12,038.

51.     OCR has long made clear that "[h]arassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents," 2010 DCL at 2, recognizing that harassment often includes conduct that creates a hostile environment for many students.

### c. Definition of "hostile school environment."

52.     For purposes of administrative enforcement of Title IX, the Department has found harassing conduct to be "sufficiently serious" to create a hostile school environment where it is sufficiently severe, pervasive, or persistent as to interfere with a student's educational opportunities.  1997 Guidance at 12,038; 2001 Revised Guidance at v-vi; 2010 DCL at 2; 2011 DCL at 3.  Applying a sliding-scale approach, the Department's position has been that a single incident may be sufficiently severe to create a hostile environment without being repetitive or ongoing in nature, whereas less severe but ongoing or pervasive conduct may also create a hostile environment depending on the circumstances.  2010 DCL at 2; 2011 DCL at 3.

53.     OCR has long emphasized that a school's inquiry into whether sexual harassment has created a hostile environment should consider the following factors: (a) "[t]he degree to which the conduct affected one or more students' education," (b) "[t]he type, frequency, and duration of the conduct," (c) "[t]he identity of and relationship between the alleged harasser and the subject or subjects of the harassment," (d) "[t]he number of individuals involved," (e) "[t]he age and sex of the alleged harasser and the subject or subjects of the harassment," (f) "[t]he size of the school, location of the incidents, and context in which they occurred," (g) "[o]ther incidents [of sexual harassment] at the school," and (h) other "[i]ncidents of gender-based, but nonsexual harassment" that may, when "combined with incidents of sexual harassment," be "sufficiently serious to create a sexually hostile environment."  2001 Revised Guidance at 5-7.

### 2. The Department has consistently required schools to prevent, investigate, address, and remedy the effects of sexual harassment.

54.     Under the Department's longstanding Title IX enforcement policies, where a school has actual or constructive notice of conduct against a student that may constitute sexual harassment, the school is obligated to take "immediate and appropriate steps" to investigate the

conduct and, where the investigation reveals that harassment has occurred, to "take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." *Id*. at 11-13, 15; *see also* 1997 Guidance at 12,042; 2010 DCL at 2-3; 2011 DCL at 4.  Where OCR investigates a complaint against a school and finds that it has failed to respond to, remedy, and prevent sexual harassment, it will find the school to be in violation of Title IX and provide it the opportunity to voluntarily resolve that violation before the Department initiates further enforcement action.

### a. *Notice requirements.*

55.     For harassment against a student by a school employee occurring under the auspices of the employee's responsibilities toward students, the school is responsible for taking corrective action regardless of whether it has actual notice.  2001 Revised Guidance at 10.

56.     For harassment against a student by another student or other third party, a school must respond where "a responsible employee 'knew, or in the exercise of reasonable care, should have known' about the harassing conduct." *Id*. at 13; 1997 Guidance at 12,042; 2010 DCL at 2 n.9; 2011 DCL at 4.  A responsible employee is one who "has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment, or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility."  2001 Revised Guidance at 13.

57.     The Department has never before required a student to make a complaint to a specific employee to provide sufficient notice to the institution.  *Id*.; 1997 Guidance at 12,036-37, 12,042.  "A school can receive notice of harassment in many different ways," including, *inter alia*, a formal grievance filed with the school's Title IX coordinator, a complaint by a targeted

student made to a teacher or other responsible employee, an incident directly witnessed by a school employee, media reports, or other means. 2001 Revised Guidance at 13.

### b. Investigation and grievance procedure requirements.

58. Under current policy, once an educational institution has actual or constructive notice of conduct constituting sexual harassment, it "should take immediate and appropriate steps to investigate or otherwise determine what occurred." *Id*. at 15; *see also* 1997 Guidance at 12,042; 2010 DCL at 2. The investigation must be "prompt, thorough, and impartial," but "[t]he specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors." 2001 Revised Guidance at 15; *see also* 1997 Guidance at 12,042; 2010 DCL at 2; 2011 DCL at 4-5.

59. Even if an individual incident would not, by itself, constitute actionable sexual harassment, schools' obligation to investigate *all* potentially harassing conduct has been grounded in the Department's recognition that investigations of individual incidents "could lead to the discovery of additional incidents that, taken together, may constitute a hostile environment" to which the school is obligated to respond under Title IX. 2010 DCL at 2.

60. OCR has long required schools to investigate harassment that occurred or originated off-campus to determine whether the effects of that harassment are affecting a student's access to a school's program or activity. For example, an off-campus rape could impose continuing educational harm on a victim if the student's assaulter was a teacher or classmate, or lived in the same dorm. The Department has previously required schools to investigate such conduct to determine whether it has created a hostile environment within its education program. *See* 2011 DCL at 4; 2014 Q&A at 29.

61.     The Department has authorized schools to take immediate measures to protect a student experiencing harassment during the pendency of an investigation, including separating the targeted student from the alleged harasser in classes or housing, providing counseling to the targeted student or alleged harasser, or disciplining the alleged harasser.  2001 Revised Guidance at 16; 1997 Guidance at 12,043; 2010 DCL at 3.  OCR has warned that such measures "should not penalize the student who was harassed" and that "any separation of the target from an alleged harasser should be designed to minimize the burden on the target's educational program (*e.g.*, not requiring the target to change his or her class schedule)."  2010 DCL at 3.

62.     Pursuant to the requirement in the Department's Title IX regulations that institutions "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by [the regulations]," 34 C.F.R. § 106.8(b), the Department has traditionally afforded institutions a great degree of flexibility in developing effective grievance procedures based on the types of conduct at issue and school-specific considerations.  In its various sexual harassment guidance documents, the Department has long cautioned against a one-size-fits-all approach to grievance procedures since factors including "differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience" should inform the "detail, specificity, and components" of grievance processes used by individual schools.  2001 Revised Guidance at 20; *see also* 2011 DCL at 9; 1997 Guidance at 12,045.  For example, whether a complaint resolution process is completed in a timely manner depends "on the complexity of the investigation and the severity and extent of the harassment."  2001 Revised Guidance at 20.

63.     Under longstanding policy, OCR considers six factors in determining whether a school's grievance process is prompt and equitable, including whether (a) notice of the school's

grievance procedures has been given to students, parents, and employees; (b) those procedures have been applied to complaints alleging harassment; (c) complaints have been investigated in an "[a]dequate, reliable, and impartial" manner, including providing the opportunity to present witnesses and other evidence; (d) the school has designated and followed "reasonably prompt timeframes for the major stages of the complaint process;" (e) the school provides notice to the parties of the outcome of the complaint; and (f) the school has provided "[a]n assurance that [it] will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate." *Id.*

64.     The 2011 DCL and the 2014 Q&A provided greater detail to schools on how they should meet these requirements in the context of investigating alleged sexual harassment, including sexual violence. 2011 DCL at 8-14; 2014 Q&A at 9-14, 24-38. In the 2011 DCL, the Department emphasized that schools should provide comparable procedural rights to complainants and alleged harassers, and articulated the Department's position that schools "must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred)," the same standard of proof that OCR itself uses in resolving complaints of discrimination under all of the civil rights laws it enforces, including Title IX. 2011 DCL at 11. The Department noted that it would be inconsistent, and therefore inequitable, to use a higher standard such as a clear and convincing standard used in criminal complaints, for complaints of sexual harassment but not for other forms of harassment.

65.     The 2011 DCL reminded institutions that the different standards of proof for a Title IX investigation as compared to a criminal investigation are warranted by the distinct aims of these investigations, noting that institutions are required by Title IX to investigate conduct that may constitute unlawful sexual harassment even where this conduct would not warrant criminal

charges. *Id.* Thus, the Department noted that a concurrent criminal inquiry does not relieve an institution of its responsibility to promptly investigate and address sexual harassment. *Id.*

66. In the 2014 Q&A, the Department also reminded institutions that equity requires them to make accommodations for students with disabilities to ensure those students' equal access to the grievance process. 2014 Q&A at 7. These accommodations may include "providing electronically-accessible versions of paper forms to individuals with print disabilities, or by providing a sign language interpreter to a deaf individual attending a training." *Id.*

### c. *Corrective measures.*

67. Where a school's inquiry or investigation reveals that harassment occurred, the school must "take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." 2001 Revised Guidance at 11-13, 15; *see also* 2010 DCL at 2-3; 2011 DCL at 4. The Department has required these remedial steps to be taken regardless of whether the student or students targeted for harassment made a formal complaint to the institution. 2001 Revised Guidance at 15-16; 1997 Guidance at 12,042.

68. Recognizing that school personnel knowledgeable of Title IX's requirements "are in the best position to prevent harassment and to lessen the harm to students" when harassment occurs, the Department has traditionally afforded schools flexibility in fashioning remedies to stop, prevent, and cure the effects of harassment on a student or the broader school community. 2001 Revised Guidance at ii; 1997 Guidance at 12,034.

69. Depending on the context, appropriate remedial measures may include, *inter alia*, actions specific to the individual students involved (which may, but need not, include discipline

of the harasser), trainings for students and staff, modifications of school policies and practices, and steps to prevent retaliation.  2010 DCL at 3.

### d. *Confidentiality and privacy protections.*

70.     The Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), generally forbids disclosure of a student's education record without the consent of the student or, for minors, the student's parent.

71.     Recognizing potential tensions between schools' FERPA obligations and their Title IX obligations to effectively investigate and respond to sexual harassment, the Department, since the 1997 Guidance, has provided guidance to schools on how to avoid unlawful disclosure of students' protected information.  The 2001 Revised Guidance reaffirmed language from the 1997 Guidance, which advised schools that they are prohibited from releasing information to a complainant that is contained in another student's education record unless "(1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution."  2001 Revised Guidance at 20 n.102; *see also* 1997 Guidance at 12,038.  The 2001 Revised Guidance explained how schools must balance the privacy interests of all students against the interest in disclosing sufficient information to conduct an investigation and notify a complainant of the result.  2001 Revised Guidance at 17-18.

72.     The 2011 DCL and 2014 Q&A further addressed these issues.  2011 DCL at 5, 13-14; 2014 Q&A at 18-24, 36-37.

*e.  Consistency with other civil rights laws enforced by OCR.*

73.  The Department has always used the same definitions and imposed the same standards to address sexual harassment under Title IX as it has for race-based harassment under Title VI and disability-based harassment under Section 504 and Title II.

74.  In 1994, the Department published a guidance document, *Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance; Notice*, 59 Fed. Reg. 11,448 (Mar. 10, 1994) ("1994 Racial Harassment Guidance"), addressing schools' Title VI obligations to prevent, address, and remedy harassment based on race, color, or national origin.  OCR will find a school to be in violation of Title VI where a school "has created or is responsible for a racially hostile environment—*i.e.*, harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by a recipient," including where a school "has effectively caused, encouraged, accepted, tolerated or failed to correct a racially hostile environment of which it has actual or constructive notice," regardless of whether the harasser is a school employee or another party.  1994 Racial Harassment Guidance at 11,449.  This is the same standard the Department has imposed for Title IX sexual and gender-based harassment cases for many years.

