# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK and THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, | |
| Plaintiffs, | Civil Action No. 1:20-cv-4260-JGK |
| v. | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF EDUCATION and ELISABETH DEVOS, *in her official capacity as the Secretary of Education,* | |
| Defendants. | |

## INTRODUCTION

1.      For nearly fifty years, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), has been a crucial tool for addressing and eradicating sex-based discrimination in federally funded education programs and activities.  Under the landmark federal civil rights law, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX's expansive prohibitions have protected generations of students, employees, and others from the myriad forms of sex-based discrimination in elementary and secondary schools, colleges, universities, and other entities offering education programs and activities.[1]

2.      On May 19, 2020, the U.S. Department of Education (the "Department") radically and unjustifiably amended the Department's longstanding Title IX implementing regulations

---

[1] For ease of reference, this Complaint collectively refers to covered entities as "schools" or "institutions," although Title IX also applies to other recipients offering education programs or activities (*e.g.*, libraries, museums).

through its Final Rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Final Rule").  The Final Rule guts decades of firmly established policy on schools' obligations to respond to sexual harassment and other forms of sex discrimination; strips existing protections for students and others targeted for and victimized by sexual harassment; invents new rights for individuals accused of sexual harassment that find no basis in the letter or spirit of Title IX; and imposes onerous new procedural requirements on educational institutions.  Implementing the Final Rule would be a significant undertaking under normal circumstances, yet, in the midst of the COVID-19 global pandemic, the Final Rule gives schools a mere 87 days to implement the extensive and unwarranted changes to their policies, practices, and procedures.

3.      As the Supreme Court has consistently recognized, the scope of Title IX's anti-discrimination protections is far-reaching.  The Court has held that Title IX must be construed expansively to "accord it a sweep as broad as its language."  *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982).  Accordingly, Title IX "covers a wide range of intentional unequal treatment" based on sex.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

4.      To fulfill Title IX's broad anti-discrimination mandate, the Department is charged with implementing and enforcing Title IX to ensure that schools provide all students, employees, and others safe, nondiscriminatory learning environments.  Through its Office for Civil Rights ("OCR"), the Department enforces Title IX's implementing regulations, codified at 34 C.F.R. pt. 106, by, among other things, investigating sex discrimination complaints against schools, seeking voluntary measures to cure violations, and, in relatively rare cases, initiating administrative enforcement proceedings that may result in the termination of federal funds.

5.      For decades, the Department has consistently interpreted Title IX to require schools to investigate all sexually harassing conduct of which they have actual or constructive notice, and to take steps reasonably calculated to prevent, address, and remedy any adverse effects on individual students or the school environment.  Until now, the Department has applied these same standards to all forms of harassment, including gender-based harassment under Title IX; harassment based on race, color, or national origin under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000d7 ("Title VI"); and harassment based on disability under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("Title II").

6.      In late 2018, the Department published a notice of proposed rulemaking, 83 Fed. Reg. 61,462 (Nov. 29, 2018) (the "Proposed Rule"), under the auspices of providing greater protections for individuals *accused* of sexual harassment.  During the notice and comment period, the Department received nearly 125,000 comments, many of which vigorously opposed the Proposed Rule as an unwarranted departure from existing policies, a threat to the rights, safety, and well-being of victims of sexual harassment and other forms of gender-based discrimination, and a contravention of the Department's statutory mandate to combat sex discrimination in schools.  A wide range of New York stakeholders—including the State's Attorney General, The State University of New York ("SUNY"), New York State Education Department ("NYSED"), The Board of Education of the City School District of the City of New York (a/k/a the New York City Department of Education) ("NYCDOE"), public and private colleges and universities, public school districts, and victims' rights groups, among others—submitted comments in opposition to the Proposed Rule.

3

7.      Nevertheless, on May 19, 2020, the Department published the Final Rule, retaining most of the objectionable provisions of the Proposed Rule.  Upending decades of established Title IX policy, the Final Rule redefines sexual harassment narrowly to exclude many forms of harassment that deprive students and others from equal access to educational opportunities; drastically limits, and in many instances prohibits, institutions from investigating and addressing harassment; guts Title IX's longstanding protections for survivors of sexual harassment and assault; and abdicates the Department's central role in enforcing schools' compliance with Title IX's prohibitions against sexual harassment.

8.      In addition, the Final Rule prescribes, for the first time in Title IX's history, an unduly prescriptive and burdensome grievance and adjudicatory process that schools must follow when they receive complaints of sexual harassment.  The Final Rule imposes—in conflict with Title IX's central purpose of protecting students from sex-based discrimination—arbitrary and burdensome procedural requirements that will frustrate schools' ability to protect students.

9.      The Final Rule will subject elementary and secondary schools serving students in Kindergarten through 12th grade ("K-12") to unique harm.  The Final Rule arbitrarily imposes the new grievance procedures, with limited exception, without regard to and in a manner that conflicts with the unique, fundamental Constitutional and statutory obligations and responsibilities K-12 schools have to the children they are required to educate in a safe and secure school environment.  The Final Rule puts K-12 schools in the untenable position of having to reconcile these conflicting obligations to the students entrusted to their care. Moreover, the Final Rule's inflexible procedural requirements will traumatize elementary and secondary students by forcing them to participate in adversarial processes that are not

4

developmentally appropriate, pedagogically sound, or suitable for children or the K-12 school environment.

10.     The Final Rule radically and unjustifiably departs from the Department's longstanding Title IX enforcement policies.  The Department's drastic redefinition of sexual harassment and the severe narrowing of schools' obligations to investigate and respond to harassing conduct that impedes access to their education programs will permit schools to ignore conduct that harms students and others, interferes with equal access to education, and disrupts the school environment.  The Final Rule turns Title IX on its head: it deprives individuals experiencing sexual harassment the longstanding right to go to school free from discriminatory and harassing conduct, while creating a slew of highly prescriptive, burdensome grievance procedures that will discourage victims from stepping forward and make it more difficult for schools to fulfill their obligation of eradicating sex-based discrimination in their programs and activities.  These changes are an abrupt and stark departure from decades of Department policy, and greatly undermine the central purpose of Title IX to address and prevent sex-based discrimination in educational institutions.

11.     The Final Rule contains significant provisions—including the newly-added preemption and retaliation provisions—that were not included in the Proposed Rule and therefore not subject to public notice and comment.  The preemption clause, Final Rule at 30,573 (§ 106.6 (h)), requires schools to comply with the Final Rule to the extent a conflict with state or local law exists.  The retaliation provision, *id.* at 30,578-79 (§ 106.71), adopts an unduly expansive definition of "retaliation," unjustifiably restricting schools' ability to take action against respondents who refuse to participate in grievance proceedings, and forcing schools to grapple with how to pursue code of conduct proceedings against respondents for actions that may

not rise to the level of "sex discrimination or sexual harassment . . . but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment" without running afoul of the Final Rule's preemption and retaliation provisions. *Id.*

12.     The preemption and retaliation provisions—together and separately—will hinder the State, NYCDOE, and New York's K-12 and postsecondary educational institutions from enforcing their own policies that provide greater substantive and procedural protections to victims of sexual harassment and assault than the amended Title IX regulations under the Final Rule.  At the postsecondary level, New York Education Law Article 129-B, N.Y. Educ. Law §§ 6439-6449 (known as the "Enough is Enough" law), enacted in 2015 to combat sexual assault on college and university campuses statewide, sets comprehensive and careful standards for colleges in addressing sexual assault and has served as a model for similar laws across the country.  At the K-12 level, New York's Dignity for All Students Act, N.Y. Educ. Law §§ 10-18 ("DASA"), provides broad protections from sexual harassment for K-12 students, including imposing obligations on K-12 schools to prevent and respond to gender-based discrimination, harassment, including sexual harassment, intimidation, and bullying.  Until this point, these laws complemented and were coextensive with Title IX as they furthered the common purpose of addressing sexual harassment in educational institutions.  Now, the Final Rule will frustrate Plaintiffs' and New York educational institutions' ability to enforce more robust protections under Enough is Enough, DASA, and institutions' own codes of conduct.  Perversely, a school's good-faith compliance with these existing state-level protections may, under the Final Rule, violate the Title IX regulations.  Despite the significance of these provisions, the Department failed to follow proper procedures in adopting them in the Final Rule.

13.     Adding insult to injury, the Department published the Final Rule in the midst of the global COVID-19 pandemic that has shuttered nearly every school and college campus in the country for at least the remainder of the 2019-2020 school year and possibly beyond.  Ignoring the extraordinary challenges that schools face during this public health crisis—including shifting to virtual teaching and learning, implementing measures to keep school campuses safe, and having to divert their limited financial resources to this response—the Department has nevertheless set the effective date of the Final Rule for August 14, 2020, less than 90 days after issuing a rule that will discard decades of established Title IX policy and practice.

14.     The Final Rule will cause immediate, irreparable, and ongoing injury to Plaintiff the State of New York (the "State"), Plaintiff NYCDOE, the State's educational institutions, and the State's students and residents.  Implementation of the Final Rule will drain and divert educational resources from educational institutions operated or governed by Plaintiffs; hinder Plaintiffs' effective administration and enforcement of New York state laws and institutional policies; harm Plaintiffs' interest in ensuring all students can attend school in a safe, nondiscriminatory environment conducive to teaching and learning; impede schools' obligation to ensure that policies and procedures are age-appropriate and pedagogically sound; and frustrate Plaintiffs' interest in enforcing robust civil rights protections for all victims of sexual harassment.

15.     Defendants' drastic departure from longstanding Title IX policy violates the Administrative Procedure Act ("APA").  *First*, the Department exceeds its statutory authority by imposing burdensome procedural requirements that frustrate, rather than effectuate, Title IX's robust anti-discrimination protections.  *Second*, the Final Rule is contrary to law, because it unduly narrows the scope of protections afforded to students under Title IX, conflicts with other

7

federal civil rights laws prohibiting harassment, violates students' federal privacy rights, and conflicts with federal protections for students with disabilities. *Third*, the Final Rule is arbitrary and capricious because it fails to (a) justify the Department's departure from decades of settled policy, (b) adequately consider the substantial harms to educational institutions, their students and employees, and the general public, or (3) justify the contravention of the Department's longstanding policy of applying the civil rights laws it enforces in a consistent manner, by creating weaker standards for sexual harassment than for harassment based on race, national origin, and disability. *Finally*, in publishing the Final Rule, Defendants failed to observe procedures required by law, as certain provisions, including the preemption provision, were not included in the Proposed Rule and were thus issued without adequate notice to the public.

16.     Plaintiffs bring this action to vacate the Final Rule and enjoin its implementation because (a) the Final Rule exceeds the Department's statutory jurisdiction, authority, and limitations in violation of the APA, 5 U.S.C. § 706(2)(C); (b) the Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A); and (c) the Department failed to observe procedure required by law in issuing aspects of the Final Rule in violation of 5 U.S.C. § 706(2)(D).

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

18.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

19.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiff is a

resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

**PARTIES**

20.     Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.  Plaintiff is aggrieved by Defendants' actions and has standing to bring this action because the Final Rule harms its sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Final Rule is vacated and enjoined.

21.     Plaintiff NYCDOE is a city school district governed by Article 52-A of the New York Education Law.  NYCDOE is the largest public school district in the nation.  It serves 1.1 million students in over 1,600 schools.  The NYCDOE is aggrieved by Defendants' actions and has standing to bring this action because the Final Rule: impedes its ability to ensure that all students can attend school in a safe, nondiscriminatory environment conducive to teaching and learning, and to ensure that its policies and procedures are age-appropriate and pedagogically sound; causes harm to NYCDOE students; and harms NYCDOE's economic interests.

22.     Defendant United States Department of Education is a cabinet agency within the executive branch of the United States government, and is an agency within the meaning of 5 U.S.C. § 552(f).  The Department promulgated the Final Rule and is responsible for its enforcement.

23.     Defendant Elisabeth DeVos is the United States Secretary of Education and is sued in her official capacity.

# ALLEGATIONS

I.  **Title IX and the Department's Implementing Regulations Broadly Prohibit Discrimination on the Basis of Sex, Including Sexual and Gender-Based Harassment, in Federally Funded Education Programs and Activities.**

A.  **Overview of Title IX.**

24.    Title IX, a landmark federal civil rights law, was enacted by Congress in 1972 with the broad goal of ensuring that all students have access to educational opportunities free from discrimination on the basis of sex, and to further protect faculty, staff, and others from sex-based discrimination in educational institutions.  Title IX, which provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a), applies to all aspects of a school's education program, including academics, extracurricular activities, housing, admissions, recruiting, and employment.

25.    Title IX, enacted under Congress's Spending Clause powers, was modeled after Title VI, which broadly prohibits all recipients of federal funds (including educational institutions) from discriminating against individuals on the basis of race, color, or national origin.  *See* U.S. Dep't of Educ., Off. for Civ. Rts., *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,038 n.2 (Mar. 13, 1997) ("1997 Guidance").  Title IX's anti-discrimination protections are virtually identical to those under Title VI and Section 504 (which prohibits federal funding recipients from discriminating against individuals on the basis of disability).  The Department has long recognized that Title IX's protections against sexual harassment are similar to those applicable to racial harassment in Title VI, as well as to the harassment protections for employees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII").

26.     As with Title VI, Section 504, and other civil rights laws adopted under the Spending Clause, Title IX conditions federal education funding on covered institutions' compliance with the statute's broad anti-discrimination mandate.  Title IX authorizes and directs federal agencies that extend federal education funding, including the Department, to administratively enforce its protections.  *See* 20 U.S.C. § 1682.  An institution's failure to comply with Title IX and refusal to adopt voluntary corrective measures to cure violations after being notified of a violation by an agency may result in the termination of or refusal to extend federal funds to that institution.  *Id.*

27.     Under the Civil Rights Restoration Act of 1987 ("CRRA"), Congress amended Title IX, Title VI, Section 504, and the Age Discrimination Act to clarify that the terms "program or activity" and "program" under those laws are defined as "all of the operations" of a covered entity, "any part of which is extended Federal financial assistance."  Pub. L. No. 100-259, 102 Stat. 28 (1988) (codified at 20 U.S.C. § 1687 (Title IX); 42 U.S.C. § 2000d-4a (Title VI); 29 U.S.C. § 794(b) (Section 504); 42 U.S.C. § 6108 (Age Discrimination Act)).  In enacting the CRRA, Congress emphasized the expansive original purpose of these civil rights laws, finding that "certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application" of the laws and that "legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered."  *Id.*

28.     Title IX contains a provision exempting an educational institution controlled by a religious organization from parts of the law that are inconsistent with the organization's religious tenets.  20 U.S.C. § 1681(a)(3).

B.       **The Department's Title IX Implementing Regulations.**

29.       Every federal agency that provides federal funds to educational institutions must issue regulations to effectuate Title IX.  20 U.S.C. § 1682.

30.       As the Department provides funding to virtually all public schools, colleges, and universities, and the vast majority of private higher educational institutions, it plays a significant role in enforcing Title IX's broad anti-discrimination mandate and regulating schools' compliance with the law.

31.       The Department's predecessor, the U.S. Department of Health, Education, and Welfare promulgated the agency's Title IX implementing regulations in 1975.  40 Fed. Reg. 24,128 (June 4, 1975) (codified at 45 C.F.R. pt. 86).  The regulations were formally adopted and recodified without substantive changes by the Department when it began operations in 1980.  45 Fed. Reg. 30,802, 30,955-65 (May 9, 1980) (codified at 34 C.F.R. pt. 106).  The Department has enforced those regulations ever since.  These regulations have furthered Title IX's core purpose of addressing and eradicating sex discrimination in education, and have provided a framework for institutions' compliance with Title IX's broad anti-discrimination mandate.

32.       The regulations, mirroring the statute, provide that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."  34 C.F.R. § 106.31(a).

33.       In addition, the regulations specifically prohibit institutions from engaging in enumerated conduct, on the basis of sex, in "providing any aid, benefit, or service to a student." 34 C.F.R. § 106.31(b).  These specific prohibitions include, *inter alia*, "(1) [t]reat[ing] one

12

person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; (2) [p]rovid[ing] different aid, benefits, or services or provide aid, benefits, or services in a different manner; (3) [d]eny[ing] any person any such aid, benefit, or service; (4) [s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment; . . . (6) [a]id[ing] or perpetuat[ing] discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees; [and] (7) [o]therwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity." *Id.*

34. To effectuate these protections, the Department's Title IX regulations have always provided that where the Assistant Secretary for Civil Rights ("Assistant Secretary") finds that a covered institution has discriminated on the basis of sex, that institution "shall take such remedial action as the Assistant Secretary deems necessary to *overcome the effects* of such discrimination," and, "[i]n the absence of a finding of discrimination on the basis of sex," that the institution "may take affirmative action to overcome the effects of conditions which resulted in limited participation . . . by persons of a particular sex."  34 C.F.R. § 106.3(a)-(b).  The regulations further mandate that every applicant for and recipient of federal funding from the Department assure that the applicant or recipient's education program or activity will comply with the Title IX regulations, and that such assurance "shall not be satisfactory to the Assistant Secretary" if the applicant or recipient "fails to commit itself to take whatever remedial action is necessary . . . to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination whether occurring prior or subsequent to the submission to the Assistant Secretary of such assurance."  34 C.F.R. § 106.4(a).

35.     The regulations contain other procedural requirements designed to protect students from discrimination and ensure schools' compliance with the statute's anti-discrimination protections.  These include, *inter alia*, requiring that institutions (a) designate at least one employee to coordinate Title IX compliance and investigations, 34 C.F.R. § 106.8(a), (b) establish and publish a grievance procedure for the "prompt and equitable resolution of student and employee complaints" regarding prohibited discriminatory conduct, *id.* § 106.8(b), and (c) implement "specific and continuing steps" to widely disseminate their Title IX anti-discrimination policies to reach students, parents, applicants for admission, employees, recruiters, unions, and others, *id.* § 106.9.

