**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK and THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION and ELISABETH DEVOS, *in her official capacity as the Secretary of Education*, <br><br> Defendants. | No. 1:20-cv-04260-JGK |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................1

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................3

    I.     Statutory Framework ...........................................................................................3

    II.    Regulatory Framework ........................................................................................4

    III.   Longstanding ED Policy on Sexual Harassment ...............................................5

    IV.   The Challenged Rulemaking..................................................................................8

LEGAL STANDARD...........................................................................................................9

ARGUMENT .....................................................................................................................10

    I.     Plaintiffs Will Suffer Irreparable Harm if the Rule Is Not Preliminarily
         Enjoined Prior to its August 14 Effective Date. ...............................................10

         A.  The Rule requires schools to overhaul their Title IX policies and
             procedures in an unreasonably short timeframe in the midst of the
             COVID-19 pandemic. ............................................................................11

         B.  The Rule interferes with the ability of medical schools and teaching
             hospitals to respond to the COVID-19 pandemic. ..................................13

         C.  The Rule interferes with the State's administration of—and schools'
             compliance with—other federal, state, and local laws. .........................14

         D.  The Rule will irreparably harm victims of sexual harassment and frustrate
             schools' ability to ensure safe, nondiscriminatory learning environments............15

    II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ................................16

         A.  The Rule exceeds ED's statutory authority. ..........................................16

         B.  The Rule is arbitrary, capricious, and not in accordance with law. .......................19

         C.  ED failed to observe required proper procedure......................................27

    III.   The Balancing of Equities and Public Interest Favor the Requested Injunction. ........29

    IV.   A Nationwide Injunction is Necessary to Prevent Harm to Plaintiffs and
         the Public. ...........................................................................................................30

CONCLUSION...................................................................................................................30

# TABLE OF AUTHORITIES

**CASES**

*Barnes v. Gorman*,
   536 U.S. 181 (2002).................................................................................................25

*Batalla Vidal v. Nielsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................................................................20

*Bauer v. DeVos*,
   325 F. Supp. 3d 74 (D.D.C. 2018) ..................................................................10, 30

*California v. HHS*,
   351 F. Supp. 3d 1267 (N.D. Cal. 2019) .................................................................15

*Cannon v. University of Chicago*,
   441 U.S. 677 (1979).........................................................................................4, 25, 26

*Central United Life Inc. v. Burwell*,
   128 F. Supp. 3d 321 (D.D.C. 2015)........................................................................30

*Central United Life Insurance Co. v. Burwell*,
   827 F.3d 70 (D.C. Cir. 2016) ...........................................................................16, 30

*City of Arlington v. FCC*,
   569 U.S. 290 (2013)................................................................................................16

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*,
   365 F. Supp. 3d 28 (D.D.C. 2019)..........................................................................24

*Davis v. Monroe County Board of Education*,
   526 U.S. 629 (1999)........................................................................................ *passim*

*District of Columbia v. U.S. Department of Agriculture*,
   --- F. Supp. 3d ----, 2020 WL 1236657 (D.D.C. 2020) .............................10, 11, 30

*Doe v. Columbia University*,
   831 F.3d 46 (2d Cir. 2016)......................................................................................18

*Encino Motorcars, LLC v. Navarro*,
   136 S.Ct. 2117 (2016).......................................................................................19, 27

*Faiveley Transport. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)....................................................................................10

*Fitzgerald v. Barnstable School Committee*,
   555 U.S. 246 (2009)................................................................................................25

*Gebser v. Lago Vista Independent School District,*
   524 U.S. 274 (1998)..............................................................................6, 21, 22

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
   481 F.3d 60 (2d Cir. 2007).............................................................................10

*Harmon v. Thornburgh,*
   878 F.2d 484 (D.C. Cir. 1989).......................................................................30

*Humane Society of U.S. v. Zinke,*
   865 F.3d 585 (D.C. Cir. 2017).......................................................................23

*Jackson v. Birmingham Board of Education,*
   544 U.S. 167 (2005).........................................................................................3

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016)...........................................................................30

*Mingo Logan Coal Co. v. EPA,*
   829 F.3d 710 (D.C. Cir. 2019).......................................................................24

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual*
   *Automobile Insurance Company*, 463 U.S. 29 (1983) ...........................................19

*National Black Media Coalition v. FCC,*
   791 F.2d 1016 (2d Cir. 1986).........................................................................27

*North Haven Board of Education v. Bell,*
   456 U.S. 512 (1982).......................................................................................3-4

*New York v. U.S. Department of Health and Human Services,*
   414 F. Supp. 3d 475 (S.D.N.Y. 2019)...................................................... 16-17, 23

*New York v. U.S. Department of Homeland Security,*
   408 F. Supp. 3d 334 (S.D.N.Y. 2019)....................................................10, 11, 14

*Nken v. Holder,*
   556 U.S. 418 (2009).......................................................................................29

*Time Warner Cable Inc. v. FCC,*
   729 F.3d 137 (2d Cir. 2013)...........................................................................27

*Trump v. International Refugee Assistance Project,*
   137 S. Ct. 2080 (2017)...................................................................................30

*U.S. Department of Transportation v. Paralyzed Veterans of America,*
   477 U.S. 597 (1986).........................................................................................4

*Williams v. Metzler*,
    132 F.3d 937 (3d Cir. 1997)........................................................................20

*Winter v. NRDC*,
    555 U.S. 7 (2008)........................................................................10, 29, 30

*Yu v. Vassar College*,
    97 F. Supp. 3d 448 (S.D.N.Y. 2015)..........................................................18

*Yusuf v. Vassar College*,
    35 F.3d 709 (2d Cir. 1994)........................................................................18

*Zeno v. Pine Plains Central School District*,
    702 F.3d 655 (2d Cir. 2012)................................................................4, 8, 15


**FEDERAL STATUTES**

Administrative Procedure Act, 5 U.S.C. §§ 701-706 ........................3, 10, 16, 19, 27, 30

Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988)..........................4

Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ...........................................20, 26

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(b) ................................................4

Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-2000d-7.........................................4

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.............1, 3, 4, 8, 17, 18


**FEDERAL REGULATIONS**

Final Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 29, 2020)
    (to be codified at 34 C.F.R. pt. 106) ............................................................... *passim*

Proposed Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018) .........................2

U.S. Department of Education, Family Educational Rights and Privacy Act Regulations,
    34 C.F.R. 99.1-.67.....................................................................................26

U.S. Department of Education, Title IX Regulations,
    34 C.F.R. §§ 106.1-106.71 ............................................................... *passim*

**FEDERAL GUIDANCE DOCUMENTS**

U.S. Department of Education, Office for Civil Rights, *Dear Colleague Letter: Campus Sexual Misconduct* (Sept. 22, 2017) ....................................................................7, 23

U.S. Department of Education, Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) ..............................................6, 7, 23, 25

U.S. Department of Education, Office for Civil Rights, *Dear Colleague Letter: Prohibited Disability Harassment* (July 25, 2000) ......................................................................8

U.S. Department of Education, Office for Civil Rights, *Dear Colleague Letter: Sexual Harassment Issues* (Jan. 25, 2006) .................................................................6

