Exhibit 13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:20-cv-04260-JGK |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, | |
| Defendants. | |

**DECLARATION OF JOSEPH STORCH**

1.      I, Joseph Storch, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

2.      I submit this Declaration in support of the State of New York's litigation against the United States Department of Education ("ED" or "The Department") and Elisabeth DeVos, in her official capacity as Secretary of Education, regarding the recently issued rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Final Rule").  I have compiled the information in the statements set forth below either through personal knowledge, through The State University of New York ("SUNY") personnel who have assisted me in gathering this information from our institution, or on the basis of documents I have reviewed.  I have also familiarized myself with the Final Rule in order to understand its immediate impact upon SUNY.

3.      I am an Associate Counsel at The State University of New York and serve as Chair of the SUNY Office of General Counsel Student Affairs Practice Group.  I have held this position since August 2007.  I received a Bachelor of Arts, *summa cum laude* from SUNY Oswego, a Master of

Public Policy from the University at Albany, and a Juris Doctor, Public Law Concentration, from Cornell University Law School.

4.      I serve as the Principal Investigator of the SUNY Student Conduct Institute, an institute which provides trainings, both live and digital, on the requirements for the investigation and adjudication of sexual and interpersonal violence claims.  I serve as the Principal Investigator for the SUNY Campus Climate Survey, which collects information on the prevalence of incidents of sexual harassment and sexual and interpersonal violence among faculty, staff, and students, as well as the survey respondent's level of understanding of the availability and applicability of laws, regulations and policies covering this area.  The SUNY survey is one of the largest comprehensive surveys of campus climate around sexual and interpersonal violence in the nation.

5.      In 2014-2015, I served as an advisor to the Office of Governor Andrew M. Cuomo, where I helped draft New York Education Law Article 129-B ("NYEL 129-B"), which established procedures for the prevention of and response to sexual assault, dating violence, domestic violence, and stalking at higher education institutions.

## Background on SUNY and Receipt Of Federal Education Funds

6.      SUNY is the nation's largest comprehensive system of higher education.  SUNY's 64 campuses include four-year State-operated institutions, two-year Community Colleges, and statutory campuses located at Cornell University and Alfred University.

7.      SUNY was founded in 1948, in large part to provide educational opportunities to individuals that other educational institutions would not admit.  Alongside the City University of New York, SUNY provides a public option to hundreds of thousands of people annually.  As of Fall 2019 more than 415,000 students were enrolled in a degree program at a SUNY campus.  In total, SUNY served 1.4 million students in credit-bearing courses and programs, continuing education, and

community outreach programs in the 2018-19 academic year.  One in three New Yorkers with a college degree is a SUNY alumnus.

8.      In the 2018-2019 fiscal year, SUNY received over $1.4 billion dollars in funding from the federal government for education, financial aid, and sponsored research.

9.      In addition, SUNY has received over $1 billion dollars in federal education grants each year for at least the last seven fiscal years.[1]  Based on all enrolled students in 2018-19, (full time and part time), approximately 150,000 SUNY Students were offered a total of about $634 million in Pell Grants in academic year 2018-19.

10.     The federal funds that SUNY receives are essential to provide learning, research, and service opportunities in New York State and beyond.  SUNY faculty and scholars receive hundreds of millions of dollars to conduct innovative research on pressing problems for New York State, and beyond.

11.     A loss of, or reduction of access to federal funds would cripple the University, harm students, reduce patient access to SUNY and partner hospitals and health care facilities, reduce critical research conducted by University staff, and reduce the number of students and professionals who are able to graduate from SUNY.

12.     Within the higher education community, SUNY is regarded as a national leader in programs and policies for responding to and preventing sexual and interpersonal violence, having built a structure that balances the right of reporting parties to be heard and protected from misconduct with the due process guaranteed to accused individuals under the Constitution and federal and state law and regulation.

---

[1] In the 2012-13 fiscal year, SUNY received $1.325 billion; in the 2013-14 fiscal year, SUNY received $1.299 billion; in the 2014-15 fiscal year, SUNY received $1.269 billion; in the 2015-16 fiscal year, SUNY received $1.259 billion; in the 2016-17 fiscal year, SUNY received $1.242 billion; in the 2017-18 fiscal year, SUNY received $1.335 billion; and in the 2018-2019 fiscal year, SUNY received $1.42 billion.

