# Exhibit 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>Defendants. | No. 1:20-cv-04260-JGK |

## DECLARATION OF VICTORIA A. AJIBADE

1. I, Victoria A. Ajibade, Esq., pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

2. I submit this Declaration in support of the State of New York's litigation against the United States Department of Education ("DOE") and Elisabeth DeVos, in her official capacity as Secretary of Education, regarding the recently issued rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 84 Fed. Reg. No. 30026 (May 19, 2020) (the "Final Rule"). I have compiled the information in the statements set forth below either through personal knowledge, through the State University of New York Downstate Health Sciences University ("SUNY Downstate") personnel who have assisted me in gathering this information from our institution, or on the basis of documents I have reviewed. I have also familiarized myself with the Final Rule in order to understand its immediate impact upon SUNY Downstate.

3. I am the Assistant Vice President of Diversity and Inclusion/Chief Diversity Officer at SUNY Downstate located in Kings County, New York. I obtained my Juris Doctorate from Touro College Jacob D. Fuchsberg Law Center in 2001, and received a bachelor's degree from the State

-1-

University of New York at Stony Brook. My educational background includes: certifications from the Cornell School of Industrial and Labor Relations in the areas of Strategic Human Resources Leadership and Diversity and Inclusion. I have been employed as the Assistant Vice President of SUNY Downstate's Office of Diversity and Inclusion since August 9, 2018. Prior to my tenure at Downstate, I served as the Chief Diversity Officer/Title IX Coordinator for the City University of New York—Kingsborough Campus from 2015-2018. Additionally, in 2012, I had the distinct honor and privilege of having served as the inaugural Chief Title IX Coordinator for the New City Department of Education which is our nation's largest school system.

### Background on SUNY Downstate

4. As one of the nation's leading urban medical centers, SUNY Downstate traces its roots back to 1860, when a school of medicine was founded at the Long Island College Hospital. The new college's faculty revolutionized medical education in this country by bringing the teaching of medicine to the hospital bedside, rejecting the idea that physicians should be trained exclusively in university lecture halls. As an academic medical center, SUNY Downstate serves the people of Brooklyn through its three-fold mission of education, research, and patient care.

5. Today, SUNY Downstate Health Sciences University comprises a College of Medicine, School of Health Professions, College of Nursing, School of Graduate Studies, School of Public Health, and the University Hospital of Brooklyn ("UHB"). SUNY Downstate is the only academic medical center in Brooklyn -- making UHB the borough's only hospital located at an academic medical center -- and UHB offers the most advanced and comprehensive care available to its globally diverse population of over 2.3 million people.

6. In its five constituent colleges and schools, SUNY Downstate educates a total of approximately 1,800 students, over half of whom are racial minorities and more than 70 percent of

whom receive financial aid. In addition, SUNY Downstate trains about 1,000 medical residents, who are assigned to two dozen affiliated hospitals.

7.  More physicians who practice medicine in New York City received their training at SUNY Downstate's College of Medicine than at any other medical center in the country. And in Brooklyn, specifically, SUNY Downstate has trained nearly half of all doctors practicing in numerous specialty areas. SUNY Downstate's College of Medicine ranks seventh in the country in the number of its graduates who are now engaged in academic medicine.

8.  SUNY Downstate is one of the largest employers in Brooklyn, with a total of over 4,000 employees, more than half of whom reside in Brooklyn.

9.  SUNY Downstate is one of SUNY's twenty-nine State-operated colleges, and UHB is one of three hospitals that SUNY operates (along with the health science centers at Stony Brook and Upstate). SUNY campuses are listed as separate line items in the New York State budget, however, SUNY has flexibility (within statutory limits) to distribute funding among campuses and programs according to the priorities of SUNY's Board of Trustees.

10. SUNY Downstate receives significant amounts of funding from the federal government for education, financial aid, and for research activities. SUNY Downstate and its students are particularly reliant on funds provided and administered by the Department of Education. In each of the 2018-19 and 2019-20 academic years, SUNY Downstate received more than $40 million dollars in federal student aid, which includes graduate and undergraduate loans, Pell Grants, and Work Study funds.

