# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK and THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION and ELISABETH DEVOS, *in her official capacity as the Secretary of Education*, <br><br> Defendants. | No. 1:20-cv-04260-JGK |

**AASA, THE SCHOOL SUPERINTENDENT'S ASSOCIATION, THE COUNCIL OF THE GREAT CITY SCHOOLS, AND THE NATIONAL ASSOCIATION OF SECONDARY SCHOOL PRINCIPALS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

HUSCH BLACKWELL LLP

Karen Courtheoux (NY Bar No. 4810487)
John W. Borkowski (IL Bar No. 6320147)*
Scott Schneider (TX Bar No. 24054023)**
Aleksandra O. Rushing (MO Bar No. 68304)*
Paige Duggins-Clay (TX Bar No. 24105825)**
Allen F. James (MO Bar No. 70675)*
120 South Riverside Plaza, Suite 2200
Chicago, Illinois  60606
Phone:  (312) 526-1538
Fax:  (312) 655-1501
karen.courtheoux@huschblackwell.com
john.borkowski@huschblackwell.com

*Admission* Pro Hac Vice *Pending*
***Not Yet Admitted to Practice in this Court*

Dated:  July 2, 2020

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF INTEREST ............................................................................................. 1

SUMMARY OF ARGUMENT ............................................................................................ 3

ARGUMENT ....................................................................................................................... 5

I.      The Department's Final Rule Significantly Increases the Procedural, Staffing,
        Training and Record Keeping Requirements on Public School Districts Under
        Title IX............................................................................................................................ 5

II.     The Effective Date of the Final Rule is Unreasonable and Unworkable for School
        Districts During the Current Pandemic............................................................................ 8

III.    Aspects of the Final Rule Specifically Related to K-12 Schools May Ultimately
        be Struck Down................................................................................................................ 14

CONCLUSION.................................................................................................................... 18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Statutory Authorities**

20 U.S.C. § 1681(a) ................................................................................................. 17

**Rules and Regulations**

Final Rule, U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) ..................................................... 3, 7, 15

Proposed Rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* 83 Fed. Reg. at 61,462 (Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) ........................................................... 14

**Additional Authorities**

AASA and Assoc. of Sch. Bus. Officials Int'l, *Reopening means an additional $1.8 million in costs for average-sized school district, administrators estimate* (June 10, 2020)*, https://www.asumag.com/covid-19/article/21133640/reopening-means-an-additional-18-million-in-costs-for-averagesized-school-district-administrators-estimate* ................................................................................. 13

*American Federation of Teachers, Reopening Schools during a Time of Triple Crisis: Financial Implications*, https://www.aft.org/sites/default/files/wysiwyg/reopen-schools-financial-implications.pdf. (last visited June 29, 2020) ............................. 13

*Antonia Noori Farzan et al., Live updates: Global Death Toll from Coronavirus Surpasses Half a Million, The Washington Post*, https://www.washingtonpost.com/nation/2020/06/29/coronavirus-live-updates-us/. (updated June 29, 2020) ................................................................................... 10

Centers for Disease Control and Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. (last visited June 29, 2020) ................................................................................... 10

Centers for Disease Control and Prevention, *Cleaning and Disinfection for Households*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html. (updated May 27, 2020) ....................................................... 11

Centers for Disease Control and Prevention, *Considerations for Wearing Cloth Face Coverings*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov ....................................................................................................... 11

ii

Centers for Disease Control and Prevention, *Daily Updates of Totals by Week and State*, https://www.cdc.gov/nchs/nvss/vsrr/COVID19/index.htm. (last visited June 29, 2020) ......... 10

Centers for Disease Control and Prevention, *Information for Healthcare Providers about Multisystem Inflammatory Syndrome in Children (MIS-C)* (May 20, 2020), https://www.cdc.gov/mis-c/hcp/. ........................................................................................ 10

Centers for Disease Control and Prevention, *Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes*, https://www.cdc.gov/coronavirus/2019-ncov/community/reopen-guidance.html. (updated May 27, 2020) ............................................................................................. 12

*Colin Dwyer and Allison Aubrey, CDC Now Recommends Americans Consider Wearing Cloth Face Coverings In Public, NPR*, https://www.npr.org/sections/coronavirus-live-updates/2020/04/03/826219824/president-trump-says-cdc-now-recommends-americans-wear-cloth-m ...................................................................................................... 11

*Council of Chief State School Officers, Letter to Honorable Lamar Alexander*, https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf. (June 24, 2020) ............. 13

