**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK and
THE BOARD OF EDUCATION FOR THE
CITY SCHOOL DISTRICT OF THE CITY
OF NEW YORK,

     *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION and
ELISABETH D. DEVOS, *in her official
capacity as Secretary of Education*,

     *Defendants*.

Civil Action No. 20-4260-JGK

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 2

   I.    Statutory Background and Prior OCR Guidance ...................................................... 2

   II.   The Rule ................................................................................................................... 3

     A.   Obligation to Respond to Sexual Harassment ................................................... 3

     B.   A Fair Grievance Process.................................................................................... 4

Legal Standard ...................................................................................................................... 7

Argument .............................................................................................................................. 8

   I.    Plaintiffs Are Unlikely to Succeed on the Merits. .................................................. 8

     A.   The Rule Falls within ED's Statutory Authority ............................................. 8

        1.    The Rule's Application to an Education Program or Activity Is Reasonable and Consistent with Title IX. ................................................................................ 8

        2.    ED Has Statutory Authority to Require a Fair Grievance Process. ....................... 10

     B.   The Rule's Provisions Are Not Arbitrary and Capricious. ............................................ 11

        1.    There Is No Prior Regulation from Which This Rule Departs. ............................. 12

        2.    The Rule's Definitions Are Reasonable. ............................................................. 13

           i.    The Definition of *Sexual Harassment* Is Reasonable. ........................................ 13

           ii.    The Definition of *Notice* Is Reasonable. ........................................................... 14

        3.    It is Reasonable to Apply Formal Complaint Procedures to K-12. ...................... 15

        4.    The Rule Is Consistent with FERPA. .................................................................. 18

     C.   ED Complied with the APA's Rulemaking Procedures. ............................................. 19

   II.   A Preliminary Injunction Is Not Necessary to Prevent Irreparable Harm to Plaintiffs. ... 21

     A.   Plaintiffs Have Not Demonstrated Irreparable Harm from the Costs of Implementing the Rule. .......................................................................................................................... 21

     B.   The Rule Does Not Preclude Plaintiffs' Compliance with Other Laws. ...................... 25

     C.   Plaintiffs' Speculation about the Rule's Effects Is Not Irreparable Harm.................... 27

   III.   The Balance of Equities and Public Interest Weigh in Defendants' Favor. ................. 28

   IV.   Any Injunctive Relief Should Be Limited to Plaintiffs. ............................................... 29

Conclusion ........................................................................................................................... 30

Certificate of Compliance ................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Air Transp. Ass'n v. FAA*,
   169 F.3d 1 (D.C. Cir. 1999) .................................................................................. 17

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
   724 F.3d 243 (D.C. Cir. 2013) ............................................................................. 17

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
   344 F. Supp. 3d 158 (D.D.C. 2018) ...................................................................... 22

*California v. Health & Human Servs.*,
   351 F. Supp. 3d 1267 (N.D. Cal.),
   *aff'd*, 941 F.3d 410 (9th Cir. 2019), *cert. granted, judgment vacated* (U.S. July 9, 2020) ..........
   .............................................................................................................................. 27

*Camp v. Pitts*,
   411 U.S. 138 (1973) .............................................................................................. 28

*Cannon v. Univ. of Chi.*,
   441 U.S. 677 (1979) .......................................................................................... 10, 11

*Chevron USA, Inc. v. NRDC*,
   457 U.S. 837 (1984) ................................................................................................ 8

*Cooling Water Intake Structure Coal. v. EPA*,
   905 F.3d 49 (2d Cir. 2018) ................................................................................... 21

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) ...................................................................................... 1, 9, 14

*District of Columbia v. USDA*,
   No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020),
   *appeal filed* No. 20-5136 (D.C. Cir. May 14, 2020) ............................................. 22

*Doe v. Baum*,
   903 F.3d 575 (6th Cir. 2018) ........................................................................... 11, 12

*Doe v. Miami Univ.*,
   882 F.3d 579 (6th Cir. 2018) ................................................................................ 11

*Doe v. Univ. of Mississippi*,
   No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229 (S.D. Miss. July 24, 2018)............ 11

*Doe v. Univ. of Scis.*,
  961 F.3d 203 (3d Cir. 2020) ........................................................................ 12

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*,
  733 F.3d 393 (2d Cir. 2013) ........................................................................ 23

*Experience Works, Inc. v. Chao*,
  267 F. Supp. 2d 93 (D.D.C. 2003) ............................................................... 22

*FBME Bank Ltd. v. Lew*,
  209 F. Supp. 3d 299 (D.D.C. 2016) ............................................................. 20

*First Am. Discount Corp. v. CFTC*,
  222 F.3d 1008 (D.C. Cir. 2000) ................................................................... 21

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.*,
  19 F. Supp. 3d 111 (D.D.C. 2014),
  *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015) ....................... 17

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ........................................................................ 21

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ................................................................................. 29

*Hillsborough Cty., Fla. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985) ..................................................................................... 20

*Howe v. Burwell*,
  No. 2:15-CV-6, 2015 WL 4479757 (D. Vt. July 21, 2015) ......................... 26

*Inv. Co. Inst. v. CFTC*,
  891 F. Supp. 2d 162 (D.D.C. 2012),
  *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) ........................................................... 18

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ......................................................................... 27

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ..................................................................................... 29

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
  463 U.S. 29 (1983) ....................................................................................... 12

*Munaf v. Geren*,
  553 U.S. 674 (2008) ....................................................................................... 7

*Nat'l Ass'n for Surface Finishing v. EPA,*
    795 F.3d 1 (D.C. Cir. 2015) ...................................................................... 18

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) ................................................................ 17

*Nat'l Black Media Coal. v. FCC,*
    791 F.2d 1016 (2d Cir. 1986) .................................................................... 19

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ........................................................................... 12, 13

*New York v. DHS,*
    408 F. Supp. 3d 334 (S.D.N.Y. 2019) ................................................... 8, 22

*New York v. Pruitt,*
    Nos. 18-CV-1030 (JPO), 18-CV-1048 (JPO), 2018 WL 2411595 (S.D.N.Y. May 29, 2018) .....
    .................................................................................................................. 30

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................. 29

*NRDC v. EPA,*
    529 F.3d 1077 (D.C. Cir. 2008) ................................................................ 17

*Rossley v. Drake Univ.,*
    342 F. Supp. 3d 904 (S.D. Iowa 2018) ..................................................... 11

*Sierra Club v. EPA,*
    167 F.3d 658 (D.C. Cir. 1999) .................................................................. 18

*Small Refiner Lead Phase-Down Task Force v. EPA,*
    705 F.2d 506 (D.C. Cir. 1983) .................................................................. 19

*Stringfellow Mem'l Hosp. v. Azar,*
    317 F. Supp.3d 168 (D.D.C. 2018) ........................................................... 20

*Sussman v. Crawford,*
    488 F.3d 136 (2d Cir. 2007) ........................................................................ 8

*Time Warner Cable Inc. v. FCC,*
    729 F.3d 137 (2d Cir. 2013) ...................................................................... 20

*Vullo v. OCC,*
    378 F. Supp. 3d 271 (S.D.N.Y. 2019) ...................................................... 28

*United States v. New York*,
   708 F.2d 92 (2d Cir. 1983)............................................................................ 23

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).................................................................................... 7, 8

