# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK and THE BOARD OF EDUCATION FOR THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION and ELISABETH DEVOS, in her official capacity as the Secretary of Education,<br><br>*Defendants*, | Civil Action No. 1:20-cv-4260 (JGK) |

**BRIEF OF FAMILIES ADVOCATING FOR CAMPUS EQUALITY AS *AMICUS CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

———————————————

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICUS CURIAE ............................................................. 1

ARGUMENT ......................................................................................................................... 4

    I. The Final Rules Will Increase Decision Making Accuracy ................................... 4

    II. The Final Rules Will Restore Equitable Procedures ........................................... 6

    III. FACE Student Experiences Illustrate the Need for the Final Rules .................... 7

        A.    Student 1 ..................................................................................... 7

        B.    Student 2 ..................................................................................... 8

        C.    Student 3 ..................................................................................... 9

        D.    Student 4 ..................................................................................... 10

        E.    Student 5 ..................................................................................... 11

        F.    Student 6 ..................................................................................... 13

        G.    Student 7 ..................................................................................... 14

        H.    Student 8 ..................................................................................... 15

        I.    Student 9 ..................................................................................... 15

        J.    Student 10 ................................................................................... 16

        K.    Student 11 ................................................................................... 18

        L.    Student 12 ................................................................................... 19

        M.    Student 13—Elliott Pitts ............................................................. 21

CONCLUSION ...................................................................................................................... 22

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Rules and Regulations**

Final Rule, U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 FR 30026-30579 (May 19, 2020 (to be codified at 34 C.F.R. pt. 106)) ................................................................................................... 1

## **Other Authorities**

American Bar Association, *ABA Task Force on College Due Process Rights and Victim Protections*, June 26, 2017, https://www.americanbar.org/news/abanews/aba-newsarchives/2017/06/aba_task_force_onco/.................................................................................. 1

American Law Institute (ALI), *Principles of the Law, Student Sexual Misconduct: Procedural Frameworks for Colleges and Universities*, https://www.ali.org/projects/show/project-sexualand-gender-based-misconduct-campus-procedural-frameworks-and-analysis/.................................... 1

Candida L. Saunders, "The Truth, The Half-Truth, and Nothing Like the Truth, Reconceptualizing False Allegations of Rape," *The British Journal of Criminology*, 52(6), 1152-1171 (2012) http://bjc.oxfordjournals.org/content/52/6/1152.full.pdf ......................................... 5

Catherine Burr, "False Allegations of Sexual Harassment: Misunderstandings and Realities*," Academic Matters; The Journal of Higher Education*, October-November 2011 Issue, 2014, http://www.academicmatters.ca/2011/10/false-allegations-of-sexual-harassment-misunderstandings-and-realities/#sthash.58utUNNa.dpuf.these ..................................................... 5

EduRisk, *Confronting Campus Sexual Assault: An Examination of Higher Education Claims*, February 2015, *EduRiskSolutions.org,* http://www.ncdsv.org/ERS_Confronting-Campus-Sexual-Assault_2015.pdf ............................................................................................................... 5

Erica L. Green, DeVos's Rules Bolster Rights of Students Accused of Sexual Misconduct, May 6, 2020, *New York Times*, https://www.nytimes.com/2020/05/06/us/politics/campus-sexualmisconduct-betsy-devos.html .......................................................................................... 7

Jake New, "Must vs. Should: Colleges say the Department of Education's guidance on campus sexual assault is vague and inconsistent," Feb. 25, 2016, *Inside Higher Ed*, https://www.insidehighered.com/news/2016/02/25/colleges-frustrated-lack-clarification-title-ixguidance .............................................................................................................................. 6

John Erwin, "Missing The Mark; False Allegations in the U.S. Government," *American Analyst*, p. 8, August 8, 2014, https://www.scribd.com/doc/236235147/False-Allegations-in-the-U-S-Government................................................................................................................................ 5

John Villasenor, *"A probabilistic framework for modelling false Title IX 'convictions' under the preponderance of the evidence standard,"* Law, Probability and Risk, Volume 15, Issue 4, December 2016, pp. 223–237, https://doi.org/10.1093/lpr/mgw006 ........................................ 5, 23

National District Attorneys Assn., Women Prosecutors Section, White Paper; *National Sexual Assault Investigation and Prosecution Best Practices Guide,* January 3, 2018, https://www.ciclt.net/ul/ndaajustice/WhitepaperFinalDraft-SA.pdf. ........................................... 4

Robert A. Nash and James Ost, *False and Distorted Memories* (Current Issues in Memory) (2017) *Psychology Press* (Kindle Ed.)............................................................................. 5

Samantha Harris and KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22:49, 58-60, 61-62, NYUJ Legis. & Pub. Pol'y, 2019, https://nyujlpp.org/wp-content/uploads/2019/12/Harris-Johnson-Campus-Courts-in-Court-22-nyujlpp-49.pdf. ................................................................................................ 6

Title IX lawsuit database maintained by KC Johnson: https://docs.google.com/spreadsheets/d/1CsFhy86oxh26SgTkTq9GV_BBrv5NAA5z9cv178Fjk3 o/edit#gid=0 ............................................................................................................... 4

Washington Post and Kaiser Family Foundation Survey, 2015, http://apps.washingtonpost.com/g/page/national/washington-post-kaiser-family-foundation-survey-of-college-students-on-sexual-assault/1726/.................................................... 5

## STATEMENT OF INTEREST OF AMICUS CURIAE

Families Advocating for Campus Equality (FACE) is a 501(c)(3) nonprofit advocating for equitable treatment of those affected by Title IX sexual misconduct disciplinary proceedings. Notwithstanding its 2013 formation by mothers whose sons had been wrongfully accused of sexual misconduct,[1] FACE advocates for all parties' rights and protections in sexual misconduct disputes because we are primarily women and parents of daughters as well as sons.

