UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

STATE OF NEW YORK, ET AL.,

                        Plaintiffs,          20-CV-4260 (JGK)

          - against -                        OPINION AND ORDER

UNITED STATES DEPARTMENT OF
EDUCATION, ET AL.,

                        Defendants.
————————————————————————————————

JOHN G. KOELTL, District Judge:

     This case is an action by the State of New York and the
Board of Education for the City School District of the City of
New York ("NYC DOE"), against the defendants, the United States
Department of Education ("DOE") and Elisabeth DeVos, as the
Secretary of the DOE. On May 19, 2020, the DOE published a final
rule in the Federal Register, <u>Nondiscrimination on the Basis of
Sex in Education Programs or Activities Receiving Federal
Financial Assistance</u>, 85 Fed. Reg. 30,026 (May 19, 2020) (to be
codified at 34 C.F.R. pt. 106), (the "Rule"), which is scheduled
to take effect on August 14, 2020. The Rule generally describes
"sexual harassment" and establishes grievance procedures that
educational institutions receiving federal funding
("recipients") must follow to decide complaints about sexual
harassment. The Rule was subject to public notice and comment
and the DOE received nearly 125,000 comments. The plaintiffs
disagree with how the DOE defined "sexual harassment" and with

the grievance procedures that the DOE included in the Rule. The plaintiffs allege that the Rule violates various provisions of the Administrative Procedure Act ("APA") and contend in particular that the DOE actions in adopting the Rule were "arbitrary and capricious."

The plaintiffs now move pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction enjoining the implementation of the Rule. In the alternative, the plaintiffs move under the APA, 5 U.S.C. § 705, to stay the effective date of the Rule until the plaintiffs' claims can be adjudicated on the merits. Although the plaintiffs would have drawn lines differently from those drawn in the Rule, they have failed to show that they will likely prevail on their argument that the DOE acted "arbitrarily and capriciously" or otherwise in violation of law when it promulgated the Rule. Therefore, as explained in detail below, the motion for a preliminary injunction, or for a stay, is **denied.**

## I. Background

### A. Legal Framework

Title IX of the Education Amendments of 1972 ("Title IX") was enacted to "avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." Cannon v. Univ. of Chicago, 441 U.S. 677, 704 (1979). The statute provides that

"[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.[1] Title IX defines "program or activity" in relevant part as "all of the operations" of a school[2] or covered entity, "any part of which is extended Federal financial assistance." 20 U.S.C. § 1687.

The statute's dual purposes are enforced by federal administrative agencies that disburse funding ("administrative enforcement scheme") and by the courts through private litigation ("judicial enforcement scheme"). Congress expressly authorized an administrative enforcement scheme for Title IX. The DOE is authorized to promulgate rules, regulations, and orders, and may use "any . . . means authorized by law," including the termination of funding, to effectuate the statute's restrictions. Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 638-39 (1999) (citation omitted). Under this administrative enforcement scheme, no action shall be taken until the DOE "has advised the appropriate person or persons of the failure to comply with the requirement and has determined

---

[1] The statute lists certain exemptions, none of which are at issue in this case. 20 U.S.C. §§ 1681(a)(1)-(9).
[2] This opinion uses "school" to refer to any public or private educational institution, including K-12 schools and postsecondary institutions, that receives federal financial assistance and is covered by Title IX.

that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682. In the event an agency takes action to terminate financial assistance, the statute also requires the DOE to file a full written report with the relevant committees of the House and Senate and states that no action will become effective until thirty days after the filing of such report. Id. While the statute does not expressly speak to a remedy in private litigation, the Supreme Court has held that Title IX may also be enforced by a judicially implied private right of action, Cannon, 441 U.S. at 709, and that in cases alleging intentional discrimination, money damages are available as a remedy, Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 76 (1992).

Subsequently, the Supreme Court examined the conditions under which schools would be liable for monetary damages under Title IX for sexual harassment of students by teachers or peers in cases brought by private plaintiffs. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998) (teacher-on-student harassment); Davis, 526 U.S. 629 (student-on-student harassment). Among other things, the Supreme Court's decisions established that a school could be subject to monetary liability only when a school exhibited "deliberate indifference" that subjected a student to harassment; that harassment must take place in a context "subject to the school district's control" and that liability exists for harassment "that is so severe,

4

pervasive, and objectively offensive that it can be said to
deprive the victims of access to the educational opportunities
or benefits provided by the school." Davis, 526 U.S. at 644-45,
650. Further, a school is liable in damages only when an
appropriate person, who is, "at a minimum, an official of the
recipient entity with authority to take corrective action to end
the discrimination," "has actual knowledge of discrimination and
fails to adequately respond." Gebser, 524 U.S. at 290.

The DOE refers to the Supreme Court's definitions of
actionable sexual harassment, actual knowledge, and deliberate
indifference as the "Gebser/Davis framework." 85 Fed. Reg. at
30,032-33. The Gebser/Davis framework for private claims for
monetary damages was guided by analogy to the administrative
enforcement mechanism of Title IX because the Supreme Court
recognized that in fashioning a judicially-created private cause
of action, the Court should be guided by the administrative
mechanism that Congress explicitly provided in Title IX. Davis,
526 U.S. at 641; Gebser, 524 U.S. at 289 ("It would be unsound,
we think, for a statute's express system of enforcement to
require notice to the recipient and an opportunity to come into
voluntary compliance while a judicially implied system of
enforcement permits substantial liability without regard to the
recipient's knowledge or its corrective actions upon receiving
notice.").

### B. DOE Guidance

The Rule is the DOE's first regulation identifying sexual harassment as unlawful sex discrimination under Title IX. However, since 1997, the DOE has issued guidance discussing how schools should resolve allegations concerning sexual harassment and sexual violence. In 1997, the DOE published Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ("1997 Guidance"). The 1997 Guidance stated that "[i]n order to give rise to a complaint under Title IX, sexual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education or creates a hostile or abusive educational environment." 62 Fed. Reg. at 12,034.