75.  As with its sexual harassment guidance documents, the Department emphasized in the 1994 Racial Harassment Guidance that whether a hostile environment exists "must be determined from the totality of the circumstances," considering factors including the nature, scope, frequency, duration, and location of the harassing conduct, as well as the identity, number, and relationship of the persons involved.  *Id*.  The guidance, also mirroring the Department's longstanding approach to sexual harassment, stated that the overall severity, persistence, or

pervasiveness must be weighed, and that "[g]enerally, the severity of the incidents needed to establish a racially hostile environment under title VI varies inversely with their pervasiveness or persistence." *Id.* As with sexual harassment under the 2001 Revised Guidance, the 1994 Racial Harassment Guidance provides that where racial harassment exists, a school "has a legal duty to take reasonable steps to eliminate it" and that the "appropriate response . . . must be tailored to redress fully the specific problems experienced at the institution as a result of the harassment" and "be reasonably calculated to prevent its recurrence." *Id.* at 11,453, 11,450.

76.     As conveyed in OCR's July 25, 2000 *Dear Colleague Letter on Prohibited Disability Harassment*[8] ("2000 DCL") which remains in force, OCR follows substantially similar standards for disability-based harassment that may violate Section 504 or Title II as it does for sexual harassment under Title IX and racial harassment under Title VI. *See* 2000 DCL.

77.     The 2010 DCL clarified that the Department follows the same standards for discriminatory harassment under all the laws it enforces, and that these guidance documents are still operative for harassment violative of Title VI, Section 504, and Title II. 2010 DCL at 1-4.

78.     As required by the CRRA, the Department's implementing regulations for Title IX, Title VI, and Section 504 use a common definition of covered "program or activity." *See* 20 U.S.C. § 1687 (Title IX); 34 C.F.R. § 100.13(g) (Title VI); 34 C.F.R. § 104.3(k) (Section 504); *see also* 1994 Racial Harassment Guidance at 11,448; 2000 DCL.

---

[8] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html.

**III. The Final Rule Sharply Departs from the Department's Well-Established Policies, Undermining Protections for Harassed Students and Abdicating the Department's Essential Role in Eliminating Sexual Harassment in Schools.**

    **A. The Department's Efforts to Downplay Sexual Harassment and Weaken Existing Title IX Protections.**

    79. Since 2017, Defendants have engaged in an ongoing campaign to roll back Title IX's protections against sexual assault, including sexual violence, particularly in the context of higher education. Turning away from decades of well-established enforcement policies, the Department has taken a number of steps to strip existing legal protections for survivors of campus sexual assault and to minimize the Department's role in enforcing Title IX on behalf of students who experience such harassment—up to and including its issuance of the Final Rule.

    80. After Secretary DeVos was confirmed to her cabinet position on February 7, 2017, she swiftly oversaw the Department's dismantling of existing Title IX protections against sexual harassment. On April 12, 2017, Secretary DeVos named Candice Jackson, a vocal critic of the previous administration's Title IX policies, as the Deputy Assistant Secretary and Acting Assistant Secretary of Civil Rights, in which capacity she led OCR until July 2018.

    81. After assuming their roles, both Secretary DeVos and Ms. Jackson publicly criticized the Department's Title IX policies and characterized most campus sexual assaults as a non-issue. Jackson publicly belittled student survivors of sexual assault, contending that "90 percent of [their complaints] — fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because she just decided that our last sleeping together was not quite right.'"[9]

---

[9] Erica L. Green *et al.*, *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.

82.     Echoing this sentiment, Secretary DeVos, in September 2017, gave public remarks in which she criticized OCR's "incredibly broad definitions" of sexual harassment, opining that "if everything is harassment, then nothing is." U.S. Dep't of Educ., *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017).[10] In her remarks, the Secretary focused on the rights of students accused of sexual harassment, stating that "[t]he notion that a school must diminish due process rights [of alleged harassers] to better serve the 'victim' only creates more victims." *Id.* Taking a swipe at the settled principle that sexual harassment victims should not bear the brunt of interim remedies to protect their access to educational opportunities, the Secretary said measures like changing class schedules or housing assignments should not "punish the accused" during the investigation and grievance process. *Id.*

83.     The Secretary further asserted that "the prior administration weaponized the Office for Civil Rights to work against schools and against students" and went so far as to describe the then-current sexual harassment guidance to schools as "un-American." *Id.* She contended that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.* Remarking that "[s]tudents, families, and school administrators are generally not lawyers and they're not judges [and] [w]e shouldn't force them to be so for justice to be served," the Secretary criticized the "quasi-legal structures" schools used to fulfill their Title IX obligations to fairly resolve sexual harassment complaints, dismissively calling them "kangaroo courts." *Id.*

84.     Against this backdrop, on September 22, 2017, OCR issued a Dear Colleague Letter on Campus Sexual Misconduct[11] ("2017 DCL") and an accompanying document, entitled

---

[10] *Available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.
[11] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

*Q&A on Campus Sexual Misconduct.*[12]  The 2017 DCL announced that the Department was

rescinding both the 2011 DCL and 2014 Q&A.  The letter asserted, without providing any

evidentiary support, that the 2011 DCL and 2014 Q&A had "not succeeded in providing clarity

for educational institutions or in leading institutions to guarantee educational opportunities on the

equal basis that Title IX requires."  2017 DCL at 2.  The 2017 DCL, signed by Acting Assistant

Secretary Jackson, pertained specifically to "campus sexual misconduct" and did not mention or

address other forms of sexual harassment or sex discrimination in schools.  *Id.* at 1-2.

85.     The 2017 DCL noted that the Department intended to continue to rely on the 2001

Revised Guidance and the "reaffirmation" of that guidance in the 2006 DCL.  *Id*. at 2.  The letter

did not mention the 2010 DCL, nor has the Department withdrawn that document.

**B.      The Department Promulgated the Proposed Rule Shortly After Rescinding
          OCR's 2011 and 2014 Guidance Documents.**

86.     On November 29, 2018, the Department promulgated the Proposed Rule.

87.     The Proposed Rule contained significant revisions and amendments to the

Department's longstanding Title IX regulations, including proposing unjustified redefinitions of

key terms; relaxing schools' obligations to investigate, address, and remedy sexual harassment;

imposing onerous, prescriptive, quasi-judicial procedural requirements that schools must follow

in investigating and handling complaints; and largely erasing schools' obligation to remedy the

effects of sexual harassment both for targeted students and their broader school communities.

The proposed procedural requirements curtailed schools' previous flexibility and discretion in

tailoring grievance procedures for sexual harassment complaints to local circumstances.

88.     The detailed new grievance procedures in the Proposed Rule, which focused on

the subset of sexual harassment complaints by individual complainants against individual

---

[12] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

respondents, afforded stronger rights to accused students than those to students targeted for discriminatory harassment, for the first time in the Department's history of enforcing Title IX. *Id.* at 61,471-80. These changes included—without legal support or justification—giving respondents the right to file *sex discrimination* complaints against their schools with OCR based on alleged violations of the mandatory grievance procedures, even where such violations were not based on sex. *Id*. at 61,497.

89. The Proposed Rule did not contain any language preempting schools' application of stronger state or local protections against sexual harassment. To the contrary, the Proposed Rule "emphasize[d] that when determining how to respond to sexual harassment, recipients have flexibility to employ age-appropriate methods, exercise common sense and good judgment, and take into account the needs of the parties involved" and averred that the proposed grievance procedures were intended to provide "recognition that a recipient needs flexibility to employ grievance procedures that work best for the recipient's educational environment." Proposed Rule at 61,468, 61,472. The Proposed Rule did not suggest that schools would be constrained from applying stronger protections under state or local law, or their own codes of conduct.

90. In assessing the likely costs of the Proposed Rule, the Department failed to include or account for the substantial monetary and nonmonetary costs of the Proposed Rule, including the costs of an increase in sexual harassment and violence, and various legal and compliance costs education institutions would be forced to incur.

91. During the notice and comment period, the Department received more than 124,000 comments on the Proposed Rule, *see* Final Rule at 30,044, many of which vigorously opposed the core aspects of the proposed regulatory changes.

92. The State opposed the Proposed Rule, identifying many of the unreasonable, unworkable, and unlawful provisions that remain in the Final Rule and are the subject of this challenge.[13] SUNY, NYSED, other public and private higher educational institutions in the State, public school districts, and other stakeholders submitted comments in opposition to the Proposed Rule. Eighteen other states and the District of Columbia also opposed the Proposed Rule. Comments in opposition were also submitted by advocacy groups for women and girls, LGBTQ people, and sexual assault survivors, among others; mental health professionals; and associations representing school administrators and educational institutions across the country.

93. On March 27, 2020, in a letter to Secretary DeVos, 17 states and the District of Columbia urged the Department to suspend the rulemaking process for the Proposed Rule while the "nation's educational institutions respond to the national emergency caused by the novel coronavirus (COVID-19) and until both K-12 schools and institutions of higher education resume normal operations." The letter noted that over 93 percent of all K-12 institutions, and more than 1,140 colleges and universities had closed or were in the process of closing in response to this extraordinary national public health emergency. The letter explained that the burdens the Proposed Rule would place on schools, if finalized, "would be untenable and ultimately counterproductive to student safety" in light of this unprecedented pandemic. Specifically, "[d]uring this crisis, schools will need the flexibility to fashion and revise investigation, resolution, and grievance procedures on an ongoing basis, in order to carry out Title IX's mandate in the manner that best addresses the impact of the pandemic and the needs of their school populations and communities," and some of the new legal obligations in the Proposed Rule "would be both impossible and unsafe" for institutions to implement.

---

[13] Letter from Attorney General Letitia James to Hon. Betsy DeVos, *et al.* (Jan. 30, 2019), *available at* https://ag.ny.gov/sites/default/files/nyoag_title_ix_comment_letter_draft_final_for_filing.pdf.

**C.    The Final Rule.**

94.    The Department publicly released the text of the Final Rule on May 6, 2020, in a document exceeding 2,000 pages,[14] and published the 554-page Final Rule in the Federal Register on May 19, 2020.  Final Rule at 30,026-579.

95.    The Final Rule is scheduled to take effect on August 14, 2020.  *Id.* at 30,026.

96.    The Final Rule amends regulations implementing Title IX of the Education Amendments of 1972.  Specifically, it (a) amends 34 C.F.R. § 106.3's remedial requirements; (b) amends 34 C.F.R. § 106.6 to, *inter alia*, add a preemption clause that was not part of the Proposed Rule; (c) significantly changes the provisions governing Title IX coordinators and schools' obligation to broadly disseminate their nondiscrimination policies under the former 34 C.F.R. §§ 106.8 and 106.9; (d) alters the procedure for religiously-controlled schools to seek exemptions under 34 C.F.R. § 106.12; (e) adds a host of new definitions applicable only to sexual harassment in the new 34 C.F.R. § 106.30; (f) drastically alters schools' obligations to respond to sexual harassment in the new 34 C.F.R. § 106.44; (g) adds a lengthy set of grievance procedures that schools must follow for sexual harassment complaints in the new 34 C.F.R. § 106.45; and (h) adds a retaliation provision in the new 34 C.F.R. § 106.71.