36.     With respect to the religious exemption contained in 20 U.S.C. § 1681(a)(3), the Department's Title IX regulations have, since 1975, permitted religious institutions to claim this exemption "by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization."  34 C.F.R. § 106.12(b).  Following receipt of such a statement, OCR's longstanding practice has been to acknowledge the claimed exemptions in writing, reminding the institution that it remains bound by all other provisions of Title IX for which no exemption was claimed.  The Department posts all religious exemption requests, and its responses to those requests, on its website.[2]  Copies of all requests and responses from 1975 to the present are available online.  The purpose of this longstanding practice is two-fold: it (a) follows the statutory mandate to respect religious institutions' beliefs in the enforcement of Title IX, and (b) provides notice to prospective and current students and employees of those institutions that certain Title IX protections may be unavailable to them.

_____

[2] U.S. Dep't of Educ., Off. for Civ. Rts., *Other Correspondence*, https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html (last updated May 5, 2020).

II.     **The Department Has Consistently Enforced Title IX's Protections to Protect Victims of Sexual and Gender-Based Harassment from Harm for Decades.**

37.     For many years, the Department has recognized sexual harassment as a form of sex discrimination that, ignored or inadequately addressed, results in educational harms to victimized students.  In turn, the Department has consistently enforced Title IX to protect students and others from sexual harassment that impedes or denies access to institutions' programs or activities.  As required by law, the Department has always employed the same standards for addressing sexual harassment under Title IX as it does for other forms of discriminatory harassment under Title VI, Section 504, and Title II.  Through the Final Rule, the Department has created an unlawful and unjustifiable schism between its enforcement standards for sexual harassment and all other forms of prohibited harassment in schools.

A.     **The Department Has Consistently Interpreted Title IX's Protections Against Sexual Harassment Since At Least 1997.**

38.     The Department articulated its well-settled sexual harassment policies in multiple guidance documents issued by OCR over the course of two decades.

39.     In 1997, OCR issued the 1997 Guidance to advise institutions of their obligations under Title IX to respond to sexual harassment of students and OCR's standards for investigating and enforcing schools' compliance with those obligations.  Four years later, in 2001, OCR issued substantially similar guidance to update and replace the 1997 Guidance.  *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001)[3] ("2001 Revised Guidance").

40.     The 1997 Guidance and 2001 Revised Guidance were both issued by the Department following a public notice and comment process.

---

[3] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

41.     The 2001 Revised Guidance, which remains in effect but will be superseded on August 14, 2020 by the Final Rule, reiterates the definitions and standards set forth in the 1997 Guidance.  The document clarified that OCR's policies for the administrative enforcement of Title IX were unaffected by two intervening Supreme Court decisions, *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), and *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), which only addressed the liability standards for private Title IX sexual harassment lawsuits seeking monetary damages.  2001 Revised Guidance at i-iv.

42.     As the Department observed in the 1997 Guidance, OCR's enforcement of Title IX revealed "that a significant number of students, both male and female, have experienced sexual harassment, that sexual harassment can interfere with a student's academic performance and emotional and physical well-being, and that preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn." 1997 Guidance at 12,034.  The Department noted that OCR had "long recognized that sexual harassment of students engaged in by school employees, other students, or third parties is covered by Title IX" and that "OCR's policy and practice is consistent with the Congress' goal in enacting Title IX—the elimination of sex-based discrimination in federally assisted education programs."  *Id.*  The Department added that guidance specific to sexual harassment "is important because school personnel who understand their obligations under Title IX are in the best position to *prevent* harassment and to lessen the harm to students if, despite their best efforts, harassment occurs."  *Id.* (emphasis added).

43.     In the 2001 Revised Guidance, the Department expressly distinguished the standards OCR applies to investigations and administrative enforcement of its Title IX regulations from the standards applicable to private suits seeking monetary damages, the latter of

which were addressed in *Gebser* and *Davis*.  2001 Revised Guidance at i.  The Department stated

that the 2001 Revised Guidance is, "[i]n most other respects . . . identical to the 1997 Guidance"

and was intended "to serve the same purpose" as the earlier document in providing a framework

for educators to prevent and mitigate the harm of sexual harassment faced by their students.  *Id.*

44.    The 2001 Revised Guidance explains that the liability standards used in *Gebser*

and *Davis* "are limited to private actions for monetary damages" and that those cases "did not

change a school's obligations to take reasonable steps under Title IX and the regulations to

prevent and eliminate sexual harassment as a condition of its receipt of Federal funding," a

position, it noted, that was "uniformly agreed" upon by the institutions and individuals who

submitted comments.  *Id.* at ii, iv.  In the 2001 Revised Guidance, the Department noted that the

Supreme Court, in *Gebser*, specifically distinguished its authority to establish liability standards

for private damages suits from the authority of federal agencies, including the Department, to

"promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate,"

under circumstances that may not give rise to a claim for money damages.  *Id.* at ii.

45.    In 2006, OCR issued a guidance document, *Dear Colleague Letter: Sexual

Harassment Issues* (Jan. 25, 2006)[4] ("2006 DCL"), "to increase awareness of an important issue

affecting students—sexual harassment—and to remind [schools] of the principles that a school

should use to recognize and effectively respond to the sexual harassment of students."  2006

DCL.  The letter reiterated schools' "essential" obligation to prevent and remedy sexual

harassment, reaffirming the 2001 Revised Guidance as the operative statement of OCR's

enforcement policies for sexual harassment, and expressly distinguishing OCR's administrative

enforcement standards from those applicable to private Title IX damages lawsuits.  *Id.*

---

[4] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006 html.

46.     On October 26, 2010, amid growing national attention to bullying in schools,

OCR issued a Dear Colleague Letter on Harassment and Bullying[5] ("2010 DCL"), to clarify

when bullying amounted to discriminatory harassment in violation of Title IX and other civil

rights laws.  The letter reminded schools that they have substantially similar obligations to

prevent, investigate, and respond to harassment, regardless of whether the harassment is based on

sex, race, color, national origin, or disability.  *Id.* at 1-4.

47.     On April 4, 2011, the Department further supplemented its 2001 Revised

Guidance with a Dear Colleague Letter on Sexual Violence[6] ("2011 DCL") to address rising

concerns about pervasive sexual violence in schools.  The letter clarified that sexual violence

(including rape, sexual assault, sexual battery, and sexual coercion) is a form of sexual

harassment covered by Title IX and provided schools guidance on responding to sexual violence

faced by their students.  2011 DCL at 1.  The letter also noted that about 1 in 5 women and 1 in

16 men were victims of attempted or completed sexual assault in college, and, in just one recent

school year, there were "800 reported incidents of rape and attempted rape and 3,800 reported

incidents of other sexual batteries at public high schools."  *Id.* at 2.

48.     The 2011 DCL explained that schools should adhere to the standards and

procedures contained in the 2001 Revised Guidance when addressing incidents of sexual

violence and other forms of sexual harassment, and provided further recommendations to

educational institutions on the proper application of Title IX's various requirements (*e.g.*,

publishing nondiscrimination notices, designating a Title IX coordinator, and adopting and

publishing grievance procedures) to complaints of sexual violence.  *Id.* at 2-3.

---

[5] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.
[6] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

49.     On April 29, 2014, OCR published a supplemental guidance document, *Questions and Answers on Title IX and Sexual Violence*[7] ("2014 Q&A"), to "further clarify the legal requirements and guidance articulated in the [2011] DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent is recurrence, and address its effects."  2014 Q&A at ii.

50.     The Department withdrew the 2011 DCL and 2014 Q&A in September 2017.

**B.      These Guidance Documents Used the Same Definitions of Key Terms, Including Sexual Harassment, and Set Forth Compliance Standards Consistent with Title IX's Anti-Discrimination Mandate.**

51.     The Department's guidance documents issued between 1997 and 2014 consistently (1) defined key terms, including "program or activity" and "sexual harassment," (2) explained schools' obligations under Title IX to respond to and remedy sexual harassment, (3) articulated when the Department would find an institution to be in violation of those obligations, and (4) clarified the privacy protections that must be afforded to students during sexual harassment investigations.

**1.      Definitions of key terms.**

*a.      Definition of "education program or activity."*

52.     Consistent with the statutory definition of "education program or activity" contained in Title IX, 20 U.S.C. § 1687, and the Department's Title IX regulations, 34 C.F.R. § 106.2(h), the Department has treated "all of [a] school's operations," including "all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored

---

[7] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

by the school at another location, or elsewhere," to be subject to Title IX's requirements.  1997 Guidance at 12,038; 2001 Revised Guidance at 2-3.

### b.  Definition of "sexual harassment."

53.     Under the Department's longstanding enforcement policies, sexual harassment is defined as "unwelcome conduct of a sexual nature" that "can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."  2001 Revised Guidance at 2.  Where the harassment rises to the level that it "den[ies] or limit[s] . . . the student's ability to participate in or to receive benefits, services, or opportunities in the school's program," it is a form of sex discrimination prohibited by Title IX.  *Id.*  Sexual harassment can take the form of either (1) *quid pro quo* harassment, where a teacher or other school employee conditions a student's participation in a program or activity on their submission to unwanted sexual conduct, or (2) hostile environment harassment, defined as unwelcome conduct of a sexual nature by employees, students, or others that "is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex." *Id.* at 5; *see also* 1997 Guidance at 12,038.

54.     OCR has long made clear that "[h]arassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents," 2010 DCL at 2, recognizing that harassment often includes conduct that creates a hostile environment for many students.

### c.  Definition of "hostile school environment."

55.     For purposes of administrative enforcement of Title IX, the Department has found harassing conduct to be "sufficiently serious" to create a hostile school environment where it is sufficiently severe, pervasive, or persistent as to interfere with a student's educational opportunities.  1997 Guidance at 12,038; 2001 Revised Guidance at v-vi; 2010 DCL at 2; 2011

DCL at 3.  Applying a sliding-scale approach, the Department's position has been that a single incident may be sufficiently severe to create a hostile environment without being repetitive or ongoing in nature, whereas less severe but ongoing or pervasive conduct may also create a hostile environment depending on the circumstances.  2010 DCL at 2; 2011 DCL at 3.

56.     OCR has long emphasized that a school's inquiry into whether sexual harassment has created a hostile environment should consider the following factors: (a) "[t]he degree to which the conduct affected one or more students' education," (b) "[t]he type, frequency, and duration of the conduct," (c) "[t]he identity of and relationship between the alleged harasser and the subject or subjects of the harassment," (d) "[t]he number of individuals involved," (e) "[t]he age and sex of the alleged harasser and the subject or subjects of the harassment," (f) "[t]he size of the school, location of the incidents, and context in which they occurred," (g) "[o]ther incidents [of sexual harassment] at the school," and (h) other "[i]ncidents of gender-based, but nonsexual harassment" that may, when "combined with incidents of sexual harassment," be "sufficiently serious to create a sexually hostile environment."  2001 Revised Guidance at 5-7.

**2.  The Department has consistently required schools to prevent, investigate, address, and remedy the effects of sexual harassment.**

57.     Under the Department's longstanding Title IX enforcement policies, where a school has actual or constructive notice of conduct against a student that may constitute sexual harassment, the school is obligated to take "immediate and appropriate steps" to investigate the conduct and, where the investigation reveals that harassment has occurred, to "take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again."  *Id*. at 11-13, 15; *see also* 1997 Guidance at 12,042; 2010 DCL at 2-3; 2011 DCL at 4.  Where OCR investigates a complaint against a school and finds that it has failed to respond to, remedy, and prevent sexual

harassment, it will find the school to be in violation of Title IX and provide it the opportunity to voluntarily resolve that violation before the Department initiates further enforcement action.

### a. Notice requirements.

58.     For harassment against a student by a school employee occurring under the auspices of the employee's responsibilities toward students, the school is responsible for taking corrective action regardless of whether it has actual notice.  2001 Revised Guidance at 10.

59.     For harassment against a student by another student or other third party, a school must respond where "a responsible employee 'knew, or in the exercise of reasonable care, should have known' about the harassing conduct."  *Id.* at 13; 1997 Guidance at 12,042; 2010 DCL at 2 n.9; 2011 DCL at 4.  A responsible employee is one who "has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment, or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility."  2001 Revised Guidance at 13.

60.     The Department has never before required a student to make a complaint to a specific employee to provide sufficient notice to the institution.  *Id.*; 1997 Guidance at 12,036-37, 12,042.  "A school can receive notice of harassment in many different ways," including, *inter alia*, a formal grievance filed with the school's Title IX coordinator, a complaint by a targeted student made to a teacher or other responsible employee, an incident directly witnessed by a school employee, media reports, or other means.  2001 Revised Guidance at 13.

### b. Investigation and grievance procedure requirements.

61.     Under current policy, once an educational institution has actual or constructive notice of conduct constituting sexual harassment, it "should take immediate and appropriate steps to investigate or otherwise determine what occurred."  *Id.* at 15; *see also* 1997 Guidance at

12,042; 2010 DCL at 2.  The investigation must be "prompt, thorough, and impartial," but "[t]he specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors."  2001 Revised Guidance at 15; *see also* 1997 Guidance at 12,042; 2010 DCL at 2; 2011 DCL at 4-5.

62.     Even if an individual incident would not, by itself, constitute actionable sexual harassment, schools' obligation to investigate *all* potentially harassing conduct has been grounded in the Department's recognition that investigations of individual incidents "could lead to the discovery of additional incidents that, taken together, may constitute a hostile environment" to which the school is obligated to respond under Title IX.  2010 DCL at 2.

63.     OCR has long required schools to investigate harassment that occurred or originated off-campus to determine whether the effects of that harassment are affecting a student's access to a school's program or activity.  For example, an off-campus rape could impose continuing educational harm on a victim if the student's assaulter was a teacher or classmate, or lived in the same dorm.  The Department has previously required schools to investigate such conduct to determine whether it has created a hostile environment within its education program.  *See* 2011 DCL at 4; 2014 Q&A at 29.

64.     The Department has authorized schools to take immediate measures to protect a student experiencing harassment during the pendency of an investigation, including separating the targeted student from the alleged harasser in classes or housing, providing counseling to the targeted student or alleged harasser, or disciplining the alleged harasser.  2001 Revised Guidance at 16; 1997 Guidance at 12,043; 2010 DCL at 3.  OCR has warned that such measures "should not penalize the student who was harassed" and that "any separation of the target from an alleged

harasser should be designed to minimize the burden on the target's educational program (*e.g.*, not requiring the target to change his or her class schedule)."   2010 DCL at 3.

65.     Pursuant to the requirement in the Department's Title IX regulations that institutions "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by [the regulations]," 34 C.F.R. § 106.8(b), the Department has traditionally afforded institutions a great degree of flexibility in developing effective grievance procedures based on the types of conduct at issue and school-specific considerations.  In its various sexual harassment guidance documents, the Department has long cautioned against a one-size-fits-all approach to grievance procedures since factors including "differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience" should inform the "detail, specificity, and components" of grievance processes used by individual schools.  2001 Revised Guidance at 20; *see also* 2011 DCL at 9; 1997 Guidance at 12,045.  For example, whether a complaint resolution process is completed in a timely manner depends "on the complexity of the investigation and the severity and extent of the harassment."  2001 Revised Guidance at 20.

66.     Under longstanding policy, OCR considers six factors in determining whether a school's grievance process is prompt and equitable, including whether (a) notice of the school's grievance procedures has been given to students, parents, and employees; (b) those procedures have been applied to complaints alleging harassment; (c) complaints have been investigated in an "[a]dequate, reliable, and impartial" manner, including providing the opportunity to present witnesses and other evidence; (d) the school has designated and followed "reasonably prompt timeframes for the major stages of the complaint process;" (e) the school provides notice to the parties of the outcome of the complaint; and (f) the school has provided "[a]n assurance that [it]

will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate." *Id.*

67. The 2011 DCL and the 2014 Q&A provided greater detail to schools on how they should meet these requirements in the context of investigating alleged sexual harassment, including sexual violence. 2011 DCL at 8-14; 2014 Q&A at 9-14, 24-38. In the 2011 DCL, the Department emphasized that schools should provide comparable procedural rights to complainants and alleged harassers, and articulated the Department's position that schools "must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred)," the same standard of proof that OCR itself uses in resolving complaints of discrimination under all of the civil rights laws it enforces, including Title IX. 2011 DCL at 11. The Department noted that it would be inconsistent, and therefore inequitable, to use a higher standard such as a clear and convincing standard used in criminal complaints, for complaints of sexual harassment but not for other forms of harassment.

68. The 2011 DCL reminded institutions that the different standards of proof for a Title IX investigation as compared to a criminal investigation are warranted by the distinct aims of these investigations, noting that institutions are required by Title IX to investigate conduct that may constitute unlawful sexual harassment even where this conduct would not warrant criminal charges. *Id.* Thus, the Department noted that a concurrent criminal inquiry does not relieve an institution of its responsibility to promptly investigate and address sexual harassment. *Id.*

69. In the 2014 Q&A, the Department also reminded institutions that equity requires them to make accommodations for students with disabilities to ensure those students' equal access to the grievance process. 2014 Q&A at 7. These accommodations may include

"providing electronically-accessible versions of paper forms to individuals with print disabilities, or by providing a sign language interpreter to a deaf individual attending a training." *Id.*

### c. *Corrective measures.*

70.     Where a school's inquiry or investigation reveals that harassment occurred, the school must "take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again."  2001 Revised Guidance at 11-13, 15; *see also* 2010 DCL at 2-3; 2011 DCL at 4.  The Department has required these remedial steps to be taken regardless of whether the student or students targeted for harassment made a formal complaint to the institution.  2001 Revised Guidance at 15-16; 1997 Guidance at 12,042.

71.     Recognizing that school personnel knowledgeable of Title IX's requirements "are in the best position to prevent harassment and to lessen the harm to students" when harassment occurs, the Department has traditionally afforded schools flexibility in fashioning remedies to stop, prevent, and cure the effects of harassment on a student or the broader school community. 2001 Revised Guidance at ii; 1997 Guidance at 12,034.