U.S. Department of Education, Office for Civil Rights, *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011) (withdrawn)..........................................................6

U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014) (withdrawn) ..................................................7

U.S. Department of Education, *Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance; Notice*, 59 Fed. Reg. 11,448 (Mar. 10, 1994) ......................................................................8

U.S. Department of Education, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001) ........... *passim*

U.S. Department of Education, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) .......................................................................5, 6, 22, 25

## INTRODUCTION

On May 19, 2020—in the midst of the worst global health pandemic in modern times—the U.S. Department of Education ("ED") and Secretary of Education Betsy DeVos ("Defendants") published a final rule that upends ED's 45-year-old regulations implementing Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), stripping longstanding protections for sexual harassment victims and imposing breathtakingly expansive new procedural requirements on K-12 and postsecondary educational institutions in handling students' sexual harassment complaints.[1]  The 554-page Final Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Rule"), is set to go into effect on August 14, just 87 days after publication.  The Rule reverses decades of ED's Title IX policies, drastically narrows the circumstances under which schools must (or even can) respond to harassing conduct based on sex, and invents new, enforceable Title IX rights for individuals accused of sexual harassment that find no basis in the letter or spirit of the statute.

The Rule's onerous, arbitrary requirements, coupled with the grossly unrealistic effective date, are irreparably harming Plaintiffs the State of New York (the "State") and the Board of Education for the City School District of the City of New York ("NYCDOE") ("Plaintiffs"), and will continue to do so.  The Rule demands that schools scramble to understand its extensive departures from established policy and procedural requirements (including prescribing new, one-size-fits-all, quasi-judicial grievance procedures); adopt new policies to implement and comply

---

[1] For brevity, Plaintiffs use "schools" to refer to all K-12 schools and postsecondary institutions covered by Title IX.

with these changes; train students and staff on their altered rights and responsibilities; and expend funds to hire additional staff and purchase new technology.  These changes, under normal circumstances, would be nearly impossible to complete in less than 90 days.  Under current conditions—in which campuses are closed indefinitely due to the COVID-19 pandemic, teaching and learning are happening remotely, and already constrained school budgets are being further depressed by the diversion of resources to the pandemic response—the mid-August effective date, as one organization put it, "is as cruel as it is counter-productive."  *See* Am. Council on Educ., *Statement of ACE President Ted Mitchell on Final Title IX Regulations* (May 6, 2020) [Ex. 1].[2]

The State and other states urged ED not to release the Rule during the COVID-19 crisis, since implementation would be "both impossible and unsafe."  *See* Letter from J. Shapiro *et al.* to E. DeVos *et al.* (Mar. 27, 2020) [Ex. 2].  Secretary DeVos scoffed at these concerns, asserting that "[w]e've been working on this for more than two years so it's not a surprise to institutions that it was coming."  *See* Mark Keierleber, *DeVos releases Title IX campus sexual assault rule, courting controversy amid coronavirus pandemic*, LA School Report (May 6, 2020) [Ex. 3].  The Secretary's comments disregarded the sheer magnitude of the pandemic-related challenges facing schools, the Rule's extraordinary and unwarranted departure from more than 30 years of settled Title IX policy on sexual harassment, and the considerable changes between the November 29, 2018 Notice of Proposed Rulemaking, 83 Fed. Reg. 61,462 ("NPRM"), and the

---

[2] All exhibit references are to exhibits to the Declaration of Joseph Wardenski filed with Plaintiffs' accompanying motion.

Rule (including several significant provisions that appeared for the first time in the Rule), for which no school could have prepared.

The Rule violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and its implementation should be enjoined. Specifically, the Rule (1) exceeds ED's statutory authority by drastically narrowing schools' obligation and ability to respond to sexual harassment and conferring enforceable procedural rights on individuals accused of sexual harassment; (2) is arbitrary, capricious, and contrary to law because it violates Title IX and frustrates the statute's broad antidiscrimination mandate, fails to adequately explain ED's marked departure from decades of consistent enforcement policy under Title IX and other civil rights statutes, fails to consider important aspects of the problem, and relies on a flawed cost-benefit analysis; and (3) was issued without observance of procedure required by law, as significant provisions were issued without notice and comment. 5 U.S.C. § 706(2)(A), (C), (D).

Plaintiffs respectfully ask the Court to preliminarily enjoin implementation of the Rule, without geographic limitation, or, in the alternative, to stay the impending August 14 effective date until Plaintiffs' claims can be adjudicated on the merits.

## BACKGROUND

### I. Statutory Framework

Title IX, a landmark federal civil rights law designed to eradicate sex discrimination in schools, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX "covers a wide range of intentional unequal treatment" and has a "broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see also N. Haven Bd. of Educ. v. Bell*, 456

U.S. 512, 521 (1982).  In enacting Title IX, Congress intended both "to avoid the use of federal resources to support discriminatory practices . . . [and] to provide individual citizens effective protection against those practices."  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 & n.36 (1979).

Title IX expressly provides that its protections shall be enforced administratively by federal agencies providing financial assistance to education programs and activities (including, most prominently, ED).  20 U.S.C. § 1682.  ED and other agencies are "authorized and directed to effectuate the provisions of [Title IX] . . . by issuing rules, regulations, or orders of general applicability," *id.*, and "may rely on 'any . . . means authorized by law,' including the termination of funding, to give effect to the statute's restrictions," *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 638-39 (1999) (quoting *id.*).

Title IX, Title VI, and Section 504, were amended by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988), to expansively define a "program or activity" to mean "all of the operations" of a school or other covered entity, "any part of which is extended Federal financial assistance."  *See* 20 U.S.C. § 1687 (Title IX); 42 U.S.C. § 2000d-4a (Title VI); 29 U.S.C. § 794(b) (Section 504).  Title IX and Section 504 were modeled after Title VI; accordingly, all three laws are construed similarly.  *See Cannon*, 441 U.S. at 704; *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 600 & n.4 (1986); *Zeno v. Pine Plains Cent. School Dist.*, 702 F.3d 655, 665 n.9 (2d Cir. 2012).

## II.    Regulatory Framework

ED's Title IX implementing regulations, 34 C.F.R. §§ 106.1-.71, were promulgated in 1975 by its predecessor, the U.S. Department of Health, Education, and Welfare, and have been enforced by ED, with minimal amendments, since 1980.  The regulations repeat the general

statutory prohibitions and specifically prohibit schools from, *inter alia*, "[a]id[ing] or perpetuat[ing] discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex," "[s]ubjecting any person to separate or different rules of behavior, sanctions, or other treatment," or "[o]therwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity," "in providing any aid, benefit, or service to a student" on the basis of sex.  34 C.F.R. § 106.31(a)-(b). When ED finds a violation, the school "shall take such remedial action as [ED] deems necessary to *overcome the effects* of such discrimination."  *Id.* § 106.3(a) (emphasis added).

Since 1975, the regulations have imposed affirmative obligations on schools to effectuate Title IX's antidiscrimination mandate, including to "designate at least one employee" to coordinate Title IX compliance and complaint investigations; establish and publish a grievance procedure for the "prompt and equitable resolution of student and employee complaints;" take "specific and continuing steps" to widely disseminate Title IX policies to current and prospective students and employees, parents, recruiters, and others, and "take whatever remedial action is necessary . . . to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination."  *Id.* §§ 106.8(a)-(b), 106.9, 106.4(a).