13.     In 2014, SUNY's Chancellor established a Temporary Working Group on Continual Improvement to Sexual Violence Prevention Policies,[2] following discussions between Governor Andrew M. Cuomo and the SUNY Board of Trustees.  The Board unanimously passed a Resolution,[3] which provided for uniform policies on sexual violence prevention and response.  This pioneering Policy was widely lauded, and formed the basis for legislation introduced by the Governor in 2015.[4]  That legislation, NYEL 129-B, was passed by wide bipartisan majorities.

14.     SUNY System Administration and campus staff worked with the New York State Department of Education ("NYSED"), representatives of private colleges, the City University of New York, and several other agencies over the course of several months to develop regulations implementing pieces of NYEL 129-B.[5]  SUNY also assisted NYSED in providing guidance to assist campuses in implementing the law.[6]

15.     NYEL 129-B is widely regarded as a model of a balanced approach to sexual and interpersonal violence that respects all students, provides equity in the process, and uses modern terms and best practices.  Nearly half of the law is devoted to due process/fair process, and contains rigorous standards for ensuring fairness in investigations.

**SUNY's Current Policies and Procedures in Implementing Title IX**

16.     Although each SUNY college is governed by its own Code of Conduct and processes, Title IX investigations at each college are also governed by New York State Law,

---

[2] https://system.suny.edu/sexual-violence-prevention-workgroup/.
[3] https://www.suny.edu/about/leadership/board-of-trustees/meetings/webcastdocs/Sexual%20Assault%20Response%20and%20Prevention%20REVISED-Merged.pdf.
[4] https://system.suny.edu/media/suny/content-assets/documents/sexualviolenceprevention/SUNY-Policies-Sexual-Violence-Prevention-Response-Updated-Jun2015.pdf.
[5] Part 48 Annual Aggregate Data Reporting by New York State Institutions of Higher Education Related to Reports of Domestic Violence, Dating Violence, Stalking and Sexual Assault, NEW YORK STATE EDUCATION DEPARTMENT (Aug. 31, 2017), available at https://www.regents.nysed.gov/common/regents/files/917brca4.pdf.
[6] Complying with Education Law Article 129-B, NEW YORK STATE EDUCATION DEPARTMENT (June 2, 2016), available at http://www.nysed.gov/common/nysed/files/article-129-b-guidance.pdf.

SUNY System Policy, and collective bargaining agreements.  Policies are often developed through a committee or working group system that engages various stakeholders, from the President's cabinet, to leadership and staff in student affairs, academic programs, faculty, students, and other groups.  Policies and collective bargaining discussions are also often conducted in concert with leadership and staff at SUNY System Administration and the Board of Trustees.

17.     Each SUNY college or university is required to appoint a Title IX Coordinator.  At some SUNY campuses, this role may be shared among multiple staff.  At many campuses, there are Deputy Title IX Coordinators, Title IX Investigators, and Prevention Specialists, among other roles.  Their responsibilities include receiving reports of unequal treatment on the basis of sex, sexual harassment, and sexual and interpersonal violence, conducting or coordinating investigations, writing or reviewing interim and final reports, and liaising with student affairs, law enforcement, conduct officials, and other actors.  They ensure that the parties to any investigation are treated equitably, arrange for interim administrative measures to avoid the creation of a further hostile environment pending the outcome of an investigation and adjudication, and collect data to identify when individuals or organizations are engaging in a pattern of discrimination and may present an imminent threat.

18.     All SUNY colleges and universities are bound by the SUNY Policies on Sexual Violence Prevention and Response.  Pursuant to this policy, SUNY campuses must provide all student-parties the right to present evidence and testimony at a hearing, whether through telephone, videoconferencing or testifying with a room partition.  These policies also provide students with the right to ask questions of the decision-maker and fact witnesses and indirectly request responses from the other party via the decision-maker.

19.     SUNY also has designated "responsible employees," the precise makeup of which differs by campus.  Some collective bargaining units, such as United University Professions (UUP) voluntarily adopted responsible employee status for most of their members in their most recent contract.[7]  When conduct is reported to such responsible employees, campus policy has been to require the responsible employee to forward the complaint to the Title IX Coordinator or designee.