11. The federal funds that SUNY Downstate receives are essential to its three-fold mission to provide education, research, and patient care. Many of SUNY Downstate's undergraduate and

graduate students would simply be unable to matriculate without the provision of such financial aid packages.

12. The Department of Education can enforce what it determines to be violations of Title IX by suspending, terminating, or refusing to grant or continue federal funds from the Department of Education. If SUNY Downstate were to lose its federal funding from the Department of Education, it would not only result in a loss of jobs and placement for students, but also have a very real, and very adverse, impact on the patient care provided to the hundreds of thousands of Brooklyn residents who rely on SUNY Downstate for their healthcare needs.

**SUNY Downstate's Current Policies and Procedures in Implementing Title IX**

13. SUNY Downstate has a longstanding commitment to diversity and equal opportunity in all aspects of our campus experiences, including Title IX. The campus's Office of Diversity and Inclusion ("ODI"), which manages the institution's Title IX program, has enjoyed the full support the Office of the President and senior leadership, with respect to the development, implementation and enforcement of Title IX policies in our educational and workplace environments.

14. ODI has extensive, nuanced expertise with regard to the breadth and complexity of Title IX because we recognize that, in addition to the well-known segments of Title IX like athletics and sexual misconduct, the scope of Title IX consists of other socially vital areas that include, but are not limited to: gender-identity, gender-based pay inequity, the rights of pregnant and parenting students, conscious/unconscious gender segregation in career and technical education, disparities in the hiring of women available to teach STEM courses as well as the institution's obligation to mitigate or eradicate any achievement gaps between the sexes in STEM courses. SUNY Downstate's ODI has balanced these complicated and sensitive efforts by

positioning ODI as a confidential resource to all members of the campus community. While sexual misconduct on the basis of sex was a protected category and was thereby incorporated into SUNY Downstate's non-discrimination policy, in 2018, SUNY Downstate drafted and promulgated a stand-alone sexual misconduct policy to underscore the institution's message of zero tolerance for any such conduct.

15.     SUNY Downstate's ODI currently consists of the Assistant Vice President/Chief Diversity Officer, the Title IX Associate and the Associate Director, for a total of three staff members who are trained and have the subject matter expertise to address such complaints. In addition to Title IX, ODI is responsible vetting all EEO-related complaints, affirmative action planning, and various SUNY Systems Diversity initiatives. ODI also conducts campus wide EEO educational trainings pursuant to Title VII, corrective action trainings and department specific trainings by request.

16.     SUNY Downstate's sexual misconduct policy clearly defines prohibited conduct of a sexual nature, and delineates who and how one may file a Title IX-related complaint at SUNY Downstate. Under this policy, sexual misconduct is defined "as any unwelcome sexual advance, request for sexual favors, or other verbal or physical conduct of a sexual nature, as well as gender-based harassment that need not include sexual advances, when: (a) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or status as a student; (b) submission to or rejection of such conduct is used as the basis for decisions affecting the employment or academic status of said individual; or (c) any such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or educational experience, creates an intimidating, hostile or offensive work or educational environment.

17. The definition of sexual misconduct is not limited by geography. SUNY Downstate asserts jurisdiction of Title IX complaints that take place off-campus where the alleged incident took place in a setting that is deemed an extension of the workplace, such as University sanctioned holiday gatherings, retirement events, work conferences, etc. Moreover, SUNY Downstate, sua sponte, may exercise jurisdiction where one or more of the parties to a Title IX complaint are members of the campus community and a sufficient nexus to the work or educational environment is articulated.

18. As a general rule, ODI will accept verbal or written complaints. Individuals may file complaints electronically by using the complaint form available on ODI's website, email or telephone. An individual may file a complaint anonymously. ODI reviews the anonymous complaints to ascertain whether there is a legitimate investigative avenue. Title IX-related complaints alleging sexual misconduct against a student are managed by SUNY Downstate's Office of Student and Academic Affairs.