*JoAnn Bartoletti Letter to Assistant Secretary Kenneth L. Marcus* (Jan. 18, 2019), *https://www.nassp.org/wordpress/wp-content/uploads/2019/01/NASSP_Title_IX_Comments_-_1.17.19_V2.pdf* ........................... 17

Michael Casserly, *CGCS Comments on Proposed Title IX Regulations at* 2 (Jan. 30, 2019) ................................................................................................................................. 14

*Nicole Chavez and Artemis Moshtaghian, 48 States have Ordered or Recommended that Schools Don't Reopen this Academic Year, CNN*, https://www.*CNN*.com/2020/04/18/us/schools-closed-coronavirus/index.html. (updated May 7, 2020) ............... 9

*Remarks by President Donald J. Trump, Vice President Mike Pence, and Members of the Coronavirus Task Force in Press Briefing*, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-pr ..................................................................................................................... 10

Sasha Pudelski, *Letter to Secretary Betsey DeVos*, (Jan. 22, 2018), *https://aasa.org/uploadedFiles/AASA_Blog* ................................................................. 17

Staff Reports, *Massachusetts Releases Guidelines for Reopening Schools: Here's What to Know, NBC 10 Boston*, https://www.nbcboston.com/news/coronavirus/school-reopening-guidelines-expected-to-be-released/2148817/. (updated June 25, 2020) ............... 13

*Summary of Major Provisions of the Department of Education's Title IX Final Rule* (May 6, 2020), https://bit.ly/2xL9Ws4 .................................................................... 7

U.S. Dep't of Educ., *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010), *https://bit.ly/2yPkXct* ............................................................................................... 6

U.S. Dep't of Educ., *Highlights from Secretary DeVos' Remarks on Title IX Enforcement*, https://www.ed.gov/news/press-releases/highlights-secretary-devos-remarks-title-ix-enforcement. (Sept. 7, 2017) .......................................................................... 5

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017), *https://bit.ly/35Up8jt* ........................................................................................................ 6

U.S. Dep't of Educ., *Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students*, https://www.ed.gov/news/press-releases/secretary-devos-takes-historic-action-strengthen-title-ix-protections-all-students. (May 6, 2020) ...................... 5

## <u>STATEMENT OF INTEREST</u>

*Amici* are the three most prominent associations of public school district leaders and urban public school districts in the United States. *Amici* represent tens of thousands of administrators and teachers and tens of millions of students in American public school districts. They have a strong interest in ensuring that their members have an appropriate amount of time to understand and properly implement the extensive changes mandated by the first set of regulations issued under Title IX since the 1970s. The effective date of the Final Rule, however, does not give them adequate time, especially in light of the unprecedented demands that responding to the evolving COVID-19 crisis has imposed on public school districts.[1]

*Amicus curiae*, AASA, The School Superintendent's Association ("AASA"), founded in 1865, is the professional organization for over 13,000 educational leaders in the United States and throughout the world. AASA members range from chief executive officers, superintendents and senior level school administrators to cabinet members, professors and aspiring school system leaders. Throughout its more than 150 years, AASA has advocated for the highest quality public education for all students and provided programing to develop and support school system leaders. AASA members advance the goals of public education and champion children's causes in their districts and nationwide.

*Amicus curiae*, the Council of the Great City Schools (the "Council"), is a coalition of 76 of the nation's largest urban public school systems, and is the only national organization exclusively representing the needs of urban public schools. Founded in 1956 and incorporated in 1961, the Council serves as the national voice for urban educators and provides a forum to share best practices. The Council is composed of school districts with enrollments greater than 35,000

---

[1] No person or entity other than *Amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

students located in cities with a population exceeding 250,000. Districts located in the largest city of any state are also eligible for membership based on urban characteristics. The Council's member districts have a combined enrollment of over 8.2 million students. Headquartered in Washington, D.C., the Council promotes urban education through research, instruction, management, technology, legislation, communications, and other special projects.

*Amicus curiae*, the National Association of Secondary School Principals ("NASSP"), is the leading organization of and voice for principals and other school leaders across the United States. NASSP seeks to transform education through school leadership, recognizing that the fulfillment of each student's potential relies on great leaders in every school committed to the success of each student. Principals serve as the leaders of their schools and strive to put each child in the best situation to succeed. They build their schools to be centers for learning where students feel safe, comfortable, and cared for. With regard to sexual harassment and assault, principals require a clear federal policy to set in place procedures that ensure all reports are addressed in an efficient fashion that offers fair protections for both the accuser and the accused.