**STATUTES**

5 U.S.C. § 705........................................................................................... 8

20 U.S.C. § 1092........................................................................................ 3

20 U.S.C. § 1681.................................................................................... 1, 9

20 U.S.C. § 1682.............................................................................. 8, 10, 20

20 U.S.C. § 1687........................................................................................ 9

34 U.S.C. § 12291....................................................................................... 3

**REGULATIONS**

34 C.F.R. § 106.6.................................................................................. 4, 16

34 C.F.R. § 100.7...................................................................................... 20

34 C.F.R. § 106.8................................................................................. 16, 24

34 C.F.R. § 106.30........................................................................... *passim*

34 C.F.R. § 106.31.................................................................................. 8, 9

34 C.F.R. § 106.44........................................................................... *passim*

34 C.F.R. § 106.45........................................................................... *passim*

66 Fed. Reg. 5,512–01 (Jan. 19, 2001) .................................................... 2

73 Fed. Reg. 74,806 (Dec. 9, 2008) ....................................................... 19

83 Fed. Reg. 61,462 (Nov. 29, 2018) (NPRM)................................... 3, 18, 20

85 Fed. Reg. 30,026 (May 19, 2020) (Rule) .................................... *passim*

**OTHER AUTHORITIES**

2001 Guidance, https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf ............................ 10

2020 Regs Rapid Response, Association of Title IX Administrators, https://atixa.org/r3/ .......... 23

2020 Title IX Regulations, SUNY, https://system.suny.edu/sci/news/5-19-20-title-ix-
    regulations/index.html ................................................................................................. 23

Am. Coll. of Trial Lawyers, *White Paper on Campus Sexual Assault Investigations*, https://
    www.actl.com/docs/default-source/default-document-library/position-statements-and-white-
    papers/task_force_allegations_of_sexual_violence_white_paper_final.pdf ............................. 2

*DCL from Assistant Secretary for Civil Rights*, https://www2.ed.gov/about/offices/list/ocr/letters/
    colleague-title-ix-201709.pdf................................................................................................ 3

*Dear Colleague Letter (DCL) from Assistant Secretary for Civil Rights*, https://www2.ed.gov/
    about/offices/list/ocr/letters/colleague-201104.pdf ................................................................. 2

Exec. Order 12,866,
    58 Fed. Reg. 51,735 (Sept. 30, 1993) ........................................................................ 17

Exec. Order 13,563,
    76 Fed. Reg. 3821 (Jan. 18, 2011) ............................................................................. 17

Jeannie Suk Gersen,
    *How Concerning Are the Trump Administration's New Title IX Regulations?*, The New
    Yorker (May 16, 2020), https://www.newyorker.com/news/our-columnists/how-concerning-
    are-the-trump-administrations-new-title-ix-regulations ...................................................... 2, 3

OMB Circular A-4 (Sept. 17, 2003),
    https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf .......... 17, 18

*Open Letter from Members of the Penn Law School Faculty*, http://media.philly.com/documents/
    OpenLetter.pdf ............................................................................................................... 2

*Questions and Answers (Q&A) on Title IX and Sexual Violence*, https://www2.ed.gov/about/
    offices/list/ocr/docs/qa-201404-title-ix.pdf .............................................................................. 2

## INTRODUCTION

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although the Supreme Court has held that sexual harassment and sexual violence may constitute unlawful sex discrimination, *e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the Department of Education (ED) has never before issued regulations treating such acts as unlawful sex discrimination.

The Rule that Plaintiffs challenge is a landmark step in ED's efforts to ensure that schools receiving federal funding do not tolerate sexual harassment, including sexual assault and sexual violence. It clearly defines sexual harassment under Title IX and sets forth fair procedures for addressing such misconduct, bringing clarity to a field that was previously addressed only by unenforceable and unclear guidance. It obligates schools to take all allegations of sexual harassment seriously and offer supportive measures to complainants promptly upon becoming aware of allegations of harassment. Where complainants elect to file formal complaints, it obligates schools to investigate thoroughly and to provide remedies to complainants after allegations are proven, while respecting due process rights of both parties. And it provides clarity for all involved, firmly delineating students' rights and schools' obligations.

While Plaintiffs evidently would prefer that ED adopt a different rule (or no rule at all), they are not entitled to relief here. First, Plaintiffs have not demonstrated that they are likely to succeed on the merits. Under arbitrary and capricious review, Plaintiffs bear a heavy burden to show that ED irrationally connected the facts to its conclusions. Rather than meet this burden, Plaintiffs mischaracterize the scope of the Rule, the definition of sexual harassment, and the extent to which the Rule applies to an education program or activity. Second, Plaintiffs cannot succeed

1

in their arguments that ED's cost-benefit analysis (which is not subject to judicial review) contravenes the Administrative Procedure Act (APA) or that the Rule is not a logical outgrowth of the proposed rule. Finally, preliminary relief is unwarranted because Plaintiffs have not established any imminent irreparable injury and the balance of the equities weighs in Defendants' favor.

## BACKGROUND

### I.     Statutory Background and Prior OCR Guidance

ED has never before issued regulations identifying sexual harassment as unlawful sex discrimination under Title IX. ED's Office for Civil Rights (OCR) has instead over the years issued guidance explaining how it believed schools should resolve sexual harassment and sexual violence allegations. *See, e.g.*, 66 Fed. Reg. 5,512–01 (Jan. 19, 2001); *Dear Colleague Letter (DCL) from Assistant Secretary for Civil Rights*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; *Questions and Answers (Q&A) on Title IX and Sexual Violence*, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

The latter two documents were widely derided for ignoring students' rights and producing unreliable outcomes. *E.g.*, Exs. 1, 2. Students found responsible under these guidance documents regularly won lawsuits against their schools. Jeannie Suk Gersen, *How Concerning Are the Trump Administration's New Title IX Regulations?*, The New Yorker (May 16, 2020), https://www.newyorker.com/news/our-columnists/how-concerning-are-the-trump-administrations-new-title-ix-regulations. In September 2017, OCR withdrew the 2011 DCL and the 2014 Q&A and announced rulemaking on the subject. *DCL from Assistant Secretary for Civil Rights*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

## II.     The Rule

ED released its proposed rule on November 29, 2018. 83 Fed. Reg. 61,462 (Nov. 29, 2018) (NPRM). The final Rule was released informally on May 6, 2020, and published on May 19, 2020. 85 Fed. Reg. 30,026 (May 19, 2020) (Rule). The Rule contains the following key provisions:

### A.     Obligation to Respond to Sexual Harassment

Sexual harassment that violates Title IX includes (1) a recipient's employee conditioning an educational benefit or service upon a person's participation in unwelcome sexual conduct; (2) unwelcome sexual conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; and (3) sexual assault, dating violence, domestic violence, or stalking (as defined in the Clery Act, 20 U.S.C. § 1092(f), and the Violence Against Women Act, 34 U.S.C. § 12291(a)). 34 C.F.R. § 106.30(a).