In support of its mission to balance the parties' interests in sexual misconduct disputes, FACE Co-President Cynthia P. Garrett has served on an American Bar Association Task Force, and as a liaison on an American Law Institute sexual misconduct project, both focused on developing equitable Title IX disciplinary procedures,[2] and similarly comprised of attorneys with diverse perspectives (including victims' advocates, campus administrators, and attorneys for Title IX complainants and respondents).

FACE has been contacted by nearly 2000 students and an increasing number of faculty members experiencing result-driven disciplinary processes in which schools have: refused to disclose details of the conduct of which they've been accused; denied them access to evidence relied on to find them responsible; refused them the opportunity to question their accusers and

---

[1] No person or entity other than amici and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

[2] American Law Institute, *Principles of the Law, Student Sexual Misconduct: Procedural Frameworks for Colleges and Universities*, https://www.ali.org/projects/show/project-sexual-and-gender-based-misconduct-campus-procedural-frameworks-and-analysis/; American Bar Association, *Task Force on College Due Process Rights and Victim Protections*, June 26, 2017, https://www.americanbar.org/news/abanews/aba-news-archives/2017/06/aba_task_force_onco/

witnesses; relied on evidence inadmissible in any other adjudicatory arena; ignored their lack of harmful intent or good-faith beliefs; and dispensed with any presumption they may be innocent.

Fortunately, FACE is uniquely positioned to give a voice to those wrongfully accused students who are the silent and faceless 'other victims' of Title IX. Though most often speechless and almost always nameless, FACE members have been praying and advocating for change for years, in the hope that no more students are forced to endure the soul-destroying Title IX processes to which they or family members were subjected.

Understandably, Title IX complainants have dominated the public narrative concerning campus sexual assault, whether through accuser-focused movies like *The Hunting Ground*, national press coverage, or narratives on social media. In an attempt to rectify and elucidate the reasons for the disparity in awareness, thirteen FACE student reports are summarized in section III. of the Argument below and reproduced in full in the Appendix.

These FACE student and family accounts illustrate how accused students are silenced by humiliation, vilification, and trauma, based merely on the accusation they've engaged in sexual misconduct. Once found responsible, there is no benefit for these students to insist they were wrongfully accused - the accusation alone is considered sufficient proof of their guilt. Even if they were to flag a 'not responsible' finding as evidence of their innocence, it will predictably be said "they got off." Because there is nothing to gain by telling anyone beyond family and close friends that one's been falsely accused of such a heinous crime, the resulting isolation compounds the trauma of having been wrongfully labeled a sexual predator.

In contrast, today there are unequivocal incentives for complainants to publicize their allegations. If complainants "win" their Title IX case, they're honored for their bravery in speaking out. If they lose, complainants can still claim victimhood and accuse the school of

ignoring their trauma. For complainants, there are few disincentives to revealing their stories, which is why their stories, and not those of the wrongfully accused, tend to dominate the media.

FACE cannot, of course, begin to remedy the asymmetry of the public narrative with a single amicus brief, but it can at least make this Court aware that there is an alternate, lesser heard version of the Title IX equation. In submitting this amicus brief, FACE hopes to illustrate for the Court how the Department of Education's Office for Civil Rights' ("OCR") final Title IX regulations ("Final Rules")[3] are critically and immediately necessary to increase decision making accuracy and restore basic fairness to Title IX campus proceedings for all students and faculty.

## SUMMARY OF ARGUMENT

FACE receives 4 to 5, and sometimes up to 20 desperate calls and emails from accused students, faculty, and their families every week.[4] Disturbingly, it is not only college students whose lives are being devastated by arbitrary and sex-discriminatory Title IX practices; since 2016, FACE has received distraught calls from over 100 families of K-12 students, some "as young as 6," in which even the conduct of children engaged in "typical playground games" has "been recast as disturbing accusations of sexual misconduct."[5] The damage to these children's education and emotional stability, is heartbreaking. FACE also receives many calls from parents of disabled students accused of harassment, stalking, unwanted touching, or of simply being "creepy."[6] Under current school policies, disabled students have been "subjected to processes

---

[3] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 FR 30026-30579 (May 19, 2020 (to be codified at 34 C.F.R. pt. 106)).

[4] See the Appendix, beginning at page 30 for the statement of parent and FACE Vice President Shelley Dempsey, who is responsible for and reports on incoming calls from families of accused students and professors.