In 2001, the DOE published a "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties." Wardenski Decl., Ex. 4 ("2001 Guidance"). In the 2001 Guidance, the DOE declared that the Gebser and Davis decisions created a standard limited to monetary liability that was not applicable to administrative enforcement. Id. at ii. However, the 2001 Guidance stated that although the Davis Court's definition of harassment differed somewhat from the definition used by the DOE in the 1997 Guidance, the definitions were "consistent" because both agreed

that the "conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program." Id. at vi. The 2001 Guidance also stated that a school could be in violation of Title IX if certain responsible employees "knew, or in the exercise of reasonable care should have known" about the harassment. Id. at 13.[3] Responsible employees included "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." Id.

### C. The Rule

In late 2018, the DOE published a notice of proposed rulemaking, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Proposed Nov. 29, 2018) (to be codified at 34 C.F.R. Pt. 106) ("Proposed Rule"). Compl. ¶ 6. During the notice and comment period, the DOE received nearly 125,000 comments on the Proposed Rule. Id. On May 19, 2020, the DOE

---

[3] The DOE subsequently issued Dear Colleague Letters in 2006, 2010, and 2011, as well as a Q&A in 2014. Wardenski Decl., Exs. 5-8. In 2017, the DOE issued another Dear Colleague Letter that withdrew the 2011 letter and 2014 Q&A and stated that the DOE would "continue to rely on" its 2001 Guidance. Id. at Ex. 9.

published the Rule in the Federal Register; the Rule has an effective date of August 14, 2020. 85 Fed. Reg. at 30,028. In setting this effective date, the DOE sought to balance requests to have the Rule take effect during the summer, when many schools were out of session, with the need to provide for sufficient time to comply. Id. at 30,534. The DOE noted that the APA generally requires at least 30 days' notice after publication and that, in the ordinary course, 60 days would be sufficient for recipients to come into compliance with the Rule. Id. To provide additional time for compliance, particularly in view of the COVID-19 national emergency, the DOE determined that the appropriate effective date for the Rule should be August 14, 2020, 87 days after the Rule's publication in the Federal Register, and offered to continue to provide technical assistance to recipients after the Rule became effective. Id. at 30,534-35.

The Rule contains several provisions that depart from past DOE guidance. In the context of sexual harassment, the Rule defines "education program or activity" to "include[ ] locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 34

C.F.R. 106.44(a). The Rule also creates a three-pronged definition of sexual harassment that includes conduct on the basis of sex that satisfies one of the following criteria: (1) quid pro quo harassment; (2) certain offenses under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f),[4] and the Violence Against Women Reauthorization Act of 2013 ("VAWA"), 34 U.S.C. § 12291 et seq.;[5] and (3) "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30(a).[6]

Notably, the Rule requires that schools have actual, rather than constructive, notice of sexual harassment before they are

---

[4] The Clery Act requires institutions of higher education to disclose campus crime statistics and security information about certain criminal offenses, including sexual assault, that occur in particular geographic areas, including the public property immediately adjacent to a facility that is owned or operated by the institution for educational purposes. 20 U.S.C. §§ 1092(f)(1)(F) and 1092(f)(6)(A)(iv); see 85 Fed. Reg. at 30,511.

[5] The VAWA amended the Clery Act to require institutions of higher education to report information about additional criminal offenses, including domestic violence, dating violence, and stalking. 20 U.S.C. §§ 1092(f)(6)(A)(i) and 1092(f)(7); see 85 Fed. Reg. at 30,511.

[6] The full definition of sexual harassment is "conduct on the basis of sex that satisfies one or more of the following: (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) 'Sexual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a)(30)." 34 C.F.R. § 106.30(a).

required to respond. Schools must "respond promptly in a manner
that is not deliberately indifferent" but a "recipient is
deliberately indifferent only if its response to sexual
harassment is clearly unreasonable in light of the known
circumstances." 34 C.F.R. § 106.44. Postsecondary institutions
have actual knowledge when a "Title IX Coordinator or any
official of the recipient who has authority to institute
corrective measures on behalf of the recipient" receives notice
of sexual harassment or allegations of sexual harassment. 34
C.F.R. § 106.30(a). In contrast, K-12 schools have actual
knowledge when notice is provided to any employee. Id. Thus,
"[n]otice results whenever any elementary and secondary school
employee, any Title IX Coordinator, or any official with
authority: Witnesses sexual harassment; hears about sexual
harassment or sexual harassment allegations from a complainant
(i.e., a person alleged to be the victim) or a third party
(e.g., the complainant's parent, friend, or peer); receives a
written or verbal complaint about sexual harassment or sexual
harassment allegations; or by any other means." 85 Fed. Reg. at
30,040. Once a school has notice, it is required to "treat
complainants and respondents equitably by offering supportive
measures . . . to a complainant, and by following a grievance
process . . . before the imposition of any disciplinary
sanctions or other actions that are not supportive measures

10

. . . against a respondent." 34 C.F.R. § 106.44(a).[7] The Rule

also establishes that a "recipient's treatment of a complainant

or a respondent in response to a formal complaint of sexual

harassment may constitute discrimination on the basis of sex

under title IX." 34 C.F.R. § 106.45(a).

The school must establish a grievance process that meets

certain basic requirements, 34 C.F.R. § 106.45(b)(1); must

provide notice of the allegations to known parties, and notify

parties that they may have an advisor of their choice, 34 C.F.R.

§ 106.45(b)(2); must investigate the allegation in a formal

complaint and must dismiss the complaint after an investigation

if, for example, the conduct did not constitute sexual

harassment, and may dismiss a formal complaint if, for example,

---

[7] Supportive measures are defined as "non-disciplinary, non-punitive individualized services offered . . . to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed" that are "designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party." 34 C.F.R. § 106.30. Examples of supportive measures include "counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures." 85 Fed. Reg. at 30,401. The DOE noted that schools have discretion to use different types of supportive measures, and that in the K-12 context, "common actions by school personnel designed to quickly intervene and correct behavior are not punitive or disciplinary and thus would not violate the § 106.30 definition of supportive measures or the provision in § 106.44(a) that prevents a recipient from taking disciplinary actions or other measures that are 'not supportive measures' against a respondent without first following a grievance process[.]" Id. at 30,182. Examples of allowable supportive measures include "educational conversations, sending students to the principal's office, or changing student seating or class assignments." Id.

the complainant chooses to withdraw the complaint or the
respondent is no longer enrolled or employed by the school, 34
C.F.R. § 106.45(b)(3); and may consolidate formal complaints
when the allegations of sexual harassment arise out of the same
facts or circumstances, 34 C.F.R. § 106.45(b)(4). During an
investigation of a formal complaint, the school must

> [p]rovide both parties an equal opportunity
> to inspect and review any evidence obtained
> as part of the investigation that is
> directly related to the allegations raised
> in a formal complaint, including the
> evidence upon which the recipient does not
> intend to rely in reaching a determination
> regarding responsibility and inculpatory or
> exculpatory evidence whether obtained from a
> party or other source, so that each party
> can meaningfully respond.