97.    The Final Rule's stated purpose is to "better align the Department's Title IX regulations with the text and purpose of Title IX, the U.S. Constitution, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and recipients with respect to sexual harassment allegations."  *Id.* at 30,030.

98.    The Final Rule purports to accomplish these goals by (1) redefining "sexual harassment" and other key terms, at odds with longstanding definitions used by the Department

---

[14] U.S. Dep't of Educ., Title IX Regulations Addressing Sexual Harassment (Unofficial Copy) (May 6, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf.

in enforcing Title IX and other civil rights laws; (2) narrowly limiting when and how a recipient must respond to sexual harassment, and preempting schools from following more expansive protections under conflicting codes of conduct or state or local law; (3) imposing extensive new procedural requirements and creating new rights for accused students that are not designed to prevent or address *sex* discrimination, exceeding the Department's authority under Title IX; (4) removing critical notice requirements for prospective and current students and employees; (5) ignoring compliance with contrary federal law; and (6) failing to acknowledge and quantify widespread harms and costs to covered institutions, their students, and the broader public.

99.     The Final Rule does not refute or alter the Department's central factual findings undergirding its longstanding Title IX policies on sexual harassment, including that sexual harassment in schools is common, can interfere with students' ability to learn and their overall well-being, and that "preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn." *See* 1997 Guidance at 12,034. To the contrary, the Department cited data illustrating the continued prevalence of sexual harassment in schools and the adverse impacts on students who experience harassment. Final Rule at 30,075-81. The Department fails to justify how the drastic changes to its Title IX policies are consistent with these findings.

100.    Indeed, the Department concedes that the redefinition of "sexual harassment" was not required by *Gebser* or *Davis*. *Id.* at 30,033. It fails to adequately explain or justify how, in the administrative enforcement context, the "text and purpose" of Title IX in protecting students from sex discrimination would be furthered by these changes that effectively reduce protections for students experiencing sexual harassment and make it harder for their schools to respond to it. The Department also wholly ignores the fact that there is no evidence suggesting that any

burdens faced by accused students in defending against sexual harassment allegations is *based on sex*, such that the Department lacks the authority to create new enforceable rights for the accused as a form of sex discrimination under *Title IX*.

### 1. The Final Rule redefines key terms without adequate justification.

#### a. Redefinition of "education program or activity."

101. The Final Rule unlawfully and arbitrarily restricts a school's response to "sexual harassment *in* an education program or activity of the recipient against a person in the United States." Final Rule at 30,574-75 (§ 106.44(a)) (emphasis added).

102. The Final Rule defines "education program or activity," exclusively with respect to sexual harassment and not to other forms of conduct prohibited under Title IX, as those "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." *Id.* The Final Rule requires institutions to dismiss complaints with regard to conduct that "did not occur in the recipient's education program or activity, or did not occur against a person in the United States." *Id.* at 30,576 (§ 106.45(b)(3)).

103. The Final Rule's confusing redefinition effectively demands that students who experience sexual harassment, before seeking relief from their schools, ascertain the degree of their school control over campus events, student groups, and buildings to determine whether Title IX protections apply. It also wholly disregards schools' statutory obligation to address harassment, wherever it occurred, that has the effect of limiting or denying a student's access to education programs and activities. The Department has also failed to justify this geographic

limitation in light of its practice of applying civil rights statutes, including Title VI, outside of the United States in appropriate circumstances.[15]

104.    The Final Rule's restrictions conflict with Title IX's statutory language, which does not depend on where the underlying conduct occurred, but instead prohibits discrimination based on its effects on a student's educational opportunities.  20 U.S.C § 1681(a).  Moreover, the text of Title IX provides that the term "program or activity" and "program" mean "*all of the operations of*" a covered entity.  *Id.* § 1687 (emphasis added).  This definition was required by the CRRA, which adopted a uniform, expansive definition of "program or activity" for Title IX, Title VI, and Section 504.  *See* 20 U.S.C. § 1687 (Title IX); 34 C.F.R. § 100.13(g) (Title VI); 34 C.F.R. § 104.3(k) (Section 504); *see also* 1994 Racial Harassment Guidance at 11,448; 2000 DCL.

105.    The Final Rule's redefinition of "program or activity" applies only to conduct that constitutes sexual harassment under the Final Rule's new, narrow definition of that term.  The existing definition will continue to apply to other forms of sex-based discrimination, including, perhaps, gender-based harassment that is not sexual in nature.  The Final Rule's redefinition of "program or activity" thus creates arbitrary and unlawful limitations on the Department's enforcement powers and schools' obligations to respond to sexual harassment, as compared to all other forms of discrimination, including harassment.

106.    The Final Rule's definition will lead to confusion for schools and students over whether students facing sexual harassment can seek relief from their schools.  For example, the Final Rule likely bars American universities from offering Title IX protections to students in university-sponsored study abroad programs.  Likewise, students undergoing remote learning

---

[15] *See, e.g.*, U.S. Dep't of Justice, Title VI Legal Manual (Updated), § V, at 4 (2016) (describing the circumstances in which Title VI applies to discriminatory conduct outside the United States).

due to the COVID-19 pandemic who experience sexual harassment by peers, teachers, or others online, or harassment at home that impedes their ability to attend classes, must guess whether this conduct falls under the Final Rule's definition of "program or activity." The Final Rule is, at best, ambiguous on these questions. The Department fails to sufficiently explain how these results comport with agency interpretation and the anti-discrimination purposes of Title IX.

107.    Further, the Department's decision to limit the scope of proscribed conduct under Title IX based on location is arbitrary when Congress, under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1902(f) ("Clery Act"), requires reporting of information regarding crimes occurring on "[p]ublic property . . . immediately adjacent to and accessible from the campus" to current and prospective students, since it is relevant to understand how crimes impact the campus learning environment. 20 U.S.C. § 1902(f). It is illogical to require institutions to report off-campus conduct to current and prospective students if, as the Final Rule unreasonably assumes, that same conduct could never affect a student's access to the education program or activity.

### b. Redefinition of "sexual harassment."

108.    The Final Rule redefines sexual harassment as "conduct on the basis of sex that satisfies one or more of the following: (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) 'Sexual assault' as defined in [the Clery Act,] 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in [the Violence Against Women Act ("VAWA"),] 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8),

or 'stalking' as defined in 34 U.S.C. 12291(a)(30)." Final Rule at 30,574 (§ 106.30(a)). Schools must dismiss complaints that do not meet this new definition. *Id.* at 30,576 (§ 106.45(b)(3)).

109. The Department's new definition of sexual harassment is a dramatic departure from longstanding Department practice, and will greatly limit the range of covered conduct.

110. First, this definition restricts schools' obligation under the Title IX regulations to prevent and respond to harassing conduct by requiring that sexual harassment be severe, pervasive, and "objectively offensive" before a school can respond. *Id.* at 30,574 (§ 106.30).

111. By contrast, the Department previously defined sexual harassment as unwelcome conduct of a sexual nature that "is sufficiently severe, persistent, *or* pervasive to limit a student's ability to participate in or benefit from an education program or activity." 1997 Guidance at 12,038 (emphasis added). Thus, even "a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment," and less severe, pervasive conduct that created a hostile environment was also considered to be harassment prohibited by Title IX. 2001 Revised Guidance at 5-9.

112. Under the Department's new definition, a single, severe, objectively offensive incident of sexual harassment may now be excluded from protection under the amended Title IX regulations (unless such conduct met the Clery Act or VAWA definitions incorporated into the definition), and persistent or pervasive conduct that limits a student's access to a school's education program or activity will almost certainly be unprotected.

113. Second, the requirement that the unwelcome sexual conduct "effectively denies a person equal access" to educational opportunities in order to be subject to Title IX coverage runs counter to the plain language of Title IX, which broadly protects all students from any conduct on the basis of sex that has the effect of excluding the student from participation in, being denied

the benefits of, or being subjected to discrimination under a school's education program or activity. Title IX is violated not just when an individual is "effectively denie[d] equal access" to an education program or activity, but also when conduct impairs or limits that individual's ability to enjoy the benefits and services of that program or activity.

114. Consistent with schools' affirmative obligation under Title IX and the longstanding regulations to affirmatively prevent discriminatory harassment and address hostile school environments resulting from such harassment, schools have always been obligated to investigate *all* potentially harassing conduct that may limit or deny educational opportunities to a student. Now, under the Final Rule, a school will have no obligation to respond to harassment until it has already affected one or more students' access to education. As such, students will now have to wait until the harassment they face severely and significantly affects their access to education before their schools are required—or even permitted—to act.

115. Third, although the Final Rule (like the Proposed Rule) purports only to apply to sexual harassment, including by adding new definitions and procedures applicable only to sexual harassment, Final Rule at 30,574-78 (§§ 106.30, 106.44, 106.45), the preamble to the Final Rule suggests that schools will also have to apply the Final Rule's new grievance procedures to other forms of "non-sexual harassment sex discrimination." *Id.* at 30,095; *see also* Proposed Rule at 61,462. Because the Final Rule itself does not say this—and, in fact, uses language specific to "sexual harassment"—schools will have to grapple with this ambiguity and whether and when to apply the new provisions to other forms of sex discrimination experienced by their students.

116. Fourth, the new definition of harassment is also inconsistent with the definitions of harassment used by the Department in enforcing like protections against harassment based on race, color, national origin, and disability under Title VI, Section 504, and Title II. As the

Department's enforcement policies for those laws remain unchanged, the Final Rule effectively establishes a separate, weaker enforcement standard for sexual harassment relative to all other forms of discriminatory harassment.

117. Fifth, the Final Rule's definition ignores the uniformity with which sexual harassment has long been defined under both Title IX and Title VII with respect to employees of educational institutions (including faculty, staff, and student employees). Under Title VII, sexual harassment is actionable when the harassment is sufficiently severe *or* pervasive to alter the conditions of the victim's employment.[16] The EEOC, in administratively enforcing Title VII, recognizes that hostile environment sexual harassment can result from "unusually severe" isolated incidents and gender-based harassment of a non-sexual nature that is sufficiently severe or pervasive.[17] Until the promulgation of the Final Rule, employees of covered institutions enjoyed consistent, parallel protections under both laws. Now, a student may be forced to endure worse sexual harassment than the student's teachers before the school is required to respond.

118. Finally, the Final Rule's redefinition of sexual harassment may prevent institutions from providing meaningful redress for a variety of unwelcome sexual conduct, in direct contravention to Title IX's mandate that requires institutions to prevent, address, and remedy the effects of such conduct on a student's educational access. The Final Rule fails to offer sufficient justification for the many harms that will result from this stark redefinition.