72.     Depending on the context, appropriate remedial measures may include, *inter alia*, actions specific to the individual students involved (which may, but need not, include discipline of the harasser), trainings for students and staff, modifications of school policies and practices, and steps to prevent retaliation.  2010 DCL at 3.

### d. *Confidentiality and privacy protections.*

73.     The Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"), generally forbids disclosure of a student's education record without the consent of the student or, for minors, the student's parent.

26

74.     Recognizing potential tensions between schools' FERPA obligations and their

Title IX obligations to effectively investigate and respond to sexual harassment, the Department,

since the 1997 Guidance, has provided guidance to schools on how to avoid unlawful disclosure

of students' protected information.  The 2001 Revised Guidance reaffirmed language from the

1997 Guidance, which advised schools that they are prohibited from releasing information to a

complainant that is contained in another student's education record unless "(1) the information

directly relates to the complainant (e.g., an order requiring the student harasser not to have

contact with the complainant); or (2) the harassment involves a crime of violence or a sex

offense in a postsecondary institution."  2001 Revised Guidance at 20 n.102; *see also* 1997

Guidance at 12,038.  The 2001 Revised Guidance explained how schools must balance the

privacy interests of all students against the interest in disclosing sufficient information to conduct

an investigation and notify a complainant of the result.  2001 Revised Guidance at 17-18.

75.     The 2011 DCL and 2014 Q&A further addressed these issues.  2011 DCL at 5,

13-14; 2014 Q&A at 18-24, 36-37.

### *e.  Consistency with other civil rights laws enforced by OCR.*

76.     The Department has always used the same definitions and imposed the same

standards to address sexual harassment under Title IX as it has for race-based harassment under

Title VI and disability-based harassment under Section 504 and Title II.

77.     In 1994, the Department published a guidance document, *Racial Incidents and*

*Harassment Against Students at Educational Institutions; Investigative Guidance; Notice*, 59

Fed. Reg. 11,448 (Mar. 10, 1994) ("1994 Racial Harassment Guidance"), addressing schools'

Title VI obligations to prevent, address, and remedy harassment based on race, color, or national

origin.  OCR will find a school to be in violation of Title VI where a school "has created or is

27

responsible for a racially hostile environment—*i.e.*, harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by a recipient," including where a school "has effectively caused, encouraged, accepted, tolerated or failed to correct a racially hostile environment of which it has actual or constructive notice," regardless of whether the harasser is a school employee or another party.  1994 Racial Harassment Guidance at 11,449.  This is the same standard the Department has imposed for Title IX sexual and gender-based harassment cases for many years.

78.     As with its sexual harassment guidance documents, the Department emphasized in the 1994 Racial Harassment Guidance that whether a hostile environment exists "must be determined from the totality of the circumstances," considering factors including the nature, scope, frequency, duration, and location of the harassing conduct, as well as the identity, number, and relationship of the persons involved.  *Id.*  The guidance, also mirroring the Department's longstanding approach to sexual harassment, stated that the overall severity, persistence, or pervasiveness must be weighed, and that "[g]enerally, the severity of the incidents needed to establish a racially hostile environment under title VI varies inversely with their pervasiveness or persistence."  *Id.*  As with sexual harassment under the 2001 Revised Guidance, the 1994 Racial Harassment Guidance provides that where racial harassment exists, a school "has a legal duty to take reasonable steps to eliminate it" and that the "appropriate response . . . must be tailored to redress fully the specific problems experienced at the institution as a result of the harassment" and "be reasonably calculated to prevent its recurrence."  *Id.* at 11,453, 11,450.

79.     As conveyed in OCR's July 25, 2000 *Dear Colleague Letter on Prohibited Disability Harassment*[8] ("2000 DCL") which remains in force, OCR follows substantially similar standards for disability-based harassment that may violate Section 504 or Title II as it does for sexual harassment under Title IX and racial harassment under Title VI.  *See* 2000 DCL.

80.     The 2010 DCL clarified that the Department follows the same standards for discriminatory harassment under all the laws it enforces, and that these guidance documents are still operative for harassment violative of Title VI, Section 504, and Title II.  2010 DCL at 1-4.

81.     As required by the CRRA, the Department's implementing regulations for Title IX, Title VI, and Section 504 use a common definition of covered "program or activity."  *See* 20 U.S.C. § 1687 (Title IX); 34 C.F.R. § 100.13(g) (Title VI); 34 C.F.R. § 104.3(k) (Section 504); *see also* 1994 Racial Harassment Guidance at 11,448; 2000 DCL.

**III.   The Final Rule Sharply Departs from the Department's Well-Established Policies, Undermining Protections for Harassed Students and Abdicating the Department's Essential Role in Eliminating Sexual Harassment in Schools.**

    **A.    The Department's Efforts to Downplay Sexual Harassment and Weaken Existing Title IX Protections.**

82.     Since 2017, Defendants have engaged in an ongoing campaign to roll back Title IX's protections against sexual assault, including sexual violence, particularly in the context of higher education.  Turning away from decades of well-established enforcement policies, the Department has taken a number of steps to strip existing legal protections for survivors of campus sexual assault and to minimize the Department's role in enforcing Title IX on behalf of students who experience such harassment—up to and including its issuance of the Final Rule.

83.     After Secretary DeVos was confirmed to her cabinet position on February 7, 2017, she swiftly oversaw the Department's dismantling of existing Title IX protections against

---

[8] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html.

sexual harassment.  On April 12, 2017, Secretary DeVos named Candice Jackson, a vocal critic

of the previous administration's Title IX policies, as the Deputy Assistant Secretary and Acting

Assistant Secretary of Civil Rights, in which capacity she led OCR until July 2018.

84.  After assuming their roles, both Secretary DeVos and Ms. Jackson publicly

criticized the Department's Title IX policies and characterized most campus sexual assaults as a

non-issue.  Jackson publicly belittled student survivors of sexual assault, contending that "90

percent of [their complaints] — fall into the category of 'we were both drunk,' 'we broke up, and

six months later I found myself under a Title IX investigation because she just decided that our

last sleeping together was not quite right.'"[9]

85.  Echoing this sentiment, Secretary DeVos, in September 2017, gave public

remarks in which she criticized OCR's "incredibly broad definitions" of sexual harassment,

opining that "if everything is harassment, then nothing is."  U.S. Dep't of Educ., *Secretary

DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017).[10]  In her remarks, the

Secretary focused on the rights of students accused of sexual harassment, stating that "[t]he

notion that a school must diminish due process rights [of alleged harassers] to better serve the

'victim' only creates more victims."  *Id.*  Taking a swipe at the settled principle that sexual

harassment victims should not bear the brunt of interim remedies to protect their access to

educational opportunities, the Secretary said measures like changing class schedules or housing

assignments should not "punish the accused" during the investigation and grievance process.  *Id*.

86.  The Secretary further asserted that "the prior administration weaponized the

Office for Civil Rights to work against schools and against students" and went so far as to

---

[9] Erica L. Green *et al.*, *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.
[10] *Available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

describe the then-current sexual harassment guidance to schools as "un-American." *Id.* She

contended that "any school that uses a system biased toward finding a student responsible for

sexual misconduct also commits discrimination." *Id.* Remarking that "[s]tudents, families, and

school administrators are generally not lawyers and they're not judges [and] [w]e shouldn't force

them to be so for justice to be served," the Secretary criticized the "quasi-legal structures"

schools used to fulfill their Title IX obligations to fairly resolve sexual harassment complaints,

dismissively calling them "kangaroo courts." *Id.*

87.     Against this backdrop, on September 22, 2017, OCR issued a Dear Colleague

Letter on Campus Sexual Misconduct[11] ("2017 DCL") and an accompanying document, entitled

*Q&A on Campus Sexual Misconduct*.[12] The 2017 DCL announced that the Department was

rescinding both the 2011 DCL and 2014 Q&A. The letter asserted, without providing any

evidentiary support, that the 2011 DCL and 2014 Q&A had "not succeeded in providing clarity

for educational institutions or in leading institutions to guarantee educational opportunities on the

equal basis that Title IX requires." 2017 DCL at 2. The 2017 DCL, signed by Acting Assistant

Secretary Jackson, pertained specifically to "campus sexual misconduct" and did not mention or

address other forms of sexual harassment or sex discrimination in schools. *Id.* at 1-2.

88.     The 2017 DCL noted that the Department intended to continue to rely on the 2001

Revised Guidance and the "reaffirmation" of that guidance in the 2006 DCL. *Id*. at 2. The letter

did not mention the 2010 DCL, nor has the Department withdrawn that document.

**B.      The Department Promulgated the Proposed Rule Shortly After Rescinding
OCR's 2011 and 2014 Guidance Documents.**

89.     On November 29, 2018, the Department promulgated the Proposed Rule.

---

[11] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.
[12] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

90.    The Proposed Rule contained significant revisions and amendments to the Department's longstanding Title IX regulations, including proposing unjustified redefinitions of key terms; relaxing schools' obligations to investigate, address, and remedy sexual harassment; imposing onerous, prescriptive, quasi-judicial procedural requirements that schools must follow in investigating and handling complaints; and largely erasing schools' obligation to remedy the effects of sexual harassment both for targeted students and their broader school communities. The proposed procedural requirements curtailed schools' previous flexibility and discretion in tailoring grievance procedures for sexual harassment complaints to local circumstances.

91.    The detailed new grievance procedures in the Proposed Rule, which focused on the subset of sexual harassment complaints by individual complainants against individual respondents, afforded stronger rights to accused students than those to students targeted for discriminatory harassment, for the first time in the Department's history of enforcing Title IX. *Id.* at 61,471-80.  These changes included—without legal support or justification—giving respondents the right to file *sex discrimination* complaints against their schools with OCR based on alleged violations of the mandatory grievance procedures, even where such violations were not based on sex.  *Id*. at 61,497.

92.    The Proposed Rule did not contain any language preempting schools' application of stronger state or local protections against sexual harassment.  To the contrary, the Proposed Rule "emphasize[d] that when determining how to respond to sexual harassment, recipients have flexibility to employ age-appropriate methods, exercise common sense and good judgment, and take into account the needs of the parties involved" and averred that the proposed grievance procedures were intended to provide "recognition that a recipient needs flexibility to employ grievance procedures that work best for the recipient's educational environment."  Proposed

Rule at 61,468, 61,472.  The Proposed Rule did not suggest that schools would be constrained from applying stronger protections under state or local law, or their own codes of conduct.

93.     In assessing the likely costs of the Proposed Rule, the Department failed to include or account for the substantial monetary and nonmonetary costs of the Proposed Rule, including the costs of an increase in sexual harassment and violence, and various legal and compliance costs education institutions would be forced to incur.

94.     During the notice and comment period, the Department received more than 124,000 comments on the Proposed Rule, *see* Final Rule at 30,044, many of which vigorously opposed the core aspects of the proposed regulatory changes.

95.     Both the State and the NYCDOE opposed the Proposed Rule, identifying many of the unreasonable, unworkable, and unlawful provisions that remain in the Final Rule and are the subject of this challenge.  SUNY, NYSED, other public and private higher educational institutions in the State, public school districts, and other stakeholders submitted comments in opposition to the Proposed Rule.  Eighteen other states and the District of Columbia also opposed the Proposed Rule.  Comments in opposition were also submitted by advocacy groups for women and girls, LGBTQ people, and sexual assault survivors, among others; mental health professionals; and associations representing school administrators and educational institutions across the country.

96.     On March 27, 2020, in a letter to Secretary DeVos, 17 states and the District of Columbia urged the Department to suspend the rulemaking process for the Proposed Rule while the "nation's educational institutions respond to the national emergency caused by the novel coronavirus (COVID-19) and until both K-12 schools and institutions of higher education resume normal operations."  The letter noted that over 93 percent of all elementary and

secondary schools, and more than 1,140 colleges and universities had closed or were in the

process of closing in response to this extraordinary national public health emergency.  The letter

explained that the burdens the Proposed Rule would place on schools, if finalized, "would be

untenable and ultimately counterproductive to student safety" in light of this unprecedented

pandemic.  Specifically, "[d]uring this crisis, schools will need the flexibility to fashion and

revise investigation, resolution, and grievance procedures on an ongoing basis, in order to carry

out Title IX's mandate in the manner that best addresses the impact of the pandemic and the

needs of their school populations and communities," and some of the new legal obligations in the

Proposed Rule "would be both impossible and unsafe" for institutions to implement.

> ### C.      The Final Rule.

97.      The Department publicly released the text of the Final Rule on May 6, 2020, in a

document exceeding 2,000 pages,[13] and published the 554-page Final Rule in the Federal

Register on May 19, 2020.  Final Rule at 30,026-579.

98.      The Final Rule is scheduled to take effect on August 14, 2020.  *Id.* at 30,026.

99.      The Final Rule amends regulations implementing Title IX of the Education

Amendments of 1972.  Specifically, it (a) amends 34 C.F.R. § 106.3's remedial requirements;

(b) amends 34 C.F.R. § 106.6 to, *inter alia*, add a preemption clause that was not part of the

Proposed Rule; (c) significantly changes the provisions governing Title IX coordinators and

schools' obligation to broadly disseminate their nondiscrimination policies under the former 34

C.F.R. §§ 106.8 and 106.9; (d) alters the procedure for religiously-controlled schools to seek

exemptions under 34 C.F.R. § 106.12; (e) adds a host of new definitions applicable only to

sexual harassment in the new 34 C.F.R. § 106.30; (f) drastically alters schools' obligations to

---

[13] U.S. Dep't of Educ., Title IX Regulations Addressing Sexual Harassment (Unofficial Copy) (May 6, 2020),
https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf.

respond to sexual harassment in the new 34 C.F.R. § 106.44; (g) adds a lengthy set of grievance procedures that schools must follow for sexual harassment complaints in the new 34 C.F.R. § 106.45; and (h) adds a retaliation provision in the new 34 C.F.R. § 106.71.

100.    The Final Rule's stated purpose is to "better align the Department's Title IX regulations with the text and purpose of Title IX, the U.S. Constitution, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and recipients with respect to sexual harassment allegations." *Id.* at 30,030.

101.    The Final Rule purports to accomplish these goals by (1) redefining "sexual harassment" and other key terms, at odds with longstanding definitions used by the Department in enforcing Title IX and other civil rights laws; (2) narrowly limiting when and how a recipient must respond to sexual harassment, and preempting schools from following more expansive protections under conflicting codes of conduct or state or local law; (3) imposing extensive new, prescriptive procedural requirements on all schools and students, and creating new rights for accused students that are not designed to prevent or address *sex* discrimination, exceeding the Department's authority under Title IX; (4) removing critical notice requirements for prospective and current students and employees; (5) ignoring compliance with contrary federal law; and (6) failing to acknowledge and quantify widespread harms and costs to covered institutions, their students, and the broader public.

102.    The Final Rule does not refute or alter the Department's central factual findings undergirding its longstanding Title IX policies on sexual harassment, including that sexual harassment in schools is common, can interfere with students' ability to learn and their overall well-being, and that "preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn." *See* 1997 Guidance

at 12,034.  To the contrary, the Department cited data illustrating the continued prevalence of

sexual harassment in schools and the adverse impacts on students who experience harassment.

Final Rule at 30,075-81.  The Department fails to justify how the drastic changes to its Title IX

policies are consistent with these findings.

103.     Indeed, the Department concedes that the redefinition of "sexual harassment" was

not required by *Gebser* or *Davis*.  *Id.* at 30,033.  It fails to adequately explain or justify how, in

the administrative enforcement context, the "text and purpose" of Title IX in protecting students

from sex discrimination would be furthered by these changes that effectively reduce protections

for students experiencing sexual harassment and make it harder for their schools to respond to it.

The Department also wholly ignores the fact that there is no evidence suggesting that any

burdens faced by accused students in defending against sexual harassment allegations is *based

on sex*, such that the Department lacks the authority to create new enforceable rights for the

accused as a form of sex discrimination under *Title IX*.

### 1.   The Final Rule redefines key terms without adequate justification.

#### a.   *Redefinition of "education program or activity."*

104.     The Final Rule unlawfully and arbitrarily restricts a school's response to "sexual

harassment *in* an education program or activity of the recipient against a person in the United

States."  Final Rule at 30,574-75 (§ 106.44(a)) (emphasis added).

105.     The Final Rule defines "education program or activity," exclusively with respect

to sexual harassment and not to other forms of conduct prohibited under Title IX, as those

"locations, events, or circumstances over which the recipient exercised substantial control over

both the respondent and the context in which the sexual harassment occurs, and also includes any

building owned or controlled by a student organization that is officially recognized by a

36

postsecondary institution." *Id.* The Final Rule requires institutions to dismiss complaints with regard to conduct that "did not occur in the recipient's education program or activity, or did not occur against a person in the United States." *Id.* at 30,576 (§ 106.45(b)(3)).

106.    The Final Rule's confusing redefinition effectively demands that students who experience sexual harassment, before seeking relief from their schools, ascertain the degree of their school control over campus events, student groups, and buildings to determine whether Title IX protections apply. It also wholly disregards schools' statutory obligation to address harassment, wherever it occurred, that has the effect of limiting or denying a student's access to education programs and activities. The Department has also failed to justify this geographic limitation in light of its practice of applying civil rights statutes, including Title VI, outside of the United States in appropriate circumstances.[14]

107.    The Final Rule's restrictions conflict with Title IX's statutory language, which does not depend on where the underlying conduct occurred, but instead prohibits discrimination based on its effects on a student's educational opportunities. 20 U.S.C § 1681(a). Moreover, the text of Title IX provides that the term "program or activity" and "program" mean "*all of the operations of*" a covered entity. *Id.* § 1687 (emphasis added). This definition was required by the CRRA, which adopted a uniform, expansive definition of "program or activity" for Title IX, Title VI, and Section 504. *See* 20 U.S.C. § 1687 (Title IX); 34 C.F.R. § 100.13(g) (Title VI); 34 C.F.R. § 104.3(k) (Section 504); *see also* 1994 Racial Harassment Guidance at 11,448; 2000 DCL.