## III.  Longstanding ED Policy on Sexual Harassment

For decades, ED has recognized that sexual harassment of students, whether by school employees, peers, or others, can result in educational harms to targeted students.  In a 1997 guidance document, issued after notice and comment, ED publicized its longstanding interpretation of Title IX's application to sexual harassment.  *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ("1997 Guidance").  In the guidance, ED noted that it had "long

recognized that sexual harassment of students . . . is covered by Title IX," and set forth the legal standards school must follow in meeting their Title IX obligations to prevent, address, and remedy such harassment. *Id.* In issuing the guidance, ED found that "a significant number of students, both male and female, have experienced sexual harassment, that sexual harassment can interfere with a student's academic performance and emotional and physical well-being, and that preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn." *Id.*

After the 1997 Guidance was published, the Supreme Court held that schools are subject to monetary liability in Title IX sexual harassment cases brought by private plaintiffs. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-92 (1998) (teacher-on-student harassment); *Davis*, 526 U.S. at 633 (student-on-student harassment). Subsequently, ED issued the *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001) ("2001 Guidance") [Ex. 4], also after notice and comment. The 2001 Guidance reiterated ED's factual findings and retained the enforcement standards from the 1997 Guidance, clarifying that *Gebser* and *Davis* applied only to private damages suits and did not compel ED to adopt the monetary liability standard for administrative enforcement purposes. *Id.* at i-iv.

ED's interpretation of Title IX's sexual harassment protections, articulated in the 1997 Guidance, reiterated in the 2001 Guidance, and reaffirmed in later guidance documents,[3] has

---

[3] *See Dear Colleague Letter: Sexual Harassment Issues* (Jan. 25, 2006) [Ex. 5] ("2006 DCL"); *Dear Colleague Letter: Harassment and Bullying* 1-3, 10 (Oct. 26, 2010) [Ex. 6] ("2010 DCL"); *Dear Colleague Letter: Sexual Violence* 3-6 (Apr 4. 2011) (withdrawn) ("2011 DCL") [Ex. 7];

been consistent for decades.  First, ED has defined "sexual harassment" as "unwelcome conduct
of a sexual nature" that "can include unwelcome sexual advances, requests for sexual favors, and
other verbal, nonverbal, or physical conduct of a sexual nature," including both quid pro quo
harassment and hostile environment harassment.  *Id.* at 2, 5.  Where such harassment is
"sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit
from the education program, or to create a hostile or abusive educational environment," it is
discriminatory harassment subject to Title IX's protections.  *Id.* at vi, 5-7.  "Harassment does not
have to include intent to harm, be directed at a specific target, or involve repeated incidents" to
deny or limit educational opportunities to a student or group of students.  2010 DCL at 2.
Whether a hostile environment exists is a fact-dependent inquiry, based on the "totality of the
circumstances," that must weigh factors including the age and number of the parties involved,
other incidents at the school, and other school-specific factors.  2001 Guidance at 5-7.

Second, ED has consistently required that, where a school has actual or constructive
notice of sexual harassing conduct, regardless of whether a student files a formal complaint, it is
obligated to "respond promptly and effectively," including by immediately investigating the
conduct, and, where such investigation reveals that harassment occurred, to "take prompt and
effective steps reasonably calculated to end any harassment, eliminate a hostile environment if
one has been created, and prevent harassment from occurring again."  2001 Guidance at 9, 15-

---

*Q&A on Title IX and Sexual Violence* (Apr. 29, 2014) (withdrawn) ("2014 Q&A") [Ex. 8]; *Dear
Colleague Letter: Campus Sexual Misconduct* 1 (Sept. 22, 2017) ("2017 DCL") [Ex. 9].  When
ED withdrew the 2011 and 2014 guidance documents, it expressly stated that the 2001 Guidance
remained ED's enforcement policy for sexual harassment.  2017 DCL at 2.

16; *see also* 2010 DCL at 2-3.  ED has consistently applied these same standards to racial

harassment under Title VI and disability harassment under Section 504 and Title II.  *See Racial*

*Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance;*

*Notice*, 59 Fed. Reg. 11,448 (Mar. 10, 1994) ("1994 Racial Harassment Guidance"); *Dear*

*Colleague Letter: Prohibited Disability Harassment* (July 25, 2000) ("2000 DCL") [Ex. 10];

2010 DCL at 1-4.

Third, as required by the Title IX statute, ED has required schools to adopt grievance

procedures for the "prompt and equitable" resolution of sex discrimination complaints, including

sexual harassment complaints, and that public institutions ensure those processes respect the due

process rights of the accused.  2001 Guidance at 19-22.  Consistent with courts' deference to

schools' disciplinary decisions, *see Davis*, 526 U.S. at 648, *Zeno*, 702 F.3d at 666, ED has

always given schools broad latitude to tailor their grievance procedures to local circumstances,

including state and local legal requirements.  *See* 2001 Guidance at 20.

## IV.     The Challenged Rulemaking

The Rule reflects an abrupt and unjustified departure from ED's well-settled Title IX

policies and represents a sweeping rewrite of ED's longstanding Title IX regulations.[4]  It amends

ED's Title IX regulations by, *inter alia*, (a) stripping references to schools' obligation to remedy

sex discrimination, including removing the requirement in § 106.3 that schools "overcome the

effects" of Title IX violations; (b) adding a new set of definitions applicable *only* to sexual

harassment in the new § 106.30 and purporting to redefine "program or activity" in the new

§ 106.44, in conflict with the statutory definition of the term in 20 U.S.C. § 1687; (c) drastically

---

[4] *See* Redline Showing the Final Rule's Amendments to ED's Title IX Regulations [Ex. 12].

altering schools' obligations to respond to sexual harassment in § 106.44; and (d) adding a sweeping set of one-size-fits-all grievance procedures that schools *must* follow to investigate and adjudicate sexual harassment complaints in the new § 106.45.

Section 106.45 imposes a lengthy, burdensome grievance process on schools. *See* Laura Brantley Decl. ¶ 13 & Ex. D [Ex. 11] ("Brantley"). Schools must, following an investigation, provide the parties all the evidence "directly related to the allegations," prepare an investigative report, and share it with the parties. K-12 schools must allow each party to submit written questions to any party or witness, while postsecondary institutions must conduct live hearings, with cross-examination by parties' "advisors of choice." Rule at 30,575-77 (§§ 106.45(b)(1), (5)-(6)). All schools must utilize a decision-maker different from the investigator, issue detailed written determinations, and provide the opportunity for appeals. *Id.* at 30,577-78 (§ 106.45(b)(7)-(8)). The Rule also provides respondents new, enforceable rights to claim Title IX violations based only on procedural violations, even where such violations were not based on sex. *Id.* at 30,575 (§ 106.45(a)).