20.     SUNY campuses must also comply with NYEL 129-B, which provides a comprehensive framework for higher education institutions to prevent, remedy and address sexual violence.   NYEL 129-B harmonizes the procedural protections required by the Fourteenth Amendment, Title IX, and the 2013 Violence Against Women Act ("VAWA") Amendments to the Clery Act.  NYEL requires, among other things, that institutions:

a.  Provide parties with an opportunity to offer evidence during an investigation, and at a hearing, where appropriate;

b.  Respect the complainant's right to determine whether to participate in the process;

c.  Respond to sexual and interpersonal violence that occurs on-campus, off-campus, or while studying abroad;

d.  Provide confidentiality, privacy protections, and specific evidentiary exclusions for parties; and

e.  Allow for necessary flexibility for institutions, including the ability to make modifications to the process that allow all students to equitably participate.

21.     Finally, SUNY provides trainings to students, faculty and staff in the law and best practices around investigations and adjudications of conduct violations, including sexual and interpersonal violence allegations through its Student Conduct Institute.  The Institute provides in-

---

[7] See AGREEMENT BETWEEN THE STATE OF NEW YORK AND UNITED UNIVERSITY PROFESSIONS, 2016-2022, https://uupinfo.org/contract/pdf/20162022NYSUUPAgreement.pdf, Appendix A-5, at 80-81.

depth live and digital training on due process and fair process, trauma-informed investigations and adjudications, questioning and weighing of evidence, Title IX regulations and guidance, the Clery Act, and state law (including New York State Education Law 129-B).

22.     Typically, university code of conduct policies are amended through a committee or working group system.  Amendments are usually made in the winter or spring for the following fall, after multiple levels of review from a designated committee, review and approval by counsel, review and approval by Cabinet and the President, and then, pursuant to New York State Education Law,[8] consideration and passage by the College Council (for State-operated colleges) or Board of Trustees (for Community Colleges and the College of Environmental Science and Forestry).

23.     In calendar year 2018, 1,497 incidents were reported to SUNY Title IX offices.  Of the incidents reported, 790 occurred on campus, 622 occurred off campus, and 110 occurred in an unknown location.  As far as the Title IX Coordinators were aware, 295 incidents were reported to municipal law enforcement and 792 were reported to campus University Police or Public Safety.

**<u>SUNY Must Immediately Overhaul Its Title IX Program to Comply With The Final Rule</u>**

24.     The Final Rule will immediately impact several well-established requirements for investigating and adjudicating cases of campus sexual assault and sexual harassment at SUNY campuses, pose confusing and unworkable situations for SUNY and its campuses, and require massive investments in overhauling policies and procedures, all at a time when SUNY is dealing with the COVID-19 crisis.

25.     For example, the Final Rule requires SUNY's campuses to train its employees on the new Title IX requirements.  SUNY understands the effective date of the Final Rule to be August 14, 2020, and that all of SUNY's 64 campuses are required to come into compliance by that date.

---

[8] N.Y. Educ. L. §356.

This compliance would require SUNY to review the Final Rule; amend all of SUNY's Code of Conduct and Title IX policies; and then train hundreds, if not thousands, of students, faculty and staff – all within a matter of weeks.

26.    SUNY typically mails changes to its Codes of Conduct to new students before summer orientation.  Given the short turnaround time between the Rule's publication and summer orientations, generally held in July and August, SUNY would have to procure, pay for and print thousands of copies of its new policies, and pay to mail these new policies to its community in short order.  By contrast, Codes of Conduct amendments are generally finalized in the winter and spring of the prior academic year to allow sufficient time for board approval, formatting, printing, and mailing to new students before summer orientation.

27.    All of these changes would need to take place at a time when SUNY's Boards, Committees, and Councils are not meeting in person in order to promote social distancing and minimize transmission of the coronavirus.  We do not have plans to resume in-person meetings in the immediate future.

28.    Additionally, the Final Rule requires outreach to all students to notify them of the changes in policy and procedure, and to ensure that they understand how to report sexual harassment or sexual violence.  SUNY colleges would likely need to use email or other electronic means to do so because of the COVID-19 crisis, and could not guarantee that these communications will be meaningfully understood before the start of the fall semester.  Many students have already reported that they struggle to keep up with the many electronic notifications from their institutions during this pandemic.