19. Upon intake of a Title IX-related complaint, ODI, in consultation with campus stakeholders (which might include leaders from the Office of General Counsel, the Office of Student and Academic Affairs, the Office for Graduate Medical Education, or Human Resources, as appropriate), will render a recommendation as to what, if any, interim supportive measures should occur. Upon receipt of a complaint, ODI will contact the individual directly for additional information. ODI will determine whether the complaint articulates a violation of the policy and, if so, will conduct an investigation. ODI also provides guidance and technical assistance in the event that the person reporting an issue is unsure of the appropriate category for the conduct at issue.

20. ODI's investigative process includes, but is not limited to, conducting an interview of the complainant and other relevant parties, requesting supporting evidence (e-mails, text messages, screenshots, pictures, etc.), an interview of the respondent, and if appropriate witnesses identified by the respondent. ODI carefully reviews such complaints and makes the determination as to whether there has been articulation of a violation of the sexual misconduct policy. Complaints that fail to articulate a violation of policy, or that are brought by a complainant-witness who later withdraws the complaint or is unresponsive/uncooperative will be administratively closed without prejudice.

21. It is ODI's policy to respect the privacy of all parties and witnesses involved in Title IX complaints. However, the need for confidentiality must be balanced against the obligation to cooperate with lawful investigations, to provide due process to the accused, and/or to take necessary action to conciliate, investigate, or resolve the complaint. Therefore, at the discretion of the Chief Diversity Officer, information regarding the subject complaint may be disclosed in appropriate circumstances.

22. Between August 9, 2018 to date, ODI has fielded 27 sexual misconduct complaints. It should be noted that, in some of these cases, the complainant did not articulate sexual misconduct within the meaning of SUNY Downstate's sexual misconduct policy and the allegations were not substantiated.

23. ODI participates in student orientations, as well as customized employee orientations, advising attendees of their rights and responsibilities pursuant to Title IX. This is bolstered by the annual dissemination of the President's Reaffirmation of the Institution's Commitment to Diversity, Affirmative Action and Title IX Letter center-wide email.

24. ODI has developed and disseminated separate tailored educational Title IX trainings to student and staff, consistent with longstanding federal Title IX guidance, the institution's obligations under the Clery Act, and the goals of Title VII and New York's "Enough is Enough" statute, Education Law §129-B. Since November 2018, ODI has conducted over 100 live training sessions to students, faculty and staff, and over 2,000 individuals have completed ODI's online trainings on SUNY Downstate's anti-discrimination policies.

### **Immediate Impact of The Final Rule upon SUNY Downstate**

25. The Final Rule will have a substantial and unnecessarily disruptive impact on SUNY Downstate's Title IX investigations.

26. Most notably, the Final Rule would redirect the institution's attention away from its most pressing mission which is to provide an effective, focused emergency response to COVID-19 in that the vast majority of SUNY Downstate's student population and workforce are essential workers.

27. Upon UHB's designation by Governor Andrew Cuomo as a COVID-only facility in late March 2020, UHB devoted all available resources to combatting the virus. This included the immediate cessation or suspension of all elective medical admissions, all elective surgeries, all obstetric deliveries (both scheduled and spontaneous), all elective imaging studies and ambulatory care appointments. UHB transferred out existing, non-COVID patients to other facilities, forgoing the revenue that treating such patients would have provided. UHB also undertook emergency credentialing of staff to support patient care and maintain adequate staffing (including physicians, nurses, respiratory therapists, social workers, etc.) during a time of profound fear and unease among the general population and its workforce. Hospital bed capacity was increased to allow for critical/intensive care, which itself requires plastic barriers between patient bays, and outdoor tents

were erected for use as a potential surge space.  UHB utilized two Body Collection Project trailers from the Office of the Chief Medical Examiner to help deal with decedents.