*Amici* and their members are deeply concerned that the U.S. Department of Education's ("Department") recently announced Title IX regulations, which require extensive changes to public school districts' policies, staffing, training and record-keeping, have set an unreasonable implementation deadline of August 14, 2020—less than three months following publication of the new regulations in the Federal Register. Public school districts, many of which have been closed for months and whose faculties are now off for the summer, will be unable to meet that deadline without diverting significant time and resources that are sorely needed to respond to the ongoing global pandemic and safely open schools in the summer. Moreover, *Amici* believe that the Plaintiff's challenges to aspects of the regulations affecting public schools are likely to be

successful, raising the substantial possibility that the rushed changes required of their members now may ultimately have to be undone. Therefore, *Amici* write to underscore the harms the August 14, 2020 compliance date imposes on them and the risk that it entails specifically for public school teachers and students, and urge this Court to enjoin that deadline in order to allow public school districts sufficient time to implement the new regulations.

## SUMMARY OF ARGUMENT

The Department recently issued final regulations under Title IX for the first time in nearly half a century. *See* U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) (hereinafter, "Final Rule"). The Final Rule is the result of a year-and-a-half-long rulemaking that culminated in a 600,000-word Federal Register notice. The Final Rule, among other things, requires public school districts to rewrite thousands of district-specific policies and procedures in order to comply with scores of new administrative mandates. And yet the Department has set an abbreviated compliance deadline of August 14, 2020, less than three months after the publication of the Final Rule.

Given the scope of the changes required of public school districts by the Final Rule, that deadline is unreasonable. The regulations significantly increase the procedural, staffing, training and record keeping burdens on school districts. Moreover, nearly all of the school districts led by AASA, served by NASSP members, and belonging to the Council have been closed for months in response to state-wide orders responding to COVID-19. With the bulk of their staff off for the summer, *Amici* are now frantically preparing for a new school year in the face of this ongoing global pandemic. Their singular focus at this moment is on how to reopen schools, while keeping students and staff safe. In light of this extraordinary burden, which is falling to *Amici* (without the benefit of significant state or federal guidance or supplemental resources), the August 14, 2020

implementation deadline is arbitrary and unworkable. This deadline effectively requires school districts to divert attention and resources from the critical mission of ensuring health and safety when they reopen schools in the fall.

The implementation deadline itself imposes imminent and irreparable harms on public school districts, if the compliance deadline is not stayed. These harms are particularly relevant to the balance of hardships and public interest factors associated with the standard for preliminary injunctive relief. *Amici* support the request for a preliminary injunction of the implementation deadline set forth in the Final Rule to permit public school districts sufficient time to assess how most effectively to incorporate the new requirements into their policies, procedures and practices.

*Amici* also believe it would be prudent to delay implementation of the Final Rule until there is a final resolution of the substantive issues in this lawsuit. Because aspects of the Final Rule have not been tailored to address the unique context of K-12 public education, *Amici* believe that Plaintiff is likely ultimately to prevail on at least some aspects of their challenge on the merits. If this occurs and the implementation deadline is *not* enjoined or stayed, the harms described above would be exacerbated, as rushed changes adopted now would have to be undone at that time. Given the challenges of the global pandemic, *Amici* seek reasonable certainty that the entirely new framework established by the Final Rule actually is required by Title IX in the K-12 context. This request is particularly appropriate in that the current implementation deadline occurs during the summer when almost all of *Amici's* teachers and non-essential administrative staff are off, schools have been closed, and many administrators are away either due to COVID-19 work-from-home relocation or normal summer schedules.

The personnel currently planning for the safe reopening of America's public schools should not be required to divert their attention from the critical mission of effectively and safely providing

public education in order to rapidly implement extensive changes in Title IX related policies, procedures, staffing, training and record-keeping, particularly when this Court ultimately may conclude that not all of those changes are necessary.

## ARGUMENT

I.    **The Department's Final Rule Significantly Increases the Procedural, Staffing, Training, and Record Keeping Requirements on Public School Districts under Title IX.**

On September 7, 2017, the Department announced that, for the first time in over 40 years, it would issue new federal regulations regarding Title IX.[2] The Department allowed itself almost three years to craft the extensive Final Rule which, when finalized, was described by the Department as a "game-changer."[3] In a variety of ways detailed below, the Final Rule is especially a "game-changer" for public K-12 institutions. Most notably, it will require every public school district in the country to:

- Draft and implement new institutional investigatory and adjudicatory procedures for employee and student disciplinary matters and reconcile those procedures with preexisting state-specific statutory obligations;
- Renegotiate collective bargaining agreements;
- Create an infrastructure to comply with the Final Rule's internal notice obligations;
- Implement a system to comply with the Final Rule's vast record-keeping requirements;
- Train its Title IX personnel on compliance with the new Final Rule; and
- Train every single school employee on the Final Rule's new and unprecedented mandatory reporting obligation.