A recipient must respond when (1) it has actual knowledge of sexual harassment (2) that occurred within its education program or activity (3) against a person in the United States. *Id.* § 106.44(a). "Actual knowledge" includes notice "to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient." *Id.* § 106.30(a). Recognizing the unique circumstances of K-12 students, actual knowledge also includes notice to "any employee of an elementary and secondary school." An "education program or activity" includes situations over which the recipient exercises substantial control and buildings owned or controlled by student organizations officially recognized by a postsecondary institution. *Id.* § 106.44(a). A recipient violates Title IX when its response to harassment is clearly unreasonable in light of the known circumstances. *Id.*

When a recipient has actual knowledge of sexual harassment, it must promptly offer the complainant supportive measures as defined in § 106.30, whether or not a formal complaint is

filed. *Id.* § 106.44(a). Supportive measures are "non-disciplinary, non-punitive individualized services" "designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment." *Id.* § 106.30(a). The recipient's Title IX Coordinator must also explain how to file a formal complaint. *Id.* § 106.44(a).[1]

## B.    A Fair Grievance Process

Where a complainant (or the Title IX Coordinator) files a formal complaint of sexual harassment, the Rule mandates a consistent, transparent grievance process to resolve that complaint fairly and accurately. 34 C.F.R. § 106.45. "A recipient's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX." *Id.* § 106.45(a). The grievance process must "include reasonably prompt time frames for conclusion," *id.* § 106.45(b)(1)(v), and its principal features are summarized below.

**No Discipline Before A Finding of Responsibility.** A grievance process must "provid[e] remedies to a complainant where a determination of responsibility for sexual harassment has been made against the respondent." *Id.* § 106.45(b)(1)(i). Recipients must "follow[] a grievance process

---

[1] A formal complaint is defined in 34 C.F.R. § 106.30(a). Where state law permits parents or guardians to act on behalf of a minor child, they may file a formal complaint or otherwise act under the Final Rule. *Id.* § 106.6(g).

that complies with this section before the imposition of any disciplinary sanctions." *Id.* § 106.45(b)(1)(i).[2]

**Determinations Based on Evidence.** The Rule requires "an objective evaluation of all relevant evidence," *id.* § 106.45(b)(1)(ii); provides that "credibility determinations may not be based on a person's status as a complainant, respondent, or witness," *id.*; and requires that Title IX Coordinators, investigators, decision-makers, and facilitators of any informal resolution "not have a conflict of interest or bias" for or against complainants or respondents. *Id.* § 106.45(b)(iii). Evidence about the complainant's sexual predisposition or prior sexual behavior is not relevant, with limited exceptions. *Id.* § 106.45(b)(6)(i)-(ii).

**Written Notice**. Upon receipt of a formal complaint, a recipient must provide written notice that includes "[n]otice of the recipient's grievance process" and "[n]otice of the allegations of sexual harassment potentially constituting sexual harassment as defined in § 106.30, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview." *Id.* § 106.45(b)(2)(i)(A)-(B).

**Investigations.** A recipient must investigate the allegations of every formal complaint. 34 C.F.R. § 106.45(b)(3)(i).[3] In doing so, a recipient must "[p]rovide an equal opportunity for the

---

[2] Schools may immediately remove respondents on an emergency basis where appropriate. *Id.* § 106.44(c).

[3] A recipient must dismiss a formal complaint where "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States." *Id.* § 106.45(b)(3)(i). Such a dismissal, however, is only for purposes of Title IX and "does not

parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence." *Id.* § 106.45(b)(5)(ii). It may not "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." *Id.* § 106.45(b)(5)(iii). A recipient must send the parties and their advisors an electronic or hard copy of evidence that is directly related to the allegations, with ten days for the parties to review and respond. *Id.* § 106.45(b)(5)(vi). A recipient must then send the parties and their advisors a copy of the investigative report summarizing relevant evidence, with ten days to review and respond. *Id.* § 106.45(b)(5)(vii). The Rule permits (but does not require) schools to facilitate informal resolution of formal complaints, if the parties voluntarily agree and the allegations do not concern harassment of a student by an employee. *Id.* § 106.45(b)(9).

**Hearings.** Absent informal resolution, postsecondary institutions must conduct live hearings with cross-examination. *Id.* § 106.45(b)(6)(i). While cross-examination "must be conducted directly, orally, and in real time," it may be conducted only "by the party's advisor of choice and never by a party personally[.]" *Id.* At the request of either party, it must be conducted remotely, using technology permitting simultaneous audio and video. *Id.* Before each answer, "the decision-maker(s) must first determine whether the question is relevant and explain any decision to exclude a question as not relevant." *Id.* Recipients other than postsecondary institutions (including K-12 schools) may, but need not, provide for *any* hearing—though they must "afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party." *Id.* § 106.45(b)(6)(ii).

---

preclude action under another provision of the recipient's code of conduct." *Id.*

**Standard of Evidence.** A school may elect "whether the standard of evidence to be used to determine responsibility [in its grievance process] is the preponderance of the evidence standard or the clear and convincing evidence standard," provided that the same standard applies (1) for claims against students as against employees, and (2) to all formal complaints of sexual harassment. *Id.* § 106.45(b)(1)(vii); *see also id.* § 106.45(b)(7)(i). At all times, "the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest[s] on the recipient and not on the parties." *Id.* § 106.45(b)(5)(i). Decision makers must issue a written determination explaining the result and rationale as to each allegation and send the written determination simultaneously to both parties. *Id.* § 106.45(b)(7).

**Appeal Rights.** A recipient "must offer both parties an appeal from a determination regarding responsibility, and from a recipient's dismissal of a formal complaint or any allegations therein," on the bases of procedural irregularity, newly discovered evidence, or bias or conflict of interest, that affected the outcome of the matter. *Id.* § 106.45(b)(8)(i). Appeals may be offered on other bases if they are offered equally to both parties. *Id.* § 106.45(b)(8)(ii).

## LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy" that "should never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). A plaintiff is entitled to such "extraordinary remedy" only "upon a clear showing" that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). The likelihood-of-success standard is "more rigorous" in cases involving government action. *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007). Plaintiffs alternatively move for a stay under 5 U.S.C. § 705, which authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial

review "to prevent irreparable injury." The same factors apply. *New York v. DHS*, 408 F. Supp. 3d 334, 353 n.5 (S.D.N.Y. 2019).

**ARGUMENT**

**I.     Plaintiffs Are Unlikely to Succeed on the Merits.**

**A.     The Rule Falls within ED's Statutory Authority**

ED is authorized "to effectuate the provisions of" Title IX "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. Because this "is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," the Rule must be "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron USA*, *Inc. v. NRDC*, 457 U.S. 837, 843–44 (1984).

**1.     The Rule's Application to an Education Program or Activity Is Reasonable and Consistent with Title IX.**

Plaintiffs first contend that the Rule's application to "an education program or activity" is too narrow and that the Rule should apply to more activities. *See* Pls.' Mem. ISO Mot. Prelim. Inj. 17-18, ECF No. 19 [hereinafter Mot.]. This is conclusory. Plaintiffs offer no support, instead quoting another regulation, a guidance document, and the Rule. *Id.* But none of these documents shows that ED exceeded its statutory authority. First, they are not statutes, which are the measure of *statutory* authority. Second, Plaintiffs fail to explain any unlawful inconsistency: The cited regulation, 34 C.F.R. § 106.31(a), is still in effect, and ED observed that it will continue to use its "definition[] of 'program or activity.'" Rule at 30,203 & n.899. Furthermore, the 2001 Guidance has no legal effect because it is guidance. At any rate, the guidance's examples of an education program or activity (e.g., school facilities, school buses, school sponsored class or training programs) *would* constitute an education program or activity under the Rule. *See* Rule at 30,201

8

(citing approvingly this portion of the 2001 Guidance).