[5] *Id.*

[6] *Id.*

they could not navigate" without assistance from trained advocates.[7]

The reality is that the disabled, students of color, first generation college students, and those without resources to retain legal assistance are all more likely to be disadvantaged by past OCR mandates' impact on school Title IX policies at every level of education. The Final Rules' detailed and carefully considered requirements for equitable Title IX procedures are crucial to increasing decision making accuracy at every level of education. The Final Rules have taken into account the nearly 600 post-2011 accused-student lawsuits filed over schools' flawed Title IX policies and procedures, as well as the almost 200 court decisions and rulings in favor of respondents.[8]

As OCR explains in the Preamble, the grievance process set forth in the Final Rules "effectuates Title IX's non-discrimination mandate both by reducing the opportunity for sex discrimination to impact investigation and adjudication procedures" and "by promoting a reliable fact-finding process so that recipients are held liable for providing remedies to victims of sex discrimination...."[9]

## ARGUMENT

## I. <u>The Final Rules Will Increase Decision Making Accuracy</u>

FACE knows well how difficult it is for young students to defend themselves against sexual misconduct allegations. Accused students trust their school will treat them fairly and are told "tell the truth and you'll be fine." In reality, students are blindsided by campus attorneys and

---

[7] *Id.*

[8] KC Johnson Title IX lawsuit database,

https://docs.google.com/spreadsheets/d/1CsFhy86oxh26SgTkTq9GV_BBrv5NAA5z9cv178Fjk3o/ edit#gid=0

[9] Final Rules, p. 30101

administrators who act as prosecutors, compiling only evidence to establish their guilt, while denying them access to any equivalently experienced advocate, attorney, or even a parent.[10]

Evidence of the increasing phenomenon of wrongful findings of responsibility on campuses is apparent in the cases of FACE students involving scenarios in which wrongful accusations have been found to occur more frequently. These include a "complainant's attempts to conceal or deny discovered infidelity; … consensual sexual activity that is subsequently regretted; and historic complaints following the breakdown of a relationship."[11] Reliable indications of an innocent accused student is that the story follows one of these patterns, and the process lacked fair procedures.

Of course, wrongful allegations are not all intentionally false; there are misperceptions and inconsistencies in the interpretation of behavior, such as that almost half of all college women believe a "nod in agreement" isn't consent.[12] In addition to the fact that 78% of cases

---

[10] More troubling are campus officials soliciting criminal investigators to listen in on student interviews without the latter's knowledge. National District Attorneys Assn., Women Prosecutors Section, *National Sexual Assault Investigation and Prosecution Best Practices Guide*, January 3, 2018, https://www.ciclt.net/ul/ndaajustice/WhitepaperFinalDraft-SA.pdf.

[11] Saunders, Candida L., "The Truth, The Half-Truth, and Nothing Like the Truth, Reconceptualizing False Allegations of Rape," *The British Journal of Criminology*, 52(6), 1152-1171 (2012) http://bjc.oxfordjournals.org/content/52/6/1152.full.pdf ; Erwin, John, "Missing The Mark; False Allegations in the U.S. Government," *American Analyst*, p. 8, August 8, 2014, https://www.scribd.com/doc/236235147/False-Allegations-in-the-U-S-Government.

[12] Washington Post and Kaiser Family Foundation Survey, 2015, http://apps.washingtonpost.com/g/page/national/washington-post-kaiser-family-foundation-survey-of-college-students-on-sexual-assault/1726/

involve alcohol,[13] memories are easily contaminated by peer influence, social barometers, ideology, and attitudes,[14] and on campus powerful ideology infuses not only the disciplinary process but the entire campus belief system and is unchecked by fear of reprisal for critical expression.

Compounding the effect of the lower preponderance of evidence standard demanded by OCR,[15] other OCR directives prohibiting cross-examination, minimizing the need for due process of the accused, along with the absence of adequate notice, discovery of evidence, testimony under oath or sanctions for false statements, all contribute to erroneous findings of guilt.

The Final Rules are desperately needed to assist campus officials in reaching accurate decisions because they clarify OCR's previously "vague and inconsistent" policies on how and

---

[13] EduRisk, *Confronting Campus Sexual Assault: An Examination of Higher Education Claims*, February 2015, *EduRiskSolutions.org*,  http://www.ncdsv.org/ERS_Confronting-Campus-Sexual-Assault_2015.pdf

[14] Robert A. Nash and James Ost, *False and Distorted Memories* (Current Issues in Memory) (2017) Psychology Press (Kindle Ed.), at p. 55.

[15] John Villasenor, "A probabilistic framework for modelling false Title IX 'convictions' under the preponderance of the evidence standard," *Law, Probability and Risk*, Volume 15, Issue 4, December 2016, pp. 223–237, https://doi.org/10.1093/lpr/mgw006; Burr, Catherine, "False Allegations of Sexual Harassment: Misunderstandings and Realities*," Academic Matters; The Journal of Higher Education*, October-November 2011 Issue, 2014, http://www.academicmatters.ca/2011/10/false-allegations-of-sexual-harassment-misunderstandings-and-realities/#sthash.58utUNNa.dpuf.these

when schools should respond to sexual harassment.[16] They specify the scope of conduct that falls under Title IX and the methods schools must use to reach accurate and equitable resolutions of complaints. Requirements that respondents be informed of the details of the allegations and evidence against them, procedures that require a full presentation and consideration of evidence, and allowing an advocate to assist students in asserting their defenses, will all facilitate their ability to have the allegations thoroughly probed, thereby increasing the likelihood of accurate findings of responsibility.