34 C.F.R. § 106.45(b)(5)(vi).

Postsecondary institutions are required to provide for a
live hearing, at which decision-maker(s) must permit each
party's advisor of choice[8] to conduct cross examination of other
parties and witnesses. 34 C.F.R. § 106.45(b)(6)(i). K-12 schools
may, but are not required to, provide a hearing, but must
"afford each party the opportunity to submit written, relevant
questions that a party wants asked of any party or witness,
provide each party with the answers, and allow for additional,

---

[8] "If a party does not have an advisor present at the live hearing, the
recipient must provide without fee or charge to that party, an advisor of the
recipient's choice, who may be, but is not required to be, an attorney, to
conduct cross-examination on behalf of that party." 34 C.F.R. § 106.45(6)(i).

limited follow-up questions from each party." 34 C.F.R.
§ 106.45(b)(6)(ii). The decision-maker(s), who must be different
from the Title IX Coordinator or investigator(s), must issue a
written determination. 34 C.F.R. § 106.45(b)(7).

The Rule prohibits retaliation against any individual and
states that no person "may intimidate, threaten, coerce, or
discriminate against any individual . . . because the individual
has . . . participated or refused to participate in any manner
in an investigation, proceeding, or hearing." 34 C.F.R.
§ 106.71. It also provides that to the extent of a conflict
between the Rule or state or local law, the obligation to comply
with the Rule "is not obviated or alleviated by any State or
local law." 34 C.F.R. § 106.6(h).

In publishing the Rule, the DOE stated that it followed
Executive Orders 12866 and 13563, which among other things,
require that the DOE adopt a regulation only on a reasoned
determination that the regulation's benefits justify its costs.
85 Fed. Reg. at 30,564. The DOE estimated that the Rule would
result in a net cost of about 48 to 62 million dollars over ten
years. Id. at 30,565.

The Rule contains severability provisions that provide that
if any provision is held invalid, the remainder of the subpart
or the application to any person, act, or practice shall not be

affected thereby. See 34 C.F.R. §§ 106.18, 106.24, 106.46, 106.82.

As the largest public school district in the nation, the NYC DOE serves over 1.1 million K-12 students and employs over 135,000 employees. Id. at ¶ 3. To implement the Rule, the NYC DOE estimates that it will need to hire at least ten additional staff members, including Title IX investigators and attorneys, at an annual coast of at least $1 million. Brantley Decl. ¶ 62. Schools must also devote resources to find additional staff to serve as "advisors of choice" at a potential annual cost of over $750,000 to the State University of New York, Storch Decl. ¶ 31, and major expense to the City University of New York, which is "undergoing severe financial hardships and has instituted a hiring freeze," Pepe-Souvenir Decl. ¶ 26. Because of the COVID-19 pandemic, schools are also facing uncertainty as to when they will reopen and unexpected fiscal challenges. Brantley Decl. ¶ 56; Pepe-Souvenir Decl. ¶¶ 28, 30. In addition, the State University of New York Downstate Health Sciences University operates a hospital, which was designated as a COVID-only site from late March to early June, 2020. Dkt. No. 78. The hospital has conducted thousands of COVID-19 tests, treated nearly 800 infected patients, and has tragically lost 297 patients. Ajibade Decl. ¶ 27.

The plaintiffs filed this action on June 04, 2020. The plaintiffs allege that the Rule exceeds the DOE's statutory authority in violation of 5 U.S.C. § 706(2)(C); that the Rule is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law under 5 U.S.C. § 706(2)(A); and that the DOE failed to observe procedures required by law in issuing aspects of the Rule, in violation of 5 U.S.C. § 706(2)(D). On June 25, 2020, the plaintiffs filed this motion for a preliminary injunction.[9]

## II.

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). To obtain a preliminary injunction, the plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). When the moving party seeks an injunction that will affect government action taken pursuant to a regulatory scheme, the plaintiffs must establish a "clear or substantial"

---

[9] The Court received briefs from various amici curiae. Dkt. Nos. 28, 46, 58, 64, 69, 70, 74.

likelihood of success on the merits. Sussman v. Crawford, 488 F.3d 136, 140 (2d Cir. 2007) (per curiam) (internal quotation marks and citations omitted). A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). When the federal government is a party, the last two factors merge. See Nken v. Holder, 556 U.S. 418, 435 (2009). The standard for a stay under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. See Bauer v. DeVos, 325 F. Supp. 3d 74, 104-05 (D.D.C. 2018).

## A. Likelihood of Success

### 1. Section 706(2)(C)

A reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C). "When a court reviews an agency's construction of the statute which it administers," the first question is "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). If a statute is "silent or ambiguous with respect to the specific issue," and the agency has acted pursuant to an express or implied delegation of authority, "the [second] question for the court is

whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

The plaintiffs argue that the Rule exceeds the DOE's authority because it narrows the definition of "program or activity" and establishes prescriptive grievance procedures that fail to effectuate Title IX's protections against sex discrimination.

**a.**

Title IX defines program or activity as "all of the operations of" the school. 20 U.S.C. § 1687. The plaintiffs argue that this definition is unambiguous and thus any attempt by the defendants to narrow the definition is contrary to the plain text of the statute and is impermissible under the first Chevron step. However, the DOE states that it will interpret "program or activity" "in accordance with Title IX statutory (20 U.S.C. 1687) and regulatory definitions (34 C.F.R. 106.2(h)), guided by the Supreme Court's language" in Davis. 85 Fed. Reg. at 30,196. At oral argument, the DOE maintained that the Rule's definition is also exemplary, rather than exclusionary, and states only that in the context of sexual harassment, "program or activity" is defined to "include[ ] locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned

or controlled by a student organization that is officially
recognized by a postsecondary institution." 34 C.F.R.
§ 106.44(a) (emphasis added).