### c. *Elimination of references to hostile school environment.*

119. The Final Rule strips all references in the Title IX regulations to schools' obligations to address hostile school environments resulting from sexual harassment, including

---

[16] *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (emphasis added); U.S. Equal Emp't Opportunity Comm'n, *Policy Guidance on Current Issues of Sexual Harassment* (Mar. 19, 1990), https://www.eeoc.gov/laws/guidance/policy-guidance-current-issues-sexual-harassment ("EEOC Guidance").
[17] *See* EEOC Guidance.

amending 34 C.F.R. § 106.3 to strike a requirement that institutions take remedial actions OCR deems necessary to "overcome the effects of [sex-based] discrimination." Indeed, in contrast to all of the Department's earlier guidance documents on sexual harassment and other forms of harassment, the terms "hostile environment" and "hostile climate" will be completely absent from the amended Title IX regulations after the Final Rule becomes effective.

120. The Final Rule's sole focus on responding to harassment against one individual by another individual ignores the cardinal principle that "[h]arassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents," 2010 DCL at 2, to create a hostile environment.

### 2. The Final Rule arbitrarily and unlawfully limits when a recipient must respond to conduct in violation of Title IX.

121. Contrary to the text and purpose of Title IX, the Final Rule drastically limits schools' obligations to respond to sexual harassment that impermissibly and arbitrarily restricts what conduct a recipient may respond to under Title IX. The Department fails to adequately explain the sea change from decades of longstanding and consistent enforcement policy, as reflected in OCR's various guidance documents on sexual harassment, and ignores how these new enforcement standards will frustrate, and effectively preclude, the ability of institutions to combat and eliminate sex discrimination in education.

### a. The "actual knowledge" definition impermissibly allows institutions to avoid responding to known incidents of sexual harassment.

122. The Final Rule defines "actual knowledge" as "notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to any employee of an elementary and secondary school." Final Rule at 30,574 (§ 106.30(a)). The

Final Rule states that "[i]mputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge," and that the "mere ability or obligation to report sexual harassment or to inform a student about how to report sexual harassment, or having been trained to do so, does not qualify an individual as one who has authority to institute corrective measures on behalf of the recipient." *Id.* The Final Rule limits a recipient's obligation to respond to sexual harassment to instances of which the recipient has "actual knowledge." *Id.* at 30,574-75 (§ 106.44(a)).

123.    Previously, schools were required to respond to sexual harassment whenever an employee with authority to respond to the harassment, knew, or in the exercise of reasonable care, should have known about the harassing conduct. 1997 Guidance at 12,042; 2001 Revised Guidance at 13; 2010 DCL at 2 n.9; 2011 DCL at 4.

124.    The Department's definition and circumscription of an institution's obligation to respond to allegations of which it has actual knowledge renounces this standard, which made clear that institutions had to respond to all sexually harassing conduct where the institution knew or reasonably should have known about it. *See* 1997 Guidance at 12,042; 2001 Revised Guidance at 13; 2011 DCL at 4.

125.    The Final Rule fails to justify its new standard, particularly in light of the reality that students are most likely to disclose sexual assault and harassment to trusted sources, such as a residential advisor, guidance counselor, or professor. Instead, the Final Rule now authorizes institutions to do nothing—even where dozens of employees who can take action or report to appropriate officials have actual knowledge of harassment—so long as the Title IX Coordinator or high-ranking university official can disclaim actual knowledge. The Department offers no reasonable explanation for these added hurdles for complainants at the university level.

126.     The Final Rule arbitrarily imposes different definitions of actual knowledge in K-12 institutions and post-secondary institutions, with no explanation for why university students should face added barriers in order to trigger an institutional response to sexual harassment.

127.     The Final Rule's reliance on the Supreme Court's decisions in *Gebser* and *Davis* are misplaced, as these decisions only addressed the liability standard for private Title IX lawsuits seeking monetary damages, and specifically distinguished monetary liability standards from those federal agencies can apply in the administrative enforcement context.  As the Supreme Court explicitly noted in *Gebser*, "[t]he Department of Education could enforce the requirement administratively: Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate."  524 U.S. at 292.  Indeed, the Department issued the 2001 Revised Guidance after those decisions, to affirm that these cases "did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding."  2001 Revised Guidance at ii.

128.     The Final Rule offers no explanation for the Department's about-face from its position that *Gebser* and *Davis* had no bearing on OCR's administrative enforcement of Title IX.

### b.  The definitions of "complainant" and "formal complaint" impose undue restrictions on schools' ability to respond to sexual harassment.

129.     The Final Rule defines "complainant," for purposes of sexual harassment claims only, as "an individual who is alleged to be the victim of conduct that could constitute sexual harassment."  Final Rule at 30,574 (§ 106.30).  The Department's Title IX regulations do not otherwise define a complainant for any other form of sex-based discrimination.  Although the Final Rule permits *any* individual to notify a school that sexual harassment is occurring, and for the Title IX Coordinator to make a formal complaint in lieu of a student targeted for harassment,

the rule confusingly uses the term "complainant" to describe a targeted student even if that student did not make a formal complaint. *See id.* at 30,573-74 (§§ 106.8(a), 106.30).

130. The Final Rule defines "formal complaint" as "a document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent and requesting that the recipient investigate the allegation of sexual harassment." *Id.* at 30,574 (§ 106.30(a)).

131. The Final Rule newly limits individuals who can file a formal complaint, providing that "[a]t the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed." *Id.* By requiring that a formal complaint can only be filed by or on behalf of a student currently "participating in or attempting to participate in" an education program or activity at the time of the complaint (as opposed to when the harassment occurred), the Final Rule unjustifiably forecloses the ability of sexual harassment survivors who withdrew from school due to the damaging effects of that harassment from seeking justice from their schools through the administrative process.

132. These narrow, formalistic definitions are not supported by Title IX, which does not include any limitations on making or receiving complaints. *See* 20 U.S.C. § 1681. Nor are they supported by Title IX's mandate that schools take reasonable steps to prevent and remedy known sexual harassment and sex discrimination, regardless of how institutions learn about it.

133. The Final Rule also fails to consider the limiting effect of the definitions of "complainant" and "formal complaint," including that it may chill reporting, and does not offer sufficient accommodations for individuals with disabilities that may impede their ability to read, write, or sign a formal complaint, or to otherwise participate in the prescribed grievance process.

### c. The "deliberate indifference" standard runs counter to Title IX's mandate and past practice.

134.     The Final Rule provides that an educational institution with actual knowledge must respond "in a manner that is not deliberately indifferent."  Final Rule at 30,574 (§ 106.44(a)).  An institution is "only" deliberately indifferent "if its response to sexual harassment is clearly unreasonable in light of the known circumstances."  *Id.*

135.     Consistent with Title IX's mandate that no person "be excluded from participation in, be denied the benefits of, or be subjected to discrimination" on the basis of sex, 20 U.S.C. § 1681(a), the Department has long required schools to act reasonably, promptly, and effectively in taking steps to end sexual harassment and prevent its recurrence.  34 CFR § 106.31; 1997 Guidance at 12,042; 2001 Revised Guidance at 10; 2010 DCL at 2-3; 2011 DCL at 4.

136.     In contrast, the Final Rule permits schools to respond ineffectively to sexual harassment as long as the response is not "clearly unreasonable in light of the known circumstances," Final Rule at 30,574-75 (§ 106.44(a)), even if the response does not stop, prevent, or redress harassment.

137.     In an attempt to justify its departure from previous standards, the Department cites only to decades-old Supreme Court precedent that explicitly limits the liability standards on which the Department relies to private Title IX lawsuits seeking monetary damages, and which subsequent Department guidance clarified did not apply to its enforcement of Title IX.  The Final Rule does not point to any instances in which schools were burdened or unfairly penalized by the existing reasonableness standard, and otherwise fails to justify its departure from this well-established standard.

### 3. The Final Rule's mandatory and permissive dismissal provisions impermissibly allow for sexual harassment to go unaddressed.

138.    The Final Rule mandates that "[i]f the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's program or activity, or did not occur against a person in the United States, then the recipient must dismiss the formal complaint with regard to that conduct." Final Rule at 30,576 (§ 106.45(b)(3)). Accordingly, a school must dismiss a complaint *before* an investigation if the allegations, on their face, are not severe, pervasive, and objectively offensive, *see id.*, even if a reasonable investigation might have revealed that the alleged conduct meets the stringent standard. Likewise, a school must dismiss a complaint that meets the Final Rule's definition of sexual harassment if the conduct occurred outside of the bounds of an educational program or activity, *see id.* at 30,574-75 (§ 106.44(a)), or outside the United States, even where the effects of such harassment harm a student's ability to participate in that program or activity and are redressable by the institution.

139.    In forcing schools to dismiss complaints that do not meet the narrow, unlawful, and arbitrary definitions the Final Rule adopts, the Department exceeds its statutory authority by forcing schools to violate students' and employees' civil rights under Title IX. Title IX only authorizes the Department to issue rules "to effectuate the [anti-discrimination] provision of [Title IX]." 20 U.S.C. § 1682. Title IX delegates no authority to the Department to limit schools' protection of students against discrimination, hamper schools' ability to enforce their own procedures to best respond to a wide-variety of conduct subject to disciplinary action, or afford substantive Title IX rights to individuals (including those accused of misconduct) that are not themselves facing discrimination on the basis of sex.

140. The Final Rule fails to consider practical complications created by the mandatory dismissal provision. For example, where an institution investigates and dismisses a Title IX complaint, the institution will have lost critical time and resources before the institution can begin to investigate whether the conduct alleged also violates its own disciplinary code. The Final Rule provides little clarity on how institutions should conduct these successive investigations, or whether parallel investigations under different enforcement regimes can happen concurrently.

141. The Final Rule adds permissive dismissal language, allowing institutions to dismiss complaints where "a complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; the respondent is no longer enrolled or employed by the recipient; or specific circumstances prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein." Final Rule at 30,576 (§ 106.45(b)(3)(ii)).

142. This provision disregards Title IX's mandate, and calls into question whether victims of sexual harassment would be afforded Title IX protections in circumstances where their harassers are no longer on campus. For example, the Final Rule, read literally, would allow an institution to ignore harassment perpetrated by a graduating senior, where that student would graduate before the newly-prescribed grievance process could be completed. Similarly, a school would have no duty to investigate harassment against a student by an alumnus or other campus visitor who is not enrolled or employed by the school, regardless of the impact of the harassment on the targeted student or students' access to the school's education program or activity. This provision also fails to define what "specific circumstances" warrant permissive dismissal.

143.   The Final Rule fails to justify why a vast range of unwelcome sexual conduct is no longer within the ambit of Title IX's protections, or to square these new limits with the broad scope of conduct that the Supreme Court recognizes as covered by Title IX.  Nor does the Final Rule provide evidence that institutional resources were previously inappropriately directed at resolving claims of sexual harassment under Title IX.

### 4. The Final Rule imposes prescriptive new grievance procedures that are designed to protect accused students, not to address and remedy sex discrimination in schools.