108.    The Final Rule's redefinition of "program or activity" applies only to conduct that constitutes sexual harassment under the Final Rule's new, narrow definition of that term. The

---

[14] *See, e.g.*, U.S. Dep't of Justice, Title VI Legal Manual (Updated), § V, at 4 (2016) (describing the circumstances in which Title VI applies to discriminatory conduct outside the United States).

existing definition will continue to apply to other forms of sex-based discrimination, including, perhaps, gender-based harassment that is not sexual in nature.  The Final Rule's redefinition of "program or activity" thus creates arbitrary and unlawful limitations on the Department's enforcement powers and schools' obligations to respond to sexual harassment, as compared to all other forms of discrimination, including harassment.

109.    The Final Rule's definition will lead to confusion for schools and students over whether students facing sexual harassment can seek relief from their schools.  For example, the Final Rule likely bars American universities from offering Title IX protections to students in university-sponsored study abroad programs.  Likewise, students undergoing remote learning due to the COVID-19 pandemic who experience sexual harassment by peers, teachers, or others online, or harassment at home that impedes their ability to attend classes, must guess whether this conduct falls under the Final Rule's definition of "program or activity."  The Final Rule is, at best, ambiguous on these questions.  The Department fails to sufficiently explain how these results comport with agency interpretation and the anti-discrimination purposes of Title IX.

110.    Further, the Department's decision to limit the scope of proscribed conduct under Title IX based on location is arbitrary when Congress, under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1902(f) ("Clery Act"), requires reporting of information regarding crimes occurring on "[p]ublic property . . . immediately adjacent to and accessible from the campus" to current and prospective students, since it is relevant to understand how crimes impact the campus learning environment.  20 U.S.C. § 1902(f).  It is illogical to require institutions to report off-campus conduct to current and prospective students if, as the Final Rule unreasonably assumes, that same conduct could never affect a student's access to the education program or activity.

### b. *Redefinition of "sexual harassment."*

111.     The Final Rule redefines sexual harassment as "conduct on the basis of sex that satisfies one or more of the following: (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) 'Sexual assault' as defined in [the Clery Act,] 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in [the Violence Against Women Act ("VAWA"),] 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a)(30)."  Final Rule at 30,574 (§ 106.30(a)).  Schools must dismiss complaints that do not meet this new definition.  *Id.* at 30,576 (§ 106.45(b)(3)).

112.     The Department's new definition of sexual harassment is a dramatic departure from longstanding Department practice, and will greatly limit the range of covered conduct.

113.     First, this definition restricts schools' obligation under the Title IX regulations to prevent and respond to harassing conduct by requiring that sexual harassment be severe, pervasive, and "objectively offensive" before a school can respond.  *Id.* at 30,574 (§ 106.30).

114.     By contrast, the Department previously defined sexual harassment as unwelcome conduct of a sexual nature that "is sufficiently severe, persistent, *or* pervasive to limit a student's ability to participate in or benefit from an education program or activity."  1997 Guidance at 12,038 (emphasis added).  Thus, even "a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment," and less severe, pervasive conduct that created a hostile environment was also considered to be harassment prohibited by Title IX.  2001 Revised Guidance at 5-9.

39

115.     Under the Department's new definition, a single, severe, objectively offensive incident of sexual harassment may now be excluded from protection under the amended Title IX regulations (unless such conduct met the Clery Act or VAWA definitions incorporated into the definition), and persistent or pervasive conduct that limits a student's access to a school's education program or activity will almost certainly be unprotected.

116.     Second, the requirement that the unwelcome sexual conduct "effectively denies a person equal access" to educational opportunities in order to be subject to Title IX coverage runs counter to the plain language of Title IX, which broadly protects all students from any conduct on the basis of sex that has the effect of excluding the student from participation in, being denied the benefits of, or being subjected to discrimination under a school's education program or activity.  Title IX is violated not just when an individual is "effectively denie[d] equal access" to an education program or activity, but also when conduct impairs or limits that individual's ability to enjoy the benefits and services of that program or activity.

117.     Consistent with schools' affirmative obligation under Title IX and the longstanding regulations to affirmatively prevent discriminatory harassment and address hostile school environments resulting from such harassment, schools have always been obligated to investigate *all* potentially harassing conduct that may limit or deny educational opportunities to a student.  Now, under the Final Rule, a school will have no obligation to respond to harassment until it has already affected one or more students' access to education.  As such, students will now have to wait until the harassment they face severely and significantly affects their access to education before their schools are required—or even permitted—to act.

118.     Third, although the Final Rule (like the Proposed Rule) purports only to apply to sexual harassment, including by adding new definitions and procedures applicable only to sexual

harassment, Final Rule at 30,574-78 (§§ 106.30, 106.44, 106.45), the preamble to the Final Rule suggests that schools will also have to apply the Final Rule's new grievance procedures to other forms of "non-sexual harassment sex discrimination." *Id.* at 30,095; *see also* Proposed Rule at 61,462. Because the Final Rule itself does not say this—and, in fact, uses language specific to "sexual harassment"—schools will have to grapple with this ambiguity and whether and when to apply the new provisions to other forms of sex discrimination experienced by their students.

119. Fourth, the new definition of harassment is also inconsistent with the definitions of harassment used by the Department in enforcing like protections against harassment based on race, color, national origin, and disability under Title VI, Section 504, and Title II. As the Department's enforcement policies for those laws remain unchanged, the Final Rule effectively establishes a separate, weaker enforcement standard for sexual harassment relative to all other forms of discriminatory harassment.

120. Fifth, the Final Rule's definition ignores the uniformity with which sexual harassment has long been defined under both Title IX and Title VII with respect to employees of educational institutions (including faculty, staff, and student employees). Under Title VII, sexual harassment is actionable when the harassment is sufficiently severe *or* pervasive to alter the conditions of the victim's employment.[15] The EEOC, in administratively enforcing Title VII, recognizes that hostile environment sexual harassment can result from "unusually severe" isolated incidents and gender-based harassment of a non-sexual nature that is sufficiently severe or pervasive.[16] Until the promulgation of the Final Rule, employees of covered institutions

---

[15] *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (emphasis added); U.S. Equal Emp't Opportunity Comm'n, *Policy Guidance on Current Issues of Sexual Harassment* (Mar. 19, 1990), https://www.eeoc.gov/laws/guidance/policy-guidance-current-issues-sexual-harassment ("EEOC Guidance").
[16] *See* EEOC Guidance.

enjoyed consistent, parallel protections under both laws.  Now, a student may be forced to endure worse sexual harassment than the student's teachers before the school is required to respond.

121.   Finally, the Final Rule's redefinition of sexual harassment may prevent institutions from providing meaningful redress for a variety of unwelcome sexual conduct, in direct contravention to Title IX's mandate that requires institutions to prevent, address, and remedy the effects of such conduct on a student's educational access.  The Final Rule fails to offer sufficient justification for the many harms that will result from this stark redefinition.

### c. Elimination of references to hostile school environment.

122.   The Final Rule strips all references in the Title IX regulations to schools' obligations to address hostile school environments resulting from sexual harassment, including amending 34 C.F.R. § 106.3 to strike a requirement that institutions take remedial actions OCR deems necessary to "overcome the effects of [sex-based] discrimination."  Indeed, in contrast to all of the Department's earlier guidance documents on sexual harassment and other forms of harassment, the terms "hostile environment" and "hostile climate" will be completely absent from the amended Title IX regulations after the Final Rule becomes effective.

123.   The Final Rule's sole focus on responding to harassment against one individual by another individual ignores the cardinal principle that "[h]arassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents," 2010 DCL at 2, to create a hostile environment.

### 2. The Final Rule arbitrarily and unlawfully limits when a recipient must respond to conduct in violation of Title IX.

124.   Contrary to the text and purpose of Title IX, the Final Rule drastically limits schools' obligations to respond to sexual harassment that impermissibly and arbitrarily restricts what conduct a recipient may respond to under Title IX.  The Department fails to adequately

explain the sea change from decades of longstanding and consistent enforcement policy, as reflected in OCR's various guidance documents on sexual harassment, and ignores how these new enforcement standards will frustrate, and effectively preclude, the ability of institutions to combat and eliminate sex discrimination in education.

### a. The "actual knowledge" definition impermissibly allows institutions to avoid responding to known incidents of sexual harassment.

125.    The Final Rule defines "actual knowledge" as "notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to any employee of an elementary and secondary school."  Final Rule at 30,574 (§ 106.30(a)).  The Final Rule states that "[i]mputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge," and that the "mere ability or obligation to report sexual harassment or to inform a student about how to report sexual harassment, or having been trained to do so, does not qualify an individual as one who has authority to institute corrective measures on behalf of the recipient."  *Id.*  The Final Rule limits a recipient's obligation to respond to sexual harassment to instances of which the recipient has "actual knowledge."  *Id.* at 30,574-75 (§ 106.44(a)).

126.    Previously, schools were required to respond to sexual harassment whenever an employee with authority to respond to the harassment, knew, or in the exercise of reasonable care, should have known about the harassing conduct.  1997 Guidance at 12,042; 2001 Revised Guidance at 13; 2010 DCL at 2 n.9; 2011 DCL at 4.

127.    The Department's definition and circumscription of an institution's obligation to respond to allegations of which it has actual knowledge renounces this standard, which made clear that institutions had to respond to all sexually harassing conduct where the institution knew

or reasonably should have known about it.  *See* 1997 Guidance at 12,042; 2001 Revised

Guidance at 13; 2011 DCL at 4.

128.    The Final Rule fails to justify its new standard, particularly in light of the reality

that students are most likely to disclose sexual assault and harassment to trusted sources, such as

a residential advisor, guidance counselor, or professor.  Instead, the Final Rule now authorizes

institutions to do nothing—even where dozens of employees who can take action or report to

appropriate officials have actual knowledge of harassment—so long as the Title IX Coordinator

or high-ranking university official can disclaim actual knowledge.  The Department offers no

reasonable explanation for these added hurdles for complainants at the university level.

129.    The Final Rule arbitrarily imposes different definitions of actual knowledge in K-

12 institutions and post-secondary institutions, with no explanation for why university students

should face added barriers in order to trigger an institutional response to sexual harassment.

130.    The Final Rule's reliance on the Supreme Court's decisions in *Gebser* and *Davis*

are misplaced, as these decisions only addressed the liability standard for private Title IX

lawsuits seeking monetary damages, and specifically distinguished monetary liability standards

from those federal agencies can apply in the administrative enforcement context.  As the

Supreme Court explicitly noted in *Gebser*, "[t]he Department of Education could enforce the

requirement administratively: Agencies generally have authority to promulgate and enforce

requirements that effectuate the statute's nondiscrimination mandate."  524 U.S. at 292.  Indeed,

the Department issued the 2001 Revised Guidance after those decisions, to affirm that these

cases "did not change a school's obligations to take reasonable steps under Title IX and the

regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal

funding."  2001 Revised Guidance at ii.

131.    The Final Rule offers no explanation for the Department's about-face from its

position that *Gebser* and *Davis* had no bearing on OCR's administrative enforcement of Title IX.

### b. *The definitions of "complainant" and "formal complaint" impose undue restrictions on schools' ability to respond to sexual harassment.*

132.    The Final Rule defines "complainant," for purposes of sexual harassment claims

only, as "an individual who is alleged to be the victim of conduct that could constitute sexual

harassment." Final Rule at 30,574 (§ 106.30).  The Department's Title IX regulations do not

otherwise define a complainant for any other form of sex-based discrimination.  Although the

Final Rule permits *any* individual to notify a school that sexual harassment is occurring, and for

the Title IX Coordinator to make a formal complaint in lieu of a student targeted for harassment,

the rule confusingly uses the term "complainant" to describe a targeted student even if that

student did not make a formal complaint.  *See id.* at 30,573-74 (§§ 106.8(a), 106.30).

133.    The Final Rule defines "formal complaint" as "a document filed by a complainant

or signed by the Title IX Coordinator alleging sexual harassment against a respondent and

requesting that the recipient investigate the allegation of sexual harassment."  *Id.* at 30,574

(§ 106.30(a)).

134.    The Final Rule newly limits individuals who can file a formal complaint,

providing that "[a]t the time of filing a formal complaint, a complainant must be participating in

or attempting to participate in the education program or activity of the recipient with which the

formal complaint is filed."  *Id.*  By requiring that a formal complaint can only be filed by or on

behalf of a student currently "participating in or attempting to participate in" an education

program or activity at the time of the complaint (as opposed to when the harassment occurred),

the Final Rule unjustifiably forecloses the ability of sexual harassment survivors who withdrew

from school due to the damaging effects of that harassment from seeking justice from their schools through the administrative process.

135.     These narrow, formalistic definitions are not supported by Title IX, which does not include any limitations on making or receiving complaints. *See* 20 U.S.C. § 1681.  Nor are they supported by Title IX's mandate that schools take reasonable steps to prevent and remedy known sexual harassment and sex discrimination, regardless of how institutions learn about it.

136.     The Final Rule also fails to consider the limiting effect of the definitions of "complainant" and "formal complaint," including that it may chill reporting, and does not offer sufficient accommodations for individuals with disabilities that may impede their ability to read, write, or sign a formal complaint, or to otherwise participate in the prescribed grievance process.

### c.  The "deliberate indifference" standard runs counter to Title IX's mandate and past practice.

137.     The Final Rule provides that an educational institution with actual knowledge must respond "in a manner that is not deliberately indifferent."  Final Rule at 30,574 (§ 106.44(a)).  An institution is "only" deliberately indifferent "if its response to sexual harassment is clearly unreasonable in light of the known circumstances." *Id.*

138.     Consistent with Title IX's mandate that no person "be excluded from participation in, be denied the benefits of, or be subjected to discrimination" on the basis of sex, 20 U.S.C. § 1681(a), the Department has long required schools to act reasonably, promptly, and effectively in taking steps to end sexual harassment and prevent its recurrence.  34 CFR § 106.31; 1997 Guidance at 12,042; 2001 Revised Guidance at 10; 2010 DCL at 2-3; 2011 DCL at 4.

139.     In contrast, the Final Rule permits schools to respond ineffectively to sexual harassment as long as the response is not "clearly unreasonable in light of the known

circumstances," Final Rule at 30,574-75 (§ 106.44(a)), even if the response does not stop, prevent, or redress harassment.

140.    In an attempt to justify its departure from previous standards, the Department cites only to decades-old Supreme Court precedent that explicitly limits the liability standards on which the Department relies to private Title IX lawsuits seeking monetary damages, and which subsequent Department guidance clarified did not apply to its enforcement of Title IX.  The Final Rule does not point to any instances in which schools were burdened or unfairly penalized by the existing reasonableness standard, and otherwise fails to justify its departure from this well-established standard.

### 3.  The Final Rule's mandatory and permissive dismissal provisions impermissibly allow for sexual harassment to go unaddressed.

141.    The Final Rule mandates that "[i]f the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's program or activity, or did not occur against a person in the United States, then the recipient must dismiss the formal complaint with regard to that conduct."  Final Rule at 30,576 (§ 106.45(b)(3)).  Accordingly, a school must dismiss a complaint *before* an investigation if the allegations, on their face, are not severe, pervasive, and objectively offensive, *see id.*, even if a reasonable investigation might have revealed that the alleged conduct meets the stringent standard.  Likewise, a school must dismiss a complaint that meets the Final Rule's definition of sexual harassment if the conduct occurred outside of the bounds of an educational program or activity, *see id.* at 30,574-75 (§ 106.44(a)), or outside the United States, even where the effects of such harassment harm a student's ability to participate in that program or activity and are redressable by the institution.

142.     In forcing schools to dismiss complaints that do not meet the narrow, unlawful, and arbitrary definitions the Final Rule adopts, the Department exceeds its statutory authority by forcing schools to violate students' and employees' civil rights under Title IX.  Title IX only authorizes the Department to issue rules "to effectuate the [anti-discrimination] provision of [Title IX]."  20 U.S.C. § 1682.  Title IX delegates no authority to the Department to limit schools' protection of students against discrimination, hamper schools' ability to enforce their own procedures to best respond to a wide-variety of conduct subject to disciplinary action, or afford substantive Title IX rights to individuals (including those accused of misconduct) that are not themselves facing discrimination on the basis of sex.

143.     The Final Rule fails to consider practical complications created by the mandatory dismissal provision.  For example, where an institution investigates and dismisses a Title IX complaint, the institution will have lost critical time and resources before the institution can begin to investigate whether the conduct alleged also violates its own disciplinary code.  The Final Rule provides little clarity on how institutions should conduct these successive investigations, or whether parallel investigations under different enforcement regimes can happen concurrently.

144.     The Final Rule adds permissive dismissal language not included in the Proposed Rule, newly allowing institutions to dismiss complaints where "a complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; the respondent is no longer enrolled or employed by the recipient; or specific circumstances prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein," Final Rule at 30,576 (§

48

106.45(b)(3)(ii)), even if a hostile school environment resulting from the harassment at issue continues to affect a complainant or other students.

145.    This provision disregards Title IX's mandate, and calls into question whether victims of sexual harassment would be afforded Title IX protections in circumstances where their harassers are no longer on campus.  For example, the Final Rule, read literally, would allow an institution to ignore harassment perpetrated by a graduating senior, where that student would graduate before the newly-prescribed grievance process could be completed.  Similarly, a school would have no duty to investigate harassment against a student by an alumnus or other campus visitor who is not enrolled or employed by the school, regardless of the impact of the harassment on the targeted student or students' access to the school's education program or activity.  This provision also fails to define what "specific circumstances" warrant permissive dismissal.

146.    The Final Rule fails to justify why a vast range of unwelcome sexual conduct is no longer within the ambit of Title IX's protections, or to square these new limits with the broad scope of conduct that the Supreme Court recognizes as covered by Title IX.  Nor does the Final Rule provide evidence that institutional resources were previously inappropriately directed at resolving claims of sexual harassment under Title IX.