In addition, the Rule contains provisions absent from the NPRM, including (a) a preemption clause that may limit schools' ability to enforce state and local protections, Rule at 30,573 (§ 106.6 (h)); (b) a retaliation provision, which departs from settled definitions of retaliation at the expense of survivors' rights, *id.* at 30,578-79 (§ 106.71); and (c) a permissive dismissal provision allowing schools to dismiss meritorious sexual harassment complaints under certain circumstances that may frustrate Title IX's affirmative mandate of remedying the effects of current and past discrimination, *id.* at 30,576 (§ 106.45(b)(3)(ii)).

## LEGAL STANDARD

To obtain a preliminary injunction or a stay of the effective date under 5 U.S.C. § 705, Plaintiffs must establish that they are likely to suffer irreparable harm in the absence of preliminary relief; they are likely to succeed on the merits; the balance of the equities tips in their favor; and an injunction is in the public interest.  *See Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 104-05 (D.D.C. 2018).

## ARGUMENT

### I.   **Plaintiffs Will Suffer Irreparable Harm if the Rule Is Not Preliminarily Enjoined Prior to its August 14 Effective Date.**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations and quotation marks omitted).  "Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation marks omitted).  "Plaintiffs need only show 'a threat of irreparable harm, not that irreparable harm already ha[s] occurred.'" *New York v. U.S. Dep't of Homeland Security*, 408 F. Supp. 3d 334, 350 (S.D.N.Y. 2019) ("*DHS*") (quoting *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010)).  Where, as here, an unlawful federal agency action subjects state and local governments to economic and proprietary harms, that loss is irreparable.  *See Dist. of Columbia v. U.S. Dep't of Agric.*, --- F. Supp. 3d ----, 2020 WL 1236657, at *23 (D.D.C. 2020) ("*USDA*"); *DHS*, 408 F. Supp. 3d at 350.

Plaintiffs will suffer irreparable and imminent harm because the Rule immediately imposes significant financial programmatic, administrative burdens upon Plaintiffs, the

10

educational institutions they operate and govern, and other educational institutions in New York; hampers Plaintiffs' ability to respond to the COVID-19 global pandemic by diverting resources to implementing the wide-ranging, onerous requirements of the Rule by August 14; interferes with the State's administration of other laws and schools' compliance with those laws; and will likely subject victims of sexual harassment to significant, irreparable harm.

### A. The Rule requires schools to overhaul their Title IX policies and procedures in an unreasonably short timeframe in the midst of the COVID-19 pandemic.

Schools in New York and across the country must expend significant financial and administrative resources to implement the Rule before its August 14 effective date. The real-time burdens imposed by the Rule are being felt acutely by K-12 schools and postsecondary institutions across New York. Schools' expenditures of time and resources—and concomitant diversion from other priorities—cannot be recovered. *See DHS*, 408 F. Supp. 3d at 350. Such injury is irreparable where, as here, Plaintiffs will be unable to recover damages to compensate for the impacts of an illegal rule. *See USDA*, 2020 WL 1236657, at *23. Courts have recognized that the types of administrative burdens faced by Plaintiffs here—amending policies and procedures, conducting trainings, hiring new staff, and navigating legal conflicts created by a regulation—are sufficient to warrant preliminary injunctive relief. *See, e.g.*, *id.* at *22-26.

### 1. Schools must expend substantial, unrecoverable resources to amend policies, procedures, and publications, conduct trainings, and hire new staff.

Under normal operations, schools would require many months to implement the extensive changes imposed by the Rule. Joseph Storch Decl. ¶ 26 [Ex. 13] ("Storch"); Brantley ¶ 54; Rodney Pepe-Souvenir Decl. ¶ 13 ("Pepe-Souvenir") [Ex. 14]. Instead, the Rule gives schools mere weeks, during a global pandemic, to do so.

For example, K-12 schools and colleges will have to revise their codes of conduct, sexual harassment policies, and investigation and grievance procedures to conform to the Rule's requirements.  Brantley ¶¶ 60-61; Storch ¶ 25; Pepe-Souvenir ¶ 17; Andrea Stagg Decl. ¶ 39 [Ex. 15] ("Stagg").  NYCDOE must seek the Panel on Education Policy's approval to amend the Chancellor's Regulations to conform to the Rule, a virtual impossibility by August 14 given notice requirements and meeting schedules.  Brantley ¶ 60.  For the two largest public university systems in New York—The State University of New York ("SUNY") and the City University of New York ("CUNY")—these changes require input from multiple stakeholders and approval by their respective boards of trustees—a process which typically takes months.  Storch ¶¶ 16, 26-27; Pepe-Souvenir ¶ 13.  Similarly, schools must train employees on, and notify students and parents of, their altered rights and obligations under the Rule and related school policies. Brantley ¶ 63, Storch ¶ 25; Pepe-Souvenir ¶ 17; Stagg ¶ 40.  These challenges will be particularly acute for NYCDOE—the country's largest school district, with over 1.1 million students and 135,000 employees—and for large postsecondary systems like SUNY and CUNY.

The Rule's new grievance procedures further burden schools by necessitating the hiring of new staff.  NYCDOE, for example, anticipates needing to hire at least ten additional staff members, including Title IX investigators and attorneys, at an annual cost of at least $1 million. Brantley ¶ 62.  SUNY and CUNY also expect to devote significant resources to acquiring additional staff to serve as "advisors of choice," which institutions are required to provide to parties to Title IX hearings at no cost to them, at a potential annual cost of hundreds of thousands of dollars.  Storch ¶ 31; Pepe-Souvenir ¶ 26.

These administrative and financial burdens—which would suffice to justify a preliminary injunction in ordinary times—are exacerbated by the unexpected strain on schools' resources

12

resulting from their ongoing response to the COVID-19 pandemic.  Nationwide, most school campuses have been closed due to the pandemic and have been forced to shift to remote learning. Brantley ¶ 54; Storch ¶ 40; Pepe-Souvenir ¶ 27; Stagg ¶ 20.  For most schools, many with little or no experience with remote learning, this transition has been an enormous undertaking that has required schools to rapidly deploy and divert resources, posing extraordinary challenges to schools and students, particularly with respect to students with disabilities and low-income students with limited access to technology.  Stagg ¶¶ 22-26; Storch ¶ 40; Pepe-Souvenir ¶ 28.  As the pandemic continues, most schools cannot readily predict when they will be able to safely reopen and resume normal operations.  Brantley ¶ 55; Pepe-Souvenir ¶ 27; AASA, *Report of Initial Findings: COVID Survey 2 Impact on Public Schools* 1-2 (June 12, 2020) [Ex. 16].  Many schools are facing unexpected fiscal challenges resulting from COVID-19.  Victoria Ajibade Decl. ¶ 36 [Ex. 17] ("Ajibade"); Pepe-Souvenir ¶¶ 26-28.

For these reasons, the Rule's provisions will be practically impossible for institutions to implement before August 14, or for the foreseeable future.  The diversion of already-limited resources to implement the Rule will irreparably harm schools, their students, and the public.

### 2. *The Rule's grievance requirements threaten Plaintiffs' compliance with collective bargaining agreements.*

Many of the Rule's requirements, such as the right to cross-examination and the exclusion of hearsay, conflict with collective bargaining agreements between schools and employees.  Storch ¶ 54; Pepe-Souvenir ¶¶ 22-23.  Because schools cannot legally compel union members to follow the Rule's requirements for the union grievance process, they are grappling with how to conduct Title IX grievance hearings involving employee-respondents that comply with both the Rule and existing contracts.  Storch ¶ 56; Pepe-Souvenir ¶ 22; Stagg ¶ 46.  Given

these likely conflicts, some schools will need to engage costly outside counsel to advise them on handling these conflicts.  Stagg ¶ 46.