29.    I understand the Final Rule to impose dozens of new requirements on the Title IX hearing process, including a live hearing requirement, the right to direct cross-examination,  and

the right for parties to be represented by an advisor of choice, who may be an attorney. Given this legalization of the Title IX process, some SUNY campuses may feel the need to hire additional attorneys to serve as hearing officers for Title IX hearings.

30.     Using the number of cases that went through to the hearing process detailed in SUNY's reports to NYSED (289 cases), if each Title IX Investigative Report takes 25 hours to prepare (a conservative estimate) the overall cost of compliance will range between $578,000 per year (assuming reports are prepared by specialized non-attorneys averaging $80 per hour) and $2,348,125 (assuming reports are prepared by specialized attorneys averaging $350 per hour, conservative for New York State). If SUNY instead hired full time investigators at each campus, the cost could exceed $7 million annually.

31.     Under the Final Rule, SUNY will be obligated to provide parties with advisors of choice – at no cost to the party. Assuming 16 hours of work per hearing at a low rate of $325/hour, this will cost SUNY $5,200 per case. Assuming only 10% of the 289 cases that went through the full process require an attorney/advisor provided to one party, the cost to SUNY would be $150,800. Assuming 50% of the 289 cases require an attorney/advisor to one party, the cost to SUNY would be $ 754,000. This cost could increase exponentially if parties on both sides assert their right to an advisor of choice or fail to appear with one.

32.     I understand the Final Rule to require institutions to provide parties with the right to inspect and review all evidence obtained during a Title IX investigation, either by electronic means or hard copy. These requirements will likely require SUNY to evaluate and purchase new technology, train staff on this technology, and ensure that this technology complies with the confidentiality and privacy protections of NYEL 129-B, the Family Educational Rights and Privacy Act (FERPA) – which prohibits the disclosure of educational records without a student's

consent – and, where relevant, the Health Insurance Portability and Accountability Act (HIPAA) – which prohibits the disclosure of medical records without a patient's consent.

33.     Furthermore, these requirements may cause complainants to be more nervous about participating.  Particularly for those who may be concerned about their private sexual information being shared, such as LGBTQIA+ individuals, or others who may be targeted for retaliation by recipients of such shared information.  SUNY is also concerned that these disclosure provisions may require it to share explicit images of students, if such images directly relate to an investigation. If any of these images make it into the wrong hands, this will not only be humiliating for the students involved, but also may lead people who are victims of similar violations not to come forward.

34.     The Final Rule's required investigatory timeline adds onerous burdens and delay to SUNY's investigate process.  For example, The Final Rule's requirement that SUNY provide official notice of the charges and time for respondents to prepare before an initial interview, may increase the risk that a respondent will destroy evidence or concoct alibis before the investigation is completed.

35.     Similarly,  the  Final  Rule  may  complicate  SUNY's  partnership  with  law enforcement, who will not be bound by the waiting period and formal notice requirement before speaking with an accused individual.  Unlike traditional *Miranda* rights, the Final Rule does not appear to leave room for exceptions such as waiver, inevitable discovery, imminent destruction of evidence, or statements to a third party that are not the investigator.  The Final Rule thus creates confusion with respect to whether institutions can use evidence obtained from law enforcement in a § 106.45 grievance process.[9]

---

[9] 85 Fed. Reg. 30,099, n. 466.

36.     The Final Rule's requirement that cross-examination must be done "directly, orally, and in real time"[10] may harm certain students with hearing or speaking disabilities, which may or may not be ameliorated by a sign language interpreter,[11] as the institution would seemingly be barred from allowing a written exchange between the student and adjudicator.  Similarly, students may be harmed by the Final Rule's bar on the use of pre-recorded testimony[12] which would otherwise be allowed under NYEL 129-B where extenuating circumstances prevent the person from making it to the hearing.

37.     The Final Rule's requirement that institutions publish on their website (unless they do not maintain a website) all training materials poses unique challenges.  Requiring the publication of materials used to train the covered individuals on the websites of institutions will dis-incentivize the creation of such training materials (including high-quality materials created by SUNY and not-for-profit higher education associations) that would otherwise be protected by intellectual property laws, leading long term to lower quality of material across the board.

38.     In addition to the above, the Final Rule creates new bases for parties to challenge SUNY's Title IX procedures, including claims of bias, claims that parties did not subject themselves to full cross examination, and claims that a piece of directly related, albeit non-relevant, evidence was not provided.  SUNY will expend additional resources to determine how to best protect itself from such challenges.