28. As of this writing, SUNY Downstate had conducted nearly 2500 COVID-19 tests, had nearly 800 inpatients infected with COVID-19, and had, tragically, lost 297 patients since the start of the pandemic. SUNY Downstate's staff has bravely endured a heavy toll these past few months, and that toll is unlikely to lift anytime soon, as both clinical and ancillary disciplines will be called upon to support ongoing patient care and infection control initiatives.

29. SUNY Downstate will have to divert substantial resources to the implementation of the Final Rule in a number of ways, all of which will distract it from its overall mission in the midst of the pandemic.

30. The institution would no longer be permitted to use a "single investigator model," which has one official tasked with investigating, adjudicating and issuing disciplinary sanctions against respondents. The regulations instead require three separate individuals to work through separate pieces of a single Title IX complaint process: a Title IX coordinator, who receives reports of sexual misconduct; an investigator, to gather facts and interview parties and witnesses; and a decision maker, to determine sanctions and remedies for parties.  This new model would further strain ODI's already overworked staff, if not be outright unfeasible for its three members to effectuate, and would undermine the integrity of the existing process.  To train and/or hire additional staff to meet this need will not be possible for SUNY Downstate, given budget constraints precipitated by its aforementioned ongoing fight against COVID-19.

31. Further, because the decision maker cannot be the Title IX Coordinator or someone who has played a part in the investigation, institutions like SUNY Downstate may shy away from appointing the best-trained and qualified individuals to specific portions of investigations if they

wish to preserve the right to use such individuals during a subsequent grievance hearing. These arbitrary restrictions on roles can lead to results that directly conflict with the stated purpose of "balanced interest and restored due process."

32. The Final Rule's insistence that both parties must use an "advisor" to conduct cross-examination, without providing guidance on who can – and cannot – serve as an advisor, also adversely affects the integrity of SUNY Downstate's existing Title IX investigative process. A respondent could very well choose as an advisor someone who plays a central role in the reporting individual's career advancement (for instance, a Chief Resident), which would have the obvious effect of making a reporting individual hesitant to come forward with even legitimate complaints.

33. Additionally, the requirement that Title IX hearings be live and/or interactive creates its own chilling effect, and unnecessary undue hardship. In conjunction with the "advisor" rule, a reporting individual would be much more likely to experience unnecessary re-traumatization when required to participating in such live or interactive hearing.

34. The Final Rule's definition of sexual harassment is unduly burdensome in that it requires that unwelcome sexual conduct be severe, pervasive *and* objectively offensive, and that this conduct effectively deny access to educational opportunities to constitute a violation of Title IX, flies in the face of principles of equity and fairness. The new definition will result in a chilling effect, as students and even residents – many of whom, by definition, are in strictly hierarchical arrangements as they hope to advance toward the completion of their degree and/or fellowship – will be less willing to come forward. This is especially true in light of the different standards that the Final Rule would impose on students as compared with employees. Medical residents already occupy a unique, almost hybrid student-employee role on campus; the fact that the Final Rule's

-10-

definition of sexual harassment departs from that under Title VII will create not only a chilling effect, but unnecessary confusion for medical residents, as well.

35. The Final Rule's requirement that unwelcome sexual conduct be not only "…severe, pervasive and objectively offensive," but also result in the denial of "access to educational programming and/or activities" is unduly restrictive. This new definition would require that complainants and institutions meet new, stringent requirements before SUNY Downstate can fulfill its obligation to prevent and redress sexual misconduct. The new definition of sexual harassment has the purpose and/or effect of deterring complainants from coming forward because many complainants will not believe that their experience satisfies the Rule's new definition of sexual harassment.

36. Finally, in-person hearings are not feasible considering the nation, and Brooklyn especially, is in the midst of a pandemic whose response prescribes social distancing. SUNY Downstate does not have the physical infrastructure or fiscal resources to accommodate this change. To the extent that live hearings can be done via video conferencing, this presumes that third-party complainants or witnesses to an investigation have access to technology to meaningfully participate in any such hearing.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 19th day of June, 2020

Victoria Ajibade, Esq.
Assistant Vice President of Diversity
Inclusion/Chief Diversity Officer
SUNY Downstate Health Sciences University