The Final Rule mandates that our nation's public school districts follow a prescribed template that requires the vast majority of schools to make broad-scale and fundamental changes to a wide variety of institution-specific policies and practices with regard to Title IX proceedings.

---

[2] *See* U.S. Dep't of Educ., *Highlights from Secretary DeVos' Remarks on Title IX Enforcement* (Sept. 7, 2017), https://www.ed.gov/news/press-releases/highlights-secretary-devos-remarks-title-ix-enforcement.

[3] *See* U.S. Dep't of Educ., *Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students* (May 6, 2020), https://www.ed.gov/news/press-releases/secretary-devos-takes-historic-action-strengthen-title-ix-protections-all-students.

Implementation of the Final Rule's centerpiece requirements for institutional investigatory and adjudicatory procedures and the provision of supportive measures require a substantial overhaul of schools' disciplinary systems, which will entail extensive and labor-intensive revisions to every public school district's policies, procedures, and practices and governing both students and employees.

For example, school districts must adopt or otherwise reconcile in their policies and procedures a new Title IX-specific definition of "sexual harassment" to mean conduct that is so "severe" *and* "pervasive" *and* "objectively offensive" that it effectively denies a person equal access to the recipient's education program or activity. All of these revisions must account for a new set of mandatory response obligations triggered by a "deliberate indifference" standard, which in turn, requires implementation of various newly-mandated supportive, grievance, investigative, notice, and record-keeping obligations. They must also include new practices for adjudicating Title IX reports under prescribed evidentiary and procedural standards. All measures taken in response to sexual harassment must be meticulously documented, including at least ten separate notice requirements, documentation of supportive measures offered and accepted, and all resolutions memorialized in detailed formal reports. And, because of the Department's new definition of "sexual harassment" and limitations to Title IX's "jurisdiction," which runs counter to the Department's prior guidance regarding discriminatory harassment,[4] upon which school districts had relied for year, districts must also reconcile and revise their existing codes of student conduct

---

[4] *See, e.g.*, U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017) ("[W]hen sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond."), *https://bit.ly/35Up8jt*; U.S. Dep't of Educ., *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) ("Harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school. When such harassment is based on race, color, national origin, sex, or disability, it violates the civil rights laws that OCR enforces."), https://bit.ly/2yPkXct.

and personnel policies to address discriminatory conduct falling outside of the final Rule's jurisdiction. *See generally* U.S. Dep't of Educ., *Summary of Major Provisions of the Department of Education's Title IX Final Rule* (May 6, 2020).[5]

In addition, the final regulations require intensive training for all school employees tasked with Title IX responsibilities. These training requirements are not accompanied by any federal funding, and the Department's cost analysis does not account for large school districts that typically have *one* responsible official in each school—rather than a coordinator, an investigator, *and* a decision maker, as now required[6]—to handle Title IX and other misconduct allegations. With approximately 16 hours of training required by the regulations for each of the three (at least) responsible individuals in each school, the cost burden for large districts, like members of the Council and many districts managed by AASA and served by NASSP members, will be substantial, and it almost certainly has been underestimated by the Department.

The Department's Final Rule now applies the "actual knowledge" standard to "any employee of an elementary or secondary school" with "notice" of sexual harassment. Final Rule, 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. § 106.30(a) (*Actual knowledge*)). This standard applies to an employee witnessing or otherwise receiving notice of potential sexual harassment involving both students and peer employees. This effectively creates a mandatory reporting requirement for all school employees. *See id.* Therefore, schools must now re-train all employees—from a superintendent to a teacher to a janitor—on this mandatory reporting obligation during a time when the vast majority of these employees are not even working. Doing such training effectively will also certainly require additional personnel and resources for the vast majority of public school districts.

---

[5] Available at https://bit.ly/2xL9Ws4.
[6] *See* Final Rule, 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. 106.45(b)(7)).

Taken together, these changes significantly alter the Title IX compliance landscape to require extensive re-drafting of procedures, policies, protocols, and handbooks and renegotiation of employee contracts. In addition, because many of these changes involve the application of highly technical legal standards by school district employees, districts also now face significant re-training burdens in advance of beginning the implementation of the new policies and procedures. The process to come into compliance with these unfunded mandates necessarily requires diversion of limited time and resources from other efforts—including, as discussed below, school districts' ongoing efforts to reopen schools safely in the midst of a global pandemic.

## II.   The Effective Date of the Final Rule is Unreasonable and Unworkable for Public School Districts during the Current Pandemic.