ED explained at length that the Rule's application to an education program or activity is linked to Title IX's limitation to, 20 U.S.C. § 1681(a), and definition of, *id.* § 1687, a "program or activity." Rule at 30,195–203. In addition, ED looked to the Supreme Court's interpretation of the term. *Id.* at 30,196. The Court has observed, "The statute's plain language confines the scope of prohibited conduct *based on the recipient's degree of control over the harasser and the environment in which the harassment occurs*." *Davis*, 526 U.S. at 644 (emphasis added). In light of this, "a recipient's damages liability" is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. Concluding that the Supreme Court's interpretation was reasonable in the administrative enforcement context too, ED employed similar terminology. Rule at 30,196 & n.683.

Although Plaintiffs do not discuss Title IX's explicit limitation to "any education program or activity," they argue that the Rule relies too heavily on the Supreme Court's interpretation. Mot. 20-23. This argument is bizarre; consistency with a court's interpretation of a statute *supports* the agency's interpretation.

Plaintiffs also mischaracterize the role that the Supreme Court's decisions played in this rulemaking. Plaintiffs assert that "*Davis* or *Gebser* . . . did not require agencies to adopt the monetary liability standard for administrative enforcement." Mot. 21. This is not in dispute; ED recognized that it was not bound by *Davis* or *Gebser*, but rather found those decisions persuasive and, thus, adopted and adapted the Supreme Court's framework by adding requirements such as mandating an offer of supportive measures to complainants as part of the recipient's non-deliberately indifferent response. 34 CFR § 106.44(a); *id.* at § 106.45(b)(10)(ii); Rule at 30,032-

46, 30,196.

Plaintiffs are also incorrect that these decisions "hav[e] no bearing on [ED's] enforcement policies," Mot. 22. As ED explained, "Nothing in *Gebser* or *Davis* purports to restrict the *Gebser*/*Davis* framework only to private lawsuits for money damages. Rather, the Supreme Court justified that framework as appropriate for recognizing when a school's response to sexual harassment constitutes intentional discrimination by the school, warranting exposure to money damages in a private Title IX lawsuit." Rule at 30,033. The 2001 Guidance did not state that *Gebser* and *Davis* were irrelevant to enforcement policies either. Rather, it stated that its definition of sexual harassment was consistent with the definition in *Davis* and captured the same concept. 2001 Guidance at v-vi, https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. And, as referenced above, the 2001 Guidance has no legal effect and does not preclude the adoption of a contrary position in a rulemaking.

## 2.      ED Has Statutory Authority to Require a Fair Grievance Process.

Plaintiffs also err in contending that implementing grievance procedures to resolve harassment allegations and requiring recipients not to discriminate on the basis of sex during these procedures exceeds ED's authority by conferring new rights on respondents. Mot. 18-19. Congress has authorized ED to promulgate regulations "consistent with achievement of the objectives of" Title IX. 20 U.S.C. § 1682. One of Title IX's purposes is "to provide individual citizens effective protection against [discriminatory] practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Section 106.45(a) serves that purpose by acknowledging that sex discrimination may occur against complainants *or* respondents and cautioning against unfair treatment of any party. Contrary to Plaintiffs' misapprehension, § 106.45(a) does not assume that any unfair treatment constitutes sex discrimination. The grievance process set forth in the Rule is designed to prevent the sort of unfair treatment that may amount to sex discrimination.

10

Section 106.45(a) is supported by judicial decisions confirming that unfair grievance procedures can amount to sex discrimination. For example, courts have noted that sex discrimination may exist where a recipient fails to investigate evidence that a complainant may also have committed sexual misconduct in the same case, *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 931-32 (S.D. Iowa 2018); credited only female witnesses, *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); or ignored exonerating evidence because of preconceived notions about gender roles, *Doe v. Univ. of Mississippi*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, at *5 (S.D. Miss. July 24, 2018). *See also* Rule at 30,238 n.983 (citing additional authority). In response to such cases and commenters' observations of sex-motivated unfair treatment in Title IX proceedings, *id*. at 30,238, ED added § 106.45(a) to advise recipients that no sex-discriminatory action may be taken with respect to complainants *or* respondents during a grievance process. *Id*. For example, a decision to investigate complaints brought by women but not by men, *see Doe v. Miami Univ.*, 882 F.3d 579, 593-94 (6th Cir. 2018), or a practice of expelling women found responsible for harassment but only suspending men may constitute discrimination, Rule at 30,240.

Plaintiffs incorrectly suggest that the Rule frustrates Title IX's antidiscrimination mandate. Mot. 19. ED adopted various procedural protections—including notice, cross-examination through advisors for postsecondary students, appeal on various grounds—that not only apply equally to both parties, but also are designed to produce reliable outcomes while protecting parties from unnecessary trauma. Rule at 30,238-407. Indeed, multiple courts of appeal have required a similar live hearing with cross-examination in misconduct proceedings at postsecondary institutions. *E.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203, 214-15 (3d Cir. 2020); *Baum*, 903 F.3d 578. The Rule falls well within ED's statutory authority.

## B.     The Rule's Provisions Are Not Arbitrary and Capricious.

Under the APA, the court's "narrow" role is to assess whether the agency "examine[d] the

relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). ED has done so with respect to each aspect of the Rule.

### 1.      There Is No Prior Regulation from Which This Rule Departs.

A core premise of Plaintiffs' motion is that the Rule departs from "well-established enforcement policy." *See, e.g.*, Mot. 23. Yet there is no *law* from which the Rule departs. Title IX does not define sexual harassment, let alone the circumstances under which it is prohibited. And ED has never before promulgated a regulation on the subject. The Rule should therefore be evaluated on its own terms.

Furthermore, where the Rule differs from past nonbinding guidance, ED explained why. "Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). So long as "the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Id.*

Plaintiffs claim that two of ED's explanations—aligning administrative enforcement with *Gebser* and *Davis* and fulfilling the purposes of Title IX—render the Rule irrational because they are "*ipse dixit*," Mot. 23, but this argument is itself ipse dixit. Large portions of the Rule explain why the *Gebser*/*Davis* framework is an appropriate starting point, even if it does not represent the limits of ED's enforcement authority. Rule at 30,032-46. And Plaintiffs do not explain why furthering the purpose of Title IX—ED's precise charge—is an insufficient justification for the Rule, particularly where ED repeatedly explained how the Rule aligns with Title IX's purpose. *E.g.*, *id.* at 30,039 & n.128 (connecting the notice requirement to "Title IX's non-discrimination mandate").

Plaintiffs also assert that ED disregarded "reliance interests" in previous guidance

documents, Mot. 23, but ED recognized and took into account "that longstanding policies may have engendered serious reliance interests." Rule at 30,505. Plaintiffs' disagreement with ED's conclusions is not a basis to invalidate the Rule. *See Brand X*, 545 U.S. at 981.

### 2. The Rule's Definitions Are Reasonable.

#### i. The Definition of *Sexual Harassment* Is Reasonable.

Plaintiffs' attack on the Rule's *sexual harassment* definition, Mot. 20-23, misapplies the deferential APA standard and misconstrues the Rule. ED explained at length its reasons for adopting the definition, Rule at 30,139-80, but Plaintiffs focus on one part of the definition—the *Davis* standard—and ignore the other two parts of that definition. For example, Plaintiffs claim that the definition "excludes from protection all sexually harassing conduct that has not . . . become so severe as to 'effectively den[y]' access." Mot. 21. However, while the *Davis* standard defines sexual harassment as misconduct that "effectively denies a person equal access to the recipient's education program or activity," 34 C.F.R. § 106.30(a), that is not the Rule's only definition of the term. The other parts of the *sexual harassment* definition cover misconduct without requiring effective denial of equal access. *Id.*; *see also* Rule at 30,169-70.