## II. <u>The Final Rules Will Restore Equitable Procedures</u>

Attached in the Appendix are stories written by a small sampling of FACE families and students who have endured inequitable and result-driven Title IX procedures which could have been avoided had they been afforded the protections required by the Final Rules.[17] The Final Rules will go a long way toward restoring balance and fairness in the adjudication of Title IX cases on campuses, reduce erroneous findings of responsibility, and in turn reduce the number of lawsuits filed by both complainants and respondents.

Secretary DeVos was absolutely correct in recognizing that "we can continue to combat

---

[16] Jake New, "Must vs. Should: Colleges say the Department of Education's guidance on campus sexual assault is vague and inconsistent," Feb. 25, 2016, *Inside Higher Ed*, https://www.insidehighered.com/news/2016/02/25/colleges-frustrated-lack-clarification-title-ix- guidance; *see also* Samantha Harris and KC Johnson, *Campus Courts in Court; The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22:49, 58-60, 61-62, NYUJ Legis. & Pub. Pol'y, 2019, https://nyujlpp.org/wp-content/uploads/2019/12/Harris-Johnson- Campus-Courts-in-Court-22-nyujlpp-49.pdf.

[17] Due to the short length of the Appendix stories, we do not provide pin cites where we quote from the stories, but do provide a page number where each begins.

sexual misconduct without abandoning our core values of fairness, presumption of innocence, and due process."[18]

Enough *is* enough; the time for change is long overdue. We hope the stories of what some FACE families have suffered through will help make that clear to the Court.

### III. FACE Student Experiences Illustrate the Need for the Final Rules

#### A. Student 1

Student 1[19] was expelled for sexual assault in 2015. His parents note, it was "a traumatic experience for our son and entire family in which the university ignored significant exculpatory evidence in their quest to believe 'victims.'" Following this experience, they felt "more comfortable sending our daughter to college than our younger sons," and are convinced the Final Rules, it "would have made a difference in the outcome of our son's case." Like so many families before them, they had concerns about the panel that decided their son's guilt, which in this case "included two young female employees of the university who had been trained with [the] presumption of guilt."

The parents also believe cross-examination would have been helpful because their son's accuser "did not have to answer any questions about her story, and her words were taken as fact." Having "an adviser be an <u>active</u> part of the hearing would have been extremely helpful to our son." Instead, their lawyer was forced to be, like most lawyers under the current system, a potted plant: "She was not allowed to speak to him, witnesses, the accuser, or the hearing panel."

---

[18] Erica L. Green, "DeVos's Rules Bolster Rights of Students Accused of Sexual Misconduct," May 6, 2020, *New York Times*, https://www.nytimes.com/2020/05/06/us/politics/campus-sexual- misconduct-betsy-devos.html

[19] Appendix, p. 1.

This family hopes that the Final Rules will go into effect soon to make Title IX processes fair for all students.

### B. Student 2

Student 2[20] suffered through a "single investigator" process which "included a one-on-one interview with our son (about 45 minutes) and an interview with the complainant." Witnesses were interviewed, but there were no actual witnesses — "only the hearsay conversations."

The investigator, who also served as decision maker, "did not pursue available physical evidence that would have corroborated our son's testimony" or "follow up or pursue numerous inconsistencies in the complainant's testimony and version of events."

Among the undisputed facts at the hearing, according to this family, were:

- ☐ "Respondent asked complainant to engage in sex.

- ☐ Complainant said 'no.'

- ☐ Respondent asked complainant to perform oral sex on him.

- ☐ Complainant performed oral sex on respondent.

- ☐ Complainant stopped performing oral sex after about 5-10 seconds.

- ☐ Complainant and respondent resume kissing and holding for several minutes.

- ☐ Respondent's phone rang and after answering and a brief telephone conversation, respondent left."

In the end, the investigator somehow found *both* parties credible but only their son responsible, not an uncommon occurrence in Title IX cases, where the school official, owing a

---

[20] Appendix, p. 2.

duty of care to both parties and wary of disappointing the complainant, often chooses to give complainants less scrutiny than the accused.

This family believes that the Final Rules would have made a difference in their son's case because they require the collection and discovery of relevant evidence; in their case the investigator "was not required to and was completely not interested in collecting any evidence," which included "telephone and text messages (and corresponding time stamps) and key card time stamps to the dorm room." Nor, of course, did their son have a chance to cross-examine the complainant. The gravamen of her complaint was that she felt pressured. Her basis for feeling that was questionable at best, but no one ever asked her questions about it.

This family said that during the course of this terribly unfair process, "we consistently wondered out loud, 'How could this happen in America?'," a sentiment frequently uttered among FACE families.

## C. Student 3

Student 3[21] writes that he "was dragged through a university disciplinary process that shocked me to my core." He was not allowed:

- "to present [his] own evidence or witnesses without arbitrary administration approval (the administration had no criteria and they provided no explanation),"

- "to question my accuser or any of [complainant's] witnesses personally or through an advisor," [or]

- "to even question parts of my accuser's story."