Moreover, the DOE's explanation of "program or activity" in
the context of sexual harassment aligns with the Supreme Court's
language in Davis, "that the harassment must take place in a
context subject to the school district's control." Davis, 526
U.S. at 645. The Supreme Court held that "[t]he statute's plain
language" prohibiting any person from being "subject[ ] to
discrimination" "confines the scope of prohibited conduct based
on the recipient's degree of control over the harasser and the
environment in which the harassment occurs." Id. at 644. The DOE
did not believe that the Supreme Court's definition was "an
unreasonable interpretation," "because the Supreme Court applied
the language of the statute including the definitions of
'program or activity' provided in the statute." 85 Fed. Reg. at
30,196. The DOE thus concluded that the Rule and the Supreme
Court's approach to "program or activity" in the context of
Title IX sexual harassment should be aligned. Id.

Because the DOE recognizes the existing definition of
"program or activity" under Title IX and clarified that a
"program or activity" includes examples that are aligned with
the Supreme Court's analysis of a school's liability in the

context of monetary damages, the DOE did not redefine program or
activity in a manner in excess of its statutory authority.

**b.**

The plaintiffs argue that the Rule requires schools to
maintain prescriptive grievance procedures that confer new
rights onto individuals accused of sexual harassment and that
this conferral of rights frustrates the DOE's statutory mandate
of eliminating sex discrimination in schools. The plaintiffs
acknowledge that Title IX provides both complainants and
respondents with "the right to attend school free of sex
discrimination." Memorandum of Law in Support of Motion for
Preliminary Injunction at 18. However, the plaintiffs argue that
the Rule's grievance procedures, which allow respondents to make
complaints for any alleged violations of the procedures, stray
beyond the DOE's antidiscrimination mandate.

It is undisputed that the DOE has the authority to
promulgate rules and regulations implementing Title IX. Thus,
the DOE is authorized to "formulat[e] . . . policy" and make
"rules to fill any gap left, implicitly or explicitly, by
Congress." Chevron, 467 U.S. at 843. In exercising its
authority, the DOE determined that the grievance procedures in
Section 106.45 were meant to further "the central purpose of
Title IX, to provide protections from sex-discriminatory
practices to all persons." 85 Fed. Reg. at 30,240. In response

to comments that the Rule allows respondents, but not complainants, to claim sex discrimination whenever a requirement of the grievance procedure is not met, the DOE stated that the Rule allows "either party equally to appeal a determination regarding responsibility on the basis of procedural irregularity." Id.

The DOE received comments from individuals with personal experiences navigating campus sexual misconduct proceedings that recipients applied grievance procedures in a discriminatory manner towards both complainants and respondents. Id. at 30,238. Moreover, the Second Circuit Court of Appeals has recognized that unfair grievance procedures against a respondent can amount to sex discrimination. See Doe v. Columbia Univ., 831 F.3d 46, 57-58 (2d Cir. 2016). Because the statute does not specifically lay out how grievance procedures must be designed, it is within the authority of the DOE to decide, based on comments it received, that in order to ensure nondiscriminatory treatment of both complainants and respondents, schools should follow grievance procedures that are fair to both complainants and respondents before any disciplinary sanction can be taken against a respondent.

Accordingly, the plaintiffs have failed to show that there is a substantial likelihood that they would succeed on the Section 706(2)(C) claim.

## 2. Section 706(2)(A)

A reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"[T]he scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Courts do not ask "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." F.E.R.C. v. Elec. Power Supply Ass'n, 136 S. Ct. 760, 782 (2016). "Rather, the court must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." Id. (citing State Farm, 463 U.S. at 43 (alterations omitted)). A court must also "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error judgment." State Farm, 463 U.S. at 43 (citations omitted). "The agency's action should only be set aside if it relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise." Nat. Res. Def. Council, Inc. v. U.S. Dep't of Agric., 613 F.3d 76, 83–84 (2d Cir. 2010) (internal quotation marks and citations omitted).[10]

The plaintiffs argue that the Rule is arbitrary and capricious for five main reasons: (1) it redefines key terms to narrow the scope of Title IX impermissibly; (2) it fails to justify a departure from decades of policy; (3) it does not consider important aspects of the problem; (4) it establishes a weaker standard for sexual harassment cases under Title IX relative to other forms of discriminatory harassment under other statutes; and (5) it conflicts with the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232(g).[11]

---

[10] The Second Circuit Court of Appeals has explained that Chevron and State Farm provide "for related but distinct standards for reviewing rules promulgated by administrative agencies." Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency, 846 F.3d 492, 521 (2d Cir. 2017) (collecting cases). "State Farm is used to evaluate whether a rule is procedurally defective as a result of flaws in the agency's decisionmaking process. Chevron, by contrast, is generally used to evaluate whether the conclusion reached as a result of that process—an agency's interpretation of a statutory provision it administers—is reasonable." Id. (citations omitted). Litigants may challenge a rule under State Farm, Chevron, or both. Id. Because the plaintiffs bring their Section 706(2)(C) claims under the Chevron framework and their Section 706(2)(A) claims under the State Farm framework, and the defendants respond under the same standards, the Court analyzes the likelihood of success of those claims under the same standards used by the parties.
[11] FERPA generally forbids the disclosure of a student's education record without the consent of the student or, for minors, the student's parent, with some exceptions. 20 U.S.C. § 1232g; 34 C.F.R. §§ 99.1-.67; see 2001 Guidance at vii.

**a.**

The plaintiffs argue that the Rule's definition of "program or activity," "sexual harassment," and "notice" impermissibly narrow the scope of Title IX based on an erroneous interpretation of the relevant case law.

As discussed above, the Rule provides examples of what would constitute a program or activity and does not redefine the term in contradiction to the statute. Moreover, the Rule's alignment with the Supreme Court definition in the context of monetary liability in a private damages lawsuit does not show a clear error in judgment.