144.   After greatly narrowing the range of conduct subject to Title IX protection, the Final Rule adds dozens of new procedural requirements that institutions must follow when investigating complaints.  These formalistic, prescriptive and burdensome requirements interfere with institutional expertise and responsibilities to respond to a wide range of conduct in schools. Further, the Final Rule fails to explain how these new requirements will reduce the prevalence of sexual assault and harassment, or otherwise promote the ends of Title IX.

#### a. *The Final Rule arbitrarily changes evidentiary standards and departs from agency practice.*

145.   The Final Rule provides that a recipient must "[s]tate whether the standard of evidence to be used to determine responsibility is the preponderance of the evidence standard or the clear and convincing evidence standard, apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment." *Id.* at 30,575 (§ 106.45(b)(1)(vii)).

146.   The Final Rule departs from decades of Department practice by requiring that institutions use the same standard of evidence for complaints against students as those against employees, and by making it harder for institutions to use the preponderance of the evidence

standard.  This is at odds with the standards used by the Department and other federal agencies in administratively enforcing federal civil rights laws, and frustrates Title IX's anti-discrimination mandate.  Use of a clear and convincing standard would effectively impose a higher burden of proof on complainants than respondents, in tension with the Final Rule's separate requirement that Title IX grievance procedures must treat complainants and respondents equitably, *id.* (§ 106.45(b)(1)(i)); *see also* 2011 DCL at 11 (explaining that "[g]rievance procedures that use [a clear and convincing] standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.").

147.    The Final Rule arbitrarily authorizes schools to impose a higher burden on proving sexual harassment allegations than any other disciplinary allegations even if other disciplinary proceedings carry an equal or greater sanction.  The Department fails to justify this inconsistency, nor does it address that such a heightened and unequal standard perpetuates pervasive stereotypes that complainants of sexual harassment and assault are more likely to fabricate allegations than students who report other conduct violations.

148.    Similarly, the Department failed to adequately explain why it has departed from the evidentiary norm for resolving discrimination claims.  The preponderance of evidence standard is used in adjudicating administrative and civil claims of civil rights violations, including claims under Title VI and Title VII.  *See* 2011 DCL at 11.  In the same vein, the Department previously required that institutions use a preponderance of evidence standard in Title IX investigations.  *Id*.

149.    Additionally, the Department fails to adequately explain the Final Rule's requirement that schools use the same standard of evidence for resolving claims of student-on-student harassment as faculty-on-student harassment.  In imposing this restriction, the Final Rule

arbitrarily fails to address how students are differently situated than employees, or why standards for adjudicating Title IX complaints should be dependent upon the bargaining power of particular employees or unions.

> **b. The Final Rule impermissibly requires institutions to adopt arbitrary and unreasonably onerous procedural rules that limit, rather than advance, Title IX's broad protections against sex discrimination.**

150.    The Final Rule mandates a variety of additional procedural requirements, *see* Final Rule at 30,575-78 (§ 106.45(b)), including that postsecondary institutions must provide for a live hearing and cross-examination by each party's "advisor of choice," and "not rely on any statement of [a] party or witness [that does not submit to cross-examination] in reaching a determination regarding responsibility," *id.* at 30,577 (§ 106.45(b)(6)(i)); that the decision-maker must "determine whether [a] question is relevant and explain any decision to exclude a question as not relevant" before allowing a party to answer a question posed during cross-examination; guarantee access to evidence to both parties, "including the evidence upon which the recipient does not intend to rely," *id.* at 30,576 (§ 106.45(b)(5)(vi)); and that institutions refrain from "restrict[ing] the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence," *id.* (§ 106.45(b)(5)(iii)).

151.    Such specific, costly, and onerous one-size-fits-all procedures arbitrarily restrict a school's expertise and flexibility in responding to sexual harassment, impose heightened due process requirements in adjudicating sexual harassment claims that create inexplicable incongruity with other disciplinary procedures, and pose confusing and unworkable situations for schools, including with respect to fulfilling additional legal and professional obligations.

152.    For example, in imposing live hearing and cross-examination requirements, the Final Rule fails to adequately explain why such legalized disciplinary hearings are necessary or

appropriate for all allegations of sexual harassment in the postsecondary education context. Schools routinely employ alternative practices that provide accurate and fair determinations in adjudicating sexual harassment allegations, as well as allegations with respect to violations of similar anti-discrimination laws and conduct that implicates equal or greater sanctions. Moreover, the Department acknowledges that live hearings and cross-examination are not necessary in resolving the same conduct at the K-12 level.

153.     The Final Rule declines to mandate live hearings and cross-examination for K-12 institutions based on the Department's finding that "parties in elementary and secondary schools generally are not adults with the developmental ability and legal right to pursue their own interests on par with adults." *Id.* at 30,364. However, the Final Rule mandates live hearings and cross-examination for minors at pre-K-12 schools who are sexually harassed at post-secondary institutions, including, *e.g.*, young children attending pre-schools housed on college campuses, high school students at academic or athletic summer camps, or high school students taking college courses for high school credit at local colleges, without justification or sufficient explanation. *Id.* at 30,493. Conversely, a college student or other adult experiencing harassment on a K-12 campus, such as a student teacher or volunteer, would be subject to the Final Rule's procedural requirements but would not be required to participate in a live hearing or cross-examination. Relatedly, for education programs or activities that are not schools, such as museums and libraries, the Final Rule applies the K-12 requirements, regardless of whether the complainant or harasser are children or adults. Finally, the Final Rule makes no distinction between high school students who are 18 or older, or college students under the age of 18, in creating these drastically different procedural requirements based on the type of institution where

the harassment occurred.  The Department has failed to justify or adequately explain these arbitrary distinctions.

154.    The Final Rule's live hearing and cross-examination provisions fail to account for the reality that students may, but need not, be represented by counsel, and that these hearings will in many cases be managed by personnel who are non-attorneys, lack knowledge of evidentiary rules, and may have difficulty making correct on-the-spot relevancy determinations of questions posed during cross-examination, as they will now be required to do.  *Id.* at 30,577 (§ 106.45(b)(6)(i)).

155.    The Final Rule's "advisor of choice" provision allows for complainants to be cross-examined by a number of people whose very presence could re-traumatize them, including a respondent's twin brother, a respondent's friend who witnessed the sexual assault at issue, or the respondent's parent.  The fact that an advisor need not undergo any specialized training before conducting this cross-examination, and that, unlike an attorney, need not be bound by any professional or ethical obligations further compounds this problem.  The Final Rule fails to account for the chilling effect caused by the new live hearing and cross-examination mandates.

156.    And because the Final Rule explicitly demands that "the decision-maker(s) must not rely on any statement of [a] party or witness in reaching a determination regarding responsibility" if such "a party or witness does not submit to cross-examination at the live hearing," *id.* at 30,577 (§ 106.45(b)(6)(i)), many complainants will be faced with the difficult choice of deciding between submitting to a traumatizing cross-examination, or withdrawing from the process knowing that a finding of responsibility will be less likely.  Accordingly, the Final Rule would inexplicably bar schools from using a respondent's confession, statement against interest, or documentary evidence proving harassment occurred if the respondent refuses to

participate in cross-examination.  This effectively requires schools to ignore evidence that would be plainly admissible in court proceedings under the Federal Rules of Evidence and gives respondents a get-out-of-jail-free card to avoid a finding of responsibility.  The Department fails to justify how these procedures will further Title IX's anti-discrimination mandate of preventing, addressing, and remedying sexual harassment.

157.    The Final Rule's requirement that the decision-maker at a Title IX hearing cannot be the same person as a Title IX Coordinator, *or* the person who investigated the underlying conduct, *id.* (§ 106.45(b)(7)(i)), arbitrarily invades on institutional flexibility, and will require institutions to either hire new staff or divert resources from other critical institutional functions.

158.    Similarly, the Final Rule includes an ambiguous and overbroad conflict of interest rule, requiring "that any individual designated by a recipient as a Title IX Coordinator, investigator, decisionmaker, or any person designated by a recipient to facilitate an informal resolution process, not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent."  Final Rule at 30,575 (§ 106.45(b)(1)(iii)).  Because the Final Rule newly confers on respondents the "right" under Title IX to contest findings of responsibility based on a school's alleged noncompliance with the prescriptive new grievance procedures, this provision may enable respondents to evade responsibility and prolong grievance proceedings based on the mere assertion that an individual involved in the grievance process was "biased" against that student or "respondents generally." This may very well give schools pause on whether to appoint individuals with a background in sexual violence prevention or a known interest in protecting survivors to these positions, even if the individual is committed to impartiality in this role.

159.     Department guidance has made clear that in crafting responses to sexual harassment, the "critical issue under Title IX is whether responsive action that a school could reasonably be expected to take is effective in ending the sexual harassment and in preventing its recurrence." 1997 Guidance at 12,034. In accomplishing this obligation, school personnel should be offered "flexibility in how to respond to sexual harassment," and, accordingly, the Department has consistently acknowledged that "[p]rocedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes, and administrative structures, State or local legal requirements, and past experience." *Id.* at 12,045; *see also* 2001 Revised Guidance at 29; 2011 DCL at 9.

160.     The Final Rule fails to justify this departure from Department practice and resulting intrusion into institutional autonomy.

### 5.  The Final Rule hinders institutions' ability to apply stronger state or local protections against sexual harassment.

161.     The Department asserts that the "dismissal of a formal complaint . . . does not preclude a recipient from addressing the alleged misconduct under other provisions of the recipient's own code of conduct," and that "nothing in these final regulations . . . inherently prevents recipients from complying with State and local laws or policies." Final Rule at 30037-38, 30454, 30576. However, these assertions are belied by the many provisions in the Final Rule that significantly constrain how schools may pursue investigations under other laws or policies.

162.     The Final Rule's preemption provision provides that "[t]o the extent of a conflict between State or local law and title IX as implemented by §§ 106.30, 106.44, and 106.45, the obligation to comply with §§ 106.30, 106.44, and 106.45 is not obviated or alleviated by any State or local law." *Id.* at 30,573 (§ 106.6 (h)). This provision—which was not included in the

Proposed Rule—may obstruct institutions' ability to enforce state and local laws that are more protective of students facing harassment than the Final Rule.

163.    As a result, New York educational institutions may be precluded from providing certain protections required by the State's Enough is Enough law, including the right of reporting individuals to file complaints against individuals at different educational institutions, to obtain one-way no-contact orders or the requirement that investigators and adjudicators be trained under a "trauma-informed" approach, without potentially running afoul of the Final Rule's preemption provision.  *See* N.Y. Educ. Law §§ 6440(2), 6444(4)(a), 6444 (5)(c)(ii).

164.    The Final Rule fails to grapple with these and other potential conflicts, or their damaging effect on the ability of institutions to maintain New York's carefully considered standards for addressing sexual harassment, including sexual assault.

165.    The Final Rule's retaliation provision provides that "[i]ntimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes [unlawful] retaliation."  Final Rule at 30,578 (§ 106.71(a)).