      **4.  The Final Rule imposes prescriptive new grievance procedures that are designed to protect accused students, not to address and remedy sex discrimination in schools.**

147.    After greatly narrowing the range of conduct subject to Title IX protection, the Final Rule adds dozens of new procedural requirements that institutions must follow when investigating complaints.  These formalistic, prescriptive and burdensome requirements interfere with institutional expertise and responsibilities to respond to a wide range of conduct in schools.

Further, the Final Rule fails to explain how these new requirements will reduce the prevalence of sexual assault and harassment, or otherwise promote the ends of Title IX.

      *a.  The Final Rule arbitrarily changes evidentiary standards and departs from agency practice.*

148.    The Final Rule provides that a recipient must "[s]tate whether the standard of evidence to be used to determine responsibility is the preponderance of the evidence standard or the clear and convincing evidence standard, apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment." *Id.* at 30,575 (§ 106.45(b)(1)(vii)).

149.    The Final Rule departs from decades of Department practice by requiring that institutions use the same standard of evidence for complaints against students as those against employees, and by making it harder for institutions to use the preponderance of the evidence standard.  This is at odds with the standards used by the Department and other federal agencies in administratively enforcing federal civil rights laws, and frustrates Title IX's anti-discrimination mandate.  Use of a clear and convincing standard would effectively impose a higher burden of proof on complainants than respondents, in tension with the Final Rule's separate requirement that Title IX grievance procedures must treat complainants and respondents equitably, *id.* (§ 106.45(b)(1)(i)); *see also* 2011 DCL at 11 (explaining that "[g]rievance procedures that use [a clear and convincing] standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.").

150.    The Final Rule arbitrarily authorizes schools to impose a higher burden on proving sexual harassment allegations than any other disciplinary allegations even if other disciplinary proceedings carry an equal or greater sanction.  The Department fails to justify this

inconsistency, nor does it address that such a heightened and unequal standard perpetuates pervasive stereotypes that complainants of sexual harassment and assault are more likely to fabricate allegations than students who report other conduct violations.

151.    Similarly, the Department failed to adequately explain why it has departed from the evidentiary norm for resolving discrimination claims.  The preponderance of evidence standard is used in adjudicating administrative and civil claims of civil rights violations, including claims under Title VI and Title VII.  *See* 2011 DCL at 11.  In the same vein, the Department previously required that institutions use a preponderance of evidence standard in Title IX investigations.  *Id.*

152.    Additionally, the Department fails to adequately explain the Final Rule's requirement that schools use the same standard of evidence for resolving claims of student-on-student harassment as faculty-on-student harassment.  In imposing this restriction, the Final Rule arbitrarily fails to address how students are differently situated than employees, or why standards for adjudicating Title IX complaints should be dependent upon the bargaining power of particular employees or unions.

### b. The Final Rule impermissibly requires institutions to adopt arbitrary and unreasonably onerous procedural rules that limit, rather than advance, Title IX's broad protections against sex discrimination.

153.    The Final Rule mandates a variety of additional procedural requirements, *see* Final Rule at 30,575-78 (§ 106.45(b)), including that postsecondary institutions must provide for a live hearing and cross-examination by each party's "advisor of choice," and "not rely on any statement of [a] party or witness [that does not submit to cross-examination] in reaching a determination regarding responsibility," *id.* at 30,577 (§ 106.45(b)(6)(i)); that the decision-maker must "determine whether [a] question is relevant and explain any decision to exclude a question

as not relevant" before allowing a party to answer a question posed during cross-examination; guarantee access to evidence to both parties, "including the evidence upon which the recipient does not intend to rely," *id.* at 30,576 (§ 106.45(b)(5)(vi)); and that institutions refrain from "restrict[ing] the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence," *id.* (§ 106.45(b)(5)(iii)).

154.    Such specific, costly, and onerous one-size-fits-all procedures arbitrarily restrict a school's expertise and flexibility in responding to sexual harassment, impose heightened due process requirements in adjudicating sexual harassment claims that create inexplicable incongruity with other disciplinary procedures, and pose confusing and unworkable situations for schools, including with respect to fulfilling additional legal and professional obligations.

155.    For example, in imposing live hearing and cross-examination requirements, the Final Rule fails to adequately explain why such legalized disciplinary hearings are necessary or appropriate for all allegations of sexual harassment in the postsecondary education context. Schools routinely employ alternative practices that provide accurate and fair determinations in adjudicating sexual harassment allegations, as well as allegations with respect to violations of similar anti-discrimination laws and conduct that implicates equal or greater sanctions. Moreover, the Department acknowledges that live hearings and cross-examination are not necessary in resolving the same conduct at the K-12 level.

156.    The Final Rule declines to mandate live hearings and cross-examination for K-12 institutions based on the Department's finding that "parties in elementary and secondary schools generally are not adults with the developmental ability and legal right to pursue their own interests on par with adults." *Id.* at 30,364. However, the Final Rule mandates live hearings and cross-examination for minors who are sexually harassed at post-secondary institutions, including,

*e.g.*, young children attending pre-schools housed on college campuses, high school students at academic or athletic summer camps, high school students taking college courses for high school credit at local colleges, and college students under 18, without justification or sufficient explanation. *Id.* at 30,493. Conversely, a college student or other adult experiencing harassment on a K-12 campus, such as a student teacher or volunteer, would be subject to the Final Rule's procedural requirements but would not be required to participate in a live hearing or cross-examination. Relatedly, for education programs or activities that are not schools, such as museums and libraries, the Final Rule applies the K-12 requirements, regardless of whether the complainant or harasser are children or adults. Finally, the Final Rule makes no distinction between high school students who are 18 or older, or college students under the age of 18, in creating these drastically different procedural requirements based on the type of institution where the harassment occurred. Nor does the Final Rule adequately consider the specific needs of students with disabilities imposed by the one-size-fits-all procedural requirements. The Department has failed to justify or adequately explain these arbitrary choices.

157.    The Final Rule's live hearing and cross-examination provisions fail to account for the reality that students may, but need not, be represented by counsel, and that these hearings will in many cases be managed by personnel who are non-attorneys, lack knowledge of evidentiary rules, and may have difficulty making correct on-the-spot relevancy determinations of questions posed during cross-examination, as they will now be required to do. *Id.* at 30,577 (§ 106.45(b)(6)(i)).

158.    The Final Rule's "advisor of choice" provision allows for complainants to be cross-examined by a number of people whose very presence could re-traumatize them, including a respondent's twin brother, a respondent's friend who witnessed the sexual assault at issue, or

the respondent's parent.  The fact that an advisor need not undergo any specialized training before conducting this cross-examination, and that, unlike an attorney, need not be bound by any professional or ethical obligations further compounds this problem.  The Final Rule fails to account for the chilling effect caused by the new live hearing and cross-examination mandates.

159.    And because the Final Rule explicitly demands that "the decision-maker(s) must not rely on any statement of [a] party or witness in reaching a determination regarding responsibility" if such "a party or witness does not submit to cross-examination at the live hearing," *id.* at 30,577 (§ 106.45(b)(6)(i)), many complainants will be faced with the difficult choice of deciding between submitting to a traumatizing cross-examination, or withdrawing from the process knowing that a finding of responsibility will be less likely.  Accordingly, the Final Rule would inexplicably bar schools from using a respondent's confession, statement against interest, or documentary evidence proving harassment occurred if the respondent refuses to participate in cross-examination.  This effectively requires schools to ignore evidence that would be plainly admissible in court proceedings under the Federal Rules of Evidence and gives respondents a get-out-of-jail-free card to avoid a finding of responsibility.  The Department fails to justify how these procedures will further Title IX's anti-discrimination mandate of preventing, addressing, and remedying sexual harassment.

160.    The Final Rule's requirement that the decision-maker at a Title IX hearing cannot be the same person as a Title IX Coordinator, *or* the person who investigated the underlying conduct, *id.* (§ 106.45(b)(7)(i)), arbitrarily invades on institutional flexibility, and will require institutions to either hire new staff or divert resources from other critical institutional functions.

161.    Similarly, the Final Rule includes an ambiguous and overbroad conflict of interest rule, requiring "that any individual designated by a recipient as a Title IX Coordinator,

investigator, decisionmaker, or any person designated by a recipient to facilitate an informal resolution process, not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent." Final Rule at 30,575 (§ 106.45(b)(1)(iii)). Because the Final Rule newly confers on respondents the "right" under Title IX to contest findings of responsibility based on a school's alleged noncompliance with the prescriptive new grievance procedures, this provision may enable respondents to evade responsibility and prolong grievance proceedings based on the mere assertion that an individual involved in the grievance process was "biased" against that student or "respondents generally." This may very well give schools pause on whether to appoint individuals with a background in sexual violence prevention or a known interest in protecting survivors to these positions, even if the individual is committed to impartiality in this role.

162.    Department guidance has made clear that in crafting responses to sexual harassment, the "critical issue under Title IX is whether responsive action that a school could reasonably be expected to take is effective in ending the sexual harassment and in preventing its recurrence." 1997 Guidance at 12,034. In accomplishing this obligation, school personnel should be offered "flexibility in how to respond to sexual harassment," and, accordingly, the Department has consistently acknowledged that "[p]rocedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes, and administrative structures, State or local legal requirements, and past experience." *Id.* at 12,045; *see also* 2001 Revised Guidance at 29; 2011 DCL at 9.

163.    The Final Rule fails to justify this departure from Department practice and resulting intrusion into institutional autonomy.

### 5. The Final Rule hinders institutions' ability to apply stronger state or local protections against sexual harassment.

164.    The Department asserts that the "dismissal of a formal complaint . . . does not preclude a recipient from addressing the alleged misconduct under other provisions of the recipient's own code of conduct," and that "nothing in these final regulations . . . inherently prevents recipients from complying with State and local laws or policies."  Final Rule at 30037-38, 30454, 30576.  However, these assertions are belied by the many provisions in the Final Rule that significantly constrain how schools may pursue investigations under other laws or policies.

165.    The Final Rule's preemption provision provides that "[t]o the extent of a conflict between State or local law and title IX as implemented by §§ 106.30, 106.44, and 106.45, the obligation to comply with §§ 106.30, 106.44, and 106.45 is not obviated or alleviated by any State or local law."  *Id.* at 30,573 (§ 106.6 (h)).  This provision—which was not included in the Proposed Rule—may obstruct institutions' ability to enforce state and local laws that are more protective of students facing harassment than the Final Rule.

166.    As a result, New York educational institutions may be precluded from providing certain protections required by the State's Enough is Enough law, including the right of reporting individuals to file complaints against individuals at different educational institutions, to obtain one-way no-contact orders or the requirement that investigators and adjudicators be trained under a "trauma-informed" approach, without potentially running afoul of the Final Rule's preemption provision.  *See* N.Y. Educ. Law §§ 6440(2), 6444(4)(a), 6444 (5)(c)(ii).

167.    Many of NYCDOE's policies and procedures for preventing and addressing sexual harassment are required under DASA, which is tailored to the K-12 environment and sets detailed requirements, including prompt timeframes for reporting and investigating student-to-student and staff-to-student gender-based discrimination, harassment, intimidation, and bullying,

including sexual harassment.  *See* N.Y. Educ. Law §§ 10-18, 8 NYCRR § 100.2.  NYCDOE will be forced to overhaul its DASA-mandated protections to the extent that they conflict with the rigid requirements of the Final Rule, if such piecemeal revision is even possible.  The Final Rule requires K-12 schools within New York to discard the State's carefully considered framework for addressing sexual harassment within elementary and secondary schools in favor of the Final Rule, which fails to adequately consider the unique needs of K-12 students and schools.

168.     The Final Rule fails to grapple with these and other potential conflicts, or their damaging effect on the ability of institutions to maintain New York's carefully considered standards for addressing sexual harassment, including sexual assault.

169.     The Final Rule's retaliation provision, which was not included in the Proposed Rule, provides that "[i]ntimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes [unlawful] retaliation."  Final Rule at 30,578 (§ 106.71(a)).  The provision also suggests that any action taken against a respondent for refusing to participate in an investigation or grievance proceeding—even if that is a calculated attempt to evade responsibility—will be treated as a form of "retaliation" now prohibited by the Final Rule.  *Id.*

170.     Institutions may therefore be reluctant to address misconduct that does not meet the Final Rule's definitions under their own codes of conduct, if doing so could expose these institutions to Title IX liability.

171.    The Department fails to grapple with the deterrent effects of this provision, or otherwise advise institutions how to maintain their own investigations initiated concurrently with or following the dismissal of a formal complaint.

172.    Institutions face additional challenges should they attempt to investigate sexual harassment before, or concurrent with, a Title IX investigation.  Institutional staff who question a respondent about sexual harassment allegations may not use any of the answers provided if a formal complaint is later filed against the respondent.  *Id.* at 30,287.  This exclusionary rule defies logic and appears to prevent an institution from using information about a respondent's actions—including conduct that plainly violates Title IX—simply because it was discovered before a formal complaint was filed.  Consequently, a school could be prevented from responding to sexual harassment about which it has *actual knowledge*, at plain odds with its statutory obligations under Title IX, if such knowledge was acquired too early.

173.    The Department fails to address the Final Rule's restraints on institutional autonomy and its conflict with schools' obligations to prevent, address, and remedy all sexual harassment that is impeding or denying access to its education program or activity.

> **6.  The Final Rule arbitrarily removes important notice requirements for prospective and current students and employees, but adds burdensome new publication requirements.**

174.    The Final Rule, without sufficient justification, removes longstanding requirements that institutions broadly disseminate their Title IX nondiscrimination policies, including striking requirements in the existing 34 C.F.R. § 106.9 that schools publish their policies in local newspapers, alumni publications, and written communications distributed to all students and employees, newly limiting the publication requirement to a school's "website, if any, and in each handbook or catalog" made available to applicants, students, parents, and

employees.  Final Rule at 30,573 (§ 106.8(b)).  The Final Rule removes the express

requirements, now contained in 34 C.F.R. § 106.9, that a school's policies be disseminated to

persons involved in admissions or recruiting of students or staff.  *Id.*  It also unjustifiably amends

the longstanding requirement that a school "shall not use or distribute a publication . . . which

suggests, by text or illustration, that [it] treats applicants, students, or employees differently on

the basis of sex," newly limiting it to publications "stating" a discriminatory policy.  *Id.*

175.    Since 1975, the Department has required that institutions claiming a religious

exemption submit a letter to the Department stating which parts of the regulation conflict with a

specific tenet of the religion.  34 C.F.R. § 106.12(b).  Institutions have also been required to

provide assurances to the Department of their Title IX compliance.  34 C.F.R. § 106.4(a).

Without justification, the Final Rule provides that an "institution is not required to seek

assurance from [the Department] in order to assert" a Title IX religious exemption.  *Id.* at 30,573

(§ 106.12(b)).  Moreover, in the event that the Department notifies an institution that it is under

investigation for noncompliance with Title IX, it "may at that time raise its exemption."  *Id.*

176.    The Department fails to offer an adequate justification for its proposed changes in

light of longstanding practice.  Nor does the Department explain how these requirements confuse

or burden recipients; nor does it point to any evidence of such confusion or burden.

177.    The Final Rule arbitrarily fails to consider how these relaxed requirements

conflict with other key obligations under Title IX, and their effect on students and prospective

students.  Since 1975, the Department has required institutions to provide students with notice of

the institution's compliance with Title IX.  34 C.F.R. § 106.9(a).  The Final Rule similarly

requires institutions to notify prospective and current students and employees of their Title IX

policies.  34 C.F.R. § 106.8(a).

178.    By excusing an institution from submitting a religious exemption to the Department until it is under investigation, the Final Rule allows recipients to avoid notice provisions with impunity, and discriminate against students without warning.  Such advanced notice of an institution's exemption from Title IX is especially important to women, LGBTQ students, pregnant or parenting students, and students seeking birth control or other reproductive health care.

179.    While easing these other requirements, the Final Rule newly imposes a mandate that schools publish all Title IX trainings on their websites, or otherwise make them publicly available, for a period of seven years.  Final Rule at 30,578 (§ 106.45(b)(10)(i)(D)).  This requirement was not included in the Proposed Rule and was not subject to notice and comment.

### 7.  The Final Rule ignores compliance with contrary federal law.

180.    The Final Rule either ignores or fails to address its interaction or conflict with other federal laws, including federal privacy laws, other civil rights laws protecting students and school employees, and protections for individuals with disabilities.

#### a.  The Final Rule allows for the disclosure of sensitive education records in conflict with FERPA.

181.    FERPA provides that no institutions receiving federal funds shall have a policy or practice of permitting the release of a student's educational records to private parties without the written consent of that student's parents.  20 U.S.C. § 1232g(b)(1).  Education records are any "records, files, documents, and other materials" that contain information "directly related to a student," that are "maintained by an educational agency or institution."  *Id.* § 1232g(a)(4)(A).

182.    The Final Rule's blanket requirement that an institution provide parties an opportunity to "inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon

which the recipient does not intend to rely," Final Rule at 30,576 (§ 106.45(b)(5)(vi)), conflicts

with an institution's FERPA obligations, as much of the evidence obtained through Title IX

investigations is sensitive personally identifiable information, and may be included within

education records.

183.    Although the Final Rule provides that medical information cannot be disclosed

without consent, the Final Rule still allows respondents and advisors to Title IX investigations to

access other sensitive information, such as a complainant's academic transcript in direct

contravention of FERPA's broad protections.

### b. *The Final Rule's new definition of "sexual harassment" conflicts with Title VI, Section 504, Title II, and Title VII.*

184.    The Final Rule's redefinition of sexual harassment departs from the definition

used by the Department for discriminatory harassment under Title VI, Section 504, and Title II.

It also conflicts with the definition of harassment used by the Equal Employment Opportunity

Commission and courts for cases involving sexual harassment against employees of educational

institutions.  These inconsistent definitions conflict with the Department's longstanding policy of

enforcing all civil rights laws similarly, and its obligation under Executive Order 12866 to

"avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or

those of other Federal agencies."  Moreover, this conflict exposes students and employees of

educational institutions to inconsistent protections, permitting or requiring institutions to ignore

harassment against students that it must address for employees.  It also mandates that schools

maintain separate, inconsistent regimes to resolve harassment complaints depending only on

whether the underlying conduct is based on sex or some other protected classification.