**B.  The Rule interferes with the ability of medical schools and teaching hospitals to respond to the COVID-19 pandemic.**

The Rule is imposing unique burdens on federally-funded medical schools and teaching hospitals covered by Title IX, especially in New York, an epicenter of the COVID-19 pandemic. For example, SUNY Downstate Health Sciences University ("Downstate"), a public medical school and hospital in Brooklyn, has shifted considerable resources to treating COVID patients. Ajibade ¶ 27.  Downstate's hospital is currently a COVID-only site, and has expended and diverted substantial resources to respond to this ongoing crisis.  *Id*.  This work has taken an incredible toll on Downstate's patients, staff, students, and community—SUNY Downstate has administered over 2,500 COVID-19 tests, treated nearly 800 patients for COVID-19, and lost 297 patients since the start of the pandemic.  *Id.* ¶ 28.  Diverting critical resources to the implementation of the Rule will unnecessarily interfere with Downstate's efforts to treat COVID-19, exposing patients, staff, and the public to harm.  *Id.* ¶ 29; *see also DHS*, 408 F. Supp. 3d at 350-51.

**C.  The Rule interferes with the State's administration of—and schools' compliance with—other federal, state, and local laws.**

Plaintiffs and schools have carefully balanced their obligations under Title IX with other federal, state, and local laws that address sexual harassment and appropriate school discipline. Indeed, many state and local protections were specifically designed to complement Title IX.  *See* Storch ¶ 20; Pepe-Souvenir ¶ 16; Brantley ¶ 30.  In abandoning decades of policy, and forcing schools to comply with a new Title IX regime in a matter of weeks, the Rule disregards schools' justified reliance on ED's longstanding policy.  The Rule hamstrings the State's ability to

enforce its own civil rights laws, as well as schools' ability to comply with other federal, state, and local laws, in conflict with their educational missions.  Storch ¶ 47; Brantley ¶¶ 52-53, 57-58; Pepe-Souvenir ¶ 16.  For example, the Rule's geographic limitations, investigative report requirement, definition of sexual harassment, and actual knowledge requirement, among others, conflict with State and New York City law.  Brantley ¶ 57; Pepe-Souvenir ¶ 16.  Schools will therefore have to navigate these conflicts at substantial cost.  For example, schools may be forced to create dual investigatory and complaint resolution systems to meet their obligations under both the Rule and state and local laws, impeding the prompt and equitable resolution of Title IX investigations.  Pepe-Souvenir ¶¶ 23-24.  This interference with state and local laws is irreparable harm warranting preliminary relief.  *See California v. HHS*, 351 F. Supp. 3d 1267, 1297 (N.D. Cal. 2019).

### D.  The Rule will irreparably harm victims of sexual harassment and frustrate schools' ability to ensure safe, nondiscriminatory learning environments.

Students will be discouraged from reporting sexual harassment to their schools when they see schools dismissing complaints they were previously obligated to investigate and resolve, Pepe-Souvenir ¶ 19; Mary Haviland Decl. ¶ 32 [Ex. 18] ("Haviland"), undermining schools' ability to combat sexual harassment and to protect students' interest in attending school in a safe, nondiscriminatory school environment.  *See Zeno*, 702 F.3d at 666. The Rule's invasive requirements are also likely to expose victims at all levels to undue trauma and will likely chill victims' willingness to seek relief from their schools.  Brantley ¶ 45; Storch ¶¶ 33, 53; Haviland ¶¶ 29-30.

At the K-12 level, the Rule's grievance procedures will require children to participate in an adversarial process that is not developmentally appropriate, subjecting young students to trauma, particularly where adult perpetrators are involved.  Brantley ¶¶ 37-44.  These procedures

also subject children to questioning by multiple adults about the details of their sexual

harassment and abuse.  *Id.* ¶¶ 44-45.  The Rule will thus prevent NYCDOE and other K-12

schools from utilizing a trauma-informed approach that reduces the number of times a child is

asked to recount their sexual harassment or abuse.

The cumbersome grievance procedures will also prevent schools from promptly

investigating and addressing sexual harassment.  Brantley ¶¶ 47-51; Storch ¶ 34; Pepe-Souvenir

¶ 24.  By significantly delaying appropriate interventions and discipline, the Rule undermines the

pedagogical, remedial, and deterrent impact of those measures on students and impedes schools'

ability to maintain safe, nondiscriminatory learning environments.  Brantley ¶¶ 47-51; Storch

¶ 53; Pepe-Souvenir ¶ 19; Haviland ¶ 36.

## II.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

A court must "hold unlawful and set aside agency action" that is "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," "not in accordance with law,"

"arbitrary, capricious, [or] an abuse of discretion," or "without observance of procedure required

by law."  5 U.S.C. § 706(2).  Plaintiffs are likely to succeed on the merits of their claims because

the Rule exceeds ED's statutory authority, is not in accordance with law, is arbitrary and

capricious, and failed to observe procedures required by law.

### A.  The Rule exceeds ED's statutory authority.

The Rule violates the APA because it is "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right."  *Id.* § 706(2)(C).  In determining whether agency action

exceeds statutory authority, "the question . . . is always whether the agency has gone beyond

what Congress has permitted it to do."  *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013);

*see also New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 517 (S.D.N.Y.

2019) ("*HHS*").  "Where Congress 'has directly spoken' to the parameters of the agency's authority, 'the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) (quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984)).

Here, the Rule exceeds ED's statutory authority by, *inter alia*, (1) purporting to redefine "program or activity" only in the context of sexual harassment, and (2) establishing prescriptive, inflexible grievance procedures, which invent enforceable procedural rights under Title IX for all individuals accused of sexual harassment, even where a school's alleged violation of such procedures is not based on sex.  Plaintiffs are likely to prevail on their claim that these changes exceed ED's statutory authority under 20 U.S.C. § 1682 to issue rules that "effectuate" Title IX's protections against sex discrimination.

*1.* Title IX defines an education program or activity as "all of the operations" of a school or other covered entity, "any part of which is extended Federal financial assistance."  20 U.S.C. § 1687.  Consistent with this broad definition, the longstanding Title IX regulations specify that Title IX covers any "academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient."  34 C.F.R. § 106.31(a).  As the 2001 Guidance explained, this "means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere."  2001 Guidance at 2-3.

The Rule purports to create a separate, narrower definition of this term solely for application to sexual harassment, defining "education program or activity" as "includ[ing] locations, events, or circumstances over which the recipient exercised substantial control over

17

both the respondent and the context in which the sexual harassment occurs, and also includ[ing] any building owned or controlled by a student organization that is officially recognized by a postsecondary institution."  Rule at 30,574 (§ 106.44(a)).  Because this definition is narrower than both the statutory definition of "program or activity" in 20 U.S.C. § 1687 *and* the definition still contained in § 106.31, ED is attempting to amend the law, in excess of its authority.