39.     The Final Rule comes at a particularly difficult time for SUNY, given the ongoing hardship faced as a result of the COVID-19 global pandemic.

---

[10] *Id*. at 30,336.
[11] As allowed under the process.  85 Fed. Reg. 30,339.
[12] *Id*. at 30,320.

40.     All of our campuses are currently closed to in-person instruction, therefore, all of our classes must be delivered by remote instruction and online learning.  With our students displaced, our faculty and staff are working as hard as they can to move and support courses to digital and online systems.  This is not a simple task, but requires an institution-wide lift.  For example, we are working intently to try to provide educational access to students with disclosed disabilities, those who are taking lab or other similar coursework, and those who do not have computers, internet access, or other access to technology.

41.     Our students are reporting unprecedented levels of stress due to the uncertainty and devastation caused by COVID-19.  Even as we begin to plan to welcome students back to campus, we do not know how many students will be unable to return because they or their families lose work, because they can no longer afford to attend our programs, or because they become ill and suffer short or long term health effects.

42.     In addition to these educational challenges, SUNY operates three academic medical centers that are seeing patients that do and do not present with COVID-19. We mobilized as quickly as possible to expand ICU capacity, build negative pressure rooms, obtain ventilators and protective equipment, and, tragically, increase morgue and refrigerated storage for bodies.  Beyond the standard challenges of completing the legally required policy amendment, review, and approval process, a number of our campuses have additional challenges now that go beyond even the unprecedented challenges of COVID-19.

43.     The Final Rule's requirement that institutions implement major changes to their Title IX processes by August 14, 2020 is practically impossible for SUNY, given the significant resources it must expend on a daily basis to respond to the ongoing COVID-19 public health crisis. Many SUNY staff are serving on the front lines in the medical field and trying to save lives.  SUNY

educators are trying to make an unprecedented transition to remote learning, and to support all students in ensuring continuity of education.  SUNY's Board of Trustees and leadership are working to address major issues that can be properly (and without exaggeration) classified as "life or death" questions.  In this environment, their ability to devote significant attention to the changes required by Title IX will come at the cost of sacrificing health, safety, and well-being of patients, students, and staff.

44.    The Department asserts that implementing the Final Rule will take only 12 hours for the Title IX Coordinator and 48 hours for an attorney, plus four hours for an administrator's review.  But reading only the Final Rule is insufficient to make the changes it requires.  My own reading unearthed a number of confusing aspects of the Preamble where the Department includes additional requirements, explanations, exceptions, and examples that are not found in the text of the Final Rule.[13]  Such a process far exceeds the estimated time.

---

[13] For example, private apartments that are not part of a program or activity are not covered, except that they might be in certain cases (85 Fed. Reg. 30,093,30,199 n.875); one must be a participant in educational activities to file a formal complaint but not to receive supportive measures (*Id.* at 30,093); at the time of the formal complaint, a complainant must be "participating in or attempting to participate in the education program or activity of the recipient" (*Id.* at 30,574), except that perhaps a graduate, even a graduate from many years ago who wishes to participate in alumni activities is covered (*Id.* at 30,138, 30,219) and depending upon whether they have been admitted yet, an applicant who is harassed or assaulted on an admissions visit may or may not be covered (*Id.* at 30,187); whether misconduct meets the Final Rule's status uses a reasonable person standard accounting for ages and abilities of those involved and should be applied with a common sense approach (*Id.* at 30,158); unwelcomeness of conduct is interpreted using a *subjective* standard but "severity, pervasiveness, objective offensiveness, and denial of equal access" are to be determined by a "*reasonable person* in the shoes of the complainant." (*Id.* at 30,159, 30,170) (emphasis added); the regulations do not apply to "groups or organizations against whom a recipient wishes to impose sanctions arising from a group member being accused of sexual harassment because such potential sanctions by the recipient against the group do not involve determining responsibility for perpetrating Title IX sexual harassment but rather involve determination of whether the group violated the recipient's code of conduct" (*Id.* at 30,096, 30,274-75), but "conspiring to sexually harass people (such as fraternity members telling new pledges to ''score''), or other unwelcome conduct that harms and humiliates a person on the basis of sex may meet the elements of the *Davis* standard including pervasiveness, particularly where the unwelcome sex-based conduct involves widespread dissemination of offensive material or multiple people agreeing to potentially victimize others and taking steps in furtherance of the agreement." (*Id.* at 30,166); "effectively denies a person equal access to the recipient's education program or activity" (*Id.* at 30,574) does not actually require "entire, physical exclusion but can be undermining or detracting so as that 'victim-students are effectively denied equal access to an institution's resources and opportunities'" (*Id.* at 30,169), potentially including reactions by children outside of the school environment or a student-athlete quitting their team, skipping class, declining grades, or other factors (*Id.* at 30,170); stalking is included as a per se violation (*Id.* at 30,574), but "Stalking may not always be ''on the basis of sex'' (for example when a student stalks an athlete due to celebrity worship rather than sex), but when stalking is ''on the