The U.S. Department of Education's conclusory explanation for how it arrived at its August 14, 2020 effective date for compliance with the new Final Rule fails to address the unique factors in the K-12 setting that would make such a short compliance window unworkable under the best of circumstances. These are obviously not the best of circumstances, as the unprecedented challenges created for public K-12 schools by the COVID-19 pandemic (which shows no signs of abating) require schools to focus all of their efforts on their paramount obligation: safely returning children to their schools. That the Department would instead compel schools to divert their attention to complying with its newly promulgated Title IX regulations is remarkable and unreasonable.

While giving itself almost three years to draft the Rule, the Department has inexplicably provided public K-12 institutions—the overwhelming majority of which have been shuttered since mid-March[7]—less than three months to get into compliance. Virtually no explanation is provided

---

[7] *See* Nicole Chavez and Artemis Moshtaghian, *48 States have Ordered or Recommended that Schools Don't Reopen this Academic Year*, *CNN* (updated May 7, 2020), https://www.*CNN*.com/2020/04/18/us/schools-closed-coronavirus/index.html.

for how the Department arrived at this compliance deadline which, under the best of circumstances, would fall within a period when K-12 employees (all of whom require training under the Rule) are not on campus because of summer breaks. No explanation whatsoever, though, is provided for how such a compliance deadline is rational in light of the complications raised by COVID-19.

Regarding the latter, while acknowledging that COVID-19 created "exigent circumstances" which "require great attention and care on the part of States, local governments, and recipients of Federal financial assistance," the Department nevertheless insists on a compliance deadline which is a mere 87 days from when it issued its 2,000+ page Rule and comments (and approximately two weeks before the start of the school year for most K-12 schools).[8] In settling on this date, the Department purportedly "recognizes that the length and scope of the current national emergency relating to COVID-19 is somewhat uncertain," but in conclusory fashion, notes that an August 14, 2020 effective date "adequately accommodates the needs of recipients" "based on the information currently available to [the Department] . . . ."[9] No specifics are provided regarding what "currently available" "information" the Department was relying on in reaching this conclusion and one can only surmise what that "information" was by reviewing contemporaneous statements from the Administration.  For instance, around the time the Rule was being finalized, the Administration believed "that, by June 1st, we will be well on our way to recovery."[10]

As of the filing of this brief, there are almost 2.5 million confirmed cases of COVID-19.[11] The number of new virus infections continues to hit record daily numbers of confirmed cases, with

---

[8] *See* 85 Fed. Reg. at 30,534.

[9] *Id.*

[10] *See Remarks by President Donald J. Trump, Vice President Mike Pence, and Members of the Coronavirus Task Force in Press Briefing*  (March 30, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-14/.

[11] *See* Centers for Disease Control and Prevention, *Cases in the U.S.* (last visited June 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

nearly 45,000 Americans testing positive for the virus.[12] This daily total of positive cases is almost 30 times the collective total of infections which prompted the national emergency declaration. In addition, as of the time of this brief's filing, the virus has killed nearly 125,000 Americans.[13] Again, the Department does not specify what "currently available information" it relied on in setting its August 14th, 2020 deadline, but the scope of COVID-19 has become considerably worse since it issued the Final Rule in May 2020 and the new infection and death totals are considerably worse now than what the Administration was predicting for the summer.

In addition, two weeks after issuing the Rule, the Centers for Disease Control and Prevention issued new guidance that children, who initially were not viewed as being at risk for COVID-19 symptoms, might experience "multisystem inflammatory syndrome" if exposed to the virus.[14] Such discoveries are to be expected when dealing with a novel virus and there is no telling if more are to come before the beginning of the upcoming school year.

Significant changes have also been made in the recommendations made by the Administration and others regarding effective mitigation efforts. Most notably, the CDC and the Surgeon General both initially indicated mask wearing would not mitigate virus spread.[15] Their guidance on this issue—as well as local and state guidance—has now changed[16] and schools must now consider whether to require masks at school, how to effectively and fairly enforce mask-

---

[12] *See* Antonia Noori Farzan et al., *Live updates: Global Death Toll from Coronavirus Surpasses Half a Million*, THE WASHINGTON POST (updated June 29, 2020), https://www.washingtonpost.com/nation/2020/06/29/coronavirus-live-updates-us/.

[13]*See* Centers for Disease Control and Prevention, *Daily Updates of Totals by Week and State* (last visited June 29, 2020), https://www.cdc.gov/nchs/nvss/vsrr/COVID19/index.htm.

[14] Centers for Disease Control and Prevention, *Information for Healthcare Providers about Multisystem Inflammatory Syndrome in Children (MIS-C)* (May 20, 2020), https://www.cdc.gov/mis-c/hcp/.