More fundamentally, Plaintiffs point to nothing that prohibits ED from including the *Davis* standard as one definition of *sexual harassment*. Instead, they assert the definition "does not 'effectuate' Title IX's broad protections." Mot. 21. But the *Davis* standard comes directly from the Supreme Court's interpretation of Title IX: "in the context of student-on-student harassment, damages are available *only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect*." *Davis*, 526 U.S. at 652 (emphasis added). The Court explained, "students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id*. at 651-52. But even if that behavior may be characterized as sexual harassment it does

not follow "that it denies its victims the equal access to education that Title IX is designed to protect." *Id.* at 652. ED agreed with this analysis, concluding that Title IX does not "represent[] a 'zero-tolerance' policy banning all sexual harassment. Rather, interpretations of . . . Title IX focus on sexual harassment that constitutes sex discrimination interfering with equal participation in a[n] educational environment." Rule at 30,154.

Plaintiffs also assert, unfoundedly, that ED failed to explain any inconsistencies with Title VI and Section 504 of the Rehabilitation Act. Mot. 25-26. In fact, as ED explained, "[t]he APA does not require the Department to devise identical or even similar rules to eliminate discrimination on the bases of sex, race or disability," particularly where "[t]he statutory texts attending Title VI, Title IX, and Section 504 give no indication that regulations arising from any of them must, or even may, serve as APA comparators." Rule at 30,528-29. A contrary principle would deny "agencies latitude to gradually promulgate regulations governing different subject matters under different statutes" and raise "gratuitous questions about whether to 'equalize up' or 'equalize down' the regulations across wide swaths of statutory regimes." *Id.* at 30,529. The cases that Plaintiffs cite, Mot. 25, state that Title VI, Title IX, and Section 504 should be interpreted similarly. But they do not state that ED cannot promulgate regulations as to one statute without promulgating identical regulations as to others.

## ii.     The Definition of *Notice* Is Reasonable.

The Rule reasonably requires that recipients have actual, rather than constructive, knowledge of sexual harassment before they must respond. Plaintiffs' only argument on this point is that *Gebser* and *Davis* did not intend to require recipients to have actual knowledge in the administrative enforcement context. *See* Mot. 21-22. Once again, however, ED does not view *Gebser* and *Davis* as mandatory, nor did the Supreme Court limit ED's authority to promulgate a rule that requires recipients to have actual knowledge.

Furthermore, although the Rule's actual knowledge requirement is similar to *Gebser* and *Davis*, it has been adapted to the administrative enforcement context for reasons that are independent from those decisions. ED adapted "the *Gebser/Davis* condition of actual knowledge to include notice to more recipient employees than what is required under the *Gebser/Davis* framework, in a way that takes into account the different needs and expectations of students in elementary and secondary schools, and in postsecondary institutions." Rule at 30,038. ED explained that the constructive notice standard in prior guidance was vague and required notice to certain "responsible employees," which also generated confusion. *Id*. at 30,038-43.

The Rule expanded the pool of people who may have notice in the K-12 context and clarifies that actual notice to any elementary or secondary school employee requires the school to respond. 34 C.F.R. § 106.30(a). For all recipients, notice to a recipient's Title IX Coordinator or to any employee with authority to institute corrective measures conveys actual notice to the recipient. *Id*. ED explained that "imposing a 'should have known' standard unintentionally creates a negative incentive for Title IX Coordinators and officials with authority to inquiry about possible sexual harassment in ways that invade the privacy and autonomy of students and employees at postsecondary institutions." *Id.* at 30,041. Such a negative consequence is not necessary because recipients must give students, parents, and others notice of the Title IX Coordinator's contact information, and information regarding how to report sexual harassment. 34 C.F.R. § 106.8(a)-(c).

### 3.    It is Reasonable to Apply Formal Complaint Procedures to K-12.

Plaintiffs' objection that the Rule focuses unduly on individual complainants and respondents, Mot. 23-24, is misplaced. The Rule allows recipients to consolidate formal complaints involving multiple complainants or respondents arising from the same facts or circumstances. 34 C.F.R. §§ 106.45(b)(4); *see also* Rule at 30,290-91, 30,307, 30,436. This provision specifically enables recipients to address incidents of harassment affecting multiple

students.

Moreover, Plaintiffs' objection regarding alleged burdens placed on students of different age or ability levels, particularly in the K-12 setting, Mot. 15-17, is groundless. It fails to recognize that once a K-12 school employee observes or has notice of sexual harassment, the school must respond even if no one reports the harassment. 34 C.F.R. §§ 106.8(a), 106.30(a); Rule at 30,121-22. Moreover, any person may report sexual harassment to any K-12 employee. *Id.* Such reports may be made on behalf of students who cannot write due to youth or early developmental stage; such reporting does not require (or preclude) the participation of a parent or guardian. Upon receiving such a report, the recipient must respond, including by offering supportive measures to the alleged harassment victim. 34 C.F.R. § 106.44(a); Rule at 30,122. Additionally, the recipient must begin a grievance process when a complainant files a formal complaint or a Title IX Coordinator signs one. 34 C.F.R. §§ 106.30(a), 106.44(b)(1); Rule at 30,122, 30,051-53, 30,327 (considering K-12 setting). In cases involving a minor child or student with a disability, a parent or guardian also may file a formal complaint. 34 C.F.R. § 106.6(g); Rule at 30,122, 30,136.

### 4.  There Is No Basis to Second-Guess ED's Cost-Benefit Analysis.

Plaintiffs' claims relating to ED's cost-benefit analysis are not subject to review. ED did not undertake a cost-benefit analysis to comply with Title IX, but rather only to comply with Executive Orders 12866 and 13563. Rule at 30,564. Alleged violations of these "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *see Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999).[4]

---

[4] Nor is this a case where ED "decide[d] to rely on a cost-benefit analysis as part of its rulemaking,"

Even if ED's cost-benefit analysis were reviewable, it would readily withstand scrutiny. Courts "review an agency's cost-benefit analysis deferentially." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013). It is not enough to argue that an agency "could have used *better* data," as "the sole question before [the court] is whether [the agency] has acted reasonably, not whether it has acted flawlessly." *NRDC v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008).

Contrary to Plaintiffs' assertion, Mot. 24, ED carefully considered the costs associated with incidents of sexual harassment, Rule at 30,538-69, but concluded that such costs should not be included in the analysis. *Id.* at 30,545-46. Specifically, because Clery Act data did not support a finding that the 2011 DCL affected the underlying rate of sexual harassment, ED lacked evidence to conclude that the Rule would affect the underlying number of incidents of sexual harassment. *Id.* at 30,539-46; *see also id.* at 30,545. An agency's analysis need only consider costs that are attributable to the rule itself. OMB Circular A-4 at 15 (Sept. 17, 2003), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf. While Plaintiffs may disagree with ED's conclusion, they and other commenters failed to provide alternative data to more accurately capture an appropriate baseline, 83 Fed. Reg. at 61,485-86; *see also* Rule at 30,551, and their alternative view of the evidence is insufficient to deem the Rule irrational. *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 12 (D.C. Cir. 2015); *see also Sierra Club v. EPA*,

---

thus creating the possibility that "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012), *see also* Rule at 30,028-30, 30,564.