In addition to effectively tying his hands behind his back, "the university refused to provide any details of the accusation until after the investigation had concluded." Finally, late on

---

[21] Appendix, p. 4.

the night before the hearing, the school denied all but one of Student 3's witnesses, then at the hearing refused to ask any of his pre-submitted written questions. This is exactly why the Final Rules provide for live questioning by a student's advisor: school officials, despite the duty of care they owe *both* parties, are often reluctant to ask pre-submitted written questions of a complainant.

Student 3's "life and career trajectories" were "permanently altered" by this experience, which included a two-and-a-half year suspension. It took his family thousands of dollars and the intervention of a court to provide Student 3 with the rights any student in America should receive when accused of a life- and career-ending offense.

### D.  Student 4

Student 4's[22] family tells an Orwellian story familiar to those who have experienced the Title IX process. Six days after the alleged assault, the complainant told campus security that their son had sexually assaulted her. Instead of proceeding at a normal pace, their son was "abruptly pulled out of his lab class and told he was suspended" shortly after meeting with a school dean, who had told him only that "there was 'inappropriate touching' and he 'did not get affirmative consent.'"

Despite not even involving sexual intercourse, the entire campus was alerted and the charges made the news that night. What is most striking about this account is how the accuser's version of events evolved over time. The accuser initially texted her roommate that she had been "teasing him earlier that day, and I did kiss him and stuff," and she asked if what had happened between them "counted as sexual assault." The roommate then consulted the Department of Justice definition of sexual assault, and, after they reviewed it together, decided that it "would

---

[22] Appendix, p. 5.

count." The accuser's own mother did not seem to have believed her daughter was assaulted, telling her she "just needed to be more careful with boys."

Late on a Thursday afternoon their son was told that he had until Monday to submit a statement responding to the allegations, despite not knowing exactly what his accuser was alleging he did. The Final Rules, of course, would require far more notice than this, but the unfairness did not end there. Student 4 received no hearing and did not have a chance to confront his accuser. Even the investigator never verbally questioned him.

This family believes "cross-examination would have made a difference in the outcome of this case." Unfortunately, their son was ultimately found responsible and has suffered from being stigmatized as a "sex offender." This family signed their statement "anonymous and forever changed."

### E. Student 5

When Student 5[23] received notice that he'd been accused of sexual misconduct, his first reaction was to be unconcerned. After all, though he "obviously understood that any allegation of sexual misconduct is extremely serious," he also, like many other FACE students, "(naively) believed that 'my innocence would protect me from harm. I assumed that 'the truth would set me free'," which is another phrase uttered frequently by FACE students.

Even though the allegations against Student 5 involved "a sexual encounter that occurred hundreds of miles from campus, over summer break, with a girl who was not even a student at my university," the school still pursued a disciplinary process. This situation—where the complainant was not even a student, and the alleged incident occurred both hundreds of miles

---

[23] Appendix, p. 9.

away and was entirely unrelated to school activities—would not be permitted to happen under the Final Rules.

Although Student 5 "assumed" the adjudication process would be "neutral, fair, and balanced [and] that the investigation would reveal that the allegation against me lacked merit," he was "eventually found 'Responsible' on nothing more than my accuser's word." Until "the last minute," the university withheld from Student 5 the fabricated evidence submitted by the complainant. As a result, Student 5 was unable to review the evidence against him until the hearing was in process: "So there I was, a 22-year-old kid, sitting in front of a panel of university administrators, clumsily attempting to prove that the evidence was fake, but with no real way of doing so. Had I been presented that false evidence prior to the hearing, I would have had an opportunity to develop a strategy for demonstrating that it was fraudulent." Neither was he permitted cross-examination to expose his accuser's "very well documented history of pathological dishonesty."

Student 5 was not permitted to have an advocate: "A student accused of a Title IX violation has his entire educational and professional future hanging in the balance. Expecting him to defend himself under such circumstances is not only cruel, but incongruous with the stated goal of a fair and effective process."

The protections promised by the Final Rules would not have allowed this process—the school would have been forced to give him the evidence before the hearing and allow an advisor to cross-examine his accuser. In the end, Student 5 was forced to file a lawsuit and spend a significant amount of money to vindicate himself and restore his reputation.

Unfortunately for accused students, justice often comes at a very high price

### F.  Student 6

Two weeks before his last final exam, Student 6[24] was summoned to the Title IX office and told that he'd been charged with a sexual assault that supposedly happened six months earlier. Student 6 was only interviewed once "and was the last person to be interviewed." By that time the investigator had clearly made up her mind.

As is common with a single-investigator model, their son had no opportunity to question his accuser and no chance to put his case before a panel of neutral factfinders. Indeed, the investigator in that case had "made public Facebook posts deriding neutrality and promoting a video likening college campus[es] to hunting grounds for sexual predators."

Though Student 6 was able to produce a photograph showing the accuser smiling "immediately after her encounter with [their] son," and was also able to show she'd told people about two other sexual encounters she'd had with others that night, he was found responsible simply because the investigator-decision maker found the accuser more credible.

The proceeding was rife with other irregularities. While their son's statement "was included verbatim in the evidentiary file," only the investigator's summarized "impressions of witness testimony was presented for my son's review." He was never able to read the testimony itself and was not allowed to confront any of the witnesses against him.

Their son ultimately was hospitalized for attempted suicide. Unlike the complainant, he had to seek out and pay for his own support, and the family "had to spend $25,000 just to defend our son from an overzealous and unfair process that threatened not only my son's educational and professional future, but also his very life."