The plaintiffs argue that the Rule's definition of sexual harassment as conduct on the basis of sex that is unwelcome conduct determined by a reasonable person to be so "severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity" does not include harassment that is either severe or pervasive but still deprives victims of access to opportunities and is a departure from decades of DOE guidance that established harassment under a "severe, persistent or pervasive" standard. Put differently, the plaintiffs argue that the DOE relied on factors that Congress had not intended the agency to consider when it defined harassment so narrowly.

While it is true that the 2001 Guidance stated that the Supreme Court decisions in _Gebser_ and _Davis_ created standards limited to monetary liability and not administrative enforcement, it also noted that the Guidance's use of "severe, persistent, or pervasive" and the Supreme Court's use of "severe, pervasive, and objectively offensive," were ultimately consistent. In addition, the Rule's definition of sexual harassment is broader than just the _Davis_ standard. The Rule also provides that quid pro quo harassment, as well as sexual assault, dating violence, domestic violence, and stalking, as defined under the Clery Act and the VAWA, all constitute harassment without regard to whether such action is "severe, pervasive, and objectively offensive" or denies a person equal access to the education program or activity. 34 C.F.R. § 106.30(a).

The DOE recognizes that it was not required to adopt the definition of sexual harassment in the _Gebser_/_Davis_ framework, but chose to do so, to "promote important policy objectives with respect to a recipient's legal obligations to respond to sexual harassment." 85 Fed. Reg. at 30,032-33. The DOE received some comments that the "severe or pervasive" standard burdened First Amendment expression, for example, by punishing expression in the college context that exists for the exchange of ideas, even when words or ideas exchanged may offend others. _Id._ at 30,141.

Ultimately, the DOE reasoned that using the "severe, pervasive, and objectively offensive" standard "helps ensure that Title IX is enforced consistent with the First Amendment," while quid pro quo harassment and sex offenses under the Clery Act and the VAWA do not face any limitation as to severity, pervasiveness, or denial of equal access "because prohibiting such conduct presents no First Amendment concerns and such serious misconduct causes denial of equal educational access." Id. at 30,033. Thus, quid pro quo harassment and Clery Act and VAWA offenses are considered per se actionable sexual harassment, while the "'catch-all' Davis formulation that covers purely verbal harassment also requires a level of severity, pervasiveness, and objective offensiveness." Id. at 30,142. The DOE has articulated a rational connection between the facts found and why the DOE chose to define sexual harassment as it did; the DOE's action does not reflect an implausible reading of the concerns with which it was presented. While the DOE acknowledged that it was not bound by the Davis formulation of sexual harassment, turning to that Supreme Court authority could hardly be characterized as "arbitrary or capricious."

The DOE similarly adopts the notice requirements of the Gebser/Davis framework, but "tailor[s]" them to the "unique context of administrative enforcement." Id. at 30,038. The Rule provides that the pool of people who may have notice are the

Title IX Coordinator or any person with authority to institute corrective measures in postsecondary schools and all employees of K-12 schools. The Rule also requires those individuals to respond only when they have actual knowledge. The DOE noted that past guidance that had attributed notice to responsible employees who "should have known" about harassment did not specify the circumstances requiring an investigation; in addition, past guidance that defined responsible employees as those who had a "duty to report" misconduct and whom a "student could reasonably believe" had the duty to report "may have unintentionally discouraged disclosures or reports of sexual harassment by leaving complainants with too few options for disclosing sexual harassment to an employee without automatically triggering a recipient's response." Id. at 30,040. The DOE believed that the new definition of notice provided clarity as to when recipients were required to investigate. Id. at 30,041. Furthermore, the DOE wished to "respect the autonomy of complainants" by providing clear information about how to access supportive measures if and when the complainant desires a recipient to respond. Id. at 30,043. The Rule provides postsecondary institutions with wide discretion to craft and implement the recipient's own employee reporting policy to decide which employees may be mandatory reporters, but requires that all students and employees receive notice of the Title IX

Coordinator's contact information and have clear reporting channels for reporting harassment. Id. In the K-12 context, the DOE determined that young students would not be able to distinguish between simply disclosing harassment to a school employee or doing so for the purpose of triggering an investigation and thus made all employees individuals who may have notice. Id. at 30,107. Given these concerns, the DOE has also articulated a rational connection between the facts found and why the DOE chose to define notice as it did.

The plaintiffs contend that the narrowing of these terms would impermissibly allow, or even demand, that schools ignore sex-based conduct that may impede or limit a student's access to educational opportunities. At oral argument, they argued that even the Supreme Court recognized that Title IX was focused on the protection of individuals from discriminatory practices, whereas other statutes that allowed for private damages, like Title VII, were aimed centrally to compensate victims of past discrimination. Gebser, 524 U.S. at 287. However, the Supreme Court specifically fashioned the standard for monetary liability for violations of Title IX to match the standards of Title IX's administrative enforcement scheme. See id. at 290 ("Because the express remedial scheme under Title IX is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of

further direction from Congress, that the implied damages remedy should be fashioned along the same lines."). The DOE in turn, sought to align its instructions to recipients about their obligations to respond to sexual harassment with the standards created under the judicial enforcement scheme. The decision to use the Supreme Court's Gebser/Davis framework to clarify the meaning of "program or activity" and as a starting point to define "sexual harassment" and "notice" is not based on a clear error in judgment. Moreover, any view that an alternative definition may be better than the one used in the Rule is not a basis to find the Rule arbitrary or capricious.

### b.

When an agency changes an existing policy, it must explain its changed position and must also be aware that longstanding policies may have engendered serious reliance interests that must be taken into account. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (citing Smiley v. Citibank (S. Dakota), N.A., 517 U.S. 735, 742 (1996)). While an agency must "show that there are good reasons" for its new policy, it need not show that "the reasons for the new policy are better than the reasons for the old one." Id. (emphasis in original).

The plaintiffs argue that the DOE failed to take into account the reliance interests of recipients, who had fashioned their procedures to comply with decades of DOE guidance and had

relied on such guidance in drafting their training and investigation procedures and collective bargaining agreements and in complying with state and city laws.