166.    Institutions may therefore be reluctant to address misconduct that does not meet the Final Rule's definitions under their own codes of conduct, if doing so could expose these institutions to Title IX liability.

167.    The Department fails to grapple with the deterrent effects of this provision, or otherwise advise institutions how to maintain their own investigations initiated concurrently with or following the dismissal of a formal complaint.

168.     Institutions face additional challenges should they attempt to investigate sexual harassment before, or concurrent with, a Title IX investigation.  Institutional staff who question a respondent about sexual harassment allegations may not use any of the answers provided if a formal complaint is later filed against the respondent.  *Id.* at 30,287.  This exclusionary rule defies logic and appears to prevent an institution from using information about a respondent's actions—including conduct that plainly violates Title IX—simply because it was discovered before a formal complaint was filed.  Consequently, a school could be prevented from responding to sexual harassment about which it has *actual knowledge*, at plain odds with its statutory obligations under Title IX, if such knowledge was acquired too early.

169.     The Department fails to address the Final Rule's restraints on institutional autonomy and its conflict with schools' obligations to prevent, address, and remedy all sexual harassment that is impeding or denying access to its education program or activity.

> **6.  The Final Rule arbitrarily removes important notice requirements for prospective and current students and employees, but adds burdensome new publication requirements.**

170.     The Final Rule, without sufficient justification, removes longstanding requirements that institutions broadly disseminate their Title IX nondiscrimination policies, including striking requirements in the existing 34 C.F.R. § 106.9 that schools publish their policies in local newspapers, alumni publications, and written communications distributed to all students and employees, newly limiting the publication requirement to a school's "website, if any, and in each handbook or catalog" made available to applicants, students, parents, and employees.  Final Rule at 30,573 (§ 106.8(b)).  The Final Rule removes the express requirements, now contained in 34 C.F.R. § 106.9, that a school's policies be disseminated to persons involved in admissions or recruiting of students or staff.  *Id.*  It also unjustifiably amends

the longstanding requirement that a school "shall not use or distribute a publication . . . which suggests, by text or illustration, that [it] treats applicants, students, or employees differently on the basis of sex," newly limiting it to publications "stating" a discriminatory policy. *Id.*

171.    Since 1975, the Department has required that institutions claiming a religious exemption submit a letter to the Department stating which parts of the regulation conflict with a specific tenet of the religion. 34 C.F.R. § 106.12(b). Institutions have also been required to provide assurances to the Department of their Title IX compliance. 34 C.F.R. § 106.4(a). Without justification, the Final Rule provides that an "institution is not required to seek assurance from [the Department] in order to assert" a Title IX religious exemption. *Id.* at 30,573 (§ 106.12(b)). Moreover, in the event that the Department notifies an institution that it is under investigation for noncompliance with Title IX, it "may at that time raise its exemption." *Id.*

172.    The Department fails to offer an adequate justification for its proposed changes in light of longstanding practice. Nor does the Department explain how these requirements confuse or burden recipients; nor does it point to any evidence of such confusion or burden.

173.    The Final Rule arbitrarily fails to consider how these relaxed requirements conflict with other key obligations under Title IX, and their effect on students and prospective students. Since 1975, the Department has required institutions to provide students with notice of the institution's compliance with Title IX. 34 C.F.R. § 106.9(a). The Final Rule similarly requires institutions to notify prospective and current students and employees of their Title IX policies. 34 C.F.R. § 106.8(a).

174.    By excusing an institution from submitting a religious exemption to the Department until it is under investigation, the Final Rule allows recipients to avoid notice provisions with impunity, and discriminate against students without warning. Such advanced

notice of an institution's exemption from Title IX is especially important to women, LGBTQ students, pregnant or parenting students, and students seeking birth control or other reproductive health care.

175.    While easing these other requirements, the Final Rule newly imposes a mandate that schools publish all Title IX trainings on their websites, or otherwise make them publicly available, for a period of seven years.  Final Rule at 30,578 (§ 106.45(b)(10)(i)(D)).  This requirement was not included in the Proposed Rule and was not subject to notice and comment.

### 7.  The Final Rule ignores compliance with contrary federal law.

176.    The Final Rule either ignores or fails to address its interaction or conflict with other federal laws, including federal privacy laws, other civil rights laws protecting students and school employees, and protections for individuals with disabilities.

#### a.  *The Final Rule allows for the disclosure of sensitive education records in conflict with FERPA.*

177.    FERPA provides that no institutions receiving federal funds shall have a policy or practice of permitting the release of a student's educational records to private parties without the written consent of that student's parents.  20 U.S.C. § 1232g(b)(1).  Education records are any "records, files, documents, and other materials" that contain information "directly related to a student," that are "maintained by an educational agency or institution."  *Id.* § 1232g(a)(4)(A).

178.    The Final Rule's blanket requirement that an institution provide parties an opportunity to "inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely," Final Rule at 30,576 (§ 106.45(b)(5)(vi)), conflicts with an institution's FERPA obligations, as much of the evidence obtained through Title IX

investigations is sensitive personally identifiable information, and may be included within education records.

179.    Although the Final Rule provides that medical information cannot be disclosed without consent, the Final Rule still allows respondents and advisors to Title IX investigations to access other sensitive information, such as a complainant's academic transcript in direct contravention of FERPA's broad protections.

### b. The Final Rule's new definition of "sexual harassment" conflicts with Title VI, Section 504, Title II, and Title VII.

180.    The Final Rule's redefinition of sexual harassment departs from the definition used by the Department for discriminatory harassment under Title VI, Section 504, and Title II. It also conflicts with the definition of harassment used by the Equal Employment Opportunity Commission and courts for cases involving sexual harassment against employees of educational institutions.  These inconsistent definitions conflict with the Department's longstanding policy of enforcing all civil rights laws similarly, and its obligation under Executive Order 12866 to "avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies."  Moreover, this conflict exposes students and employees of educational institutions to inconsistent protections, permitting or requiring institutions to ignore harassment against students that it must address for employees.  It also mandates that schools maintain separate, inconsistent regimes to resolve harassment complaints depending only on whether the underlying conduct is based on sex or some other protected classification.

181.    The Final Rule's redefinition of "education program or activity" arbitrarily limits institutions' ability to respond to sexual harassment, while the Department's policies for other forms of discriminatory harassment are unchanged.  The Final Rule's redefinition thus creates a weaker enforcement regime for sexual harassment relative to all other forms of harassment.

182.    The Final Rule fails to address how schools should—or must—respond to harassment based on sex and one or more other bases, such as race, national origin, or disability. An African American student targeted for harassment because of the student's race and sex, for example, will now need to navigate multiple processes and conflicting standards in seeking help from the student's school, as will school officials charged with handling the complaint.

183.    Similarly, the Final Rule fails to instruct institutions on how to investigate sexual harassment complaints by employees, including student employees, that implicate both Title IX and Title VII.  The Final Rule mandates that a school must dismiss a complaint that does not rise to the level of sexual harassment as defined in the Final Rule, *id.* at 30,574 (§ 106.45(b)), even though this conduct may be actionable under Title VII's hostile work environment or sex-based harassment standards.  Accordingly, a school faces a Catch-22: either dismiss a complaint made by an employee alleging conduct that does not rise to the level of sexual harassment as defined in Title IX and risk liability under Title VII, or pursue an investigation of allegations under Title VII and risk liability under Title IX.

184.    Finally, the Final Rule fails to address likely conflicts between the onerous procedural requirements, including the cross-examination and live hearing requirements, and schools' Title VI obligations to serve students and parents with limited English proficiency.

### c. *The Final Rule undermines protections for individuals with disabilities.*

185.    The Final Rule fails to grapple with institutions' concurrent obligations to students and employees under federal disability rights laws, including Section 504, Title II, and the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482 ("IDEA"), and the conflicts between the Final Rule's prescriptive procedural requirements and individuals' rights under these laws.

186.    For example, the Final Rule's definition of "formal complaint" makes no exception for students with learning disabilities, students who are visually impaired, or students with other disabilities who would have extreme difficulty submitting a signed, written complaint. The Final Rule's definition of "complainant" also presumes that students are both aware of and have access to the Title IX coordinator and other responsible staff, without regard for the challenges this may pose for students with particular disabilities.

187.    The Final Rule's live hearing requirement will similarly negatively impact students with disabilities, who may not, or cannot, participate fully in such hearings.  The cross-examination requirement, and the other procedural requirements in the Final Rule, may also stigmatize and discriminate against students with disabilities.

## 8. The Final Rule fails to acknowledge and quantify widespread harms and costs to schools resulting from its onerous requirements.

188.    The Final Rule includes a Regulatory Impact Analysis purporting to quantify the costs and benefits of the Final Rule.  *See* Final Rule at 30,563-70.

189.    The cost-benefit analysis in the Final Rule expressly refuses to quantify the impact of the Final Rule on sexual assault incidents and harassment, despite the fact that such incidents have concrete and obvious costs and are the very conduct the Final Rule governs.  *Id.* at 30,539.  Although the Department itself acknowledges that the Final Rule will result in a net decrease of investigation into sexual harassment, it fails to consider the costs of a reduction in reporting, and instead only considers the potential cost savings of such reductions.  *Id.* at 30,547, 30,551.  Despite expressly declining to assess the true costs of the Final Rule on sexual harassment outcomes, the Department concluded without evidence that "the mandatory offer of supportive measures in § 106.44(a)" will reduce negative outcomes.  *Id.* at 30,545.

190. The Final Rule further ignores or underestimates increased compliance and legal costs that will result from implementation of the Final Rule. *Id.* at 30,549.

191. Moreover, the Final Rule's estimate of the annual rate of Title IX complaints based on sexual harassment or sexual violence is unreasonably low, and fails to account for current trends in sexual harassment complaints, including in the Department's own data.

## INJURY TO PLAINTIFF

192. The Final Rule harms Plaintiff's economic, sovereign, and quasi-sovereign interests.

### A. The Final Rule Harms New York's Economic Interests.

193. The State, through NYSED and the SUNY system, directly oversees over 5,000 public elementary and secondary schools, serving approximately 2.6 million students, and public colleges and universities, serving more than 700,000 students in two-year, four-year, and graduate programs.[18] SUNY and NYSED are governed by the Board of Regents, which is responsible for the general management and supervision of all educational activities within the State, including K-12 schools, postsecondary institutions, and cultural institutions. In addition, there are more than 100 private colleges and universities in the State that are subject to Title IX's requirements, serving over 500,000 students.[19] In total, New York educational institutions affected by the Final Rule serve over 3.8 million students.

194. New York's educational institutions will expend significant financial resources in order to implement the Final Rule. Although the Final Rule acknowledges some costs to institutions in implementing the Final Rule, it fails to adequately consider the full range of

---

[18] N.Y. State Educ. Dep't, NYSED Data Site, https://data nysed.gov/ (containing links to higher education and public K-12 school enrollment data for the 2018-2019 school year).
[19] *Id.*

administrative and financial burdens that institutions will experience or to weigh those costs against any benefits of these onerous requirements.