185.    The Final Rule's redefinition of "education program or activity" arbitrarily limits

institutions' ability to respond to sexual harassment, while the Department's policies for other

forms of discriminatory harassment are unchanged.  The Final Rule's redefinition thus creates a weaker enforcement regime for sexual harassment relative to all other forms of harassment.

186.    The Final Rule fails to address how schools should—or must—respond to harassment based on sex and one or more other bases, such as race, national origin, or disability. An African American student targeted for harassment because of the student's race and sex, for example, will now need to navigate multiple processes and conflicting standards in seeking help from the student's school, as will school officials charged with handling the complaint.

187.    Similarly, the Final Rule fails to instruct institutions on how to investigate sexual harassment complaints by employees, including student employees, that implicate both Title IX and Title VII.  The Final Rule mandates that a school must dismiss a complaint that does not rise to the level of sexual harassment as defined in the Final Rule, *id.* at 30,574 (§ 106.45(b)), even though this conduct may be actionable under Title VII's hostile work environment or sex-based harassment standards.  Accordingly, a school faces a Catch-22: either dismiss a complaint made by an employee alleging conduct that does not rise to the level of sexual harassment as defined in Title IX and risk liability under Title VII, or pursue an investigation of allegations under Title VII and risk liability under Title IX.

188.    Finally, the Final Rule fails to address likely conflicts between the onerous procedural requirements, including the cross-examination and live hearing requirements, and schools' Title VI obligations to serve students and parents with limited English proficiency.

> *c.   The Final Rule undermines protections for individuals with disabilities.*

189.    The Final Rule fails to grapple with institutions' concurrent obligations to students and employees under federal disability rights laws, including Section 504, Title II, and the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482 ("IDEA"), and the

conflicts between the Final Rule's prescriptive procedural requirements and individuals' rights under these laws.

190.    For example, the Final Rule's definition of "formal complaint" makes no exception for students with learning disabilities, students who are visually impaired, or students with other disabilities who would have extreme difficulty submitting a signed, written complaint. The Final Rule's definition of "complainant" also presumes that students are both aware of and have access to the Title IX coordinator and other responsible staff, without regard for the challenges this may pose for students with particular disabilities.

191.    The Final Rule's live hearing requirement will similarly negatively impact students with disabilities, who may not, or cannot, participate fully in such hearings.  The cross-examination requirement, and the other procedural requirements in the Final Rule, may also stigmatize and discriminate against students with disabilities.

> **8.  The Final Rule fails to acknowledge and quantify widespread harms and costs to schools resulting from its onerous requirements.**

192.    The Final Rule includes a Regulatory Impact Analysis purporting to quantify the costs and benefits of the Final Rule.  *See* Final Rule at 30,563-70.

193.    The cost-benefit analysis in the Final Rule expressly refuses to quantify the impact of the Final Rule on sexual assault incidents and harassment, despite the fact that such incidents have concrete and obvious costs and are the very conduct the Final Rule governs.  *Id.* at 30,539.  Although the Department itself acknowledges that the Final Rule will result in a net decrease of investigation into sexual harassment, it fails to consider the costs of a reduction in reporting, and instead only considers the potential cost savings of such reductions.  *Id.* at 30,547, 30,551.  Despite expressly declining to assess the true costs of the Final Rule on sexual

harassment outcomes, the Department concluded without evidence that "the mandatory offer of supportive measures in § 106.44(a)" will reduce negative outcomes. *Id.* at 30,545.

194.   The Final Rule further ignores or underestimates increased compliance and legal costs that will result from implementation of the Final Rule. *Id.* at 30,549.

195.   Moreover, the Final Rule's estimate of the annual rate of Title IX complaints based on sexual harassment or sexual violence is unreasonably low, and fails to account for current trends in sexual harassment complaints, including in the Department's own data.

**IV.   The Final Rule Arbitrarily and Unreasonably Imposes a One-Size-Fits-All Grievance Procedure on K-12 School Districts, Like NYCDOE, That Have the Duty to Educate Children in a Safe School Environment.**

**A.   NYCDOE's Policies and Procedures Implementing Its Obligation to Address Sexual Harassment in a Developmentally Appropriate and Pedagogically Sound Manner.**

196.   NYCDOE is committed to maintaining a safe and supportive educational and work environment for all students, employees, applicants for employment, and other individuals who do business with the NYCDOE, use NYCDOE facilities, or otherwise interact with the NYCDOE, that is free from unlawful discrimination, harassment, or bullying of students.  To further this goal, NYCDOE has promulgated a set of regulations that aim to prevent harassment, intimidation, discrimination, and bullying of students; require the reporting of this alleged conduct; ensure prompt, fair, and developmentally appropriate investigations; and provide both victims and accused students with interventions, supports and, where applicable for students who have been found to have engaged in sexual harassment, a pedagogically sound disciplinary response consistent with federal and state requirements.

197.   NYCDOE's specific policies and procedures implementing this commitment to students and employees are codified in Chancellor's Regulations A-830, *Anti-Discrimination*

*Policy and Procedures for Filing Internal Complaints of Discrimination* ("A-830"), A-831,

*Student-to-Student Sexual Harassment* ("A-831"), and A-832, *Student-to-Student*

*Discrimination, Harassment, Intimidation, and/or Bullying* ("A-832").[17]

198.     Because NYCDOE serves children in grades K through 12, and because

children's physical, emotional, and mental development is constantly evolving throughout their

elementary and secondary school years, the procedures that NYCDOE has developed to address

reports of sexual harassment involving students, either as a victim, witness, or the accused, seek

to address sexual harassment in a developmentally appropriate and pedagogically sound manner

focused on maintaining students' access to NYCDOE programs, activities, resources, and

supports.

199.     Because of the compulsory nature of elementary and secondary education, and

NYCDOE's responsibility to act in loco parentis during the school day, NYCDOE's policies and

procedures to address sexual harassment are also designed with the goal of resolving matters

expeditiously and with the flexibility needed to fashion age-appropriate remedies, interventions

and supports that allow schools to maintain a safe environment and to appropriately address

young students' physical, emotional, and educational needs.

   **1.  NYCDOE's policies preventing and addressing student-to-student sexual harassment.**

200.     A-831 sets forth NYCDOE's policy prohibiting sexual harassment committed by

students against other students.[18]  A-831 covers conduct between students that occurs during,

before, or after school hours, on school property, at school-sponsored events, on NYCDOE-

---

[17] The Chancellor's Regulations are available at https://www.schools nyc.gov/about-us/policies/chancellors-regulations/volume-a-regulations/3.

[18] NYCDOE's policies prohibiting student-to-student gender-based harassment, discrimination, intimidation, and bullying are set forth in A-832, which provides similar procedures for the reporting and investigating of such complaints.

funded transportation, or off school property, if the conduct disrupts or would foreseeably disrupt the educational process or endangers or would foreseeably endanger the health, safety, morals, or welfare of the school community.

201.    A-831 prohibits unwelcome conduct or communication of a sexual nature which is sufficiently severe, pervasive, or persistent as to: (1) substantially interfere with a student's ability to participate in or benefit from an educational program, school-sponsored activity, or any other aspect of a student's education; (2) create a hostile, offensive, or intimidating school environment; or (3) otherwise adversely affect a student's educational opportunities.  Sexual harassment may be a single incident or a series of related incidents.

202.    A-831 expressly covers sexual harassment committed through social media and/or other electronic communications.

203.    In addition, A-831 covers conduct that constitutes sexual harassment regardless of the gender, sexual orientation, gender identity, or gender expression of any of the students involved.

204.    A-831 sets forth a comprehensive reporting structure for complaints of student-to-student sexual harassment that provides multiple avenues for students, parents and other individuals to report student-to-student sexual harassment.  It also requires all school employees who witness or have knowledge or notice of student-to-student sexual harassment to immediately report the conduct through mandated channels.

205.    Pursuant to A-831, as required under DASA, NYCDOE investigates all covered allegations of sexual harassment and does not put the onus on young student victims, or on their parents or guardians, to informally or formally request an investigation before NYCDOE takes this investigative and remedial action.

206.    A-831 also sets forth procedures for resolving reports of student-to-student sexual harassment in a prompt, equitable, and developmentally appropriate manner that balances the need for both appropriate resolution and appropriate procedural protections for victims, witnesses, and accused students.  Developmentally appropriate methods are particularly important in order to minimize trauma to the impacted students and to increase reliability of the outcome.[19]

207.    Providing appropriate interventions and remedies is of paramount importance in the K-12 context both for safety and pedagogical reasons.  There are significant programmatic and legal impediments preventing the NYCDOE from removing a student from a school given students' right to compulsory education and to attend the public schools in the district in which they reside, *see* N.Y. Educ. Law § 3202(1), specific grade-level curricular and instructional requirements for students, some students' rights under federal laws to a particular school or classroom placement, due process protections afforded to students, and pedagogical interests in maintaining the continuity of instruction and minimizing disruptions to students' education.  Accordingly, NYCDOE must adhere to a careful scheme that ensures all students' rights are protected during and after an investigation and any disciplinary process.

208.    Prompt resolution is also important in the K-12 context in order for schools to provide pedagogically sound discipline to accused students.  A delayed response will be less effective at correcting behavior as appropriate.

209.    NYCDOE's prompt and equitable procedures provide for: (1) immediate notice to the victim and accused students, and their parents; (2) a completed investigation by the school

---

[19] The principal/designee is required to report any criminal activity to the New York City Police Department ("NYPD").  In addition, if a report cannot be appropriately investigated at the school level because of the nature and seriousness of the reported allegations, the principal/designee is to contact the Title IX Coordinator for further guidance.

principal or their designee ("principal/designee") within five school days of receipt of the report, including interviews and obtaining written statements from both parties and witnesses, and collection of all relevant evidence; (3) an evaluation by the principal/designee of whether the evidence substantiates the allegations and whether A-831 was violated using the preponderance of the evidence standard; and (4) within ten school days of receipt of the report, written notice to the parents of the victim and the parents of the accused student regarding whether any allegations are substantiated and whether the conduct constitutes a violation of A-831.

210.    NYCDOE's policies and procedures for addressing reports of sexual harassment do not allow students to question each other directly or through the principal/designee or to see the evidence that is collected, except as provided for in connection with a student's rights related to the imposition of a disciplinary suspension.  Indeed, NYCDOE does not place a student directly in an adversarial position with another student or employee under any circumstances. Students, including victims and witnesses, are often already reluctant to cooperate with investigations not only because of various social pressures, but also because of concerns for their safety in certain situations.  Subjecting student victims and witnesses to questioning by other students or disclosing the fact that a student witness has cooperated by sharing their statement with other students would have a marked chilling effect.

211.    Consistent with NYCDOE's obligation to educate all students and to act in loco parentis during the school day, A-831 also requires the principal/designee to provide interventions or supports to the victim, witnesses, and the accused student after the conclusion of the investigation and at any time during the investigation, as appropriate.  Examples of such interventions include counseling support, education or mental health services, and academic supports and adjustments such as changes in classes, lunch/recess, or after-school program

schedules, to the extent possible.  Principals/designees are required to develop individual support plans for students who have been the victim of, or students found to have engaged in, two or more violations of A-831 within any school year.

212.    If the principal/designee determines that the accused student violated A-831, they are required to take appropriate steps to ensure the conduct has stopped and may also impose a disciplinary response consistent with NYCDOE's Citywide Behavioral Expectations to Support Student Learning ("Discipline Code"),[20] which is NYCDOE's statutorily required code of conduct.  *See* N.Y. Educ. Law § 2801.  The Discipline Code utilizes a progressive model of discipline, which emphasizes social emotional learning and incremental interventions for positive behavioral change and accountability.

213.    If a principal/designee seeks to impose a disciplinary response that involves the removal of a student from a classroom or a suspension, Chancellor's Regulation A-443, *Student Discipline Procedures*, sets forth detailed procedures and requirements that must be followed in order to afford the student appropriate due process, as required by the Constitution and applicable laws.  *See*, *e.g.*, *Goss. v. Lopez*, 419 U.S. 565 (1975) (due process requirements for student discipline); N.Y. Educ. Law § 3214 (codifying same).

## 2.   NYCDOE's policies preventing and addressing sexual harassment of students by employees.

214.    It is NYCDOE's policy that sexual behavior of any form involving a NYCDOE employee where a student is involved is misconduct and will not be tolerated.

215.    A-830 requires any employee who witnesses sexual harassment by a NYCDOE employee or who has knowledge that a student may have been the victim of such behavior to report the conduct to the principal/designee within one school day and, within two school days,

---

[20] *Available at* https://www.schools.nyc.gov/school-life/know-your-rights/discipline-code.

to submit an electronic complaint to the NYCDOE Office of Equal Opportunity and Diversity

Management ("OEO").  Any individual, including parents and students, may file a complaint

with OEO.

216.    Chancellor's Regulation A-412 also requires NYCDOE employees to

immediately report any information concerning sexual misconduct by NYCDOE employees

involving students to their principal/supervisor and to the Special Commissioner of Investigation

for the New York City School District ("SCI"), a law enforcement agency that operates

independently of NYCDOE to investigate, among other things, allegations of sexual misconduct

by NYCDOE employees and vendors.  Parents and vendors may also report directly to SCI.

When the alleged misconduct would constitute a crime, NYCDOE principals and supervisors

must also notify the police.

217.    SCI generally investigates reports of sexual misconduct by employees that do not

rise to the level of criminal conduct or that the police decline to investigate.  OEO refers to SCI

all reports it receives of sexual misconduct by a NYCDOE employee.

218.    Once SCI conducts an investigation, it submits its final report, if the allegations

are substantiated, to the NYCDOE Chancellor (the "Chancellor").[21]

219.    Depending on the nature of the allegations, an employee who is the subject of the

investigation may be removed or reassigned from their position while the SCI investigation is

pending.  NYCDOE may also provide interventions and supports to the victim and witnesses of

the reported sexual harassment or misconduct, as appropriate.

---

[21] In some cases, depending on the allegations, SCI may refer a report of sexual misconduct by an employee back to
OEO without conducting an investigation.  In those cases, OEO conducts an investigation in the same manner as it
investigates complaints of sexual harassment filed by an employee against another employee.

220.    Upon receipt of an SCI report that substantiates allegations of sexual misconduct or sexual harassment, NYCDOE can proceed to disciplinary proceedings, which vary dependent upon the title and status of the subject employee.  Discipline may include immediate termination, suspension, a letter to file, and/or a disciplinary hearing as required by state law and collective bargaining agreements.  *See* N.Y. Educ. Law § 3020-a; N.Y. Civ. Serv. Law § 75.

### 3.  NYCDOE's policies preventing and addressing sexual harassment of employees by other employees.

221.    NYCDOE's policies for investigating and adjudicating complaints of sexual harassment of an employee by another employee comply with applicable law, including Title IX, Title VII, the New York State Human Rights Law, and the New York City Human Rights Law.

222.    A-830 provides broad protections from sexual harassment for employees, including from unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

223.    Any NYCDOE employee may file a sexual harassment complaint regarding another employee with OEO within one year of the event that is the subject of the complaint.

224.    OEO investigates such complaints and prepares a report for the Chancellor regarding whether the allegations are substantiated by a preponderance of the evidence and whether the respondent has violated A-830.

225.     OEO notifies the respondent employee in writing of the Chancellor's determination regarding whether the employee has violated A-830.

226.     If the violation results in discipline, then discipline is imposed as appropriate and according to the nature of the person's title and status as an employee.  Discipline may include termination, suspension, a letter to file, and/or a disciplinary hearing required by state law and collective bargaining agreements.  *See* N.Y. Educ. Law § 3020-a; N.Y. Civ. Serv. Law § 75.

**B.     The Final Rule Imposes Grievance Procedures that Require K-12 Students to Engage in an Adversarial Process That Is Not Developmentally Appropriate or Suitable for School-Age Children and Will Traumatize Students.**

**1.   The Final Rule creates a formal adversarial process that is unsuitable for and harmful to K-12 students.**

227.     The Final Rule imposes formalized grievance procedures that require elementary and secondary schools to force children as young as four years old into adversarial roles in a litigation-like proceeding.  K-12 schoolchildren should not be burdened with a system that assumes they possess the same judgment, experience, or maturity as adults to understand or participate in the adversarial process envisioned in the Final Rule.

228.     Requiring a child victim to participate in the adversarial process created by the Final Rule will be particularly traumatizing where the adversary is an adult employee.  The adversarial process is also developmentally inappropriate and will be traumatizing to student victims and witnesses as well as to students accused of sexual harassment.

229.     The Final Rule creates an undue burden on parents and students to obtain support from an attorney or other advisor in order to navigate the new responsibilities placed on the parties.  Under the existing non-adversarial NYCDOE procedures, the majority of those responsibilities are handled by NYCDOE staff.

230.    Several provisions in the Final Rule arbitrarily require K-12 schools to treat the victim and accused employee or student as adversaries in a manner that will cause a chilling effect, re-traumatize students, and impede the ability of K-12 schools to effectively identify, respond to, and investigate the allegations of sexual harassment:

- Schools must disclose to both the victim and the accused employee or student all evidence obtained as part of the investigation that is directly related to the allegations raised in the formal complaint and give them at least ten days to submit a written response.  Final Rule at 30,576 (§ 106.45(b)(5)(vi)).

- Schools must prepare an investigative report that summarizes the relevant evidence and send it to both parties at least ten days before the determination of responsibility for their review and response.  *Id.* at 30,576-77 (§ 106.45(b)(5)(vi)).

- As part of the response to the investigative report, the victim and the accused employee or student must have the opportunity to submit written cross-examination questions to the other party (other than certain prohibited questions) and to the witnesses.  After receiving the answers, parties must be given the opportunity to submit follow-up questions.  *Id.* at 30,577 (§ 106.45(b)(6)(ii)).