*2.*  The Rule imposes extensive, prescriptive requirements for sexual harassment grievance procedures, and purports to confer a new right on individuals *accused* of sexual harassment to raise Title IX claims based on an actual or perceived departure from these procedural rules.  Rule at 30,575 (§ 106.45(a)).  To justify this conferral of legally enforceable rights upon actual or accused perpetrators of sexual harassment, ED presumes, without legal or factual support, that respondents, as a group, face unjust treatment under the status quo *on the basis of sex*.  Although courts have recognized that, in certain circumstances, a school's treatment of a respondent *may* be actionable under Title IX where "gender is a motivating factor" leading to selective enforcement or an erroneous outcome, *see Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016), courts have squarely rejected the notion that a respondent's conclusory "allegations of a procedurally or otherwise flawed proceeding" can, without more, sustain a *sex* discrimination claim, *see Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462, 480, 485 (S.D.N.Y. 2015).

Title IX simply does not provide rights to respondents beyond those shared by *all* students—*i.e.*, the right to attend school free of sex discrimination.  Here, ED has failed to show, through data or otherwise, that respondents are, as a group, mistreated on the basis of sex under current standards.  ED purports, through the Rule, to use its Title IX authority to impose prescriptive, enforceable grievance procedures on schools and to create new rights for all

18

respondents.  Because these requirements stray well beyond ED's antidiscrimination mandate of eliminating sex discrimination in schools, and, in fact, frustrate that mandate, the Rule exceeds ED's statutory authority.

### B.  The Rule is arbitrary, capricious, and not in accordance with law.

Under the APA, the Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or where an agency failed to "give adequate reasons for its decisions."  *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016).  While "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change," an "agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy,'" and "must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  Where an agency fails to provide a "reasoned explanation" for its departure from prior policy, or where an "'[u]nexplained inconsistency' in agency policy" exists, the agency action is arbitrary and capricious.  *Id.* (quoting *Fox*, 556 U.S. at 516).

The Rule is arbitrary, capricious, and contrary to law in multiple respects because it, *inter alia*, (1) imposes definitions and onerous, confusing requirements that create unworkable situations for schools and frustrate Title IX's antidiscrimination mandate; (2) fails to adequately

19

justify its departure from decades of consistent and well-settled policy; (3) fails to consider important aspects of the problem, including relying on a flawed cost-benefit analysis that failed to properly account for the harms to students and schools caused by the Rule; (4) arbitrarily departs from ED's previously consistent interpretations of schools' obligations under Title IX, Title VI, and Section 504, and (5) conflicts with the Family Education Rights Privacy Act, 20 U.S.C. § 1232g ("FERPA").

*1.* The Rule is arbitrary and capricious because it purports to redefine key terms to impermissibly narrow Title IX's scope based on an erroneous interpretation of the relevant case law. *See Williams v. Metzler*, 132 F.3d 937, 946 (3d Cir. 1997); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 420 (E.D.N.Y. 2018).

The Rule purports to narrowly redefine "sexual harassment," "program or activity," and "notice," that, separately and together, significantly narrow the scope of prohibited conduct; reduce schools' obligation and ability to prevent, address, and remedy sexual harassment; and limit victims' ability to make complaints about sexually harassing conduct. ED claims these changes will "better align the Department's Title IX regulations with the text and purpose of Title IX, the U.S. Constitution, Supreme Court precedent and other case law." Rule at 30,030. But the Rule does precisely the opposite. Indeed, ED's reliance on Supreme Court authority as the basis for its radical new approach to sexual harassment finds no support in the very cases it cites—or otherwise.

For decades, ED has interpreted Title IX to require schools to investigate all sexual harassment (i.e., "unwelcome conduct of a sexual nature") about which they know or should have known (i.e., actual or constructive notice) to determine *if* the harassment has risen to the level of *actionable* harassment. 2001 Guidance at 15. Under this well-settled interpretation,

20

schools must take steps reasonably calculated to stop the harassment, prevent its recurrence, and remedy its adverse effects on individual students and the broader school community. *Id.* at iii, 10, 12. Now, ED conflates the *definition* of sexual harassment with the *Gebser*/*Davis* monetary liability standard, redefining sexual harassment as "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," or certain forms of sexual violence prohibited under other federal laws. § 106.30(a). This redefinition newly excludes from protection all sexually harassing conduct that has not—or, without the benefit of a full investigation, appears not to have—become so severe as to "effectively den[y]" access or to expose the school to financial liability. Because this definition will allow, or even demand, that schools ignore sex-based conduct that may impede or limit a student's access, it does not "effectuate" Title IX's broad protections.

ED's reliance on Supreme Court authority as the basis for its radical new approach to sexual harassment finds no support in *Davis* or *Gebser*, which did not require agencies to adopt the monetary liability standard for administrative enforcement. Under that standard, "funding recipients are properly held liable *in damages* only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650 (emphasis added); *see also Gebser*, 524 U.S. at 290-91.

The Supreme Court implicitly recognized that conduct of lesser severity may still be sexual harassment, even if it does not rise to a level subjecting schools to financial liability. *Davis*, 526 U.S. at 650. Indeed, as ED itself recognized in the 2001 Guidance, the Court's intent

in establishing a higher standard for monetary liability was to level the playing field between administrative complaints or lawsuits seeking injunctive relief, on one hand, and private damages suits, on the other.  *See Gebser*, 524 U.S. at 288; 2001 Guidance at ii-iv.  As explained in *Gebser*, "Title IX's express means of enforcement—by administrative agencies—operates on an *assumption of actual notice* to officials of the funding recipient" and the opportunity to cure a violation before enforcement proceedings to terminate funding can begin.  524 U.S. at 288-89 (emphasis added).  Concerned that damages lawsuits could expose schools to financial liability without similar notice, the Court expressly adopted the actual notice and deliberate indifference requirements for private suits to harmonize the administrative and judicial enforcement remedies. *See Gebser*, 524 U.S. at 289-90; *Davis*, 526 U.S. at 639 ("petitioners seek not just to establish a Title IX violation but to recover *damages*") (emphasis added).

ED acknowledged this distinction in its 2001 Guidance, correctly interpreting *Gebser* and *Davis* as having no bearing on its enforcement policies, and retaining the standards articulated in the 1997 Guidance.  2001 Guidance at i-iv.  ED fails, now, to explain why the monetary liability standard is now appropriate to trigger an *investigation* (but only, inexplicably, in the context of sexual harassment), or how a rule authorizing schools to *ignore* a broad range of sexual harassment is consistent with Title IX's purpose of preventing, eliminating, and redressing sex discrimination in schools.  Nor does ED explain how schools' continuing regulatory obligations to take remedial actions to eliminate the effects of discrimination, 34 C.F.R. § 106.4(a), can be squared with the Rule's provisions mandating only that schools be "not deliberately indifferent," to the subset of sexual harassment ED now considers actionable, Rule at 30,574 (§ 106.44(a)), and effectively licensing schools to take *no* action to other harassing conduct.

Because these changes frustrate Title IX's broad antidiscrimination mandate, and are based on a misreading of the statute and relevant case law, the Rule is arbitrary and capricious.