**SUNY's Educational Mission Will Be Undermined by The Final Rule**

45.     Under previous guidance imputing knowledge to an institution based on constructive notice of Title IX violations, each campus has established which employees serve as responsible employees under Title IX.  The Final Rule will require SUNY to undergo a new process of identifying individuals with authority, which could lead to confusion and inconsistent application.

46.     The Final Rule's geographic limitations necessarily reduce or eliminate protections for those students who do not live on-campus, and even for those who do.  Under the Rule, our institutions may not be able to use the Title IX process to protect a residential student who is raped off-campus at a private house of another student, or a student whose spouse or partner (also a student) assaults them at their private home such that they can no longer attend classes.  While some college students live in residence halls, the majority of SUNY students, particularly students at community colleges, and non-traditional and post-traditional students, do not live on campus.

47.     The adverse consequences of the Final Rule's coverage definition are particularly acute now, given that virtually all SUNY students are learning remotely due to the COVID-19 crisis.  The Final Rule is vague on how Title IX coverage may extend to students who are assaulted

---

basis of sex'' (for example, when the stalker desires to date the victim) stalking constitutes ''sexual harassment'' under § 106.30. Stalking that does not constitute sexual harassment because it is not ''on the basis of sex'' may be prohibited and addressed under a recipient's non-Title IX codes of conduct." (*Id.* at 30,172 n.772); like with the Clery Act, the incorporated VAWA crimes (*Id.* at 30,5742015) also include attempts thereof (*Id.* at 30,174); the obligation is not to have supportive measures that are "designed" to restore or preserve access, but to have measures that "do" restore of preserve access (*Id.* at 30,180); if ineligibility to play on a sports team or run for student government is listed in the sanction list or range that cross-references with the Clery Act sanction list, then such action of removal from a sports team or student government position may not be used as an interim supportive measure where a violation meets the Final Rule's definitions (*Id.* at 30,182) though it can be used if the conduct does not meet the Final Rule's definitions; supportive measures "may include…mutual restrictions on contact between the parties" (specifically listed) (*Id.* at 30,574) but this does not actually prohibit unilateral restrictions of contact (*Id.* at 30,231), but perhaps would so prohibit if they are both members of the same athletic team (*Id.*); the burden of establishing sufficient evidence in the grievance process is on the institution and not the complainant or respondent (see, for example, *Id.* at 30098) but an institution may place the burden in the case of an emergency removal on the respondent (*Id.* at 30,235); hanging a poster with the phrase "Don't Be That Guy" could potentially be covered as sex discrimination under interpretations of an aspect of the Final Rule (*Id.* at 30,470); and others.

14

while engaging in remote learning at home.  Furthermore, this geographic limitation does not comport with SUNY's obligations under the Clery Act, VAWA Amendments, and NYEL 129-B, which require SUNY to report on and respond to incidents that happen off-campus.

48.     SUNY will, to the fullest extent allowed by the Final Rule, address such conduct through its Codes of Conduct, but this will require SUNY to use two policies – SUNY's institutional policies for incidents that do not meet the coverage of the Final Rule, and a new policy, with its narrow coverage for incidents that do meet the coverage requirements.  This will burden students, faculty, and staff, and lead to confusion among complainants as to whether they enjoy the protections and rights of various laws, regulations, and policies.

49.     In many cases our institutions will not have sufficient information to determine whether conduct meets the Final Rule's new limited definitions ex ante. Institutions will likely have to perform some sort of investigation.  It is possible that only after dismissal can an institution confidently address the conduct under its own Code of Conduct.  This adds unnecessary burdens and time to the evidence gathering process, has a negative impact on both complainants and respondents, potentially compromising the institution's ability to effectively investigate conduct that the Final Rule does not even purport to regulate.