[15]*Colin Dwyer and Allison Aubrey, CDC Now Recommends Americans Consider Wearing Cloth Face Coverings In Public, NPR* (Apr. 3, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/03/826219824/president-trump-says-cdc-now-recommends-americans-wear-cloth-masks-in-public

[16] *See* Centers for Disease Control and Prevention, *Considerations for Wearing Cloth Face Coverings* (last updated June 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprevent-getting-sick%2Fcloth-face-cover.html.

wearing rules, and potentially arrange the logistics for securing and providing masks to students and employees. Similarly, the extent to which the virus survives on surfaces remains a largely unresolved issue.[17] As the research develops on this, schools may need to adjust their plans for cleaning facilities and ensure that they have sufficient disinfectants. A couple of months ago, there was also an emerging consensus that there would be seasonal fluctuations in the virus and that the summer and warm-weather months would prove inhospitable for virus spread. If true, this would reduce some of the complications with an August reopening. The exploding case count during the month of June in warm areas suggests this is not the case; consequently, schools may need to consider robust testing protocols for the reopening of schools and then coordinate that testing with community providers.

In sum, schools are faced with an expanding pandemic, an evolving understanding of the impact COVID-19 might have on students and employees, and changing (and ambitious) directives around effective risk mitigation efforts. Again, it is unclear what "information" the Department was relying on at the time in setting its effective date, but these are the harsh realities public school districts are dealing with now in trying to accomplish what has widely been acknowledged as a national imperative—the safe reopening of K-12 public schools.

Reopening will require herculean and laser-focused efforts by school administrators. By way of example, the CDC has created broad "guidelines" for reopening.[18] From now until when schools reopen in August of 2020, those guidelines recommend that schools adopt a variety of

---

[17] *See Centers for Disease Control and Prevention, Cleaning and Disinfection for Households* (updated May 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html.

[18]*See* Centers for Disease Control and Prevention, *Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes* (updated May 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/reopen-guidance.html.

plans for various situations depending on the degree of community spread of the virus. This required work includes:

- Developing short-term closure procedures if an infected person has been in a school building;
- Coordinating with local health officials to create protocols to notify local health officials about outbreaks in the community and at school;
- Creating plans to clean and disinfect school buildings thoroughly;
- Developing plans to safely run child-care programs even when a school is temporarily closed;
- Implementing strategies to continue education and related support for students to ensure continuity of education;
- Reviewing continuity plans, including plans for the continuity of teaching and learning;
- Implementing e-learning plans, including digital and distance learning options;
- Training teachers on how to deliver on-line instruction;
- Addressing the potential lack of students' access to computers and the Internet;
- Ensuring continuity of meal programs;
- Considering alternatives for providing essential medical and social services for students;
- Providing necessary services for children with special healthcare needs;
- Ensuring that emergency planning includes strategies to reduce the spread of a wide variety of infectious diseases;
- Teaching and reinforcing healthy hygiene practices;
- Training staff on healthy hygiene practices;
- Ensuring adequate supplies (e.g., soap, paper towels, hand sanitizer, tissue) to support healthy hygiene practices;
- Reviewing attendance and sick leave policies;
- Identifying critical job functions and positions, and plan for alternative coverage by cross-training staff;
- Determining how absenteeism will disrupt continuity of teaching and learning;
- Assessing the safety of scheduled group gatherings and events;
- Establishing procedures for students and staff who are sick at school;
- Creating and testing communications plans for use with the school community; and
- Reviewing and applying CDC's guidance for businesses and employers.

Over the next several weeks, moreover, these guidelines will likely be supplemented by additional state and local rules that public schools will have to digest and implement in very short time frames.[19]

---

[19] *See, e.g.*, Staff Reports, *Massachusetts Releases Guidelines for Reopening Schools: Here's What to Know*, NBC 10 BOSTON (updated June 25, 2020), https://www.nbcboston.com/news/coronavirus/school-reopening-guidelines-expected-to-be-released/2148817/.

The extent of the work being done by schools over the summer to reopen is reflected in the extraordinary projected costs of this effort. A recent report from *Amicus* AASA put the costs of reopening schools with proper safety protocols at nearly $1.8 million per district on average, or roughly $25 billion total.[20] The American Federation of Teachers estimated at least $116 billion.[21] The Council of Chief State School Officers released an estimate that it would cost between $158 billion and $245 billion to reopen safely.[22]

Put bluntly, the full attention and resources of public school districts should be focused exclusively on the complicated task of safely reopening America's schools. Only when that mission is accomplished, should school districts turn their attention to other complicated and important, but less urgent, new compliance obligations. Time and resources spent getting schools in compliance with the Department's new Title IX regulations is time and resources not being spent on the ensuring that schools can safely reopen in August.