167 F.3d 658, 662 (D.C. Cir. 1999).[5]

Equally unavailing is Plaintiffs' claim that the Rule contravenes the APA by underestimating compliance costs. Mot. 25. The APA does not permit a court to set aside agency action, let alone stay an effective date, merely because plaintiffs disagree with the agency's reasonable calculations. *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 189 (D.D.C. 2012), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013). And the Rule itself demonstrates that ED considered compliance costs where warranted, including in response to submitted comments. Rule at 30,548-68. Further, Plaintiffs offer no reason to conclude that compliance costs will increase due to the COVID-19 pandemic, as explained below. Mot. 25. ED's analysis is thus more than sufficient. *See Inv. Co. Inst.*, 720 F.3d at 379.

### 4.      The Rule Is Consistent with FERPA.

The Rule's evidence-related provisions raise no concerns under the Federal Educational Rights and Privacy Act (FERPA). In prior regulations, which Plaintiffs notably do not challenge, ED stated that under FERPA, a parent or eligible student "has a right to inspect and review any witness statement that is directly related to the student, even if that statement contains information that is also directly related to another student" if the information cannot be redacted without

---

[5] Contrary to Plaintiffs' assertion, Mot. 24-25, ED determined that offering supportive measures would likely reduce the negative impacts of sexual harassment "*if* these final regulations were to have any marginal effect" on the underlying number of incidents. Rule at 30,545 (emphasis added); *see id.* at 30,088 ("By requiring a recipient to offer supportive measures, these final regulations do not create or further a hostile environment and expressly require recipients to provide measures designed to restore or preserve a complainant's equal access to education.").

destroying its meaning. Rule at 30,424, 30,427 n. 1587 (quoting 73 Fed. Reg. 74,806, 74,832-33 (Dec. 9, 2008)). Consistent with FERPA, only evidence obtained as part of a Title IX investigation relating directly to a formal complaint's allegations must be disclosed to the parties. *Id*. at 30,427. The Rule allows a recipient to redact personally identifiable information from education records if that information does not directly relate to a formal complaint's allegations and acknowledges that such redactions may even be required under FERPA. *Id*. at 30,429, 30,437-38. The Rule does not fail to account for confidentiality concerns, as Plaintiffs charge; it merely reaches a different result than they prefer.[6]

### C.      ED Complied with the APA's Rulemaking Procedures.

Plaintiffs' claim that the NPRM provided no notice as to three of the Rule's provisions, Mot. 27, is unavailing. "[A] final rule need not be an exact replica of the rule proposed;" rather, it need only be a "logical outgrowth." *Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986). The final rule is a logical outgrowth of the NPRM if "the agency's notice would 'fairly apprise interested persons of the subjects and issues' [of the rulemaking]." *Id.* (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983)).

First, Plaintiffs had fair notice that the Rule would include a preemption provision. Mot. 28. The NPRM's Federalism section acknowledged that provisions in the regulation would implicate federalism. 83 Fed. Reg. at 61,495. Numerous commenters raised precisely the same federalism concerns that Plaintiffs now claim they could not anticipate, Rule at 30,454–63.

---

[6] With respect to any concerns regarding treatment or medical records, which may not be "education records" under FERPA, the Rule also provides that "the recipient cannot . . . use a party's records that are made or maintained by a physician, . . . unless the recipient obtains that party's voluntary, written consent to do so for a grievance process." § 106.45(b)(5)(i).

*Stringfellow Mem'l Hosp. v. Azar*, 317 F. Supp.3d 168, 187 (D.D.C. 2018); *cf. Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 170 (2d Cir. 2013) ("None of the commenters addressed such a rule during the official comment period—a fact that strongly suggests that the . . . NPRM provided insufficient notice."). And, of course, ED's regulation is within its authority to effectuate Title IX itself, 20 U.S.C. § 1682, and would thus preempt contrary state laws. *Hillsborough Cty., Fla. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). Any supposed failure of notice would be harmless. *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 311 (D.D.C. 2016).

Second, Plaintiffs had notice of the anti-retaliation provision requiring schools, but not parties, to keep information confidential during the investigation. Mot. 28. This provision developed from the NPRM proposal that recipients "not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." 83 Fed. Reg. at 61,498; *see also* 34 C.F.R. § 106.45(b)(5)(iii). It is also consistent with a related regulation that does not require a complainant to keep confidential the name of the school or any of the parties implicated by the complaint to ED. 34 C.F.R. § 100.7. Indeed, many commenters urged ED to include the provision against retaliation. Rule at 30,535–38; *e.g.*, Student Advocates of Reed College's Sexual Assault Prevention and Response Program comment ED-2018-OCR-0064-9105 at 2; New York Six Liberal Arts Consortium comment ED-2018-OCR-0064-11903 at 5; Oregon Department of Education comment ED-2018-OCR-0064-104567 at 12.

Finally, the provision that allows schools to dismiss complaints under certain circumstances, Mot. 28 (citing 34 C.F.R. § 106.45(b)(3)(ii)), resulted from ED's consideration of comments. Rule at 30,289–90; *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 71 (2d Cir. 2018) (noting that an agency may modify a rule through the notice-and-comment process). Plaintiffs describe the provision as "troubling" because it would allow schools to drop

investigations "even if the harassment has continuing adverse educational effects, and even where the school can take corrective action to redress this harassment." Mot. 28–29. But Plaintiffs' view that the provision is "troubling" is not a legal basis for setting it aside, so even if Plaintiffs lacked an opportunity to comment, the error was harmless. *See First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000). And at any rate, this provision is permissive, so the schools can choose not to dismiss a formal complaint.

## II.    A Preliminary Injunction Is Not Necessary to Prevent Irreparable Harm to Plaintiffs.

Plaintiffs have failed to "demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted).

### A.    Plaintiffs Have Not Demonstrated Irreparable Harm from the Costs of Implementing the Rule.

The "financial and administrative resources" that are allegedly required to implement the Rule, Mot. 11-14, do not constitute irreparable harm. "[O]rdinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc.*, 408 F.3d at 115. If the mine-run of costs necessary to comply with a new federal policy justified preliminary relief, the irreparable harm requirement would be satisfied in nearly every case.

Plaintiffs cite *New York v. DHS*, which concluded that plaintiffs would be harmed by the economic harm to their hospitals; increased costs to provide emergency shelter, healthcare, and other benefits; programmatic costs; and "$3.6 billion in 'economic ripple effects,' 26,000 lost jobs, and $175 million in lost tax revenue." 408 F. Supp. 3d 334, 344 (S.D.N.Y. 2019). Plaintiffs' alleged economic harms here are, in contrast, limited to the time and money required to bring their systems into compliance with the Rule, a different and substantially smaller undertaking.