---

[24] Appendix, p. 12.

### G. Student 7

Student 7's[25] case started in September 2016, when the Title IX coordinator informed him that she'd been told he "*may* have been involved in a sexual assault involving another male student," which made little sense because he could not recall ever having met the male accuser and he was not gay.

Student 7 was not particularly concerned, especially since the incident allegedly took place more than two years earlier. When he met with the Title IX coordinator, she told him the school would provide an advocate for him. They gave him a victim's advocate from the women's center.

After the family received the investigation report, they were certain the case could not possibly move forward. First, the accuser could not remember whether the alleged incident took place in March or April 2014—which seems unlikely for something that supposedly rose to the level of sexual assault. Second, one of the three witnesses named by the accuser reported the accuser never characterized what had supposedly happened between him and Student 7 as a sexual assault.

Despite hopes the case would be dropped, it went all the way to the end, and"—even though their son was found not responsible—"the effects of the process [have] been life altering for our entire family." This family strongly believes the Final Rules would have made a huge difference in their case and spared their son the trauma of a full investigation. Among other things, their son would've had a hearing, and the accuser would've had to show up, which he did not even bother to do. Moreover, there was never any chance to resolve the case informally because the school's processes prohibited it.

---

[25] Appendix, p. 14.

The Final Rules, of course, would allow common-sense resolutions to all complaints, including especially stale complaints brought by people who are no longer students at the school, which was the case here.

### H. Student 8

Student 8[26] was immediately suspended from his college sports team and put through the trauma of a Title IX process for an email he never sent.. This family was extremely grateful their daughter worked for another university and was able to connect them with FACE, who helped point them in the direction of a lawyer.

With the help of the lawyer, their son "was able to prove almost immediately that he did not initiate the email chain where the girl claimed she was harassed. In fact, he was able to prove that SHE started it." Nevertheless, instead of calling a halt to things at that point, the school went through the entire process. At the hearing they learned that "the people on the panel had not even read the investigator's report!"

The family rightly considers this "a broken system." They had to "pay thousands of dollars to exonerate their son from something that would have taken 30 minutes in a real investigation with people who are trained in this sort of thing to figure out."

### I. Student 9

Student 9's[27] story began in February 2020, when he was falsely accused of sexual misconduct by someone who had also claimed to have been assaulted by five other men. His family could not afford to hire an attorney, so his father was forced to take off work repeatedly, book a hotel near the school, and help prepare and advise his son throughout the investigation.

---

[26] Appendix, p. 16.

[27] Appendix, p. 17.

Despite providing a great deal of exculpatory evidence, Student 9 was still charged with several serious allegations.

Though a bishop in the son's church asked to be interviewed by investigators because he knew about the complainant's attempts to disrupt Student 9's engagement to another woman, the investigators refused to interview him. Before the hearing, "the complainant harassed, stalked, and attempted to publicly humiliate our son and his fiancée." But the university did nothing, claiming she had a right to do so—while telling Student 9 he could not say anything publicly against her because "that would be intimidating to her."

Student 9's hearing lasted almost 11 hours, during which he could not cross-examine his accuser and had to sit and listen while the school allowed her to introduce impermissible character evidence. Though he was ultimately found not responsible, that has not ended this family's struggle; "Even to this day, it has taken an emotional, physical, and monetary toll on our son, his fiancée, and us as a family." The family cannot afford to take legal action against the school or the accuser, but their "emotional trauma" is severe. They are deeply hopeful that the Final Rules will make these processes fairer for all students.

**J. Student 10**

Student 10's[28] case also shows the harm of an unfair process can be deep and lasting even if you win, because sometimes you still have to go through a process that can look an awful lot like *Bleak House*. His case ran for an unimaginably long time—from October 2015, when he was first charged, to December 2017, when he was finally exonerated.

A single investigator assigned to the case unsurprisingly recommended a finding of responsibility and suspension which automatically triggered a disciplinary hearing.

---

[28] Appendix, p. 20.

17

Prior to the hearing, the school failed to provide all of the witness statements, including the investigator's notes. Incredibly, given what was at stake, the school limited the hearing to two hours, "with the school taking up much of the time either explaining the process or presenting the accuser's claim." That left "very little time" for Student 10's attorney to do anything. Though the panel had more questions they were instructed there was no more time. Imagine having fewer than two hours to defend yourself against a horrific accusation, only to hear that those who held your fate in their hands could ask no more questions.

The panel found Student 10 responsible and he appealed to the school's chancellor.  In the meantime, Student 10 had received DNA results showing that his DNA was not present on the complainant. In rejecting his appeal, the chancellor said that he did not think the DNA test would have "made a substantial difference in the outcome."

Student 10 filed his second appeal to the Board of Regents in October 2017, after being found not guilty by a criminal court. "It was 16 pages long with 198 pages of exhibits."  The family showed how the accuser's story was inconsistent with the evidence, and how the school had overlooked exculpatory evidence including the DNA test.  In October 2017, the Board of Regents remanded the case to the chancellor, instructing him to "carefully review all of the new evidence presented," "expunge the disciplinary record if the discipline is not sustainable," and— regardless of what he decided— "provide a full explanation of his decision." The chancellor took almost two months, and nearly two years after the case began, the chancellor reversed his decision and found Student 10 not responsible.