The DOE acknowledged that several of its provisions departed from previous DOE Guidance and specifically stated in the Preamble that "when an agency changes its position, it must display awareness that it is changing position and show that there are good reasons for the new policy." 85 Fed. Reg. at 30,505. As discussed above, the DOE explained its reasoning for clarifying examples of "program or activity," creating a new definition of "sexual harassment," and outlining to whom notice must be given for recipients to initiate grievance procedures. The DOE recognized that it was not required to, but chose to, use the Gebser/Davis framework as a starting point. Id. at 30,032-33. The DOE had considered that to the extent that the Rule had an effect on at-will employment relationships, collective bargaining agreements, and faculty handbooks, the Rule was still the "most effective way to promote Title IX's non-discrimination mandate." Id. at 30,371. The DOE recognized that any renegotiation of collective bargaining agreements that may be required could be a time-consuming process, but determined that recipients' contracts with employees must nonetheless conform to federal law. Furthermore, the DOE concluded that the Rule did not prevent recipients from

complying with state and local laws and policies and did not find that commentators had raised any actual conflicts with state law. Id. at 30,454. It cannot be said that the DOE was unaware of reliance interests. The reasons provided by the DOE for changes in past policies were adequate to satisfy the deferential standard of review under the arbitrary and capricious standard.

c.

A court will not "lightly" reach the conclusion that an agency action should be overturned as arbitrary and capricious because the agency entirely failed to consider an important aspect of the problem. See New York v. Dep't of Justice, 951 F.3d 84, 122 (2d Cir. 2020).

The plaintiffs argue that the DOE failed to consider pervasive forms of harassment that affect multiple students and that the Rule provides for grievance procedures that focus only on individual complainants and respondents and ignore the effects of hostile school environments. However, the Rule allows recipients to consolidate formal complaints that arise out of the same facts or circumstances. In addition, the DOE acknowledged that the Rule departs from prior guidance documents "by describing sexual harassment as actionable when it effectively denies a person equal access to education rather than when the sexual harassment creates a hostile environment."

85 Fed. Reg. at 30,170-71. The DOE declined to use the hostile environment concept, "which originated to describe the kind of hostile or abusive workplace environment sexual harassment may create under Title VII," id. at 30,171, in part because the Supreme Court applied the standard of denying a person "the equal access to education that Title IX is designed to protect," id. at 30,170 (citing Davis, 526 U.S. at 652). The decision of the DOE to use a more focused standard based on Supreme Court authority is not arbitrary or capricious. It is not for this Court to decide whether the DOE's considered choice was better than the alternative proposed by the plaintiffs. That was a decision properly made by the DOE.

The plaintiffs also argue that the DOE failed to consider the unique burdens on students of different age or ability levels. While the Rule creates grievance procedures that schools must follow, the procedures account for differences between postsecondary and K-12 schools. As discussed above, the pool to which notice may be given is broader for students of K-12 than for postsecondary institutions. In addition, K-12 schools are not required to hold live-hearings in their grievance procedures. While the plaintiffs argue that even the use of written questions is developmentally improper for K-12 students, the DOE plainly considered the differences between postsecondary

and K-12 schools in balancing the implementation of Title IX and
considerations of due process.

Finally, the plaintiffs argue that the DOE relied on a
flawed cost-benefit analysis that failed to consider the costs
of unaddressed sexual harassment on students and schools, the
financial and educational costs of reduced reporting, and the
costs of compliance to implement the Rule during the COVID-19
pandemic. A court must "review an agency's cost/benefit analysis
deferentially." Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier
Safety Admin., 724 F.3d 243, 254 (D.C. Cir. 2013). "[W]hen an
agency decides to rely on a cost-benefit analysis as part of its
rulemaking, a serious flaw undermining that analysis can render
the rule unreasonable." Nat'l Ass'n of Home Builders v. Envtl.
Prot. Agency, 682 F.3d 1032, 1040 (D.C. Cir. 2012). However, the
plaintiffs' "burden to show error is high." Id. (internal
quotation marks and citations omitted). It is not for the Court
to undertake its own economic analysis and "substitute the
Court's views for those of the agency." Am. Trucking Ass'ns,
Inc., 724 F.3d at 254. The DOE denies that it actually relied on
the cost-benefit analysis; in publishing the Rule, the DOE noted
that "our decisions regarding the final regulations rely on
legal and policy considerations designed to effectuate Title
IX's civil rights objectives, and not on the estimated cost
likely to result from these final regulations." 85 Fed. Reg. at

30,097. However, the plaintiffs point out that the Rule also states "in deciding among alternative approaches, the Department is bound to choose the option that maximizes benefits and minimizes costs." Id. at 30,550.

In any event, the plaintiffs have not shown a clear likelihood of success that the DOE neglected to consider important parts of the cost-benefit analysis. The DOE acknowledged that it did not take into account the costs associated with underlying incidents of sexual harassment and assault in part because it "had insufficient evidence to assume the final regulations will have an effect on the underlying rate of sexual harassment." Id. at 30,541. The DOE found that "there is a general lack of high quality, comprehensive data on Title IX enforcement and incidents of sexual harassment and assault." Id. at 30,539. The DOE examined available data to examine whether past DOE guidance had an effect on the underlying rate of sexual harassment and was unable to conclude that it did. Id. Commentators had raised "the very real effects of sexual harassment and assault," including dropping out of school or transferring to other schools, which can reduce earning potential or increase tuition and debt, respectively. Id. at 30,545. However, the DOE did not consider these costs in part because these problems "largely arise from the underlying sexual harassment or assault rather than a recipient's response to that

misconduct." Id. The DOE did consider, however, that a subset of investigations currently being conducted would not result in formal complaints and would not trigger the grievance procedures, id. at 30,547; it also made some changes to its cost estimates in response to comments from its Proposed Rule, including adjusting costs of implementation, id. at 30,548-50. Based on the DOE's consideration of the data available, the cost-benefit analysis did not fail to take into account important aspects of the problem such that it was arbitrary and capricious.

### d.

The plaintiffs argue that the Rule establishes a weaker standard for Title IX sexual harassment cases than other forms of discriminatory harassment in Title VI and Section 504 of the Rehabilitation Act and that these statutes must be construed similarly.