195.    The Final Rule imposes a host of new, stringent limitations on the ability of Plaintiff's educational institutions to prevent, respond to, and investigate allegations of sexual harassment and assault, and other conduct, along with onerous, arbitrary procedural requirements to resolve complaints of sexual harassment.  These provisions will impose new, unjustified financial and administrative burdens on New York's educational institutions.  Plaintiff and its schools must implement these costly changes, or risk losing billions in critical federal funds that they rely on to provide education to New York students.  SUNY, the largest system of public colleges and universities in New York and one of the largest public higher education systems in the country, receives over $1 billion annually in federal funds.

196.    First, the Final Rule mandates dozens of new procedural requirements, *see* 106.45(b), including, that higher education institutions provide for a live hearing, including cross-examination "conducted directly, orally, and in real time by the party's advisor of choice." Final Rule at 30,577 (§ 106.45(b)(6)(i)).  If a student does not have an advisor, the institution must provide one at no cost to the student.  *Id.*  An institution may "not rely on any statement of [a] party or witness [that does not submit to cross-examination] in reaching a determination regarding responsibility."  *Id.*  For virtual live hearings, or where a complainant does not wish to be in the same room as the respondent, institutions are required to provide "technology enabling participants simultaneously to see and hear each other."  *Id.*

197.    The Final Rule also prohibits the decision-maker at grievance hearings from being the person who investigated the underlying complaint, or the person who serves as Title IX coordinator, requiring schools to hire multiple people to perform functions previously performed

by one person.  *See* Final Rule at 30,577 (§ 106.45(b)(7)(i)).  Where schools lack resources to hire new employees to fulfill these roles, they will be compelled to divert existing staff away from other important educational functions to comply with the prescriptive Title IX requirements.

198.    Plaintiff's educational institutions will incur significant expenses to understand and comply with the Final Rule and its lengthy, cumbersome, and often confusing new mandates, including by: familiarizing themselves with the extensive requirements of the Final Rule, considering and establishing new policies and procedures to comply with those requirements, training employees and students on their rights and obligations, hiring and training additional staff to fulfill each stage of the grievance process, purchasing new technologies to comply with the live hearing requirement, and complying with other aspects of the Final Rule.

199.    Smaller institutions, such as community colleges, will be hardest hit by the economic and administrative burdens caused by compliance with the Final Rule's new grievance procedures.  Not only will these institutions have to hire new staff, but, as these institutions typically do not have in-house counsel, they also will have to retain outside attorneys and assume the high cost of obtaining legal advice on how to comply with the Final Rule.

200.    The complicated matrix created by the Final Rule's definitions and prescriptive grievance procedures will increase institutions' legal and compliance costs.  The Final Rule's inconsistencies with federal, state, and local laws, and long-standing practices means that institutions will need to spend more time evaluating how to comply with various conflicting requirements, and will face new threats of liability if they comply with the Final Rule.  For example, compliance with the Final Rule could expose institutions to liability under Title VII, given that Title VII's definition of actionable sexual harassment covers a much broader range of

conduct than the Final Rule's definition. Similarly, compliance with the Final Rule could expose institutions to liability under Section 504 or Title II, as the Final Rule's live hearing and formal complaint requirements do not currently provide accommodations for students whose disabilities would limit their ability to meet these requirements.

201. Institutions may also need to expend significant resources on conducting successive or parallel investigations where underlying conduct overlaps with other legal or code of conduct prohibitions, to the extent such proceedings are not barred by the Final Rule's preemption and retaliation provisions. Moreover, both complainants and respondents will have new grounds to challenge institutional compliance with the Final Rule, including respondents' newly-conferred ability to challenge alleged procedural noncompliance with the Title IX regulations, that will likely force schools to assume the burdens and costs associated with investigating and resolving those complaints, and in defending themselves in any investigation by the Department into alleged procedural violations of the detailed new rules.

202. Alone and in combination, these severe constraints on the operation of Plaintiff's institutions will dramatically undermine their effectiveness and efficiency, and lead to significantly increased costs.

**B.** **The Unreasonably Short Implementation Deadline in the Midst of the Global COVID-19 Pandemic Will Harm Plaintiff.**

203. In normal times, it would be difficult, if not impossible, for most schools in New York and elsewhere to comply with the Final Rule (including familiarizing themselves with the rule, revising policies, conducting trainings, and purchasing technology) within the 87-day period between the Final Rule's publication and effective dates, particularly as the Final Rule represents a radical alteration of the Department's decades-old policies. The global COVID-19 pandemic has severely disrupted school operations in New York and across the country, and will

likely to continue to do so in the coming months and beyond. The Department's refusal to provide a reasonable implementation period under these circumstances is patently unreasonable and indefensible. Institutions' implementation of the Final Rule will impose undue economic and administrative burdens on New York's educational institutions, exacerbated by the pandemic-related fiscal and administrative challenges they are facing.

204. At a time when institutions' focus is properly on maintaining operations and educating their students under unprecedented conditions, the need to devote significant resources this summer to implementation of the Final Rule will impinge on these efforts and harm schools and their students as a result.

205. Following the Governor of New York's declaration of a state of emergency on March 7, 2020 due to COVID-19, New York State has been in the throes of an unprecedented public health crisis. *See* N.Y. Exec. Order 202, *Declaring a Disaster Emergency in the State of New York* (Mar. 7, 2020).

206. New York is one of the epicenters of the pandemic and has suffered catastrophic losses due to COVID-19. As of June 3, 2020, nearly 375,000 people in the State have been diagnosed with COVID-19 and nearly 25,000 New Yorkers had died from it.[20] In New York City alone, 201,806 residents have been diagnosed with COVID-19, 52,456 have required hospitalization to treat it, and at least 16,933 have died from it.[21] Nationally, nearly 1.8 million people have been diagnosed with COVID-19 and over 100,000 people have died from the disease.[22]

---

[20] N.Y. Dep't of Health, COVID-19 Tracker, https://covid19tracker.health ny.gov (last accessed June 3, 2020).
[21] N.Y.C. Dep't of Health & Mental Hygiene, COVID-19: Data, https://www1 nyc.gov/site/doh/covid/covid-19-data.page (last accessed June 3, 2020).
[22] Centers for Disease Control & Prevention, CDC COVID Data Tracker, https://www.cdc.gov/covid-data-tracker/ (last accessed June 3, 2020).

207.     In response to this extraordinary public health emergency, the Governor ordered all schools in New York to close temporarily on March 18, 2020.  N.Y. Exec. Order No. 202.4. This executive order was extended several times and remains in effect.

208.     As a result, most public and private K-12 schools, colleges, universities, and other educational institutions in the State are closed, with millions of students being forced to learn remotely.  The same is true for most educational institutions in other states, which are attended by many of the State's residents.

209.     This sudden transition to remote learning has transformed the educational landscape of New York State.  With students, and institutional staff scattered among homes and offices across the country, educational institutions now face the daunting task of teaching, counseling and providing critical services to students remotely.

210.     For most schools, moving virtually all of the services provided to students online requires an institution-wide overhaul.  This process strains institutional resources and is immensely challenging for teachers, faculty, students and their caretakers.

211.     In addition to educating over three million students, many public universities in New York have also been called upon to provide critical medical care and public health expertise as part of the State's efforts to combat COVID-19.  Staff within the SUNY hospital system, in particular, are on the frontlines of fighting this pandemic.

212.     The changes required by the lengthy Final Rule would be difficult for institutions to digest and implement under normal circumstances.  But in the midst of a global pandemic, the burden placed on institutions is not only untenable, but risks undermining the health and safety of New York residents.

213.    Certain changes mandated by the Final Rule, such as the live hearing requirement, are practically impossible to implement while schools are closed.  The Final Rule's significant departure from Department practice will also sow confusion for ongoing Title IX investigations, many of which are already complicated by school closures.

214.    Given the incredible challenges already facing New York's educational institutions, they should not be asked to divert critical resources in order to implement the Final Rule's arbitrary, unlawful, and unprecedented changes.

215.    Ignoring requests by states and educational institutions to delay issuance of the Final Rule during the pandemic, the Department refused to delay publication of the rule and ordered institutions to implement it in a mere 87 days.  After the Final Rule was released, Secretary DeVos dismissed concerns about the short implementation period, stating, "We've been working on this for more than two years so it's not a surprise to institutions that it was coming,"[23] disregarding the fact that the Final Rule differed in significant respects from the Proposed Rule and the virtual impossibility of digesting the lengthy, complex rule; developing and approving new policies to implement the significant changes from existing practice and onerous new procedural requirements; training faculty, staff, and students on their modified rights and obligations under the Final Rule; and simultaneously dealing with the unprecedented and evolving changes related to the COVID-19 pandemic, all during the summer months.

C.    **The Final Rule Interferes with Plaintiff's Effective Administration and Enforcement of Its State Laws and Institutional Policies.**

216.    New York has enacted laws that carefully balance the rights of students to attend schools without experiencing sex discrimination, with concerns regarding fairness to

---

[23] Mark Keierleber, *DeVos releases Title IX campus sexual assault rule, courting controversy amid coronavirus pandemic*, LA School Report (May 6, 2020), http://laschoolreport.com/devos-releases-title-ix-campus-sexual-assault-rule-courting-controversy-amid-coronavirus-pandemic/.

respondents, and the interests of educational institutions to respond in an appropriate manner for their specific campuses. New York schools have also developed policies, practices, and procedures for investigating sex discrimination and other conduct violations consistent with federal and state due process requirements and codes of conduct, which ensure that educational environments are appropriately protected from various conduct that prevents students from learning and thriving. The Final Rule upsets these carefully crafted balances, frustrates Plaintiff's ability to comply with New York law and its own institutional policies, and adds confusion regarding how Plaintiff must investigate and remedy sexual harassment.

217. First, the Final Rule's narrow definitions, restrictions on institutional responses, and dismissal provisions conflict with New York's Enough is Enough law, which was enacted to combat sexual assault on college and university campuses statewide. For example, that law applies to students "regardless of whether the violation occurs on campus, off campus, or while studying abroad." N.Y. Educ. Law § 6440(6). The Final Rule's geographic limitations on what constitutes an education program or activity, *see* 106.44(a), directly conflict with this provision. Enough is Enough explicitly includes confidentiality and privacy protections for students, including that institutions must comply with FERPA, *see id.* § 6440(2), and that reports to institutions "shall be investigated in accordance with institution policy and a reporting individual's identity shall remain private at all times if said reporting individual wishes to maintain privacy," *see id.* § 6444(1)(f); *see also id.* §§ 6444(1)(c)-(e), 6446. The Final Rule's mandatory disclosure requirement, Final Rule at 30,576 (§ 106.45(b)(5)(vi)), also conflicts with Enough is Enough's requirement that schools comply with FERPA.