231.    Reviewing evidence or an investigative report in order to prepare a response or to formulate questions for an adversary or witnesses would be a challenge for an adult; for a K-12 student, particularly younger students, it is developmentally inappropriate and will be at best incomprehensible and at worst traumatizing for the victim and/or the accused student to have to participate in the review of an investigator's accumulation and evaluation of evidence regarding whether the student was the victim or found to have engaged in sexual harassment.

232.     The creation of disclosure requirements akin to discovery required in criminal and civil proceedings is inappropriate for the K-12 school context.

233.     It is unreasonable and irrational to burden K-12 students and their parents with the responsibility of creating and responding to written cross-examination questions (and further follow-up questions) regarding allegations of sexual harassment.  Forcing K-12 students to confront written, potentially leading, cross-examination questions and prepare written answers will re-traumatize victims and witnesses and is counterproductive to creating a supportive school environment.

234.     The Final Rule's requirements that K-12 schools disclose all evidence obtained as part of the investigation and allow for written cross-examination of witnesses as a matter of regular practice in Title IX investigations is inappropriate in the K-12 context.  Children do not have the judgment, maturity or experience to understand the obligation or necessity to keep such information confidential and as a result may disclose sensitive information regarding other students or employees.  In addition, children are often already reluctant to cooperate with investigations as a result of social pressures and safety concerns and will be even less likely to do so once they understand that the school will regularly identify witnesses and provide their statements and any other evidence obtained as part of the investigation to the victim and the accused student or employee.[22]  These procedures will have a chilling effect on the reporting of sexual harassment and, therefore, will significantly impede schools' ability to prevent and address sexual harassment.

---

[22] Disclosure of student witness statements and any other evidence obtained as part of the investigation to another student or an employee may violate Chancellor's Regulation A-820, *Confidentiality and Release of Student Records; Records Retention*, as well as FERPA, which protect the privacy and confidentiality of a student's educational records from disclosure without consent or an applicable exception.

235.    The Final Rule fails to adequately consider the developmental differences between K-12 students and adults in the higher education context and arbitrarily imposes a one-size-fits-all adversarial proceeding on all students that will be harmful to K-12 victims, witnesses, and accused students.

236.    The Final Rule also arbitrarily fails to consider that because K-12 schools cannot deprive a student of educational benefits without providing due process, K-12 schools already provide students who are determined to be responsible for sexual harassment with due process that meets Constitutional requirements before imposing discipline.

> ### 2.  The Final Rule repeatedly subjects school-age victims and witnesses to multiple and unnecessary traumatizing interviews and encounters with adult investigators.

237.    The grievance procedures imposed by the Final Rule will require vulnerable children to be repeatedly questioned by multiple adults about the details of their sexual harassment and abuse.  For example: (a) the victim may make an initial report to an employee; (b) the victim will have to discuss the allegations with the Title IX Coordinator (Final Rule at 30574-75 (§ 106.44(a)); (c) if the victim or the Title IX Coordinator files a formal complaint, the victim will be re-interviewed and witnesses will be interviewed as part of the school's investigation; and (d) the victim and witnesses will have to submit to written cross-examination (and further follow up questions) directly by the accused student or employee, or their advisor. Final Rule at 30,577 (§ 106.45(b)(6)(ii)).

238.    Children who have been victimized by an employee, or another student where the student conduct is criminal in nature, will also face further questioning.  NYCDOE considers any conduct of a sexual nature involving an employee and a student to be sexual misconduct that must be referred to the NYPD and/or SCI, an independent law enforcement agency with trained

law enforcement investigators.  NYPD and/or SCI will interview the victim and any student witnesses, at least once if not multiple times, and if the employee is eventually arrested and prosecuted, victims and witnesses may have to testify at criminal hearings and trials, which may also include cross-examination.

239.    The Final Rule deprives schools of their discretion to a utilize a trauma-informed approach that reduces the number of times a child is asked to recount their sexual harassment or abuse, particularly where SCI or NYPD is involved, and instead imposes an arbitrary mandate that will require school-age victims to repeatedly retell and relive their abuse in front of strangers and in some cases, their abuser.

240.    The Final Rule subjects school-age victims and witnesses to repetitive interviews by many adults that will be re-traumatizing, could have a detrimental effect on a child's education, and may also result in less reliable investigations as memories fade over time or students and witnesses move on to other schools or decide not to cooperate, all of which will make it more difficult for schools to effectively investigate allegations of sexual harassment.

### 3.   The Final Rule arbitrarily and unreasonably creates an adversarial process that prevents K-12 schools from promptly investigating complaints of sexual harassment

241.    Prompt resolution of complaints of sexual harassment is important in the K-12 context both for student safety and for schools to impose pedagogically sound interventions and discipline to accused students.

242.    NYCDOE currently requires schools to investigate and issue a determination regarding a report of student-to-student sexual harassment within ten school days and to promptly provide interventions and impose any disciplinary response in accordance with

NYCDOE's "Citywide Behavioral Expectations to Support Student Learning," also known as the Discipline Code.

243.    NYCDOE's Discipline Code is adopted in accordance with New York Education Law § 2801, which mandates that school districts adopt codes of conduct to maintain order on school property.  Because school districts act in loco parentis to K-12 students during the school day, schools have a particularly strong interest in maintaining order on school property and ensuring student health and safety.  The Discipline Code sets forth clear expectations for student behavior.  In order for it to be effective, the NYCDOE must apply the code consistently, and respond swiftly, and promptly to address student misconduct, while simultaneously ensuring that any discipline imposed still affords full due process protections for students.

244.    In contrast, the Final Rule imposes grievance procedures that will undoubtedly take many weeks, if not months, to complete.  The Final Rule requires schools to, *inter alia*: (a) provide both parties an electronic or hard copy of all evidence obtained as part of the investigation that is directly related to the allegations raised in the formal complaint and wait at least ten days for any response before finalizing the investigatory report required by the Final Rule, Final Rule at 30,576 (§ 106.45(b)(5)(vi)); (b) prepare an investigatory report summarizing the relevant evidence and provide both parties at least ten days to submit a response to the report, including written cross-examination questions for the other party and witnesses, *id.* at 30,576-77 (§§ 106.45(b)(5)(vii), 106.45(b)(6)(ii)); (c) assign a different person to be the decision-maker to review the investigatory report and responses from the parties, and oversee a time-consuming process for written cross-examination and re-cross-examination, *id.* at 30,577 (§§ 106.45(b)(6)(ii), 106.45(b)(7)(i)); (d) issue an extremely detailed written determination similar to what a judge would issue after a civil bench trial or a hearing officer would issue after an

administrative hearing, *id.* at 30,577 (§ 106.45(b)(7)(ii)); and (e) provide both parties certain appeal rights, assign a third person to review the appeal and issue a written decision explaining the result, *id.* at 30,577-78 (§106.45(b)(8)).

245.    By delaying disciplinary consequences for weeks, or even months, the Final Rule minimizes the pedagogical effect disciplinary sanctions have on a child.  A delayed disciplinary response will be less effective at correcting behavior and will not have the same deterrent and remedial impact individually, school-wide, and cumulatively and systemically across the NYCDOE.  Such a result is counterproductive to NYCDOE's emphasis on progressive discipline and the fostering of supportive school environments.

246.    This prolonged timeframe will also significantly impede NYCDOE's ability to maintain order, and ensure student health and safety, by delaying NYCDOE's adjudication of sexual harassment complaints and imposition of appropriate disciplinary responses in accordance with the Discipline Code.

247.    The Final Rule does provide that a student can be removed from school during the weeks and potentially months of investigation required by the grievance procedures, but arbitrarily limits such removal to circumstances where there is an "immediate threat to the physical health or safety of any student or other individual arising from the allegations of sexual harassment."  Final Rule at 30,575 (106.44(c)).  This is in direct conflict with New York State law that appropriately gives schools discretion to suspend a student pending a hearing for any conduct that "poses a continuing danger to persons or property or an ongoing threat of disruption to the academic process."  N.Y. Educ. Law § 3214(3)(b)(1).  The Final Rule's arbitrarily imposed standard may prevent NYCDOE from removing a student that poses a danger to other students or disrupts the school environment during the weeks, even months, of the required

grievance procedures, which will frustrate NYCDOE's obligation to ensure a safe school environment.

248.    In cases where NYCDOE could meet the Final Rule's arbitrary standard to remove a student, the Final Rule's grievance procedures directly conflict with the complex legal framework for student disciplinary proceedings required by Constitutional mandates[23] and obligations with regard to students with disabilities promulgated under the IDEA.[24]

249.    The NYCDOE must provide a student that is subject to an emergency removal under the Final Rule with a due process hearing (with the opportunity to present evidence and question and present witnesses) within five days of the removal.[25]  For students with disabilities, NYCDOE is required to hold a Manifestation Determination Review within ten school days of the removal, in order to determine whether the student's behavior was a manifestation of the student's disability.  These proceedings would occur prior to the completion of the grievance procedures, and essentially require findings of fact to be made before completion of the Final Rule's grievance proceedings.  After the completion of the Final Rule's grievance proceedings, if a further suspension is deemed appropriate, the student may be entitled to another due process hearing in connection with the suspension.  Thus, the Final Rule untenably imposes on schools, parties, and witnesses multiple and redundant factfinding hearings throughout the complaint process, where student victims could be asked to testify repeatedly, and the accused student may also be subject to multiple suspensions for the same conduct.

---

[23] *See*, *e.g.*, *Goss*, 419 U.S. at 565.
[24] 20 U.S.C. § 1400 et seq.; 34 C.F.R. pt. 300; codified with respect to New York State at *e.g.*, N.Y. Educ. Law §§ 3214, 4404; 8 NYCRR pt. 201.
[25] *See* N.Y. Educ. Law § 3214(3)(c).

## INJURY TO PLAINTIFFS

250.    The Final Rule harms Plaintiffs' economic interests, as well as the State's

sovereign, and quasi-sovereign interests.

### A.    The Final Rule Harms Plaintiffs' Economic Interests.

251.    The State, through NYSED and the SUNY system, directly oversees over 5,000

public elementary and secondary schools, serving approximately 2.6 million students, and public

colleges and universities, serving more than 700,000 students in two-year, four-year, and

graduate programs.[26]  SUNY and NYSED are governed by the Board of Regents, which is

responsible for the general management and supervision of all educational activities within the

State, including K-12 schools, postsecondary institutions, and cultural institutions.  In addition,

there are more than 100 private colleges and universities in the State that are subject to Title IX's

requirements, serving over 500,000 students.[27]  NYCDOE is the largest public school district in

the nation, serving 1.1 million students in over 1,600 schools.  In total, New York educational

institutions affected by the Final Rule serve over 3.8 million students.

252.    Educational institutions in New York, including those operated or governed by

Plaintiffs, will expend significant financial resources in order to implement the Final Rule.

Although the Final Rule acknowledges some costs to institutions in implementing the Final Rule,

it fails to adequately consider the full range of administrative and financial burdens that

institutions will experience or to weigh those costs against any benefits of these onerous

requirements.

---

[26] N.Y. State Educ. Dep't, NYSED Data Site, https://data nysed.gov/ (containing links to higher education and public K-12 school enrollment data for the 2018-2019 school year).
[27] *Id.*

253.    The Final Rule imposes a host of new, stringent limitations on the ability of

educational institutions to prevent, respond to, and investigate allegations of sexual harassment

and assault, and other conduct, along with onerous, arbitrary procedural requirements to resolve

complaints of sexual harassment.  These provisions will impose new, unjustified financial and

administrative burdens on Plaintiffs and New York's educational institutions, which must

implement these costly changes or risk losing billions in critical federal funds that they rely on to

provide education to New York students.  SUNY, the largest system of public colleges and

universities in New York and one of the largest public higher education systems in the country,

receives over $1 billion annually in federal funds.  NYCDOE receives $1.8 to $2 billion annually

in federal funds, including approximately $680 million under Title I of the Elementary and

Secondary Education Act and over $480 million to provide free breakfasts and lunches to

students.

254.    First, the Final Rule mandates dozens of new procedural requirements, *see*

106.45(b), including, that higher education institutions provide for a live hearing, including

cross-examination "conducted directly, orally, and in real time by the party's advisor of choice."

Final Rule at 30,577 (§ 106.45(b)(6)(i)).  If a student does not have an advisor, the institution

must provide one at no cost to the student.  *Id.*  An institution may "not rely on any statement of

[a] party or witness [that does not submit to cross-examination] in reaching a determination

regarding responsibility."  *Id.*  For virtual live hearings, or where a complainant does not wish to

be in the same room as the respondent, institutions are required to provide "technology enabling

participants simultaneously to see and hear each other."  *Id.*

255.    The Final Rule also prohibits the decision-maker at grievance hearings from being

the person who investigated the underlying complaint, or the person who serves as Title IX

81

coordinator, requiring schools to hire multiple people to perform functions previously performed by one person. *See* Final Rule at 30,577 (§ 106.45(b)(7)(i)). Where schools lack resources to hire new employees to fulfill these roles, they will be compelled to divert existing staff away from other important educational functions to comply with the prescriptive Title IX requirements.

256. Plaintiffs and New York educational institutions will incur significant expenses to understand and comply with the Final Rule and its lengthy, cumbersome, and often confusing new mandates, including by: familiarizing themselves with the extensive requirements of the Final Rule, considering and establishing new policies and procedures to comply with those requirements, training employees and students on their rights and obligations, hiring and training additional staff to fulfill each stage of the grievance process, purchasing new technologies to comply with the live hearing requirement, and complying with other aspects of the Final Rule.

257. Smaller institutions, such as community colleges, will be hardest hit by the economic and administrative burdens caused by compliance with the Final Rule's new grievance procedures. Not only will these institutions have to hire new staff, but, as these institutions typically do not have in-house counsel, they also will have to retain outside attorneys and assume the high cost of obtaining legal advice on how to comply with the Final Rule.

258. The complicated matrix created by the Final Rule's definitions and prescriptive grievance procedures will increase institutions' legal and compliance costs. The Final Rule's inconsistencies with federal, state, and local laws, and long-standing practices means that institutions will need to spend more time evaluating how to comply with various conflicting requirements, and will face new threats of liability if they comply with the Final Rule. For example, compliance with the Final Rule could expose institutions to liability under Title VII,

given that Title VII's definition of actionable sexual harassment covers a much broader range of conduct than the Final Rule's definition.  Similarly, compliance with the Final Rule could expose institutions to liability under Section 504 or Title II, as the Final Rule's live hearing and formal complaint requirements do not currently provide accommodations for students whose disabilities would limit their ability to meet these requirements.

259.    Institutions may also need to expend significant resources on conducting successive or parallel investigations where underlying conduct overlaps with other legal or code of conduct prohibitions, to the extent such proceedings are not barred by the Final Rule's preemption and retaliation provisions.  Moreover, both complainants and respondents will have new grounds to challenge institutional compliance with the Final Rule, including respondents' newly-conferred ability to challenge alleged procedural noncompliance with the Title IX regulations, that will likely force schools to assume the burdens and costs associated with investigating and resolving those complaints, and in defending themselves in any investigation by the Department into alleged procedural violations of the detailed new rules.

260.    Alone and in combination, these severe constraints on Plaintiffs' operation and governance of educational institutions will dramatically undermine their effectiveness and efficiency, and lead to significantly increased costs.

**B.    The Unreasonably Short Implementation Deadline in the Midst of the Global COVID-19 Pandemic Will Harm Plaintiffs.**

261.    In normal times, it would be difficult, if not impossible, for most schools in New York and elsewhere to comply with the Final Rule (including familiarizing themselves with the rule, revising policies, conducting trainings, and purchasing technology) within the 87-day period between the Final Rule's publication and effective dates, particularly as the Final Rule represents a radical alteration of the Department's decades-old policies.  The global COVID-19

pandemic has severely disrupted school operations in New York and across the country, and will likely to continue to do so in the coming months and beyond.  The Department's refusal to provide a reasonable implementation period under these circumstances is patently unreasonable and indefensible.  Institutions' implementation of the Final Rule will impose undue economic and administrative burdens on New York's educational institutions, exacerbated by the pandemic-related fiscal and administrative challenges they are facing.

262.    At a time when institutions' focus is properly on maintaining operations and educating their students under unprecedented conditions, the need to devote significant resources this summer to implementation of the Final Rule will impinge on these efforts and harm schools and their students as a result.

263.    Following the Governor of New York's declaration of a state of emergency on March 7, 2020 due to COVID-19, New York State has been in the throes of an unprecedented public health crisis.  *See* N.Y. Exec. Order 202, *Declaring a Disaster Emergency in the State of New York* (Mar. 7, 2020).

264.    New York is one of the epicenters of the pandemic and has suffered catastrophic losses due to COVID-19.  As of June 3, 2020, nearly 375,000 people in the State have been diagnosed with COVID-19 and nearly 25,000 New Yorkers had died from it.[28]  In New York City alone, 201,806 residents have been diagnosed with COVID-19, 52,456 have required hospitalization to treat it, and at least 16,933 have died from it.[29]  Nationally, nearly 1.8 million

[28] N.Y. Dep't of Health, COVID-19 Tracker, https://covid19tracker.health ny.gov (last accessed June 3, 2020).
[29] N.Y.C. Dep't of Health & Mental Hygiene, COVID-19: Data, https://www1 nyc.gov/site/doh/covid/covid-19-data.page (last accessed June 3, 2020).

people have been diagnosed with COVID-19 and over 100,000 people have died from the disease.[30]

265.    In response to this extraordinary public health emergency, the Governor ordered all schools in New York to close temporarily on March 18, 2020.  N.Y. Exec. Order No. 202.4. This executive order was extended several times and remains in effect.

266.    As a result, most public and private K-12 schools, colleges, universities, and other educational institutions in the State are closed, with millions of students being forced to learn remotely.  The same is true for most educational institutions in other states, which are attended by many of the State's residents.