*2.* The Rule fails to justify its departure from decades of well-established enforcement policy, especially where it creates new conflicts and inconsistencies with other civil rights laws enforced by ED. *See supra* at 7. The asserted bases for the change—purported alignment with case law and the "purposes" of Title IX—are *ipse dixit* and, in any event, contradicted by ED's previous, longstanding, and plainly correct interpretation of the law, as stated in decades of guidance to schools. The Rule downplays or ignores schools' deeply-entrenched reliance interests in the decades-old enforcement policies, reflected in the 2001 Guidance, that ED reaffirmed in 2017, *see* 2017 DCL at 2, and has enforced throughout multiple presidential administrations, including the current one. These reliance interests—which are baked into analogous state and local laws, school policies and codes of conduct, staffing decisions, trainings, and collective bargaining agreements, among other things, *see supra* at 11-15—were simply not accounted for in the Rule, rendering it arbitrary and capricious. *See HHS*, 414 F. Supp. 3d at 553.

*3.* The Rule is also arbitrary and capricious because it fails to consider many important aspects of the problem. *See Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017).

*First*, the Rule's almost exclusive focus on individual complainants and individual respondents ignores ED's previous recognition, contained in still-operative guidance, that "[h]arassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents." 2010 DCL at 2. By limiting schools' obligation to investigate sexual harassment to situations in which a formal written complaint has been made to an appropriate employee, and where such complaint adequately alleges that the complained-of conduct was

23

sufficiently severe, pervasive, and objectively offensive to effectively deny that individual access to the school's program or activities, Rule at 30,574-75 (§§ 106.30, 106.44), the Rule fails to consider more pervasive forms of harassment that affect multiple students, or even entire school communities, or to explain how the highly prescriptive grievance procedures, which contemplate only individual complainants and respondents, will enable or allow schools to address hostile school environments where the problem goes beyond individual students.

*Second*, the Rule fails to adequately consider the unique burdens on students (whether targets or perpetrators of harassment) of different age or ability levels.  The Rule fails to contemplate or adequately address the chilling effect on victims resulting from the narrower definitions of actionable harassment and onerous procedural requirements; the likely significant harm and trauma for students, especially younger students in K-12 schools, caused by participation in a one-size-fits-all adversarial process that is not developmentally appropriate; or, for the reasons explained above, how schools can (or must) navigate previously congruent federal, state, and local nondiscrimination policies and institutional codes of conduct that, by virtue of the Rule, may now be at odds.

*Third*, the Rule relies on a flawed cost-benefit analysis, rendering it arbitrary and capricious.  *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732-33 (D.C. Cir. 2019); *Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 53-55 (D.D.C. 2019).  ED refused to quantify the costs of unaddressed sexual harassment on students and schools, or to consider the financial and educational costs associated with reduced reporting (considering only the potential cost savings of fewer reports being made) or with hostile educational environments that affect multiple students.  Rule at 30,539, 30,547, 30,551.  ED concluded, without evidence, that "the mandatory offer of supportive measures in § 106.44(a)" will reduce negative outcomes

on individual students, *id.* at 30,545, but was silent on adverse outcomes to students resulting from hostile climates. The Rule underestimates the extensive compliance costs schools must incur to implement its requirements, as described above, *see supra* at 11-13, *id.* at 30,549, and, despite being issued months into the COVID-19 pandemic, does not account for the higher costs schools will incur to implement the Rule by August.

4. The Rule establishes a separate, weaker standard for Title IX sexual harassment cases relative to other forms of discriminatory harassment. Consistent with the established principle that Title IX, Title VI, and Section 504 must be construed similarly, *see Cannon*, 441 U.S. at 695-96; *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009); *Barnes v. Gorman*, 536 U.S. 181, 185 (2002); 1997 Guidance at 12,034, 12,038 n.2, ED has always interpreted these laws to impose the same obligations on schools to respond to harassment based on sex, race, or disability: namely, that schools are obligated to promptly investigate, address, prevent the recurrence of, and remedy the effects of any harassment of which they have actual or constructive notice. *See supra* at 7; *see also* 2010 DCL at 2-3. This consistency also fulfilled ED's obligation, under Executive Order 12866 § 1(b)(10), 58 Fed. Reg. 51,735 (1993), to avoid inconsistent or conflicting regulations.

Now, for sexual harassment alone, schools are only required to investigate and respond to sexual harassment of which they have actual notice, if the allegations, on their face, indicate that the harassment was so severe, pervasive, and objectively offensive, as to "effectively den[y]" access to a school's program, Rule at 30,574 (§ 106.30(a)), and their response need only be "not deliberately indifferent." *Id.* (§ 106.44).

ED does not—and cannot—reasonably justify its radical reinterpretation of Title IX's protections against sexual harassment or the marked contrast between the Rule and the more

expansive, rights-protecting enforcement policies for harassment under Title VI and Section 504.
ED has offered no evidence justifying a weaker standard for sexual harassment relative to all
other forms of harassment.  Nor does it justify effectively requiring schools to adopt separate,
and potentially parallel, procedures for investigating and addressing sexual harassment (as
redefined by the Rule) and other types of harassment (including sex-based misconduct no longer
meeting ED's definition of sexual harassment).  ED utterly fails to explain why permitting
schools to *ignore* sexually harassing conduct that does not amount to "sexual harassment," as
redefined by the Rule, is consistent with schools' broader obligations under the Title IX statute
and regulations to *prevent* and *remedy* current and past discrimination, or with ED's mandate not
to provide federal funding to support schools engaging in discriminatory practices.  *See* §§ 106.3,
106.4; *see also Cannon*, 441 U.S. at 704-06.

     *5.* The Rule's grievance procedures conflict with privacy protections afforded to students
by FERPA.  FERPA generally forbids disclosure of a student's education record without the
consent of the student or, for minors, the student's parent, with limited exception.  20 U.S.C.
§ 1232g, 34 C.F.R. §§ 99.1-.67.  ED's previous sexual harassment policies carefully balanced the
rights of complainants and respondents to both privacy and fair grievance procedures.  *See* 2001
Guidance at 17-18, 20 & n.102.  The Rule's blanket requirement that schools provide parties an
opportunity to "inspect and review any evidence obtained as part of the investigation that is
directly related to the allegations raised in a formal complaint, including the evidence upon
which the recipient does not intend to rely," Rule at 30,576 (§ 106.45(b)(5)(vi)), conflicts with
schools' FERPA obligations to not disclose students' personally identifiable information or other
sensitive information, like academic transcripts or disciplinary records, the disclosure of which

may now be required by the Rule.  The Rule disrupts the careful balancing of interests espoused by ED's longstanding policy, in conflict with FERPA.

For these reasons, Plaintiffs are likely to prevail on their claim that the Rule is arbitrary, capricious, and contrary to law.

### C.  ED failed to observe required procedure.

Finally, a preliminary injunction is warranted because ED failed to follow proper procedures in issuing several major provisions of the Rule, in violation of 5 U.S.C. § 706(2)(D). *See Encino*, 136 S.Ct. at 2125; *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 169-70 (2d Cir. 2013).  "While a final rule need not be an exact replica of the rule proposed in the Notice, the final rule must be a logical outgrowth of the rule proposed." *Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986) (citation and quotation marks omitted).  "[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Id.*  Thus, a proposed rule "must describe the range of alternatives being considered with reasonable specificity." *Time Warner*, 729 F.3d at 170 (citation and quotation marks omitted).