50.     The Final Rule fails to take into account the varied type of learners we see at our SUNY campuses.  In particular, there is significant overlap and cross between college and K-12 education. High school students take SUNY classes at their own school, sit alongside college students on our campuses, at home or digitally, and in various permutations. SUNY student-teachers engage in experience-based education at K-12 institutions. The Department has drawn significant distinctions between the required processes in K-12 and post-secondary education, such as not requiring K-12 institutions to hold live hearings, and allowing a report of sexual harassment

to any employee at a K-12 institution to constitute knowledge to the institution.  These distinctions do not take into account the ages and capabilities of students in either system, or the students who straddle both systems. The Final Rule will lead to arbitrary outcomes – a SUNY student accused of assaulting a 12th grader is subject to entirely different provisions under the Final Rue than a similar SUNY student who accuses a 12th grader of assault, due to the Rule's distinctions between higher education and K-12 environments.

51.     The Final Rule's exclusionary rule, which prevents institutions from relying on statements made by any party or witness who does not submit to cross-examination, may incentivize parties to encourage witnesses and other parties not to appear. Power dynamics within a group or a residence hall can make some witnesses less inclined to participate, fearing retribution from their peers.  I have seen past cases where respondents exert influence over witnesses not to fully participate in the process. This will likely impact younger students, first-generation students, and members of marginalized groups who may be further impacted by such pressure not to participate. In these cases, SUNY is left without a meaningful recourse, as we do not have subpoena power.

52.     Relatedly, although NYEL 129-B allows complainants to decline to participate in a student conduct process and the institution to pursue charges, the Final Rule's mandate of excluding the statements of witnesses or parties who do not submit to cross-examination would effectively compel participation by a complainant to allow an institution to move forward with the process, unless the institution has uncontroverted evidence at its disposal.

53.     By requiring a party to submit to live, oral, direct cross-examination, the Final Rule risks exposing parties to questions about their past mental health history and past sexual history that would otherwise be prohibited under NYEL and SUNY's institutional policies.  Because the

cross-examination must occur live, orally, and directly, the party would have to sit and listen to such questions, as compared to NYEL, which allows for the submission of written questions and indirect examination by the adjudicator.  The Final Rule's requirements therefore risk re-traumatizing survivors of sexual harassment and sexual assault on SUNY's campus, and also undermine SUNY's mission of providing a safe educational environmental to all.

54.     The Final Rule's grievance requirements also threaten SUNY's compliance with pre-existing collective bargaining agreements.  Although the Department states that "Recipients may wish to forego receiving Federal financial assistance if the recipients do not wish to renegotiate a collective bargaining agreement . . ."[14]  this is not a real choice for SUNY, which is dependent on federal educational funding.  Furthermore, renegotiating collective bargaining agreements affecting hundreds of thousands of employees in a matter of months is no small task.

55.     Under the Final Rule, if an employee does not testify or subject themselves to cross-examination, the decision-maker could not consider the employee's statements.  However, labor arbitrations under New York law allow for the admission of hearsay testimony, with arbitrators accepting it "for what it's worth."

56.     SUNY does not have the authority to require that the decision-maker in union arbitrations use the Final Rule's prescriptive grievance procedures.  Typically, these decision-makers are independent contractors who maintain their own authority to determine which evidentiary rules and grievance procedures to follow.

57.     The Final Rule may also subject SUNY to liability under Title VII, which requires employers to redress harassing conduct when they knew or *should have known* of conduct that is

---

[14] 85 Fed. Reg. 30,444.

severe *or* pervasive.   As compared to the Final Rule's "actual knowledge" standard, and requirement that actionable conduct be severe, pervasive and objectively unreasonable.

58.     In a situation where a supervisor is alleged to have sexually harassed an employee, and both that employee and a corroborating witness are willing to make statements, but are too scared of professional consequences to face a cross-examination, Title IX would *prevent* their statements from being used in a grievance process, while an institution could find themselves liable under Title VII if they did *not* act upon such statements and redress the harassment.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.


Executed on this __*17*__ day of June, 2020

Joseph C. Storch, Esq.
Associate Counsel
The State University of New York

18