## III.   Aspects of the Final Rule Specifically Related to K-12 Schools May Ultimately be Struck Down

There are many other ways, besides its unrealistic effective date, in which the Final Rule appears not adequately to account for the uniqueness of the K-12 education context, and these problems, among others raised in Plaintiff's brief, suggest that the Final Rule may result in the Plaintiff ultimately prevailing on the merits of some of their claims. That result would simply exacerbate the harm caused by the premature effective date, because at least some of the changes the public school district are rushing to make now may well have to be undone.

---

[20] AASA and Assoc. of Sch. Bus. Officials Int'l, *Reopening means an additional $1.8 million in costs for average-sized school district, administrators estimate* (June 10, 2020), *https://www.asumag.com/covid-19/article/21133640/reopening-means-an-additional-18-million-in-costs-for-averagesized-school-district-administrators-estimate.*

[21] American Federation of Teachers, *Reopening Schools during a Time of Triple Crisis: Financial Implications* (last visited June 29, 2020), https://www.aft.org/sites/default/files/wysiwyg/reopen-schools-financial-implications.pdf.

[22] Council of Chief State School Officers, *Letter to Honorable Lamar Alexander* (June 24, 2020), https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf.

It is not surprising to *Amici* that the Final Rule has these problems, because the Proposed Rule[23] was developed without even consulting them or other prominent K-12 organizations. *See, e.g.*, Michael Casserly, *CGCS Comments on Proposed Title IX Regulations at* 2 (Jan. 30, 2019) (hereinafter "CGCS Comments") ("[W]e do not know that any of the Great City Schools were consulted or invited to any of the meetings on Title IX, despite operating the nation's largest and arguably most complex school systems"). Instead, the proposed regulations were developed against the backdrop of numerous well-publicized higher education incidents involving alleged sexual assault. Several meetings were held between Department officials and representatives of victims, those accused, and college and university administrators as the new regulations were being drafted. Similarly, many of the comments on the Proposed Rule from the public-school constituencies were dismissed in the Final Rule. Thus, despite soliciting comments regarding the Proposed Rule's impact on elementary and secondary institutions and the applicability of the proposed provisions based on the age of the parties, *see* 83 Fed. Reg. at 61,482–61,483, the Department failed to address several irreconcilable differences between the K-12 and postsecondary setting, resulting in a Final Rule which reflects a lack of understanding or appreciation for the K-12 context.

Critically, a school-age child's physical, emotional, and mental development during his or her elementary and secondary school tenure is not complete. Instructional and support services in public schools are designed in recognition of the various developmental stages of each child, and courts have routinely recognized the developmental differences between K-12 students and students in higher education. School children often have neither the judgment nor experience to

---

[23] Proposed Rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* 83 Fed. Reg. at 61,462 (Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) (hereinafter "Proposed Rule").

interact or make decisions like adults, yet the Final Rule requires young children to be able to make "formal complaints" which are "in writing" and "signed" before a school district can institute a Title IX investigation. *See* Final Rule, 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. § 106.30(a) (*Formal complaint*)).

The Final Rule's grievance procedures neglect to adequately account for the unique challenges that public school districts face on a daily basis and thus may fail to implement Title IX's fundamental requirement that no person shall be discriminated against on the basis of sex with respect to an educational program or activity. 20 U.S.C. § 1681(a). For example, public K-12 schools, whose student bodies consist almost entirely of persons who are legally considered to be minors, must follow each and every step in the Final Rule's detailed grievance procedures and delay implementing discipline until these requisite steps are completed. Final Rule, 85 Fed. Reg. at 30,575–30,578 (to be codified at 34 C.F.R. § 106.45). However, the Final Rule's procedures require multiple levels of notice and the opportunity for various parties, such as parents and attorneys, to participate in meetings or proceedings to address incidents of misconduct involving minor school-age children. *See id.* As the Council noted in its comments on the Proposed Rule, this requirement "add[s] to the adversarial and litigation-like atmosphere" the Final Rule will create. CGCS Comments at 6. For example, the regulations could have kindergarteners (or their representatives/attorneys) facing off against other kindergarteners as to the veracity of the allegations and evidence with responses and counter-responses being exchanged.[24] This approach does not take into consideration best practices in interviewing and obtaining statements in a

---

[24] *See* Final Rule, 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(ii)) ("For recipients that are elementary and secondary schools, . . . the recipient's grievance process may, but need not, provide for a hearing. With or without a hearing, after the recipient has sent the investigative report to the parties pursuant to paragraph (b)(5)(vii) of this section and before reaching a determination regarding responsibility, the decision-maker(s) must afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party.").

developmentally appropriate manner from children; potentially creates a climate of intimidation and possibly additional trauma; and allows confidential student information to be shared across countless numbers of individuals. The increased risk of retaliation, the possibility for additional trauma and the privacy concerns created by the Final Rule in the public school context are problematic.