Plaintiffs argue that their expenditures to comply with the Rule are irreparable because they

cannot later be recovered from the government. Mot. 11. However, an irreparable injury requires at least "significant" economic harm, even where the defendant has sovereign immunity.[7] *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018); *see id.* ("[I]t proves too much to suggest that 'irreparable' injury exists, as a matter of course, whenever [an entity] seeks preliminarily to enjoin the implementation of a new regulatory burden," even given that "economic loss sustained due to a federal administrative action is typically 'uncompensable' in the sense that federal agencies enjoy sovereign immunity."). Plaintiffs nowhere allege such significant economic losses or time requirements that would endanger their ability to carry out their missions. *See Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96-97 (D.D.C. 2003) (holding that a reduction of more than $21 million in federal grants did not justify preliminary relief because plaintiff had not shown that the loss "so devastated its ability to carry out its mission that it will be unable to accept and implement the grant it did receive"). Indeed, Plaintiffs make no effort to connect the modest costs and time requirements identified in their declarations—in the instances where specific quantities are provided—to their overall budgets or ability to carry out their missions. To conclude that Plaintiffs can meet their burden with such a minimal showing would result in nearly every litigant seeking injunctive relief against the federal government satisfying the irreparable injury prong. And where the Second Circuit has found

---

[7] Plaintiffs cite *District of Columbia v. USDA*, but in that case the court determined that the plaintiff-states' costs in the relevant program would "increase exponentially," as at least one state estimated its financial burden at $21 million over six years. No. CV 20-119 (BAH), 2020 WL 1236657, at *26 (D.D.C. Mar. 13, 2020), *appeal filed* No. 20-5136 (D.C. Cir. May 14, 2020). Here, Plaintiffs do not allege such an exponential increase in the cost of their educational programs.

irreparable harm based on financial losses caused by the federal government, they were direct losses imposed by the government action, not the ordinary costs of analyzing the new policy to come into compliance. *See Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (holding that plaintiffs would be irreparably harmed if the government shut down their power plant); *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (finding irreparable harm where company would incur business damages from being denied use of airport by the government).

Plaintiffs also overstate the scale of necessary compliance efforts. Many aspects of the Rule are similar to prior guidance documents. For example, similar to the Rule, the 2011 DCL required that grievance procedures include an equal opportunity for both parties to present evidence. Rule at 30,054. In addition, Title IX training organizations have been providing training and advice on how to implement the Rule since it was publicly released in May 2020. Indeed, the State University of New York (SUNY) has cautioned against "panic," and instead created a "Joint Guidance" project to help schools comply by the effective date, including a guide to "14 Things To Do Before 8/14." Exs. 3-5; *see also* Ex. 6 (providing a model policy). And many areas of divergence between the schools' current policies identified by Plaintiffs and the Rule would actually *reduce* the burden on recipients if recipients addressed only the misconduct covered by the Rule.

Plaintiffs likewise overstate their compliance burdens. Plaintiffs claim irreparable injury because of the resources that schools might expend to provide training to all students and parents. Mot. 12. But the Rule does not require training for students and parents, only notification of the Title IX Coordinator's contact information and certain policies. 34 C.F.R. §§ 106.45(b)(1)(iii), 106.8(a)-(c). Plaintiffs also claim that they will need to hire additional staff, Mot. 12, but the advisors to conduct cross-examination at hearings, 34 C.F.R. § 106.45(b)(6), may be preexisting

school employees (and Plaintiffs offer no explanation of why a "low rate" for advisors—who need not be attorneys—would be "$325/hour," Storch Decl. ¶ 31). While Plaintiffs allege that it will require a long period of time for funding recipients to comply with the Rule, Mot. 12, they do not explain why that period of time constitutes an irreparable injury to Plaintiffs. Any time required to comply with a *state's* requirements that are more burdensome than the Rule is time not attributable to the Rule. Plaintiffs' declarations also reveal uncertainty about whether more expeditious processes are available. *See, e.g.*, Storch Decl. ¶ 22 ("*Typically*, university code of conduct policies are amended through a committee or working group system." (emphasis added)); *id.* ¶ 26 ("SUNY *typically* mails changes to its Codes of Conduct to new students before summer orientation." (emphasis added)).

Plaintiffs argue that the administrative costs for compliance are heightened by COVID-19. Mot. 12-13. But COVID-19 does not waive or stay funding recipients' obligations under federal civil rights laws. Nor does COVID-19 require ED to ignore students' vital interests in the protections afforded by the Rule or in the implementation of Title IX's nondiscrimination mandate through the Rule. And while Plaintiffs articulate in a conclusory fashion that "most school campuses have been closed" and that adapting to COVID-19 has demanded school resources, Mot. 13, Plaintiffs do not explain why that means they would be irreparably harmed by coming into compliance with the Rule. Indeed, the Rule allows recipients to economically conduct video hearings by using existing rooms and equipment "such as webcams, laptops, or cell phones" as well as "free video web conferencing platforms" and "voice memo apps." Rule at 30,562.

Plaintiffs also avert to medical schools and teaching hospitals as funding recipients with particularly acute COVID-19-related concerns, Mot. 14, but fail to demonstrate that those entities' COVID-19 relief efforts will be certainly and imminently harmed by implementing the Rule.

Plaintiffs cite only the conclusory statement that "SUNY Downstate will have to divert substantial resources to the implementation of the Final Rule in a number of ways, all of which will distract it from its overall mission in the midst of the pandemic." Ajibade Decl. ¶ 29, Ex. 17 (cited at Mot. 14). Plaintiffs do not quantify these tradeoffs or explain why Title IX Coordinators or other personnel responsible for implementing the Rule will be needed for but pulled away from ongoing COVID-19 relief efforts.

Plaintiffs also argue that their existing collective bargaining agreements (CBAs) may complicate compliance with the Rule, Mot. 13-14, but the allegedly irreparable harm that Plaintiffs cite is that "some schools will need to engage costly outside counsel." Mot. 14. For the previously discussed reasons, seeking legal advice on compliance is the type of mundane compliance cost which does not satisfy the irreparable-harm standard. ED was not required to cater to the specific CBA or state statutory or regulatory context of every federal funding recipient; indeed, doing so would be unmanageable and could incentivize recipients to adopt burdensome procedures to impede regulation. Rule at 30,378 & n.1425.

### B.    The Rule Does Not Preclude Plaintiffs' Compliance with Other Laws.

Plaintiffs also argue that the Rules will "interfere[]" with compliance with other federal, state, and local laws. Mot. 14-15. As to other federal laws, one of Plaintiffs' declarations notes that research has been required to "analyz[e] how to reconcile" the Rule with FERPA, IDEA, and Title VII. Mot. 15 (citing Brantley Decl. ¶ 57, Ex. 11). However, Plaintiffs identify no conflict between the Rule and those statutes because there is none. Rule at 30,227-29, 30,421-53, 30,487, 30,494-97, 30,539. Another declaration notes that the Clery Act and VAWA amendments may require reporting of different misconduct than the Rule addresses, Mot. 15 (citing Storch Decl. ¶ 47, Ex. 13), but this also is not a conflict, *see* Rule at 30,461, 30,511-28.

As to state and local laws, Plaintiffs apparently mean that state and local laws may place

requirements on schools that are *different* than the Rule's requirements. Mot. 14-15 (citing Pepe-Souvenir Decl. ¶ 16, Ex. 14; Brantley Decl. ¶¶ 52-53, 57-58; Storch Decl. ¶ 47). But Plaintiffs identify nothing irreconcilable about the duties imposed by state and local law and the Rule, and certainly nothing that would "hamstring[]" funding recipients. Mot. 14; *see, e.g.*, Brantley Decl. ¶ 57 (explaining that New York's Department of Education "has had to devote significant resources into analyzing . . . how the Final Rule's preemption provision impacts NYCDOE's obligations under state laws").