One might wonder why Student 10 should complain, given that he won. But that question would only be asked by someone who has never suffered through a two-year investigation or seen what it can do to a person. "My son struggles dealing with the false accusation," his mother says.

"What my son went through, no one should have to go through, the depression caused by the process is heart wrenching."  She recounts holding her son for two hours while he cried without ceasing on Christmas Eve 2016. He lost his friends and many educational opportunities, and defending the baseless charges cost them $150,000.

To be sure, the Final Rules cannot prevent all harms, but they will stop the single-investigator process. They will also force schools to admit and consider exculpatory evidence, and will give those like Student 10 a chance to defend themselves without having to spend almost two years doing so.

### K.  Student 11

Student 11[29] was accused by an ex-girlfriend with whom he had recently broken up. The accusation, for an alleged incident one month into their 7 month relationship, was for " digital penetration without consent". Student 11 went to his meeting with the Title IX office confident there'd been a misunderstanding.

Unfortunately, this school also used a single investigator model, and the investigator-decision maker provided Student 11 with merely "interpretations" of the witness statements rather than transcripts or the statements themselves. The accuser also added a rape charge once she learned Student 11's family had hired an attorney, and her "language went from initially suggesting that she wanted no discipline for our son to 'he is a monster and needs to be expelled'."

Student 11 was found responsible only for the first charge of digital penetration even though on the charge of rape the accuser was found not credible. He was effectively suspended for 3 semesters which, on appeal, was deferred.

---

[29] Appendix, p. 23.

Despite a relatively positive conclusion allowing Student 11 to complete his degree, his parents report he "has been suicidal, withdrawn, angry, sad, embarrassed, isolated, and shocked that a relationship turned sour could potentially ruin his life." His parents spent a considerable amount of money throughout the 8 month process, and "are absolutely shocked and outraged with this entire process."

### L.  Student 12

Student 12's[30] story, which he tells himself, is particularly tragic. A Division III athlete with a strong academic history, he writes: "I (admittedly) lacked clarity as to what I wanted to do, knowing only that I wanted to help people. I was outgoing, a strong public speaker, and, if I'm allowed to be a touch self-aggrandizing, an intelligent political science student, who had had professors base multiple classes off of research papers I had written. I had worked hard for everything I accomplished, and prided myself upon that."

Student 12, who discovered he was the subject of a Title IX investigation through rumors upon returning to school after a break, reports "it appeared that I was one of the last people on campus to be notified ... " His description of the repercussions he suffered before having even been found responsible, is worth quoting in full:

"What followed were two weeks of personal hell. I was threatened, assaulted, cut off, and ostracized. My friends were stopped by people I hardly knew in the cafeteria, and still other friends refused to hang out with me in public, specifically citing fear of social retribution. I left the school, and returned home, not out of guilt but out of a fear I have not experienced before or since. I have spent the past 10 months trying to bring my life back together. Despite the promise from the school that the process would only take 45 days max, it took eight months. Eight months

---

[30] Appendix, p. 25.

of waiting, interviews, written statements, and a deep, lasting trauma. Trauma that drove me towards substance abuse, suicide, and an ingrained fear in my psyche. I am no longer a fearless public speaker, nor is a masters' program likely on the table. Instead, everything I worked so hard for was destroyed the moment I left the school."

Eventually found responsible, Student 12 says he will "stand by my innocence, and will do so for the rest of my life, but I am not going to argue the specifics of my case. Every time I talk about the case I am in a state of perpetual anxiety for days, and the more specific I get the worse it is." Sadly, he reports, "I am shaking writing just this."

Student 12 recalls that in his political science class, "we learned about justice being blind, about the unerring neutrality of the American justice system. After all, isn't that fundamental to American ideals? That no matter how distasteful the statement, the act, the alleged crime, you will be guaranteed a fair hearing." He concludes: "The Title IX process shatters that illusion."

In his case school policies were violated and he had no one to provide him support or assistance. Nevertheless, having been a 12 year old rape victim himself, Student 12 still believes "Title IX is one of the most important pieces of American legislation for equity in colleges ever introduced. It has allowed women who have experienced the horrors of assault to speak their truths in a comfortable, safe environment."

Student 12 is also convinced the Final Rules would have given him the chance "to stand on my own two feet, speak my truth, and defend myself the way every person deserves a right to do." As it stands now, "Justice is not Title IX, but it can be and should be, for those accused, but more importantly for those who have been raped and assaulted on campuses, because it will allow them to speak their truths without existing in a phony court, so that they can leave a Title IX hearing with the full confidence that, no matter what, the decision made was just."

### M. Student 13—Elliott Pitts

Elliott Pitts[31] is the exception that proves the rule when it comes to going public in these cases because he was a student athlete. When student athletes are charged, they are usually suspended from their team immediately. When you are a basketball player at a Division I school, like Elliott was at the University of Arizona, that makes it impossible for you to disappear quietly. So his case became public quickly, which is why he is the only student who was willing to identify himself by name in this brief.