The plaintiffs point out that the language of Title IX is identical to the language of Title VI except for the substitution of the word "sex" for "race, color, or national origin," Cannon, 441 U.S. at 695; that courts have interpreted Title IX and Title VI similarly in allowing claims under 42 U.S.C. § 1983, Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 259 (2009); and that the remedies, procedures, and rights under the Rehabilitation Act are the same as those under Title

VI, <u>Barnes v. Gorman</u>, 536 U.S. 181, 185 (2002). However, the Supreme Court has declined to require uniformity when resolving ambiguities in identical terms even within the same statute. <u>See United States v. Cleveland Indians Baseball Co.</u>, 532 U.S. 200, 213 (2001) (noting that the presumption that "identical words used in different parts of the same act are intended to have the same meaning" is "not rigid," and that the meaning of the same words may vary to meet purposes of the law). The plaintiffs cite to no case law that requires agencies to promulgate identical rules to implement the provisions of Title IX, Title VI, and Section 504.

**e.**

The plaintiffs argue that Section 106.45(b)(5)(vi)'s requirement that recipients provide "both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely," conflicts with a school's obligations under FERPA not to disclose students' sensitive information. However, the DOE noted that a recipient should interpret Title IX and FERPA in a manner to avoid any conflicts. The DOE also noted that past DOE guidance interpreted Title IX to override FERPA in the event of a direct conflict. 85 Fed. Reg. at 30,426 (citing 2001 Guidance at vii).

Furthermore, the Rule is not in direct conflict with FERPA. In publishing the FERPA regulation, the DOE stated that "a parent (or eligible student) has a right to inspect and review any witness statement that is directly related to the student, even if that statement contains information that is also directly related to another student, if the information cannot be segregated and redacted without destroying its meaning." 73 Fed. Reg. 74,806, 74,832-33. When it published the Rule, the DOE explained that it

> does not think that evidence obtained as part of an investigation pursuant to these final regulations that is directly related to the allegations raised in a formal complaint can be segregated and redacted because the evidence directly relates to allegations by a complainant against a respondent and, thus, constitutes an education record of both the complainant and a respondent.

85 Fed. Reg. at 30,427. Although parties may disagree with the DOE's conclusion that directly relevant evidence cannot be segregated and redacted and thus the evidence constitutes an education record, such an interpretation is not contrary to FERPA or its implementing regulations.

Despite the Rule's changes to the previous guidance that the DOE has promulgated since 1997, the plaintiffs have failed to show that the DOE's reasoning underlying the Rule lacks rational connection to the interests articulated by the agency

or exhibited a clear error in judgment. While the plaintiffs disagree with the choices made by the DOE, they have failed to show that those decisions were arbitrary or capricious.

Accordingly, the plaintiffs have failed to show that there is a substantial likelihood that they would succeed on their Section 706(2)(A) claim.

### 3. Section 706(2)(D)

A reviewing court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). An agency conducting notice-and-comment rulemaking is required to publish in its notice of proposed rulemaking "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The Supreme Court has recognized that "Courts of Appeals have generally interpreted this to mean that the final rule the agency adopts must be a 'logical outgrowth' of the rule proposed." Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 174 (2007) (citing National Black Media Coalition v. FCC, 791 F.2d 1016, 1022 (2d Cir. 1986)). "The object, in short, is one of fair notice." Id.

The plaintiffs argue that three provisions concerning preemption, retaliation, and permissive dismissal were not logical outgrowths of the Proposed Rule and appeared for the first time in the Rule. At oral argument, the plaintiffs

acknowledged that the alleged violations of Section 706(2)(D) would not, on their own, be sufficient to support a preliminarily injunction barring enforcement of the Rule, but should be considered in conjunction with other bases to support the issuance of an injunction.

Regardless of whether the Rule's preemption provision, Section 106.6(h), was included in the Proposed Rule, any error for not including the provision would be harmless. Federal law supersedes state law when state law conflicts with federal law such that "compliance with both federal and state regulations is a physical impossibility" or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Clean Air Markets Grp. v. Pataki, 338 F.3d 82, 87 (2d Cir. 2003) (citing Hillsborough Cty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985)).

At oral argument, the DOE explained that while the Rule does not allow retaliation for any individual who refuses to participate in an investigation, it does allow a recipient to continue with a formal investigation and discipline any party who refuses to participate accordingly; any disciplinary actions would flow from the investigation and hearing procedure and would not be retaliation.

Finally, the school's permissive dismissal provisions are merely permissive, and would not be any basis to enjoin the effective date of the Rule.

Accordingly, the plaintiffs have failed to show that there is a substantial likelihood that they would succeed on the Section 706(2)(D) claim. As the plaintiffs acknowledged at oral argument, none of these provisions would be a basis to enjoin implementation of the Rule. Indeed, more generally, there are ample severability provisions in the Rule such that if individual provisions in the Rule were ever determined to be invalid, the provisions could be severed and the remainder of the Rule would continue to be enforced.

### B. Irreparable Harm

The plaintiffs must establish that absent a preliminary injunction they will likely suffer "an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotation marks and citation omitted). Irreparable harm is "injury for which a monetary award cannot be adequate compensation[.]" Jackson Dairy Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). "Likelihood sets, of course, a higher standard than

'possibility.'" <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75, 79 (2d Cir. 1990).

The economic harm that the plaintiffs estimate they will suffer stems from the costs of amending policies and procedures, conducting training, hiring new staff, and analyzing potential legal conflicts created by the Rule. The Second Circuit Court of Appeals has instructed that "ordinary compliance costs are typically insufficient to constitute irreparable harm." <u>Freedom Holdings, Inc.</u>, 408 F.3d at 115. <u>See</u> <u>Am. Hosp. Ass'n v. Harris</u>, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."); <u>see also</u> <u>A.O. Smith Corp. v. FTC</u>, 530 F.2d 515, 527–28 (3d Cir. 1976). Were the rule otherwise, the requirement of a "likelihood of immediate and irreparable injury" would be eliminated in any case challenging governmental regulatory action because there will almost always be some compliance costs in education and training needed to comply with the new regulations.

But while "ordinary compliance costs" are not "typically" sufficient to satisfy the requirement of likely immediate and irreparable injury, there are plainly cases where such compliance costs are extensive and atypical, often with significant harm to persons or entities who are adversely affected by the new government regulation. <u>See, e.g.</u>, <u>New York</u>

40

v. United States Dep't of Homeland Sec., No. 19-3591, 2020 WL
4457951, at *30 (2d Cir. Aug. 4, 2020) (finding irreparable
injury from final rule rendering inadmissible to the United
States any non-citizen who is likely to become a "public
charge"). But this is not such a case.

The economic harm that the plaintiffs estimate they will
suffer stems from the costs of amending policies and procedures,
conducting training, hiring new staff, and analyzing legal
conflicts. But much of these costs should have been incurred
already because the Rule is scheduled to go into effect shortly.
At oral argument the plaintiffs acknowledged that they have
undertaken efforts to try to comply with the Rule's requirements
while this litigation has been pending. They stated, however,
that some provisions, such as the Rule's requirement that
decision-makers must be different from the Title IX Coordinator
or investigators, may require the hiring of additional staff,
and compliance with those requirements may not be completed by
the Rule's effective date. The plaintiffs explain that when the
NYC DOE does complete hiring, the ten additional staff will have
an annual cost of at least $1 million. Given that the NYC DOE
has 135,000 employees and that there is little risk of the
schools losing their funding for not being in full compliance

with the Rule by August 14, 2020,[12] the plaintiffs have failed to show that their economic harm is more than ordinary compliance costs that are typically insufficient to constitute irreparable injury.

Another injury that the plaintiffs allege constitutes irreparable harm is the potential impact on the plaintiffs' ability to respond to the COVID-19 pandemic by requiring the plaintiffs to divert scarce resources to implementing the Rule's new requirements. It is apparent that the responsibilities of the plaintiffs to respond appropriately to the COVID-19 pandemic are wide-ranging, numerous, and serious. The State University of New York Downstate Health Sciences University's hospital was a COVID-only facility from late March until early June, during which the pandemic devastated the health and security of New York City; the medical staff bore, and continue to bear, the tremendous physical, mental, and professional burden of trying to save lives. However, this is an unpersuasive reason to defer applying the Rule to schools faced with sexual harassment issues after the effective date of the Rule. There is nothing about the Rule or compliance with the Rule that requires resources to be taken away from efforts to combat the horrific COVID-19

---

[12] The DOE confirmed at oral argument that schools should not look at August 14, 2020 as a possible date on which the DOE would terminate their funding, because Title IX clearly provides that an agency may not take administrative action to revoke a recipient's funding until notice and opportunity to cure has been provided.

pandemic. The plaintiffs can choose to fund their compliance efforts from whatever appropriate budgetary source they choose, presumably from the same budgetary sources they have previously used for Title IX compliance efforts.

The plaintiffs also argue that the Rule will irreparably harm students and impede their interests in attending school in a safe, nondiscriminatory school environment.[13] After publishing its Proposed Rule, the DOE undertook a thorough analysis of the nearly 125,000 comments it received and revised some parts of the Proposed Rule in response. The comments discussed in the DOE's analysis showed that there were bitter disputes about which policy was the most appropriate to implement in almost every aspect of the Rule's provisions. Nevertheless, on its face, the Rule states that it aims to make processes equal for both complainants and respondents and provides that complainants receive supportive measures and that a fair grievance procedure be followed before discipline may be imposed on respondents. Rather than harming students, the Rule has the potential to benefit both complainants and respondents by providing procedural guidance for grievance procedures. This process helps not only respondents but also complainants who are given greater

---

[13] The parties dispute whether the plaintiffs may rely on injury to their residents, as parens patriae, to satisfy a showing of irreparable harm in a motion seeking a preliminary injunction against the federal government. This issue does not need to be resolved because the plaintiffs have failed to show a likelihood of harm to students.

assurance that if they prevail in the grievance proceeding, that result will not be overturned because the process did not comply with due process. The DOE's decision to balance competing interests does not show that New York's students face an actual and imminent threat of irreparable harm during the pendency of this action.

Accordingly, the plaintiffs have failed to show that implementation of the Rule will likely cause immediate and irreparable injury necessary to support a preliminary injunction.

### C. Balance of Equities and the Public Interest

Under the last injunction factor, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24. "To establish that the balance of hardships tips in their favor, the plaintiffs must demonstrate that the harm they would suffer absent the relief sought is substantially greater than the harm the defendants would suffer if the injunction were granted." Greylock Glob. Opportunity Master Fund Ltd. v. Province of Mendoza, No. 04-CV-7643, 2004 WL 2290900, at *4 (S.D.N.Y. Oct. 12, 2004) (citation omitted).

The Rule establishes new standards that depart from prior DOE guidance; as evident in the 125,000 comments received, commentators and interested parties vary in their support and opposition to the Rule's provisions, and the range of topics on which advocates fiercely contest or support the Rule is far-reaching. While the plaintiffs argue that the Rule will have detrimental effects on the health and well-being of children by forcing them to participate in proceedings and being subject to trauma and delayed resolution, the DOE argues that schools have wide latitude to implement appropriate and tailored supportive measures to ensure safety and deter harassment and that the grievance procedures allow schools to conduct fair and thorough investigations prior to determining responsibility. The DOE also contends that its prior guidance has created confusion and uncertainty among recipients and that the clarity of the Rule will contribute to constitutional due process in the Title IX context. Various amici parties have stated that the Rule's provisions provide due process rights to respondents, without which many may have faced sexual discrimination in recipients' current grievance procedures. See, e.g., Brief of Amici Curiae Families Advocating for Campus Equality, Dkt. No. 74. Because the Rule itself does confer protections on individuals who are entitled to Title IX's protections, the plaintiffs have failed to show that the Rule's implementation will necessarily harm

students. Further, while the plaintiffs will have to undertake procedures to comply with the Rule's requirements, the DOE also has a valid interest in enforcing its preferred Title IX antidiscrimination policy. On balance, the plaintiffs have not shown that their alleged injuries would be substantially greater than those of the defendants. Further, the Rule's new provisions that further the DOE's interests in due process and First Amendment rights in the context of administrative enforcement of Title IX's provisions are also in the public interest. Based on these factors, the balance of equities and the public interest do not favor an injunction.

### CONCLUSION

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2). The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The plaintiffs' motion for a preliminary injunction, and in the alternative, a stay, is **denied.** The Clerk is directed to close Docket No. 18. **SO ORDERED.**

**Dated:    New York, New York**
**        August 9, 2020**

                              /s/ John G. Koeltl
                          **John G. Koeltl**
                   **United States District Judge**

46