218. Second, the Final Rule creates uncertainty with respect to how institutions should investigate claims of sexual harassment and sexual assault. The Final Rule's restrictions on

which university staff can receive "formal complaints" interferes with procedures that have been collectively bargained for, and through which employees covered under certain contracts agree to become "responsible employees." The Final Rule offers no guidance on how institutions can reconcile its unduly restrictive definition of "sexual harassment" with the definitions offered in competing federal laws or with existing duties under collective bargaining agreements.

219. Third, the Final Rule fails to sufficiently define key terms, including its failure to define "bias" and "conflict" in the requirement that decision-makers must be free of bias and conflict, and its failure to define "specific circumstances [that] prevent the recipient from gathering evidence sufficient to reach a determination" with respect to permissive dismissals. *See* Final Rule at 30,576 (§ 106.45(b)(3)(ii)).

220. Fourth, the Final Rule fails to account for the fact that institutions will have to notify students of numerous, significant changes to its Title IX framework at a time when all students are away from schools.

221. Finally, the Final Rule also conflicts with New York schools' policies and procedures governing a wide variety of conduct to ensure full participation and access to education, while balancing due process concerns as required by federal and state law.

### D. The Final Rule Harms New York's Educational Institutions and the Provision of Education to All Students.

222. The Final Rule interferes with the right and statutory obligation of educational institutions in New York and throughout the country to provide a safe, nondiscriminatory learning environment for their students. Schools have a legal obligation and pedagogical interest in ensuring that all students—including survivors of sexual harassment—are able to learn in a safe environment. As the Department has long recognized, sex discrimination threatens the maintenance of a safe learning environment, and "can interfere with a student's academic

70

performance and emotional and physical well-being." 2001 Revised Guidance at ii. Accordingly, "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn." *Id*.

223. By interfering with a school's ability to maintain a learning environment conducive to teaching and learning, restrictions on the school's ability to respond to and prevent harassment like those contained in the Final Rule frustrate that interest. The Final Rule directly interferes with schools' ability to take the many preventive and proactive actions previously required by Title IX. By arbitrarily narrowing the definition of sexual harassment and limiting schools' ability to respond, the Final Rule imposes barriers on schools' ability to effectively address the broad range of sex-based misconduct that impedes or denies students' educational opportunities, in conflict with Title IX's statutory mandate and schools' educational missions.

224. Not only will their educational access be limited, but many students may opt to miss classes or drop out of school altogether due to a lack of safety, and compounding frustration due to their school's lack of response. These students experiencing sexual harassment at school will no doubt face compounding physical, psychological, and emotional trauma as they watch the perpetrators go unpunished. As a result, many victims of harassment may reasonably choose not to report it to their schools, to avoid being subjected to the onerous and lengthy grievance procedures that may result in no relief or protection from future harassment. The hostile environment that many survivors will face—either during the prolonged period of the grievance procedures or from remaining silent—will harm them and their classmates.

### E. The Final Rule Harms Plaintiff's Interests in Protecting Civil Rights.

225. Plaintiff has an interest in protecting the civil rights of its citizens, which the Final Rule dramatically undermines.

226. The Final Rule would impose disparate and harmful burdens on women, LGBTQ students, students of color, and students with disabilities. For example, women and LGBTQ students are more likely to experience sexual harassment and sexual assault in schools as compared to other populations.[24] The Final Rule's unlawfully narrow definitions and limitations on actionable behavior are likely to hinder institutions' ability to take preventive or remedial action, and will therefore cause even more women and LGBTQ students to experience sexual harassment and sexual assault while at school.

227. Many of the Final Rule's restrictive definitions and heightened grievance procedures will disproportionately impact students with disabilities by imposing onerous barriers to seeking and obtaining relief from sexual harassment imposed by the Final Rule.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Administrative Procedure Act – Exceeds Statutory Authority)**

228. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

229. Under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

230. Defendants may only exercise authority conferred by statute.

231. The Final Rule exceeds Defendants' authority under Title IX because the Final Rule legislates and implements narrow definitions and requirements that frustrate and limit the

---

[24] *See* Ass'n of Am. Univs., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct* xii–xvi (2017), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf.

obligation of schools to ensure that no person "shall . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" any federally funded education program or activity "on the basis of sex." 20 U.S.C. § 1681(a).

232. In addition, the Final Rule establishes prescriptive grievance procedures that purport to regulate conduct outside of Title IX's prohibition of discrimination based on sex and undermine the autonomy of New York's education institutions. Title IX only authorizes the Department to issue rules "to effectuate the [anti-discrimination] provisions of [Title IX]." 20 U.S.C. § 1682. The Final Rule exceeds this authority by casting a school's actual or alleged noncompliance with the prescriptive grievance procedures as a form of sex discrimination, and using that label to permit students accused of sexual harassment to challenge the outcome of grievance procedures through the Title IX administrative enforcement process, absent *any* evidence that accused students have been systematically disadvantaged "on the basis of sex" or that the conferral of these new rights will advance Title IX's purpose.

233. The Final Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA. 5 U.S.C. § 706(2)(C).

234. Defendants' violation causes ongoing harm to Plaintiff and its residents.

**SECOND CLAIM FOR RELIEF**

**(Administrative Procedure Act – Not in Accordance with Law)**

235. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

236. Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

237.    The Final Rule conflicts with Title IX, including by, *inter alia*, narrowing the scope of protected activity in contravention of the statute's broad anti-discrimination mandate, and narrowly redefining the term "program or activity" only in the context of sexual harassment.

238.    The Final Rule conflicts with FERPA, which prohibits the unauthorized disclosure of students' educational records.  20 U.S.C. § 1232g(b)(1).

239.    The Final Rule conflicts with Section 504, which prohibits the federal government from discriminating against individuals with disabilities.  29 U.S.C. § 794(a).

240.    The Final Rule conflicts with Executive Order 12866 which, *inter alia*, instructs that an agency "shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies."  Exec. Order 12866 § 1(b)(10), 58 Fed. Reg. 51,735 (Sept. 30, 1993).  The Final Rule conflicts with the unamended portions of the Department's Title IX regulations by, for example, (a) adding a new definition of "program or activity" applicable only to sexual harassment that is inconsistent with the existing, unchanged definition of the term in 34 C.F.R. § 106.2(h), and (b) restricting schools from responding to or remedying sexual harassment, in conflict with the longstanding and continuing requirement that schools affirmatively address all forms of discrimination on the basis of sex contained in 34 C.F.R. § 106.3(b).  The Final Rule also conflicts with the Department's regulations governing its enforcement of discriminatory harassment based on other protected classifications under Title VI and Section 504; other Department regulations governing student privacy, language access, and disability rights; and Title IX regulations promulgated by other federal agencies.

241.    The Final Rule further conflicts with Executive Order 12866, which mandates that an agency "tailor its regulations to impose the least burden on society, including individuals, businesses of different sizes, and other entities (including small communities and government

entities)," Exec. Order 12866 § 1(b)(11), by imposing uniform, onerous grievance procedures and procedural requirements on all educational institutions, in disregard of the significant burdens it will impose on institutions.

242. The Final Rule is therefore "not in accordance with law" as required by the APA. 5 U.S.C. § 706(2)(A).

243. Defendants' violation causes ongoing harm to Plaintiff and its residents.

## THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act – Arbitrary and Capricious)

244. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

245. The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

246. The Final Rule is arbitrary and capricious because Defendants' justification for their decision runs counter to the evidence before the agency, relies on factors Congress did not intend the agency to consider, and disregards material facts and evidence.

247. The Final Rule is arbitrary and capricious because its definitions and requirements create unworkable situations for Plaintiff and its institutions that frustrate the goals of Title IX and impose costly and confusing requirements.

248. The Final Rule is arbitrary and capricious because it fails to adequately justify its departure from decades of consistent and well-settled policy.

249. The Final Rule is arbitrary and capricious because it fails to consider important aspects of the problem, including the Final Rule's consequences on the reporting of sexual

harassment, its discriminatory impact on certain populations, and its interference and conflict with the administration of FERPA, Title VI, Title VII, Section 504, Title II, and the IDEA.

250. The Final Rule is arbitrary and capricious because Defendants conducted and relied on a flawed cost-benefit analysis, citing benefits the Final Rule would confer without any evidentiary basis, and failing adequately to account for the true costs the Final Rule will impose, including the significant costs to Plaintiff and to the public health and safety of their residents.

251. The Final Rule is arbitrary and capricious because it fails to consider important aspects of the problem, including the Rule's interference and conflict with the administration of FERPA, Title VI, Title VII, Section 504, Title II, and the IDEA.

252. The Final Rule is arbitrary and capricious because Defendants predetermined its outcome.

253. The Final Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A).

254. Defendants' violation causes ongoing harm to Plaintiff and its residents.

## FOURTH CLAIM FOR RELIEF

### (Administrative Procedure Act—Without Observance of Procedure Required by Law)

255. Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

256. The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

257. The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(c); *see also id.* § 553(b).

258.     The regulatory impact analysis in the Proposed Rule did not sufficiently identify and quantify the costs and benefits of the rulemaking, evading the APA's critical procedural protections that ensure agency regulations are tested through exposure to public comment, and denying Plaintiff and other affected parties an opportunity to present comment and evidence to support their positions, in violation of 5 U.S.C. § 706(2)(D).

259.     Certain provisions of the Final Rule, including the preemption provision and requirement that schools publish all Title IX training materials, were not included in the Proposed Rule and were not otherwise subject to notice and comment, evading the APA's critical procedural protections that ensure agency regulations are tested through exposure to public comment, and denying Plaintiff and other affected parties an opportunity to present comment and evidence to support their positions, in violation of 5 U.S.C. § 706(2)(D).

260.     Defendants' violations cause ongoing harm to Plaintiff and its residents.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1.     Declare that the Final Rule is in excess of the Department's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

2.     Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

3.     Declare that Defendants failed to observe procedure required by law in issuing the Final Rule, in violation of 5 U.S.C. § 706(2)(D);

4.     Enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Final Rule;

5.     Postpone the effective date of the Final Rule pending judicial review pursuant to 5 U.S.C. § 705;

6.     Vacate and set aside the Final Rule in its entirety;

7.     Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

8.     Grant other such relief as this Court may deem proper.


DATED:  June 4, 2020                    Respectfully submitted,

                                        LETITIA JAMES
                                        *Attorney General of the State of New York*

                                        Matthew Colangelo
                                          *Chief Counsel for Federal Initiatives*

                                        Elena Goldstein
                                          *Deputy Chief, Civil Rights Bureau*

                                        By: /s/ Joseph Wardenski
                                        Joseph Wardenski, *Senior Trial Counsel*
                                        Morenike Fajana, *Special Counsel*
                                        Lindsay McKenzie, *Assistant Attorney General*
                                        Amanda Meyer, *Assistant Attorney General*
                                        Office of the New York State Attorney General
                                        28 Liberty Street
                                        New York, NY 10005
                                        Phone: (212) 416-8441
                                        Fax: (212) 416-6007
                                        Joseph.Wardenski@ag.ny.gov

                                        *Attorneys for the State of New York*