267.    This sudden transition to remote learning has transformed the educational landscape of New York State.  With students, and institutional staff scattered among homes and offices across the country, educational institutions now face the daunting task of teaching, counseling and providing critical services to students remotely.

268.    For most schools, moving virtually all of the services provided to students online requires an institution-wide overhaul.  This process strains institutional resources and is immensely challenging for teachers, faculty, students and their caretakers.

269.    In addition to educating over three million students, many public universities in New York have also been called upon to provide critical medical care and public health expertise as part of the State's efforts to combat COVID-19.  Staff within the SUNY hospital system, in particular, are on the frontlines of fighting this pandemic.

270.    The changes required by the lengthy Final Rule would be difficult for institutions to digest and implement under normal circumstances.  But in the midst of a global pandemic, the

---

[30] Centers for Disease Control & Prevention, CDC COVID Data Tracker, https://www.cdc.gov/covid-data-tracker/ (last accessed June 3, 2020).

burden placed on institutions is not only untenable, but risks undermining the health and safety of New York residents.

271.    Certain changes mandated by the Final Rule, such as the live hearing requirement, are practically impossible to implement while schools are closed.  The Final Rule's significant departure from Department practice will also sow confusion for ongoing Title IX investigations, many of which are already complicated by school closures.

272.    Given the incredible challenges already facing New York's educational institutions, they should not be asked to divert critical resources in order to implement the Final Rule's arbitrary, unlawful, and unprecedented changes.

273.    Ignoring requests by states and educational institutions to delay issuance of the Final Rule during the pandemic, the Department refused to delay publication of the rule and ordered institutions to implement it in a mere 87 days.  After the Final Rule was released, Secretary DeVos dismissed concerns about the short implementation period, stating, "We've been working on this for more than two years so it's not a surprise to institutions that it was coming,"[31] disregarding the fact that the Final Rule differed in significant respects from the Proposed Rule and the virtual impossibility of digesting the lengthy, complex rule; developing and approving new policies to implement the significant changes from existing practice and onerous new procedural requirements; training faculty, staff, and students on their modified rights and obligations under the Final Rule; and simultaneously dealing with the unprecedented and evolving changes related to the COVID-19 pandemic, all during the summer months.

---

[31] Mark Keierleber, *DeVos releases Title IX campus sexual assault rule, courting controversy amid coronavirus pandemic*, LA School Report (May 6, 2020), http://laschoolreport.com/devos-releases-title-ix-campus-sexual-assault-rule-courting-controversy-amid-coronavirus-pandemic/.

C.     **The Final Rule Interferes with Plaintiffs' Effective Administration and Enforcement of State Laws and Institutional Policies.**

274.    New York has enacted laws that carefully balance the rights of students to attend schools without experiencing sex discrimination, with concerns regarding fairness to respondents, and the interests of educational institutions to respond in an appropriate manner for their specific campuses.  New York educational institutions have also developed policies, practices, and procedures for investigating sex discrimination and other conduct violations consistent with federal and state due process requirements and codes of conduct, which ensure that educational environments are appropriately protected from various conduct that prevents students from learning and thriving.  The Final Rule upsets these carefully crafted balances, frustrates Plaintiffs' ability to comply with New York law and their own institutional policies, and adds confusion regarding how Plaintiffs and New York educational institutions must investigate and remedy sexual harassment.

275.    First, the Final Rule's narrow definitions, restrictions on institutional responses, and dismissal provisions conflict with New York's Enough is Enough law, which was enacted to combat sexual assault on college and university campuses statewide, and DASA, which provides broad protections for K-12 students and imposes obligations on K-12 schools to prevent and respond to gender-based discrimination, harassment, including sexual harassment, intimidation, and bullying.  For example, Enough is Enough applies to students "regardless of whether the violation occurs on campus, off campus, or while studying abroad."  N.Y. Educ. Law § 6440(6).  The Final Rule's geographic limitations on what constitutes an education program or activity, *see* 106.44(a), directly conflict with this provision.  Enough is Enough explicitly includes confidentiality and privacy protections for students, including that institutions must comply with FERPA, *see id.* § 6440(2), and that reports to institutions "shall be investigated in accordance

with institution policy and a reporting individual's identity shall remain private at all times if said reporting individual wishes to maintain privacy," *see id.* § 6444(1)(f); *see also id.* §§ 6444(1)(c)-(e), 6446. The Final Rule's mandatory disclosure requirement, Final Rule at 30,576 (§ 106.45(b)(5)(vi)), also conflicts with Enough is Enough's requirement that schools comply with FERPA. The Final Rule also creates potential conflicts with DASA's investigation requirements for sexual harassment in K-12 schools.

276.   Second, the Final Rule creates uncertainty with respect to how institutions should investigate claims of sexual harassment and sexual assault. The Final Rule's restrictions on which university staff can receive "formal complaints" interferes with procedures that have been collectively bargained for, and through which employees covered under certain contracts agree to become "responsible employees." Likewise, NYCDOE and other K-12 school districts, consistent with their commitment to maintaining a safe and supportive learning and work environment for all students, employees, and others, and duties under federal, state and local law, must now grapple with how to investigate conduct that does not meet the Final Rule's revised definition of sexual harassment, but is still conduct that would violate state and/or local law, without running afoul of the Final Rule's preemption and retaliation provisions. The Final Rule offers no guidance on how institutions can reconcile its unduly restrictive definition of "sexual harassment" with the definitions offered in competing federal laws or with existing duties under collective bargaining agreements. Nor does the Final Rule offer any guidance to NYCDOE or other K-12 districts on how to reconcile the many existing legal protections for K-12 students and staff in this area that are incompatible with the Final Rule.

277.   Third, the Final Rule fails to sufficiently define key terms, including its failure to define "bias" and "conflict" in the requirement that decision-makers must be free of bias and

conflict, and its failure to define "specific circumstances [that] prevent the recipient from gathering evidence sufficient to reach a determination" with respect to permissive dismissals. *See* Final Rule at 30,576 (§ 106.45(b)(3)(ii)).

278.     Fourth, the Final Rule fails to account for the fact that institutions will have to notify students of numerous, significant changes to its Title IX framework at a time when all students are away from schools.

279.     Finally, the Final Rule also conflicts with New York schools' policies and procedures governing a wide variety of conduct to ensure full participation and access to education, while balancing due process concerns as required by federal and state law.

**D.      The Final Rule Harms New York's Educational Institutions and the Provision of Education to All Students.**

280.     The Final Rule interferes with the right and statutory obligation of Plaintiffs, educational institutions in New York, and schools throughout the country to provide a safe, nondiscriminatory learning environment for their students.  Schools have a legal obligation and pedagogical interest in ensuring that all students—including survivors of sexual harassment—are able to learn in a safe environment.  As the Department has long recognized, sex discrimination threatens the maintenance of a safe learning environment, and "can interfere with a student's academic performance and emotional and physical well-being."  2001 Revised Guidance at ii. Accordingly, "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn."  *Id*.

281.     By interfering with a school's ability to maintain a learning environment conducive to teaching and learning, restrictions on the school's ability to respond to and prevent harassment like those contained in the Final Rule frustrate that interest.  The Final Rule directly interferes with schools' ability to take the many preventive and proactive actions previously

required by Title IX.  By arbitrarily narrowing the definition of sexual harassment and limiting

schools' ability to respond, the Final Rule imposes barriers on schools' ability to effectively

address the broad range of sex-based misconduct that impedes or denies students' educational

opportunities, in conflict with Title IX's statutory mandate and schools' educational missions.

282.     Not only will their educational access be limited, but many students may opt to

miss classes or drop out of school altogether due to a lack of safety, and compounding frustration

due to their school's lack of response.  These students experiencing sexual harassment at school

will no doubt face compounding physical, psychological, and emotional trauma as they watch

the perpetrators go unpunished.  As a result, many victims of harassment may reasonably choose

not to report it to their schools, to avoid being subjected to the onerous and lengthy grievance

procedures that may result in no relief or protection from future harassment.  The hostile

environment that many survivors will face—either during the prolonged period of the grievance

procedures or from remaining silent—will harm them and their classmates.

283.     The Final Rule also mandates cumbersome procedures that are not

developmentally appropriate for children and will take weeks, if not months, to complete.  This

will impede Plaintiffs' interests in ensuring a safe educational environment for all students by

promptly and effectively investigating and adjudicating complaints of sexual harassment,

including the unique interests of minor children attending K-12 schools operated by NYCDOE

and other New York school districts.

### E.     The Procedures Mandated by the Final Rule will Harm NYCDOE Students.

284.     By limiting NYCDOE's ability to prevent, swiftly address, and properly

adjudicate allegations of sexual harassment, the Final Rule infringes on students' right to an

educational environment free from sexual harassment.

285.     The Final Rule also requires school-age children to participate in an adversarial process that is not developmentally appropriate and will be traumatizing to the victim, especially where the student's adversary is an adult employee, as well as to student witnesses and students who are accused of sexual harassment.  It also requires schools to conduct repeated interviews, which will needlessly re-traumatize child victims and witnesses.

286.     The Final Rule also creates a cumbersome grievance proceeding that will take weeks or even months for a K-12 school to complete, causing ongoing harm to school-age victims, witnesses and accused students.

**F.     The Final Rule Harms the State's Interests in Protecting Civil Rights.**

287.     Plaintiff has an interest in protecting the civil rights of its citizens, which the Final Rule dramatically undermines.

288.     The Final Rule would impose disparate and harmful burdens on women, LGBTQ students, students of color, and students with disabilities.  For example, women and LGBTQ students are more likely to experience sexual harassment and sexual assault in schools as compared to other populations.[32]  The Final Rule's unlawfully narrow definitions and limitations on actionable behavior are likely to hinder institutions' ability to take preventive or remedial action, and will therefore cause even more women and LGBTQ students to experience sexual harassment and sexual assault while at school.

289.     Many of the Final Rule's restrictive definitions and heightened grievance procedures will disproportionately impact students with disabilities by imposing onerous barriers to seeking and obtaining relief from sexual harassment imposed by the Final Rule.

---

[32] *See* Ass'n of Am. Univs., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct* xii–xvi (2017), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Administrative Procedure Act – Exceeds Statutory Authority)

290.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

291.    Under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

292.    Defendants may only exercise authority conferred by statute.

293.    The Final Rule exceeds Defendants' authority under Title IX because the Final Rule legislates and implements narrow definitions and requirements that frustrate and limit the obligation of schools to ensure that no person "shall . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" any federally funded education program or activity "on the basis of sex."  20 U.S.C. § 1681(a).

294.    In addition, the Final Rule establishes prescriptive grievance procedures that purport to regulate conduct outside of Title IX's prohibition of discrimination based on sex and undermine the autonomy of New York's education institutions.  Title IX only authorizes the Department to issue rules "to effectuate the [anti-discrimination] provisions of [Title IX]."  20 U.S.C. § 1682.  The Final Rule exceeds this authority by casting a school's actual or alleged noncompliance with the prescriptive grievance procedures as a form of sex discrimination, and using that label to permit students accused of sexual harassment to challenge the outcome of grievance procedures through the Title IX administrative enforcement process, absent *any*

evidence that accused students have been systematically disadvantaged "on the basis of sex" or that the conferral of these new rights will advance Title IX's purpose.

295.   The Final Rule is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA.  5 U.S.C. § 706(2)(C).

296.   Defendants' violation causes ongoing harm to Plaintiffs and to the State's residents.

## SECOND CLAIM FOR RELIEF

### (Administrative Procedure Act – Not in Accordance with Law)

297.   Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

298.   Under the APA, a court must set "aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

299.   The Final Rule conflicts with Title IX, including by, *inter alia*, narrowing the scope of protected activity in contravention of the statute's broad anti-discrimination mandate, and narrowly redefining the term "program or activity" only in the context of sexual harassment.

300.   The Final Rule conflicts with FERPA, which prohibits the unauthorized disclosure of students' educational records.  20 U.S.C. § 1232g(b)(1).

301.   The Final Rule conflicts with Section 504, which prohibits the federal government from discriminating against individuals with disabilities.  29 U.S.C. § 794(a).

302.   The Final Rule conflicts with Executive Order 12866 which, *inter alia*, instructs that an agency "shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies."  Exec. Order 12866 § 1(b)(10), 58 Fed. Reg. 51,735 (Sept. 30, 1993).  The Final Rule conflicts with the unamended portions of the

Department's Title IX regulations by, for example, (a) adding a new definition of "program or activity" applicable only to sexual harassment that is inconsistent with the existing, unchanged definition of the term in 34 C.F.R. § 106.2(h), and (b) restricting schools from responding to or remedying sexual harassment, in conflict with the longstanding and continuing requirement that schools affirmatively address all forms of discrimination on the basis of sex contained in 34 C.F.R. § 106.3(b). The Final Rule also conflicts with the Department's regulations governing its enforcement of discriminatory harassment based on other protected classifications under Title VI and Section 504; other Department regulations governing student privacy, language access, and disability rights; and Title IX regulations promulgated by other federal agencies.

303.    The Final Rule further conflicts with Executive Order 12866, which mandates that an agency "tailor its regulations to impose the least burden on society, including individuals, businesses of different sizes, and other entities (including small communities and government entities)," Exec. Order 12866 § 1(b)(11), by imposing uniform, onerous grievance procedures and procedural requirements on all educational institutions, in disregard of the significant burdens it will impose on institutions.

304.    The Final Rule is therefore "not in accordance with law" as required by the APA. 5 U.S.C. § 706(2)(A).

305.    Defendants' violation causes ongoing harm to Plaintiffs and to the State's residents.

### THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act – Arbitrary and Capricious)

306.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

307.     The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

308.     The Final Rule is arbitrary and capricious because Defendants' justification for their decision runs counter to the evidence before the agency, relies on factors Congress did not intend the agency to consider, and disregards material facts and evidence.

309.     The Final Rule is arbitrary and capricious because its definitions and requirements create unworkable situations for Plaintiff and its institutions that frustrate the goals of Title IX and impose costly and confusing requirements.

310.     The Final Rule is arbitrary and capricious because it fails to adequately justify its departure from decades of consistent and well-settled policy.

311.     The Final Rule is arbitrary and capricious because it fails to consider important aspects of the problem, including, *inter alia*, the Final Rule's consequences on the reporting of sexual harassment; its discriminatory impact on certain populations; the significant harm and trauma that will result from requiring K-12 victims, witnesses and accused students to participate in an adversarial process that is not developmentally appropriate or suitable for children; its failure to address schools' obligations to remedy hostile school environments resulting from harassment; and its interference and conflict with the administration of FERPA, Title VI, Title VII, Section 504, Title II, and the IDEA.

312.     The Final Rule is arbitrary and capricious because Defendants conducted and relied on a flawed cost-benefit analysis, citing benefits the Final Rule would confer without any evidentiary basis, and failing adequately to account for the true costs the Final Rule will impose, including the significant costs to Plaintiff and to the public health and safety of their residents.

313.    The Final Rule is arbitrary and capricious because Defendants predetermined its outcome.

314.    The Final Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

315.    Defendants' violation causes ongoing harm to Plaintiffs and the State's residents.

**FOURTH CLAIM FOR RELIEF**

**(Administrative Procedure Act—Without Observance of Procedure Required by Law)**

316.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

317.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

318.    The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ."  5 U.S.C. § 553(c); *see also id.* § 553(b).

319.    The regulatory impact analysis in the Proposed Rule did not sufficiently identify and quantify the costs and benefits of the rulemaking, evading the APA's critical procedural protections that ensure agency regulations are tested through exposure to public comment, and denying Plaintiff and other affected parties an opportunity to present comment and evidence to support their positions, in violation of 5 U.S.C. § 706(2)(D).

320.    Certain significant provisions of the Final Rule were not included in the Proposed Rule and were not otherwise subject to notice and comment, evading the APA's critical procedural protections that ensure agency regulations are tested through exposure to public comment, and denying Plaintiff and other affected parties an opportunity to present comment and

evidence to support their positions, in violation of 5 U.S.C. § 706(2)(D).  These include the Final

Rule's preemption provision, Final Rule at 30,573 (§ 106.6 (h)), retaliation provision, *id.* at

30,578-79 (§ 106.71), the permissive dismissal language allowing schools to dismiss complaints

under certain circumstances, *id.* at 30,576 (§ 106.45(b)(3)(ii)), and the requirement that schools

publish all Title IX training materials, *id.* at 30,578 (§ 106.45(b)(10)(i)(D)).

321.    Defendants' violations cause ongoing harm to Plaintiffs and the State's residents.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.    Declare that the Final Rule is in excess of the Department's statutory jurisdiction,

authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

2.    Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

3.    Declare that Defendants failed to observe procedure required by law in issuing the

Final Rule, in violation of 5 U.S.C. § 706(2)(D);

4.    Enjoin the Department and all its officers, employees, and agents, and anyone

acting in concert with them, from implementing, applying, or taking any action whatsoever under

the Final Rule;

5.    Postpone the effective date of the Final Rule pending judicial review pursuant to 5

U.S.C. § 705;

6.    Vacate and set aside the Final Rule in its entirety;

7.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

fees, pursuant to 28 U.S.C. § 2412; and

8.    Grant other such relief as this Court may deem proper.

DATED:  June 18, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

Matthew Colangelo
  *Chief Counsel for Federal Initiatives*

Elena Goldstein
  *Deputy Chief, Civil Rights Bureau*

By: /s/ Joseph Wardenski
Joseph Wardenski, *Senior Trial Counsel*
Morenike Fajana, *Special Counsel*
Lindsay McKenzie, *Assistant Attorney General*
Amanda Meyer, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8441
Fax: (212) 416-6007
Joseph.Wardenski@ag.ny.gov

*Attorneys for Plaintiff the State of New York*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: /s/ Sabita Krishnan
Sabita Krishnan
Joseph Pepe
Tonya Jenerette
Assistant Corporation Counsel
100 Church Street
New York, New York 10007
(212) 356-2273
skrishna@law.nyc.gov

*Attorneys for Plaintiff the Board of Education
of the City School District of the City of New
York*