Several major provisions that appeared in the Rule for the first time were not logical outgrowths of the NPRM and, therefore, are unlawful. These include: (1) the preemption clause, Rule at 30,573 (§ 106.6 (h)), which purports to restrict schools from following state or local laws, or their own codes of conduct, if they conflict with the Rule; (2) the retaliation provision, *id.* at 30,578-79 (§ 106.71), which provides a get-out-of-jail-free card to respondents by preventing schools from taking action against them if they refuse to participate in grievance proceedings; and (3) the provisions permitting schools to dismiss complaints under certain circumstances, *id.* at 30,576 (§ 106.45(b)(3)(ii)).

27

These new, substantive provisions have potentially far-reaching consequences on schools and students.  The preemption clause, for example, provides that, "[t]o the extent of a conflict between State or local law and title IX as implemented by §§ 106.30, 106.44, and 106.45, the obligation to comply with [those provisions] is not obviated or alleviated by any State or local law."  *Id.* at 30,573 (§ 106.6(h)).  This clause creates significant confusion regarding how schools can apply stronger state or local protections for victims of sexual harassment.  Similarly, the retaliation provision forces schools to grapple with how to enforce their own codes of conduct against respondents who, if found not responsible for sexual harassment under the Rule's narrow new definition of that term, engaged in other prohibited conduct.  *Id.* at 30,578-79 (§ 106.71(a)). The provision suggests that schools may be unable to discipline respondents who refuse to participate in grievance proceedings, even where such refusals were calculated to evade responsibility.  *Id.*  Together with the preemption clause, the retaliation provision may limit schools' ability to protect students and respond to misconduct, in conflict with their educational missions and the traditional deference to local decision-making.

The newly-added permissive dismissal provision allows schools to dismiss complaints, even during the investigation, where "the respondent is no longer enrolled or employed by the recipient," where "specific circumstances prevent the recipient from gathering evidence sufficient to reach a determination," or at the complainant's request.  Rule at 30,576 (§ 106.45(b)(3)(ii)).  This provision is troubling in several respects, including that it allows schools to drop investigations into conduct by graduating students, former students (including those who transferred to avoid sanctions), and third parties, even if the harassment has continuing adverse educational effects, and even where the school can take corrective action to

28

redress the harassment and cure any hostile environment.  ED was required to seek notice and comment on this provision, but failed to do so.

Plaintiffs and others were denied the right to object or seek changes to these provisions by ED's unlawful decision to include them without proper notice and comment.  Because ED failed to observe proper procedures, the Rule should be preliminarily enjoined.

**III.    The Balancing of Equities and Public Interest Favor the Requested Injunction.**

To obtain preliminary relief, Plaintiffs must also show that the balance of the equities tips in their favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  When the federal government is a party, these factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of the equities and public interest tip sharply in Plaintiffs' favor.

If implemented, the Rule will cause Plaintiffs significant irreparable harm by forcing their schools to immediately undertake labor-intensive and time-consuming changes to their Title IX policies and procedures, *see supra* at 11-13, which will need to be undone in the likely event the Rule is found to be unlawful.  The Rule will also irreparably injure the health and well-being of children by forcing them to participate in adversarial proceedings that are not developmentally appropriate and will be traumatizing to victims and witnesses, especially minors.  *See supra* at 15.  All victims whose complaints are investigated will needlessly suffer because of the delayed resolution of their complaints demanded by the Rule's rigid requirements.  *See supra* at 15-16. By contrast, Defendants will not be harmed by continuing to enforce ED's decades-old Title IX policies.  In short, an injunction will preserve the status quo pending adjudication of the merits.

Because there is "generally no public interest in the perpetuation of an unlawful agency action," a preliminary injunction or stay of the effective date furthers the public interest in "having governmental agencies abide by the federal laws that govern their existence and

operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)

(citation and internal quotations omitted).

## IV.     A Nationwide Injunction is Necessary to Prevent Harm to Plaintiffs and the Public.

The Court should enjoin Defendants from implementing the Rule without geographic

restriction or, in the alternative, stay the effective date of the Rule pending judicial review.[5]

"The purpose of such interim equitable relief is not to conclusively determine the rights of the

parties, but to balance the equities as the litigation moves forward . . . [and] "'consider . . . the

overall public interest.'" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087

(2017) (quoting *Winter*, 555 U.S. at 26).  Because Plaintiffs are likely to show the Rule violates

the APA, and because "[f]orcing federal agencies to comply with the law is undoubtedly in the

public interest," *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015),

*aff'd*, 827 F.3d 70 (D.C. Cir. 2016), enjoining the Rule's implementation reflects the appropriate

balance of harms.  Where, as here, Plaintiffs are likely to succeed on the merits of their APA

claims, nationwide relief is the usual remedy because "[w]hen a reviewing court determines that

agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their

application to the individual petitioners is proscribed."  *Harmon v. Thornburgh*, 878 F.2d 484,

495 n.21 (D.C. Cir. 1989); *see also USDA*, 2020 WL 1236657, at *32-39.

Furthermore, because thousands of New Yorkers attend college in other states, the State's

interest in ensuring that all of its residents can enjoy Title IX's protections can only be

accomplished through a nationwide injunction.

---

[5] Courts apply the same analysis to motions for preliminary injunctions and stays under 5 U.S.C.

§ 705.  *See Bauer*, 325 F. Supp. 3d at 104-05.

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin implementation of the Rule, or, in the alternative, stay the effective date pending judicial review.


DATED:  June 25, 2020                    Respectfully submitted,

                                         LETITIA JAMES
                                         *Attorney General of the State of New York*

                                         By: /s/ Joseph Wardenski
                                         Joseph Wardenski, *Senior Trial Counsel*
                                         Matthew Colangelo
                                            *Chief Counsel for Federal Initiatives*
                                         Morenike Fajana, *Special Counsel*
                                         Lindsay McKenzie, *Assistant Attorney General*
                                         Office of the New York State Attorney General
                                         28 Liberty Street
                                         New York, NY 10005
                                         Phone: (212) 416-8441
                                         Fax: (212) 416-6007
                                         Joseph.Wardenski@ag.ny.gov

                                         *Attorneys for Plaintiff the State of New York*

                                         JAMES E. JOHNSON
                                         *Corporation Counsel of the City of New York*

                                         By: /s/ Sabita Krishnan
                                         Sabita Krishnan
                                         Joseph Pepe
                                         Tonya Jenerette
                                         Assistant Corporation Counsel
                                         100 Church Street
                                         New York, New York 10007
                                         (212) 356-2273
                                         skrishna@law.nyc.gov

                                         *Attorneys for Plaintiff the Board of Education of the City School District of the City of New York*

31

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 8,997 words (not including the cover page, table of contents, table of authorities, or this certificate of compliance), calculated using the word count feature in Microsoft Word for Office 365, and that the brief complies with the formatting rules contained in Section II.D. of the Individual Practices of Judge John G. Koeltl.

/s/ Joseph Wardenski
Joseph Wardenski