These same rigid requirements also may prevent public school districts from being able to act swiftly to limit the harm potentially caused by misconduct by requiring formal notice, grievance and investigation requirements without exception. This is particularly problematic in the elementary school context, where timely action is not only critical to maintain order, but also necessary in order for young children to learn that their actions have consequences.

Similarly, the Department's decision to limit the circumstances under which a school district may initiate a Title IX complaint does not account for the realities faced by most public K-12 schools. For example, unlike college and university students, who come from all corners of the nation and the world and are free to determine for themselves their level of community engagement, children in public elementary and secondary schools often live year-round in the same neighborhoods as their potential harassers and, in many cases, spend their entire childhoods interacting with the same classmates and peers as they progress through school. While the regulations at least cover sexual harassment occurring in college and university residential facilities, elementary and secondary children are left with no protection against sexual harassment by their classmates (or others) in their homes—which in many cases are just steps from their neighborhood public school, even when such harassment affects their access to public education. As AASA observed in its comments the Proposed Rule, while K-12 schools are charged with standing in *loco parentis* with respect to their students, the Final Rule nevertheless "take[s] away

16

the ability of districts to initiate an investigation because the sexual misconduct occurred online or off-campus." *See* Sasha Pudelski, *Letter to Secretary Betsey DeVos* at 5, (Jan. 22, 2018).[25] In today's world in which cyberbullying and other problematic on-line behavior has become increasingly common among elementary and secondary students, this restriction seems at best highly questionable. At worst, and as NASSP stated in its comments to the Proposed Rule, "[s]chools would be required to ignore harassment that occurs outside of a school activity, including most off-campus and online harassment." *See* JoAnn Bartoletti *Letter to Assistant Secretary Kenneth L. Marcus* (Jan. 18, 2019).[26] Moreover, it creates tension between public school districts Title IX responsibilities and their duties regarding any state law and local policies, many of which *require* them to act to address sexual harassment in the on-line context.

For each of these reasons and for those stated in Plaintiff's Memorandum in Support of their Motion for Preliminary Injunction, some aspects of the Final Rule that relate to K-12 public schools are likely not to survive judicial review.  Therefore, a preliminary injunction with respect to the implementation of the Final Rule until its viability can be fully determined is particularly prudent here. Otherwise, public school districts will be racing against the clock to implement the Final Rule, instead of maintaining the necessary and essential focus on the safe reopening of schools, and then they likely will have to go back and re-redo policies and procedures they have hastily pulled together and undo costly structures that they already cannot afford.

## CONCLUSION

For these reasons, the Court should enjoin the August 14, 2020 effective date of the Final Rule in order to permit public school districts adequate time to come into compliance with the new

---

[25] *Available at https://aasa.org/uploadedFiles/AASA_Blog*(1)/AASA%20Title%20IX%20Comments%20Final.pdf.
[26] *Available at https://www.nassp.org/wordpress/wp-content/uploads/2019/01/NASSP_Title_IX_Comments_-_1.17.19_V2.pdf.*

requirements that survive judicial scrutiny without distracting them now from their critical efforts

to reopen public elementary and secondary schools safely in the midst of the COVID-19 pandemic.

Dated:  July 2, 2020

Respectfully submitted,

HUSCH BLACKWELL LLP

/s/  Karen L. Courtheoux
Karen Courtheoux (NY Bar No. 4810487)
John W. Borkowski (IL Bar No. 6320147)*
Scott Schneider (TX Bar No. 24054023)**
Aleksandra O. Rushing (MO Bar No. 68304)*
Paige Duggins-Clay (TX Bar No. 24105825)**
Allen F. James (MO Bar No. 70675)*
120 South Riverside Plaza, Suite 2200
Chicago, Illinois  60606
Phone:  (312) 526-1538
Fax:  (312) 655-1501
karen.courtheoux@huschblackwell.com
john.borkowski@huschblackwell.com

*Admission *Pro Hac Vice* Pending
**Not Yet Admitted to Practice in this Court

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of July, 2020, a copy of the above and

foregoing document was filed with the Clerk of Court using the CM/ECF system which sent

electronic notification of such filing to all those individuals currently electronically registered

with the Court.

/s/        *Karen L. Courtheoux*