To the extent that Plaintiffs suggest they are harmed because they will be "forced to create dual investigatory and complaint resolution systems," Mot. 15, the need to do so is attributable to the requirements of state law, New York City law, or plaintiffs' own choices, not the Rule. *See Howe v. Burwell*, No. 2:15-CV-6, 2015 WL 4479757, at *6 (D. Vt. July 21, 2015) ("Plaintiff must also establish that his alleged harm is not self-inflicted." (citation omitted)). A state cannot lock the federal government into its preferred policy approach through state law.

Plaintiffs cite an out-of-circuit case for support, but there plaintiffs had submitted declarations showing that their state fiscs would be harmed absent an injunction because they would be compelled to provide substitute contraceptive coverage and other state-funded healthcare. Mot. 15 (citing *California v. Health & Human Servs.*, 351 F. Supp. 3d 1267, 1297 (N.D. Cal.), *aff'd*, 941 F.3d 410 (9th Cir. 2019), *cert. granted, judgment vacated* (U.S. July 9, 2020)). Here, in contrast, Plaintiffs' declarations identify no such imminent financial loss to New York based on compliance with New York's own laws, likely because schools must *already* comply with those laws.

Plaintiffs also allude to ED disregarding their "reliance on ED's longstanding policy" by requiring compliance "in a matter of weeks," Mot. 14, ignoring both that no previous binding

regulation identified sexual harassment as unlawful sex discrimination under Title IX, and that funding recipients have been on notice of ED's proposed rule since ED promulgated the NPRM in 2018.

### C.    Plaintiffs' Speculation about the Rule's Effects Is Not Irreparable Harm.

Plaintiffs speculate that the Rule will result in decreased reporting of sexual harassment in the long run, and ultimately other negative results, Mot. 15-16. Such speculation is insufficient to justify a preliminary injunction.

First, conclusory statements do not meet Plaintiffs' burden to demonstrate harms that are "actual" or "certain." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016); *see, e.g.*, Pepe-Souvenir Decl. ¶ 20, Ex. 14 ("These requirements are likely to deter many complainants . . . from coming forward.") Stagg Decl. ¶ 49, Ex. 15 ("Students . . . may decide not to report at all.").

Second, Plaintiffs must rely solely on injuries to themselves[8]—New York cannot assert the interests of its residents as *parens patriae* against the United States. *Vullo v. OCC*, 378 F. Supp. 3d 271, 284 (S.D.N.Y. 2019).

Third, Plaintiffs' speculative arguments rest on incorrect premises. Contrary to Plaintiff's arguments that the Rule will "prevent schools from promptly investigating and addressing sexual

---

[8] Plaintiffs submit declarations from a number of entities without explaining which entities' injuries they believe constitute injuries to *Plaintiffs*. *See, e.g.*, Stagg Decl., Ex. 15 (by counsel at Barnard); Haviland Decl., Ex. 18 (by Executive Director at the New York City Alliance Against Sexual Assault). Such extra-record evidence is irrelevant to Plaintiffs' APA claims. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

harassment," Mot. 16, the Rule requires a school to "respond promptly" and "promptly contact the complainant" to discuss and offer supportive measures and inform them that such measures are available with or without the filing of a formal complaint.[9] 34 C.F.R. § 106.44(a). The Rule also requires "reasonably prompt time frames for conclusion of the grievance process." *Id. at* § 106.45(b)(1)(v). And contrary to Plaintiffs' implication, Mot. 15, hearings are not required in K-12 schools. *Id*. at § 106.45(b)(6)(ii).

What Plaintiffs describe as "cumbersome grievance procedures" are not an unnecessary "delay[]," Mot. 16, but a period for schools to conduct a fair, thorough, and factual investigation prior to determining responsibility, disciplinary sanctions, and remedies. If an immediate threat to an individual's physical health or safety exists, schools may remove respondents prior to investigating. 34 C.F.R. § 106.44(c). During the investigation (and even in the absence of an investigation), schools must continue to offer supportive measures to the complainant, with wide latitude to ensure safety and deter sexual harassment. *Id*. § 106.44(a); § 106.30(a). The Rule's requirements apply only to the serious misconduct covered by Title IX, not minor classroom disruptions, which schools may continue to handle in the ordinary course.

## III.    The Balance of Equities and Public Interest Weigh in Defendants' Favor.

The balance of equities and public interest also weigh in Defendants' favor. Where the government is a party, these inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, there is inherent harm in preventing ED from providing binding regulations to implement Title IX. In particular, prior guidance "has created confusion and uncertainty among recipients, and has not

---

[9] In the K-12 context, many common interventions such as educational conversations, sending students to the principal's office, or changing student seating or class assignments constitute permissible supportive measures. Rule at 30,182-83.

adequately advised recipients as to how to uphold Title IX's non-discrimination mandate while at the same time meeting requirements of constitutional due process and fundamental fairness." Rule at 30,030 (footnotes omitted). Plaintiffs have not shown that any harm to them would outweigh the public interest, especially when the Rule generally establishes a floor rather than a ceiling and preserves Plaintiffs' discretion to separately address misconduct falling outside Title IX. Moreover, the government, the public, schools, and students have a strong interest in legally binding requirements to uphold Title IX's nondiscrimination mandate.

## IV.     Any Injunctive Relief Should Be Limited to Plaintiffs.

Should the Court enter any relief, it should extend only to the named plaintiffs. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 765 (1994).

Entering broad relief would be particularly inappropriate here because the Rule is being challenged in other courts. *VRLC v. DeVos*, No. 20-cv-11104 (D. Mass.); *Pennsylvania v. DeVos*, No. 1:20-cv-01468 (D.D.C.); *Know Your IX v. DeVos*, No. 1:20-cv-01224 (D. Md.). And a nationwide injunction "encourages forum-shopping, raises the risk of conflicting injunctions, and stifles inter-circuit dialogue." *New York v. Pruitt*, Nos. 18-CV-1030 (JPO), 18-CV-1048 (JPO), 2018 WL 2411595, at *5 (S.D.N.Y. May 29, 2018).

Moreover, non-plaintiff recipients (including other states) may prefer for the Rule to take effect, affording them certainty as to their obligations under ED's Title IX enforcement regime. And the mere fact that New York residents attend colleges in other states, Mot. 30, does not justify nationwide relief; otherwise, any state could obtain a nationwide injunction against any federal law or regulation affecting colleges.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Motion.

Dated: July 13, 2020                              Respectfully submitted,

                                                  ETHAN P. DAVIS
                                                  Acting Assistant Attorney General

                                                  DAVID M. MORRELL
                                                  Deputy Assistant Attorney General

                                                  CARLOTTA WELLS
                                                  Assistant Branch Director
                                                  Civil Division

                                                  *Benjamin Takemoto*
                                                  BENJAMIN T. TAKEMOTO
                                                  (DC Bar # 1045253)
                                                  Trial Attorney
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  Ben Franklin Station, P.O. Box No. 883
                                                  Washington, DC 20044
                                                  Phone: (202) 532-4252
                                                  Fax: (202) 616-8460
                                                  E-mail: benjamin.takemoto@usdoj.gov

                                                  *Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 8,936 words and complies with the formatting rules in the

Individual Practices of Judge John G. Koeltl and the Court's July 8, 2020 order, ECF No. 44,

which granted Defendants leave to file an opposition brief of up to 9,000 words.

                                                  *Benjamin Takemoto*
                                                  BENJAMIN T. TAKEMOTO