Elliott was in his junior year, hoping to go professional and coach one day, when everything started to fall apart.  On the morning of December 6, 2015, he came home after the team had a big road win against Gonzaga, and celebrated with his teammates. At the party was a female volleyball player with whom Elliott had been flirting over the past several months. At the party, she say "down next to the Elliott on the couch" where he was playing video games, and "put her hand on his crotch." They started kissing and ultimately went back to his room.  She asked him to get a condom, which he did, and he put the condom on.  She then got on top of him and participated enthusiastically in sex. Afterward, Elliott left the accuser to fall asleep in his bed while he slept on the couch in the front room. When the accuser's brother found out Elliott and his sister had left the party together, he returned "to their apartment in a rage, found [his sister] naked in Elliott's bed, and proceeded to take her to the dorm room where he left her in her bed." He then began to claim that Elliott had raped his sister.

The Tucson police opened a criminal investigation which revealed the complainant had admitted "It was consensual," and then that she didn't remember what happened. The criminal investigation was closed without any charges filed.

---

[31] Appendix, p. 27.

Little did Elliot know that the Title IX process would be much worse and it is almost too bizarre to summarize sufficiently here. One fact that stands out is that the Title IX officer herself added charges to the investigation that even the complainant had not alleged. Ultimately, Elliott was faced with a terrible decision to go forward with a hearing and rely on what the family perceived to be a terribly unfair investigative process, or accept the functional equivalent of a plea offer, allowing him to finish the semester, take a one-year suspension, and preserve his NCAA eligibility. Like many defendants, he took the deal.

Unfortunately, "Little did we know, that although 18 Division I colleges were approached regarding Elliott being available for transferring to play basketball, 100 percent of these colleges passed, due to the current climate. The college administrators didn't want any negative attention that might come with Elliott's transfer."

The story didn't stop there. The accuser's family "publicly outed the agreement Elliott signed with the school, and sent it to hundreds of U of A basketball alumni and parents, as well as to Tucson journalists on ESPN to tell their side of the story."

ESPN ultimately declined to run a story after hearing Elliott's version of events, but the efforts alone have been extraordinarily traumatic for the family. Elliott ended up finishing at a community college and had to watch the Arizona Wildcats win the Pac-12 championship without him in February of 2017. His life has never been the same, and the difference that the procedural protections promised by the Final Rules would have made in his case, and in his life, are impossible to overstate.

## CONCLUSION

It is FACE's hope, through the telling of these thirteen student Title IX disciplinary process experiences, that this amicus brief has helped inform the Court's analysis of what is at

stake if the Final Rules are delayed further beyond August 14, 2020. Too many students' futures are dependent upon correcting the way our schools conduct Title IX disciplinary hearings. Too many FACE students, who range in age from six on up, have suffered and awaited change long enough.

When addressing the appropriateness of delaying the Final Rules, we respectfully ask the Court to keep in mind that the implications of your decision will be significant and widespread. While a school's "educational mission is, of course, frustrated if it allows dangerous students to remain on its campuses. Its mission is equally stymied . . . if [it] ejects innocent students who would otherwise benefit from, and contribute to, its academic environment."[32]

Furthermore, despite the fact that up to 30% of campus Title IX decisions are very likely to be wrong,[33] the transcripts of those students found "responsible" are forever imprinted with a disciplinary notation; for them there is no "ban the box," even though they've been found "responsible" (not "guilty") for conduct that, *if* it occurred, most often is not criminal, in a decision unaccompanied by rules and procedures normally used with the preponderance of evidence standard, and pursuant to a disciplinary "process" conducted by administrators and professors who euphemistically call the experience "educational."

These innocent students could be your sons, daughters, brothers or sisters – because, as you must know, "doing the right thing" no longer protects you in this 'accusation = guilt' world. These are men and even some women, teenagers and young adults, who've lost faith in our

---

[32] *Doe v. Penn, State Univ.* (M.D. Pa. 2018) 336 F. Supp. 3d 441, 449.

[33] John Villasenor, *supra*, note 15, at pp. 223–237, https://doi.org/10.1093/lpr/mgw006

justice system, entire families who are emotionally and sometimes financially destroyed;[34] all lives permanently and irrevocably changed because of a process with a 30% likelihood of error.

     For the foregoing reasons, FACE thus respectfully urges this Court to deny the Plaintiffs' motion to enjoin the Final Rules from going into effect as planned on August 14, 2020.

Dated: New York, New York
      July 17, 2020

                               Respectfully submitted,

                               */s/ Andrew T. Miltenberg*
                               Andrew T. Miltenberg, Esq.
                               Philip A. Byler, Esq.
                               Nesenoff & Miltenberg, LLP
                               363 Seventh Avenue, 5th Floor
                               New York, New York 10001
                               T: (212) 736-4500
                               amiltenberg@nmlllaw.com
                               pbyler@nmlllaw.com

                               Cynthia P. Garrett, Esq.
                               Co-President, Families Advocating for
                               Campus Equality
                               3658 Warner Street
                               San Diego, California 92106
                               T: (619) 823-5378
                               CPGarrett@FACECampusEquality.org

---

[34] For additional FACE family and other accounts Title IX experiences, please see "Our Stories; Stories From the Trenches," on the FACE website at https://www.facecampusequality.org/our-stories.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,891 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with Individual Practice Rule 2.D of Judge John G. Koeltl (to whom this case has been assigned).

*/s/ Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq.